IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO. 24-31596 |
| MMA LAW FIRM, PLLC | § | |
| | § | |
| DEBTOR | § | |
| | § | |
| MMA LAW FIRM, PLLC | § | ADVERSARY NO. |
| | § | |
| Plaintiff | § | |
| v. | § | |
| | § | |
| MATTHEW MONSON, THE | § | |
| MONSON LAW FIRM, LLC, | § | |
| KATHERINE MONSON, AND | § | |
| ALLIED TRUST INSURANCE | § | |
| COMPANY | § | |
| | § | |
| Defendants | § | |

## COMPLAINT

MMA LAW FIRM, PLLC, Plaintiff and/or Debtor, files this Complaint against Matthew Monson, The Monson Law Firm, LLC, Katherine Monson, and Allied Trust Insurance Company pursuant to FED. R. BANKR. P. 7001, requesting actual and punitive damages, and respectfully shows the Court as follows:

## INTRODUCTION

In the wake of successive hurricanes that left communities across Louisiana both literally and figuratively underwater, the courts and regulatory agencies were called upon to act with urgency to protect the public, and judges and regulators, charged with safeguarding vulnerable citizens during a time of crisis, approached that responsibility with diligence, good faith, and a profound sense of duty.

Defendants Matthew Monson, The Monson Law Firm, LLC, Katherine Monson, and Allied Trust Insurance Company recognized that moment not merely as a challenge, but as an opportunity to exploit institutions operating under extraordinary pressure. Acting as a coordinated enterprise, defendants engaged in a deliberate, multi-year course of conduct designed to eliminate litigation adversaries and avoid substantial financial exposure through the use of false complaints, misleading statements, and improper communications with courts, regulators, and law enforcement, conduct that included, but was not limited to, the targeting and attempted destruction of MMA, a new Texas law firm.

Through a calculated and sustained campaign, defendants repeatedly invoked the authority of governmental actors across multiple forums not to obtain legitimate relief, but to manipulate processes designed to protect the public. As a direct result, courts and agencies, acting in good faith, were induced to take actions that departed from fundamental legal safeguards, including the entry of a federal court order denying MMA any entitlement to fees later reversed by the United States Court of Appeals for the Fifth Circuit, and the suspension of an MMA attorney later vacated for lack of due process. This conduct unfolded against a backdrop of repeated *ex parte* communications with federal judges and the submission of materials outside the presence of opposing counsel.

The pattern extended beyond the judiciary. The Louisiana Department of Insurance imposed a $2 million fine against MMA despite lacking jurisdiction, a decision later reversed, for lack of jurisdiction. False allegations were transmitted to the Louisiana State Police, prompting the initiation of a criminal complaint grounded in information the Defendants knew to be false. Defendants further amplified their efforts through communications with a court-appointed special master, state regulators, and federal law enforcement, ensuring that the same core

misrepresentations were repeated and reinforced across multiple governmental channels.

These actions were not isolated or self-limiting. They formed part of a broader, coordinated pattern of conduct that was not tied to any natural endpoint and that continued so long as defendants faced adverse claims. Defendants' own public statements confirm both their intent and their methods: Monson has claimed credit for bar license suspensions, regulatory fines, a federal investigation, and MMA's bankruptcy, portraying these outcomes as the product of his efforts.

Critically, the conduct did not end once MMA filed for bankruptcy in April 2024. Defendants have continued the same pattern of conduct, including ongoing *ex parte* communications and public efforts to influence judicial and regulatory perceptions of MMA, even in Court that have no jurisdiction, yet continue to act.

The continuation of these acts after the alleged objective had been achieved demonstrates that defendants' conduct was not a finite dispute, but an ongoing course of racketeering activity posing a continuing threat to any adversary subject to the same methods.

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334(b). This action arises under federal law, including the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968, and 18 U.S.C. § 1964(c), and therefore also falls within this Court's jurisdiction under 28 U.S.C. § 1331.

2.      Venue is proper in the Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court"), pursuant to 28 U.S.C. § 1409.

3.      The Plaintiff hereby states that it consents to the entry of final orders or judgments by the Bankruptcy Court if it is determined that the Bankruptcy Court, absent the consent of the parties,

cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## **PARTIES**

4.      Plaintiff MMA Law Firm, PLLC (**"MMA"** or **"Plaintiff"** or **"Debtor"**)**,** formerly known as McClenny Moseley & Associates, PLLC is the Debtor in Case No. 24-31596 pending in the Southern District of Texas and can be served through its undersigned counsel.

5.      Defendant Matthew Monson can be served with this Complaint and Summons at 224 Natchez Trace, Covington, LA 70433.

6.      Defendant The Monson Law Firm, LLC (**"Monson Law"**) can be served with this Complaint and Summons through its registered agent Ronald L. Hornback at 900 Rockmead Drive, Suite 141, Kingwood, TX 77339 and Matthew Monson at 5 Sanctuary Blvd. Suite 101, Mandeville, LA 70471. Matthew Monson is the founder, managing attorney, and sole decision-maker of The Monson Law Firm, LLC. At all relevant times, Matthew Monson acted in his individual capacity and in his capacity as the agent, representative, and alter ego of The Monson Law Firm, LLC, and the acts of Matthew Monson described herein were performed within the course and scope of his role at Monson Law and for the benefit of Monson Law and its client, Allied Trust Insurance Company. Unless otherwise specified, references to 'Monson' in this Complaint refer collectively to Matthew Monson and The Monson Law Firm, LLC.

7.      Defendant Katherine Monson can be served with this Complaint and Summons at 224 Natchez Trace, Covington, LA 70433.

8.      Defendant Allied Trust Insurance Compan**y ("Allied")** can be served with the Complaint and Summons through its registered agent CT Corporation System at 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

## FACTUAL ALLEGATIONS

### BACKGROUND: MMA AND THE ALLIED CASES

9.      MMA was founded in 2016 by Texas attorneys John Zachary Moseley and James McClenney, recent law school graduates at the time.

10.      In the aftermath of Hurricane Laura's landfall in August 2020, which caused widespread devastation across Louisiana, Moseley and McClenney traveled to Louisiana to provide aid to affected residents, including distributing food and water, and to explore the representation of hurricane victims in insurance disputes.

11.      Because neither Moseley nor McClenney was licensed in Louisiana, MMA retained multiple Louisiana attorneys, including William Huye, to serve as local counsel.

12.      MMA opened a Louisiana office and began actively representing hurricane victims on a contingency fee basis, consistent with virtually every other plaintiff firm handling such matters in Louisiana.

13.      By 2022, MMA represented approximately 220 clients (the **"Allied Clients"** or **"Allied Cases"**) with claims against Allied arising from hurricane-related property damage in the State of Louisiana. Each Allied Client executed a written contingency fee agreement entitling MMA to a specified percentage of any recovery ranging from 10% to 40%.

14.      In each matter, MMA sent Allied a letter of representation expressly requiring Allied to include MMA as a payee on any settlement payment. Allied therefore had actual, written, case-specific notice, that MMA possessed a fee interest in each matter and was required to be included

on any settlement disbursement.[1]

15.     Allied understood that resolution of the Allied Cases would obligate it to fund MMA's contingency fees, representing a substantial aggregate financial exposure.

16.     By 2022, MMA was resolving similar hurricane claims for an average settlement value of $104,000.00 with an average contingency fee of $34,800.00 that created millions of dollars in potential collective fee obligations for Allied.

### ALLIED AND MONSON

17.     Monson and Allied, acting together as a coordinated enterprise, engaged in a multi-year campaign to target, dismantle, and destroy MMA for their own financial benefit.

18.     Allied first directed Mr. Monson's attention to MMA in or about June 2022. At that time, Allied knew that MMA represented hundreds of claimants with pending hurricane insurance claims.

19.     On June 2, 2022, Nicholas Arnold, an insurance defense attorney, sent an email to Allied titled "McClenny Moseley & Associates – Ida Litigation." Arnold explained that MMA was the "largest volume plaintiff firm for Ida claims" and that MMA reached out to him with 149 Allied Cases seeking a path to resolve the cases in a pre-litigation settlement conference. Mr. Arnold explained his prior experience having done this type of work before and offered his services to Allied, stating that he had previously "cut down on the insurer's legal spend otherwise required in extended litigation." Mr. Arnold explained that some of the cases were problematic, but "most of the MMA cases were worth trying to resolve early" and offered his services. [2]

---

[1] Exhibit 1: Representative sample of letters of representation sent by MMA to Allied in the Allied Cases. This exhibit does not include every letter of representation but is provided as a representative example only.
[2] Exhibit 2: Email from Arnold to Allied.

20.     Allied had before it a straightforward, lawful path: engage in a pre-litigation settlement conference, resolve the 149 claims through normal commercial negotiation, and limit its legal spend.

21.     However, Allied recognized that eliminating MMA would allow it to avoid millions of dollars in contingency fee obligations. Rather than pursue the lawful alternative, Allied joined Monson's coordinated, multi-step campaign against MMA. This conscious choice initiated a series of actions, including regulatory filings, bar complaints, and litigation maneuvers, designed to remove MMA "out of the equation" and disrupt its business operations across multiple forums.

22.     Monson publicly admitted to this agreement at a CLE presentation, stating that he represents Allied and that they "made the decision" because MMA is "such a bad law firm" that "we want to remove the lawyers out of the equation." During the CLE, Mr. Monson explained that even a "cheap" settlement with MMA at $5,000 per case would provide $750,000 in fees to MMA, but Monson and Allied instead initiated a coordinated campaign across multiple cases and forums to attack MMA's operations and disrupt its business.

23.     Allied was on board with this multi-step strategy which included selectively settling cases with other firms while leaving MMA "hanging," thereby restricting its cash flow and capacity to continue representing clients.

24.     Monson told the audience at a presentation about MMA, that opportunities such as bar complaints, insurance complaints, and other procedural actions could be leveraged repeatedly, forcing MMA to divert resources from its ongoing legal work.

25.     Rather than pursuing only lawful and ethical means to challenge MMA's representation, Monson and Allied embarked on a coordinated, multi-front campaign consisting of repeated legal,

regulatory, and administrative actions designed to "starve," discredit, and dismantle MMA as an institution.

26.     On March 18, 2024, Mr. Monson appeared and spoke at an insurance industry conference about MMA. During the presentation, he described numerous attacks, taken over time, including reporting alleged misconduct to the Louisiana Department of Insurance, with the effect of removing MMA from Louisiana cases and contributing to the firm's bankruptcy.

27.     The Monson Law Firm's website has a headline that reads: "Defeating the largest insurance and legal scheme ever uncovered." The website attributes to Monson multiple outcomes resulting from repeated acts, including three suspended bar licenses of MMA attorneys, $2 million in LDI fines, MMA's $150 million bankruptcy filing, and an ongoing federal investigation. These public statements confirm that Monson's efforts involved a series of coordinated actions over time, not merely the defense of individual cases, and were undertaken with Allied's agreement.[3]

## THE SHOW CAUSE HEARING BEFORE JUDGE CAIN

28.     Before any party filed a pleading against MMA and before the chain of judicial actions that ultimately forced MMA into bankruptcy, a series of extraordinary events occurred that set the process in motion.

29.     On October 12, 2022, MMA was ordered to appear at a show cause hearing (the **"Show Cause Hearing"**) before the Honorable James D. Cain, Jr., United States District Judge for the Western District of Louisiana on October 20, 2022. The Show Cause Hearing was scheduled *sua sponte*. No motion, complaint, or request for relief had been filed by any party.[4]

---

[3] Exhibit 3: Monson's Website
[4] Exhibit 4: Docket from case where Show Cause Order was entered. No motion was filed, simply a docket text.

30.      The only stated basis for the hearing was a docket entry directing MMA to address alleged duplicate case filings."

31.      In the days immediately preceding that hearing, Mr. Monson, counsel for Allied, engaged in undisclosed, *ex parte* communications with Judge Cain that fundamentally altered the scope and tenor of the Show Cause Hearing.

32.      While present at the courthouse for an unrelated matter, and in the absence of MMA or its counsel, Monson met with Judge Cain and presented a series of allegations against MMA, including:

      a.   **The Facebook Video**: Monson showed Judge Cain a video on Facebook in which MMA attorneys made statements about their litigation activity, including comments suggesting they had "broken" the Court's system by having filed so many cases in a single day. This video was shown privately, outside any proceeding, without notice to MMA, and just days before MMA was required to appear before Judge Cain.

      b.   **Targeting Specific Allied Cases**. Monson informed Judge Cain that MMA had filed suit in three cases in which, according to Allied, no insurance policy had been issued. Monson then provided the case numbers 22-4740, 22-4565, and 22-4961. No pleadings raising these issues had been filed prior to the Show Cause Hearing.[5]

      c.   **Allegations of Mass Settlements**: Monson asserted that MMA was attempting to mass settle cases based on an email communication forwarded to him by Allied. (Exhibit 2)

---

[5] Exhibit 5L Dockets from the three Allied Cases showing that no motion had been filed prior to the Show Cause Hearing on October 20, 2022.

d. **<u>Velawcity Allegations</u>:** Monson further represented that MMA maintained an improper relationship with Velawcity, characterizing it as the use of unlawful case runners that sent unsolicited text messages to Louisiana residents.

33. None of these issues had been raised in any filed pleading in any case prior to the Show Cause Hearing, and none were disclosed to MMA in advance of the hearing.

34. At the Show Cause Hearing, Judge Cain questioned MMA extensively on each of these topics despite the hearing being limited to "duplicate case filings." Judge Cain referenced and criticized the Facebook video, questioned MMA about alleged mass settlement practices, identified the specific Allied cases provided by Monson, raised concerns about MMA's relationship with Velawcity, and acknowledged on the record that he had spoken with Allied.

35. The transcript from the Show Cause Hearing reflects that the hearing began as an extended admonishment. For approximately the first nine pages, the Court issued warnings of sanctions despite the absence of any evidentiary record and in the absence of any filed pleading by Allied.[6]

36. The substance of the Court's concerns closely tracked the allegations Monson had presented during the Visit. After being told that MMA was mass settling cases, Judge Cain emphasized his obligation to protect the public and stated:

*"I've already **heard that y'all** sent letters out with spreadsheets saying we want to do a mass mediation. Not going to happen. These people are individuals. Each of them is different. You have a duty as lawyers to work their claim up individually and get them the best result possible."[7]*

---

[6] <u>Exhibit 6:</u> Transcript from Show Cause Hearing
[7] <u>Exhibit 6:</u> Transcript: (Page 7, Lines 17 – 25)

37.      Similarly, based on Monson's representations regarding Velawcity, Judge Cain questioned MMA regarding its marketing practices and how they "make contact with clients" and specifically questioned MMA about Velawcity, including stating:

> *"My understanding is y'all use a company called Velocity. Is that correct?"*[8]

38.      Judge Cain also addressed the specific Allied cases provided by Monson:

> *"22-4740, 22-4565, and 22-4961. **These were brought to my attention by Allied**. They're claiming that they didn't even issue a policy, and y'all filed a lawsuit for them. How do you explain that?"*[9]

39.      With respect to the Facebook video shown privately by Monson, Judge Cain stated:

> *"**I saw -- somebody sent me** the video off a Facebook page from some company called Disaster Solutions. I don't know if you're in it, but you're in it.  I did not appreciate your cavalier comments in that video about my court, we broke the system, we filed, we set a record. No, you didn't break our system.… You know, my curiosity is will you go back on Facebook and say, hey, I made a mistake, we didn't break the system. I doubt it, but my point is. And then I see a bunch of people in your office drinking daiquiris while you're claiming you're filing suit. Court doesn't appreciate that."*[10]

40.      Although the Show Cause Hearing was ostensibly limited to "duplicate filings," it became a wide-ranging inquiry into allegations that had never been pleaded and were presented to the Court by Monson and Allied outside of MMA's presence.

---

[8] Exhibit 6: Transcript: (Page 12, Lines 9 -17)
[9] Exhibit 6: Transcript: (Page 48, Lines 16-22)
[10] Exhibit 6: Transcript (Page 29, Lines 10- Page 30, Lines 1-11)

41. The impact was immediate. On October 21, 2022, the day after the Show Cause Hearing, Judge Cain entered an order staying approximately 1,600 cases, including the Allied cases (the **"Stay Order"**). [11] The stay froze a portion of MMA's active docket and directly impaired its ability to operate.

42. The Stay Order was the first in a series of judicial actions that ultimately led to MMA's collapse.

43. Mr. Monson later admitted this conduct publicly. On March 18, 2024, Mr. Monson presented a lecture regarding MMA, and said, *"I had an opportunity to show this video to Judge Cain right before the big hearing that took place on October 20th."*

44. This conduct was deliberate. Monson used his presence at the courthouse on an unrelated matter to present argument, evidence, and targeted case information to a federal judge about an adversary outside any proceeding and without notice immediately before that adversary was required to appear.

45. The result was a hearing in which MMA faced questions and accusations derived entirely from undisclosed, one-sided communications, with no opportunity to prepare, respond, or be heard in advance.

46. Monson's deliberate effort to manipulate Judge Cain, who was acting to protect the public and preserve the integrity of the judicial process, succeeded in provoking a strong reaction. At the conclusion of the Show Cause Hearing, Judge Cain admonished MMA, stating:

> *"Tell your partners in Houston stay the frick out of my court with this kind of trash. You see this person right over here? That's Marshal Gallow with the United States Marshal*

---

[11] Exhibit 7 – Order Staying 1,600 Cases

*Service."[12]*

47.     This exchange reflects how Judge Cain's well-meaning concern for the public and the court was exploited by Monson's *ex parte* communications and misrepresentations.

48.     This sequence of events, beginning with the *ex parte* communication and culminating in the 1,600-case stay, was the first domino in the cascade of judicial actions that followed.

49.     On August 8, 2023, at a subsequent hearing before Judge Cain, where Mr. Monson was present on behalf of Allied, the following exchange occurred in which Judge Cain revealed he had *ex parte* communications about MMA regarding Monson's unfounded allegations that MMA was using Velawcity as a case runner. The following exchange occurred[13]:

> **Mr. Moseley:**    An imperfect process doesn't equate to a scheme. I know you think that we had nefarious action…" (Judge Cain interrupts)
>
> **Judge Cain**:    The reason I think it is my—from **very reliable sources**, and mine are  pretty reliable, is Mr. Huye pitched this whole scheme to about two or three different law firms in this state and all of them rejected it and said we can't do that, its illegal, its unethical. So yeah, I do think it was an illegal operation. I do think it at a minimum it was very unethical. You can't pay for clients. You can't. It's not allowed. Your direct marketing, to me, was very nefarious and misleading.

50.     With no evidence in the record, Judge Cain acknowledged that his belief that MMA had engaged in nefarious conduct derived not from the evidence presented in his court, but from undisclosed extra-judicial sources he described as uniquely reliable.

---

[12] <u>Exhibit 6:</u> Transcript (Page 51, Lines 11-14)
[13] <u>Exhibit 8:</u> Transcript (Page 159, Lines 2-17)

## KATHERINE MONSON AND THE MANUFACTURED CLASS ACTION

51.      Monson has claimed that in July 2022; while attending an insurance industry conference in Galveston, his wife Katherine Monson received a text message advertisement for legal services relating to hurricane claims that he believed originated from MMA.

52.      Monson stood over his wife's shoulder in their hotel room and directed her to click the link on the text message and respond to the intake questions. As he stated at a CLE:

*"in the hotel room I was over my wife's shoulder… you're gonna click on this… answer these questions… did you get damaged? I don't know. Maybe we did. Maybe we didn't."*

53.      After completing the intake process after answering questions from the link, Katherine Monson received a retention agreement from MMA via email. Mr. Monson then instructed his wife not to respond to any further MMA communications, telling her: "baby don't respond" and "we are building a case right now."

54.      Mr. Monson thereafter directed his wife to file a class action lawsuit against MMA and Velawcity based on the text messages and follow-up communications she had received.

55.      Mr. Monson procured an attorney for his wife, and on March 14, 2023, Katherine Monson filed a Class Action complaint in this Court, Civil Action No. 4:23-cv-00928 (the **"Class Action"**), seeking $5 million in damages against MMA and Velawcity.[14]

56.      The Class Action complaint alleged that Katherine Monson "was confused" because she "was not familiar with the phone number that texted her," portraying her as a passive, unsuspecting consumer. This was false.

57.      Mr. Monson was physically present, directing Katherine Monson's every action, had already been investigating MMA for months on Allied's behalf, and immediately recognized the

---

[14] <u>Exhibit 9</u>:  Class Action Complaint filed by Katherine Monson

communication as potential evidence.

58.     Monson admitted he immediately recognized the text message as an opportunity to advance his efforts against MMA.

59.     The Class Action complaint further characterized approximately 120 follow-up emails Katherine Monson received as unwanted harassment.

60.     However, at a CLE where Monson presented a session on how he destroyed MMA, Mr. Monson described those same communications his wife received with professional admiration: "she's getting follow-up emails—the follow-up is amazing… insurance companies should do this… they would make a lot more money." He studied them, preserved them as evidence, and used them to build the case he was constructing against MMA.

61.     On April 15, 2025, the corporate representative of Velawcity was deposed in connection with litigation involving Morris Bart, a law firm involved in litigation with MMA in its bankruptcy case. The following exchange occurred during cross-examination regarding Monson's allegations that his wife received unsolicited text messages from Velawcity, on behalf of MMA: [15]

| | |
|---|---|
| **MMA's Counsel:** | Was it possible to receive a push or a text message without opting to that system? |
| **Velawcity**: | No. |
| **MMA's Counsel:** | Was it – it's- it's not capable of pushing out unsolicited text messages, is it? |
| **Velawcity:** | Impossible, in fact, to my knowledge. |
| **….** | |
| **MMA's Counsel:** | Did you check to see if Ms. Monson had opted in to receiving text communications? |
| **Velawcity:** | She did. |
| **MMA's Counsel:** | She did opt in? |

---

[15] <u>Exhibit 10:</u> Deposition Transcript Velawcity

| | |
|---|---|
| **Velawcity:** | Yes. |
| **MMA Counsel:** | And was it in writing? |
| **Velawcity:** | Opted in via web form submission. |
| **MMA's Counsel:** | She visited a web platform and physically opted in to receiving text communications? |
| **Velawcity:** | That is correct. |

62.     Under oath, a Velawcity corporate representative testified that text messages could only be sent to individuals who voluntarily opted in. Ms. Monson had opted in by submitting a web form on the website.

63.     It has not been established whether Mr. Monson directly arranged for Ms. Monson to receive the specific text message that became the basis of the $5 million class action, or whether she acted independently in initiating the filing.

64.     The Class Action was not a genuine consumer litigation matter. It was used as part of coordinated activities by the Defendants, designed to interfere with MMA's operations and business, and constituted one of multiple acts contributing to a broader pattern of misconduct.

## BAR COMPLAINTS AND DISCLOSURE OF CONFIDENTIAL INFORMATION

65.     n August 2022, Mr. Monson filed bar complaints with the Louisiana Office of Disciplinary Counsel (**"ODC"**) against MMA and nearly all of its attorneys, including Mr. Huye. He also filed bar complaints against MMA attorneys in Texas and Colorado, confirming in a deposition that these complaints were filed on behalf of Allied.[16]

66.     In response to Monson's ODC complaint against Mr. Huye, Mr. Huye submitted a confidential response to the ODC (**"Huye's Confidential Response"**).

67.     Shortly thereafter, Monson publicly disseminated Huye's Confidential Response by

---

[16] Exhibit 11: Monson Deposition (Page 163, Line 25 through Page 164, Line 1)

posting it on LinkedIn[17], and transmitted it to the FBI Special Agent Krista Bradford, with whom he was actively coordinating his campaign against MMA.[18]

68.     In February 2026, after MMA filed bankruptcy, the Bankruptcy Court ordered Monson Law Firm to produce all communications with the ODC as MMA was seeking to understand how Monson obtained possession of Huye's Confidential Response that he posted online.

69.     Mr. Monson was unable to produce any written communications. He explained that Mr. Tweed from the ODC had sent the document via email, and that the email was later deleted following a confrontation from Mr. Huye's attorney regarding possession of the confidential material.

70.     At an April 2024 presentation, Mr. Monson stated that his complaint contributed to disciplinary action against Mr. Huye, and noted that shortly thereafter, on March 4th, the firm was removed from the Western District of Louisiana.

## THE LOUISIANA DEPARTMENT OF INSURANCE CAMPAIGN

71.     The LDI campaign was significant and used in multiple ways.

72.     In August 2022, Monson submitted a complaint to the LDI, Office of Insurance Fraud, asserting false allegations against MMA, allegedly on behalf of Michael and Holly Caffarel (the **"LDI Complaint"**).

73.     Monson's LDI Complaint was particularly egregious given that his practice is devoted exclusively to representing insurance companies, yet he filed it on behalf of Michael and Holly Caffarel (the **"Cafarrells"**), allegedly as their counsel, although he never represents individuals against insurance companies.

---

[17] Exhibit 12: LinkedIn Post with Confidential Response
[18] Exhibit 13: Email to FBI with Confidential Response

74.     Instead, Monson inserted himself into the purported representation of the Cafarrels not to advocate for them, but as an instrument to disrupt MMA's operations.

75.     Specifically, in the submission to the LDI, Monson accused MMA of preventing the Cafarrels, from accessing insurance proceeds to repair their home. This allegation was false.[19]

76.     Monson has since admitted that:

    a.   He never met the Cafarrels;

    b.   He has never spoken to the Cafarrels; and

    c.   He represented the Cafarrels on a pro bono basis because of their connection to MMA.

77.     At an April 2024 presentation, Monson acknowledged that MMA's attorney, Mr. Huye, had personally endorsed the checks needed for the Cafarrels to receive their insurance proceeds, contradicting Monson's prior allegations, and said "And Huye, If I could give him any credit for anything, he did endorse those checks."

**Communications with LDI's Counsel**

78.     Mr. Monson regularly communicated with Mr. Caldwell, counsel for the LDI regarding MMA and his allegations against MMA.

79.     On April 10, 2023, LDI's counsel Mr. Caldwell contacted Mr. Monson directly by text to request assistance in contacting Magistrate Judge North, the same judge presiding over MMA's fee entitlement matters in the Eastern District of Louisiana, with whom Monson was already communicating ex parte.[20]

**LDI Sanctions Order**

80.     On May 1, 2023, the LDI issued an order and imposed $2 million in fines against MMA and its principals which was the maximum penalty within its asserted authority (the **"LDI**

---

[19] Exhibit 14: Caffarrel Complaint to LDI
[20] Exhibit 15: Text with Caldwell

**Order"**).[21]

81.     Before the LDI Order was made public, Mr. Monson received a copy of it and forwarded it to an FBI agent via text message and said, *"I don't have to tell you to keep this out of public distribution"*. In response, the FBI agent asked what prompted him to give her than instruction. In response, Mr. Monson said, "*Nothing. Someone asked me not to make it public but then he made it public.   We're totally and always have been 100%. Things come out stupid over texts. My apologies*".[22]

82.     That same day that the LDI Order was entered, Monson texted Commissioner Donelon: "Well done and more to come."

83.     On May 2, 2023, the day after the LDI Order was entered, Mr. Monson claimed credit on LinkedIn:

> *"In direct response to the complaint I filed with LDI in 9-22, the LDI just dropped the hammer on MMA for insurance fraud they committed."*

84.     MMA subsequently appealed the LDI Order.

85.     On January 31, 2025, a Louisiana Administrative Law Judge vacated the LDI Order, holding the LDI lacked jurisdiction over MMA (**"Order Reversing LDI Sanctions"**)[23].

86.     Monson knew the LDI lacked jurisdiction over a law firm yet pursued the complaint anyway.

87.     On February 1, 2025, the day after the entry of the Order Reversing LDI Sanctions, Monson sent the order by text to Mr. Caldwell, counsel for the LDI, and the following exchange occurred:

---

[21] Exhibit 16: LDI Sanctions Order
[22] Exhibit 17: Text message with FBI
[23] Exhibit 18:  Order Reversing LDI

| | |
|---|---|
| **Mr. Monson:** | Need AG's office to prosecute this ASAP. |
| **Mr. Caldwell:** | They are not going to. |
| **Mr. Monson:** | They should be called out publicly. |
| **Mr. Caldwell:** | I am still trying to build a case in Tammany because they will prosecute if I get them a good case.  The majority of the MMA filings are in the Eastern District and I'm not sure if I can get the NOLA DA's office to do anything. Let me look at my case files again on Monday and see if I can work something.  Feds have done nothing on this not surprising. |

88. Furthermore at a recent deposition in February 2026, Monson admitted that he communicated with LDI's counsel regarding sanctions on behalf of Allied.

**Louisiana Insurance Commissioner Donelon**

89. Not only did Mr. Monson communicate with counsel for the LDI, but actively cultivated a personal relationship with Louisiana Insurance Commissioner Jim Donelon, where MMA was discussed.

90. In October 2022, Monson traveled with Commissioner Donelon to London to meet with Lloyd's marketplace reinsurance brokers, and also traveled with him to Bermuda for the same purpose. Monson has admitted MMA was discussed during these meetings.

91. In a May 4, 2023 text to a reporter, Monson confirmed that the $2 million LDI sanctions were a direct result of his "**constant follow up with Commissioner Donelon.**"

**THE LOUISIANA STATE POLICE**

92. On September 20, 2023, Monson personally traveled to the Louisiana State Police (the **"LSP"**) headquarters to discuss MMA, texting: "I'm at the State Police headquarters today. Maybe I can help move things forward."

93.     On October 9, 2023, Mr. Monson was communicating with LSP Investigator Daniel Graff scheduling a time to meet at Mr. Monson's office regarding MMA.  During this text exchange, Mr. Monson tells Investigator Graff, "It will be great to assist for efforts in any way possible".[24]

94.     On October 9, 2023, LSP Investigator Daniel Graff initiated direct contact with Monson by email titled "LSP MMA Investigation," inviting him to supply materials: "Feel free to share any documents regarding the MMA investigation."

95.     On October 13, 2023, Monson confirmed an in-person meeting with LSP and transmitted pleadings filed against MMA, actively supplying litigation materials to law enforcement in furtherance of the investigation.

96.     On October 17, 2023, the LSP issued an Initial Complaint Report.[25]

97.     The reporting officers on the Initial Complaint Report were the same individuals communicating directly with Monson.

98.     The Initial Complaint Report expressly attributed the allegations to Monson, stating:

"Per LDI, allegations were brought to them by Attorney Matthew Monson… Through assisting a customer, Monson discovered irregularities in MMA's practices and determined they **were deceiving individuals and stealing insurance claim settlement funds.**"

99.      During a recent deposition of Mr. Monson, he admitted that he had absolutely no personal knowledge or evidence that MMA stole a single penny of insurance settlement claim funds. The following testimony took place on February 26, 2026[26]:

> **MMA's Counsel:**     Do you have any personal knowledge of MMA keeping money that doesn't belong to them? That belongs to a client?
>
> **Mr. Monson:**     I am unaware personally.

---

[24] Exhibit 19: Text messages with Police
[25] Exhibit 20: Louisiana State Police Report
[26] Exhibit 21: Transcript from Monson's deposition

**…..**

| | |
|---|---|
| **MMA's Counsel:** | And in no instance did you discover on behalf of a client or saw any transfer of money that didn't belong to MMA that went to a client, you didn't observe it, correct? |
| **Mr. Monson:** | I did not observe it. |

**….**

| | |
|---|---|
| **MMA's Counsel:** | And my question to you is do you have personal knowledge of MMA stealing client money, yes or no? |
| **Mr. Monson:** | No. |

100.	Although Monson admitted that he has no personal knowledge of any client funds being misappropriated by MMA, he publicly posted the Louisiana State Police **("LSP")** Initial Complaint Report on LinkedIn, celebrating and drawing attention to the initiation of the criminal investigation against MMA.

101.	By posting the Initial Complaint Report publicly online, Monson amplified the false allegations contained therein and highlighted his role in triggering the investigation, including claims that he reported purported misconduct to the LDI.

102.	On December 18, 2023, Investigator Graff confirmed via text to Monson that the LSP was coordinating with the FBI in its investigation of MMA, further evidencing that Monson's disclosures were made with knowledge of the wider governmental impact of his actions.

**THE FBI**

103.	Beginning in or about February 2023, Monson initiated and maintained an ongoing relationship with FBI Special Agent Krista Bradford concerning MMA, spanning from at least three years and involving over 100 email, text message, telephone calls, and in-person meetings.

104.	Monson transmitted dozens of separate communications to Agent Bradford, actively driving the investigative narrative.

105.    When Mr. Monson was recently asked as his February 2026 deposition if he was communicating with the FBI on behalf of Allied, his response was "generally, yes".

106.    Representative examples of Monson's FBI communications include[27]:

a.  **March 10, 2023:** Monson emailed Agent Bradford a hearing transcript with strategic commentary, noting that "McClenney and Huye are both off of the website," supplying intelligence regarding MMA's internal personnel changes.

b.  **March 14–15, 2023:** Monson received grand jury subpoenas directed to Allied directly from Agent Bradford as a "courtesy," and assured her he would facilitate Allied's "prompt response"—acting as intermediary between federal law enforcement and his own client.

c.  **March 16, 2023**: Monson emailed Agent Bradford a court order with the subject line of a smiley face ":-)," celebrating an adverse ruling against MMA.

d.  **April 29, 2023**: Monson transmitted the LDI Cease and Desist Order to Agent Bradford and instructed her to "keep [it] out of public distribution."

e.  **May 29, 2023:** Monson sends Agent Bradford a text message that reads, "You never call. You never write. I may have another contact to provide you with re MMA.  Will be vetting shortly".[28]

f.  **August 5, 2023:** Monson emailed Agent Bradford divorce pleadings involving MMA's attorneys, personal information bearing no legitimate relevance to any proceeding in which Monson was counsel.

g.  **April 5, 2024**: Monson forwarded Agent Bradford an *ex parte* communication he had received from Judge North about the Ricks Opinion, writing: "Judge North just stuck it to MMA and the Hedge Funds on the fees", directly linking his undisclosed judicial communications to his ongoing FBI coordination.

h.  **April 29, 2023:** Monson sent a text message and included a Cease & Desist Order from the LDI dated May 1, 2023 and said, "I don't have to tell you to keep this out of public distribution".  When Agent Bradford questioned Mr. Monson as to why he would say that since she never distributes anything, Mr. Monson apologized

---

[27] Exhibit 22: Various emails and text messages between Agent Bradford and Monson
[28] Exhibit 23: May 2023 text

and said, "We're totally and always have been 100%. Things come out stupid over texts. My apologies.[29]

i.   **June 23, 2023:** Monson obtains a proprietary PowerPoint presentation from MMA regarding its 4-year strategy and business plan and sends it via text message to Agent Bradord and asks her if she would like "to talk to the lady" that sent him the presentation.[30]

j.   **December 11, 2023:** Monson sends copy of Mr. Huye's confidential Response to the ODC Complaint to Agent Bradford, along with a copy of his wife's lawsuit against MMA.

k.   **May 7, 2024:** Monson obtains stolen client spreadsheets from a former MMA employee and forwards them to Agent Bradford.[31]

l.   **May 29, 2024:** Monson obtains audio recordings regarding MMA and forwards them to Agent Bradford.

m.   **December 11, 2024:** Monson emailed Agent Bradford under the subject line "Katherine Monson matter," attaching bar complaints, court orders, hearing transcripts, and communications involving his wife, identifying them as "salient".

n.   **February 1, 2025:** After the LDI Order was reversed, Mr. Monson sent a copy of the Order to Agent Bradford and said, "they keep slipping through the legal cracks".[32]

o.   **May 28, 2025:** Monson obtained documents from Morris Bart's counsel related to MMA's litigation in bankruptcy court and forwarded pleadings and transcripts to Agent Bradford.

p.   **January 19, 2026:** Monson texted Agent Bradford a copy of MMA's Rule 2004 Examination Notice seeking his FBI communications, alerting law enforcement that his conduct was becoming the subject of discovery.

107.   Once the FBI's formal investigation of MMA became public, Mr. Monson posted it on his LinkedIn page.

---

[29] Exhibit 24: Text message re LDI Complaint
[30] Exhibit 25: Text message re witness
[31] Exhibit 26: Text message re Client files
[32] Exhibit 27 : Text message re LDI Reversed

108.     On June 7, 2024 after the FBI Post was made, a reporter from Reuters contacted Mr. Monson by text message and asked if it was the first time that the FBI publicly acknowledged its investigation of MMA and stated, "I figured you would know", and in response, Mr. Monson said, *"Yes ma'am. My post is taking off. Of course it is not news to me, but everyone else is excited!"*. In response, the reporter said, "Can you ask your fbi friend if there are charges somewhere" because she was unable to find them and in response, Mr. Monson confirmed, *"No charges"*.[33]

109.     At a recent deposition in February 2026, Mr. Monson admitted:

   a.  that Agent Bradford extended him an open-ended, standing invitation to provide any information relating to MMA, which he fulfilled continuously over years;

   b.  that he obtained deposition transcripts from third parties, including Morris Bart's counsel, and transmitted them to the FBI; and

   c.  that his communications with the FBI regarding MMA were undertaken on behalf of Allied.

110.     In August 2023, Mr. Monson was contacted by another attorney asking him for Agent Bradford's first name and phone number and referenced the fact that he had just spoken to Mr. McClenney the night before.  In response to this text message, Mr. Monson provided Agent Bradford's first name and warned:

> **"HOWEVER, please be careful. The whole thing can get blown up if we are considered to work as an agent of the government".**[34]

111.     This statement by Mr. Monson clearly reflects his awareness that his coordination with the FBI risked crossing the line into acting as a government agent against his litigation adversary.

---

[33] Exhibit 28: Communications with Reporter re FBI
[34] Exhibit 29: Text with Bdger re FBI.

112.    However, during his deposition in February 2026, when questioned specifically about this text message regarding "agent of the government" the following exchange took place:[35]

| | |
|---|---|
| **MMA's Counsel:** | What does that mean, an agent of the government? |
| **Mr. Monson:** | I don't know. |
| **MMA's Counsel:** | Your words? |
| **Mr. Monson:** | I know. |
| **MMA's Counsel:** | What does that mean. Why would you tell him? |
| **Mr. Monson:** | It's something that I typed. I don't know what.. |
| **MMA's Counsel:** | You typed the words, you remember the words, and you don't know what they mean? |
| **Mr. Monson:** | I don't know what an agent for the government. |
| **MMA's Counsel:** | No, I'm asking what you, Mr. Monson, you wrote the words. What do those words mean to you? |
| **Mr. Monson:** | They mean what they say. The document speaks for itself. |
| **MMA's Counsel:** | No, it doesn't speak for itself. Please explain to me what that means or tell me that you're going to refuse to answer the question. |
| **Mr. Monson:** | It means what I said, an agent of the government. |
| **MMA's Counsel:** | Explain that to me. What does that mean? |
| **Mr. Monson:** | There is nothing to explain. |
| **MMA's Counsel:** | You're refusing to answer? |
| **Mr. Monson:** | I meant what I said |

---

[35] Exhibit 30: Transcript pages re being an agent of the government.

**MAGISTRATE JUDGE NORTH**

113.     Unlike Judge Cain with whom Mr. Monson had only one in-person communication prior to the Show Cause Hearing, Mr. Monson communicated regularly with Magistrate Judge North in the Eastern District of Louisiana via text message, cell phone and in-person meetings regarding MMA in an *ex parte* fashion.[36]

114.     Judge North was actively involved and in charge of dealing with MMA and its entitlement to fees in the Eastern District of Louisiana.

115.     Mr. Monson represented Allied in cases against MMA before Judge North.  During the same time that Monson was representing Allied, he was having communications *ex parte* with Judge North about MMA.

116.     On June 12, 2023, Judge North sent Mr. Monson an *ex parte* email that said, "This is what we spoke about earlier. Thanks." and attached a lawsuit that was filed about MMA.  On June 13, 2023, Mr. Monson responded to this email and attached copies of three lawsuits filed against MMA.

117.     On April 1, 2024, Judge North sent an ex parte email to Mr. Monson discussing a case pending before him (Ricks v. Imperial Fire – 23-2844) where the issue was MMA's entitlement to fees. Although neither Allied nor Monson were a party to the Ricks Case, Judge North sent an ex parte email titled, "MMA fee issues" and informed Mr. Monson of what was revealed in that case and that concluded by saying that he is hopeful that affirmative statements made by MMA in the Ricks Case "provide everything needed to satisfy settling defendants that they can cut checks without listing MMA as a payee".

118.     Four days later, on April 5, 2024, Judge North personally emailed Mr. Monson a copy of

---

[36] Exhibit 31: Communications with Judge North.

the Ricks Opinion, which found that insurance companies are not required to list MMA as a payee on settlement checks as previewed in the email from April 1, 2024 to Monson.

119.     MMA's bankruptcy filing did not put an end to Monson's continued *ex parte* communications with Judge North.

120.     On July 15, 2024, Mr. Monson sent a copy of a pleading from MMA's bankruptcy case via text message to Judge North.

121.     On December 18, 2024, Mr. Monson sent a text message to Judge North letting him know that MMA filed a lawsuit in its bankruptcy case against a Louisiana law firm.   Judge North responded to the text and said, "The latest. They're about the sixth firm they've sued".

122.     On December 18, 2024, Judge North sent an email to Mr. Monson and provided him with two specific case names and numbers, asking Mr. Monson to look into this and let him know what he finds out. In response to this email, Mr. Monson said that he wonders if this is another MMA/Velawcity special.

123.     Post-petition, Judge North, acting without jurisdiction, entered an order in the Eastern District of Louisiana concerning the Ricks Order. The order asserted that the Bankruptcy Court's Injunction against Morris Bart did not apply in his district and further claimed that MMA was not entitled to fees, contributing to the coordinated interference with MMA's operations.

124.     On February 2, 2026, MMA was in Bankruptcy Court on a contested evidentiary hearing on a Motion to Compel Monson to produce documents including communications with Judge North.

125.     That same day, on February 2, 2026 at 6:01 PM, after the conclusion of the hearing, Judge North sent a text message to Mr. Monson and said, "Pls call me asap".  Mr. Monson responded to this text message and said, "Who is this". Mr. Monson recently admitted that he had intentionally

deleted Judge North's contact information and text messages from his cell phone by this time and that is why he said, "Who is this".

126.     Judge North not only entered negative orders against MMA regarding their entitlement to fees, but Judge North sent an email to Mr. Moseley directly warning him that another negative news article about MMA was coming out that evening.[37]

## SPECIAL MASTER COMMUNICATIONS AND MAGISTRATE JUDGE KAY

127.     Deputy Special Master Cade Cole (the **"Special Master"**) was appointed to serve in the Hurricane Laura and Hurricane Delta litigation in the Western District of Louisiana, overseeing cases in which MMA originally represented plaintiffs, including disputes over MMA's entitlement to fees from successor firms.

128.     On April 19, 2023, Monson called Special Master on his personal cellphone to discuss a Show Cause hearing scheduled for April 26, 2023, before Magistrate Judge Kay, at a hearing at which Mr. Moseley would appear and testify.

129.     Monson texted Special Master: "Just want to make sure that the 26th includes detailed questions about exactly who is still working in Louisiana. Huey is still working behind the scenes according to my sources. His wife also supposedly is being paid increased money as a firm employee according to other former employees."[38]

130.     The Show Cause hearing transcript confirms that Judge Kay specifically questioned MMA about the topics Monson had flagged at the 26th hearing.[39]

131.     Following the hearing, Judge Kay entered the May 4, 2023 order prohibiting MMA from communicating with any of its former clients in the Western District of Louisiana.

---

[37] Exhibit 32: Email from Judge North to Moseley.
[38] Exhibit 33: Cade Cole text messages.
[39] Exhibit 34: Transcript Judge Kay Hearing (Page 10, Lines 7-23).

132. Mr. Moseley appeared at the hearing before Judge Kay and was represented by counsel[40]. This fact is critical because a few weeks later, on May 25, 2023, Judge Kay sent an unsolicited *ex parte* email directly to Mr. Moseley, without copying Mr. Moseley's counsel.[41]

133. The subject line was a news headline: "In secret audio, lawyer accused of fraud lays out plans to keep Louisiana insurance lawsuits going." The body read: "Just in case you missed it." Judge Kay simultaneously copied the email to Judge Cain and Judge North, two other federal judges presiding over matters directly affecting MMA's fee entitlements.

134. In response, Judge North replied to everyone (including Mr. Moseley) and said, "another one coming tonight".

135. On March 31, 2024, Monson sent a legislative email to state legislators and "Special Master Cole" titled "Anti McClenney Moseley/Velawcity Legislation—SB 8—HB 336," characterizing MMA's relationship with Velawcity as "unethical" and "unlawful" and claiming he "was asked by Special Master Cole to provide some suggested language" for the legislation, leveraging his access to the Special Master to drive legislative action against MMA.[42]

## COMMUNICATION WITH CURRENT AND FORMER MMA EMPLOYEES

136. Mr. Monson did not stop at communicating with judges, special master, news reporters, the Louisiana Insurance Commissioner, LDI, the FBI and the police, he also spent significant time speaking to MMA's current and former employees.

137. Former MMA employees who stole confidential and proprietary information from MMA shared them with Mr. Monson and he then forwarded this information to the FBI.

138. Former and current MMA employees provided Mr. Monson with information about

---

[40] <u>Exhibit 34</u>: Transcript Judge Kay Hearing
[41] <u>Exhibit 32</u>: Email from Judge North to Moseley.
[42] <u>Exhibit 35</u>: Legislative Email

practices and personal details about the attorneys and their personal lives.

**MMA FILES BANKRUPTCY AND MONSON TAKES CREDIT**

139. On April 9, 2024, MMA filed a chapter 11 bankruptcy case in the Southern District of Texas, and has continued to operate.

140. Monson's communications with judges, regulators, and his continued online posts persisted for nearly two years post-petition, demonstrating a sustained pattern of activity that affected MMA's operations and public reputation.

## CAUSES OF ACTION

### CAUSE OF ACTION NO. 1: VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT 18 U.S.C. §§ 1962(c) and 1964(c) AGAINST ALL DEFENDANTS

**The Enterprise**

141. MMA incorporates by reference paragraphs 1-140 into Cause of Action No. 1.

142. Defendants Matthew Monson, The Monson Law Firm, LLC, Katherine Monson, and Allied Trust Insurance Company constitute an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4) (the **"Enterprise"**). The Enterprise is an ongoing organization consisting of individuals and entities that functioned as a continuing unit with a coordinated strategy and common objectives, including interfering with MMA's operations, undermining its business relationships, and avoiding contingency fee obligations to MMA, through a series of repeated and related unlawful acts.

143. The Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity. Allied provided financial motivation and resources. Monson and Monson Law served as the operational arm, executing the campaign across multiple governmental channels. Katherine Monson served as a nominal plaintiff in the manufactured Class Action. Each

participant played a distinct role while functioning as a coordinated unit to interfere with MMA's business operations and to achieve multiple related unlawful objectives.

144. Monson's own public statements confirm the structure and coordinated nature of the Enterprise. At a CLE presentation, Monson described the Enterprise's actions in his own words: "How I brought it to the consciousness of the court system and the Department of Insurance, and essentially got them out of Louisiana and hopefully soon bankrupt and in jail." These statements establish that the Enterprise pursued a coordinated campaign to manipulate governmental actors, disrupt MMA's business operations, and gain financial and strategic advantages, rather than merely defending individual insurance claims.

**Conduct of the Enterprise.**

145. Each of the Defendants participated in the management and operation of the Enterprise.

146. Allied sat at the apex of the Enterprise's operational structure. Allied was not a passive client who retained counsel and left strategic decisions to him. Allied was the financier and directing force of the campaign. After being presented with a lawful alternative in the form of Mr. Arnold's pre-litigation settlement proposal, Allied consciously rejected that path and instead joined Monson's coordinated campaign to interfere with MMA's operations, manipulate governmental and regulatory processes, and divert contingency fees from MMA. Allied directed Monson to settle every case with every other law firm while deliberately leaving MMA "hanging" to limit its operating revenue and undermine its business standing.

147. Monson's own admissions establish that he communicated with the LDI, the FBI, and other governmental actors "as a lawyer on behalf of Allied," and that "Allied was on board" with the strategy. Allied's role was not peripheral; it provided the economic motivation, resources, and strategic direction essential for the Enterprise's operation.

148.     Matthew Monson and The Monson Law Firm, LLC served as the operational arm of the Enterprise, directing and executing each phase of the coordinated campaign across multiple governmental, regulatory, and judicial channels. Monson did not merely litigate; he orchestrated.

149.     Monson conducted *ex parte* communications with Judge Cain; maintained sustained *ex parte* contact with Magistrate Judge North; communicated over 100 times with FBI Special Agent Bradford; appeared at Louisiana State Police headquarters; lobbied the Louisiana Insurance Commissioner through travel and direct texts; filed bar complaints in multiple states; obtained and transmitted confidential documents; supervised his wife's actions in creating the manufactured Class Action; and managed the legislative and media aspects of the campaign.

150.     Monson made the strategic decisions, selected the targets, supplied false information, and narrated the campaign publicly. These coordinated acts advanced multiple unlawful objectives, including the disruption of MMA's operations, the diversion of fees, and the manipulation of governmental processes.

151.     Katherine Monson participated in the management of the Enterprise by serving as the plaintiff in the manufactured Class Action, a key instrument of the Enterprise's coordinated campaign. She did not act as an independent consumer but under Matthew Monson's supervision. He directed her interactions with MMA's intake process, dictated her responses, and instructed her to cease further contact because "we are building a case right now." She filed (or permitted to be filed in her name) a $5 million class action complaint containing false allegations. Her participation was not tangential; the Class Action itself constituted a predicate act of the Enterprise, advancing the multiple unlawful objectives pursued by the Enterprise.

**PATTERN OF RACKETEERING ACTIVITY.**

152.     Defendants engaged in a pattern of racketeering activity consisting of multiple related

predicate acts spanning from at least June 2022 through 2026, including the following:

**MAIL FRAUD (18 U.S.C. § 1341):**

153.    The LDI Complaint (August 2022): Monson caused to be mailed to the Louisiana Department of Insurance a complaint filed purportedly on behalf of Michael and Holly Caffarel, falsely accusing MMA of preventing the Cafarrels from accessing insurance proceeds needed to repair their home. This allegation was demonstrably false. Monson admitted at a CLE presentation that MMA's counsel, Huye, personally endorsed the settlement checks. Monson filed the complaint on behalf of individuals he had never met or spoken with, representing them pro bono not to advance their interests but to induce the LDI to take regulatory action against MMA. The mailing was knowingly false and intended to interfere with MMA's operations and create leverage in favor of Allied.

**False Statements Transmitted to the Louisiana State Police (October 2023):**

154.    Monson caused to be transmitted to the Louisiana State Police written materials attributing to him the allegation that MMA was "deceiving individuals and stealing insurance claim settlement funds." Monson admitted under oath that he had no personal knowledge that MMA had misappropriated client funds. The materials were knowingly false and transmitted to initiate a criminal investigation, thereby applying coordinated pressure on MMA and its principals.

**Manufactured Class Action Complaint (March 2023):**

155.    Monson caused to be filed and served through the U.S. mail the Class Action complaint filed in the name of Katherine Monson. The complaint falsely portrayed her as a passive, confused consumer who had received unwanted communications from MMA. In reality, Katherine Monson acted under Matthew Monson's supervision; he directed her interactions with MMA, recognized the text message as evidence, and instructed her on how to proceed. The complaint was knowingly

false as explained by Velawcity's corporate representative under oath, filed to create litigation and regulatory pressure against MMA, and to support Allied's financial and strategic objectives. It was not genuine consumer litigation.

**Bar Complaints Filed in Multiple States (August 2022 and thereafter):**

156.     Monson caused bar complaints to be mailed to the Louisiana Office of Disciplinary Counsel, the Texas State Bar, and the Colorado Bar against MMA and nearly all of its attorneys. Monson admitted at deposition that he filed these complaints on behalf of Allied. These complaints were filed not to address genuine ethical violations but to induce governmental and regulatory action, to create litigation pressure, and to divert MMA's resources in a coordinated manner.

## WIRE FRAUD (18 U.S.C. § 1343)

157.     Defendants used interstate wire communications, including email and text message, and other electronic transmissions, to advance a coordinated scheme to misappropriate MMA's property, create regulatory and litigation pressure, and achieve strategic objectives.

**Sustained Ex Parte Electronic Communications with Magistrate Judge North:**

158.     Monson engaged in ongoing electronic communications with Magistrate Judge North regarding matters directly affecting MMA's fee entitlements. These communications were undisclosed to MMA, contained strategic intelligence, and were intended to influence judicial decisions in a manner beneficial to Allied.

**Communications with Deputy Special Master Cole:**

159.     Monson electronically coordinated with Special Master Cole to shape court proceedings and legislative initiatives related to MMA, transmitting allegations and suggested language to influence outcomes, furthering Allied's objectives.

**Sustained Coordination with FBI Special Agent Bradford:**

160. Monson maintained over 100 communications with the FBI, providing documents, intelligence, and commentary to advance Allied's strategic interests. These transmissions included confidential and stolen materials, some of which Monson later disseminated publicly, demonstrating intentional use of interstate wires to advance the enterprise's objectives.

161. Monson admitted at deposition that these communications were undertaken "on behalf of Allied." Monson was simultaneously coordinating with the Louisiana State Police, who were themselves coordinating with the FBI.

162. Monson was aware that this conduct risked crossing a legal line, privately warning another attorney: "Please be careful. The whole thing can get blown up if we are considered to work as an agent of the government."

**Electronic Dissemination and Transmission of Confidential Materials:**

163. Monson obtained and transmitted proprietary business information, and stolen client data to law enforcement, texted regulatory officials, and publicly posted sensitive materials, all for the purpose of exerting coordinated pressure on MMA and furthering Allied's objectives.

164. In addition, Monson obtained Huye's confidential response to Monson's own ODC bar complaint, a document he admitted was transmitted to him by an ODC staff member via email, which he thereafter posted it publicly on LinkedIn for his thousands of followers to see and transmitted it electronically to FBI Special Agent Bradford, and then intentionally deleted the email from the ODC staff member who sent it to him.

165. On June 23, 2023, Monson obtained a confidential MMA PowerPoint presentation regarding its four-year business strategy and forwarded it to Agent Bradford, offering to connect her with the individual who provided it. The knowing receipt and transmission of stolen proprietary

business information constitutes independent wire fraud predicate acts in furtherance of the scheme.

**Electronic Coordination with LDI and Commissioner Donelon (2022–2023)**

166.    Monson conducted a sustained electronic lobbying campaign targeting Louisiana Insurance Commissioner Jim Donelon and LDI counsel Mr. Caldwell regarding MMA.

167.    Monson admitted in a May 4, 2023 text to a reporter that the $2 million LDI sanctions were the direct result of his "constant follow up with Commissioner Donelon." Monson knew at the time that the LDI lacked jurisdiction over a law firm.

168.    After the LDI sanctions were reversed, Monson texted LDI counsel Caldwell demanding that the Attorney General's office prosecute MMA and coordinating with Caldwell on whether the New Orleans or St. Tammany Parish DA's offices might pursue charges.

## OBSTRUCTION OF JUSTICE AND TAMPERING WITH A PROCEEDING (18 U.S.C. §§ 1503 AND 1512)

169.    Monson's deliberate, undisclosed, pre-hearing communication with Judge Cain, presenting a privately-supplied video, case numbers, and factual allegations about MMA immediately before MMA was required to appear, constituted corrupt interference with the due and proper administration of justice in a pending proceeding.

170.    Monson exploited his physical presence at the courthouse to present Judge Cain with a one-sided evidence and argument to a federal judge outside any proceeding and without notice to MMA, with the intent and result of influencing the Court's conduct of the Show Cause Hearing and the subsequent stay of 1,600 cases.

171.    Monson's multi-year pattern of *ex parte* electronic communications with Magistrate Judge North, in which Monson transmitted case materials, strategic intelligence, and commentary about MMA's ongoing litigation directly to a judge presiding over matters affecting MMA's fee

entitlements, constituted a sustained effort to corruptly influence the administration of justice in pending proceedings within the meaning of 18 U.S.C. § 1503.

172. Monson's April 2023 contact with Special Master Cole, made on the eve of a Show Cause Hearing before Judge Kay, and designed to shape the specific questions the Court would ask of MMA, constituted an attempt to corruptly influence an official proceeding within the meaning of 18 U.S.C. § 1512(b). Monson used his private access to a court-appointed officer to pre-program judicial scrutiny of his litigation adversary outside any proceeding and without MMA's knowledge.

173. Each act was undertaken to strategically benefit Allied, manipulate court and regulatory outcomes, and disrupt MMA's ability to enforce its contractual rights.

## RELATEDNESS AND CONTINUITY.

174. To establish a "pattern" of racketeering activity under 18 U.S.C. § 1961(5), a plaintiff must demonstrate that the predicate acts are related to one another and that they reflect continuity of criminal conduct. *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 239 (1989). Both requirements are satisfied here.

175. The predicate acts described above are related because they share a common purpose, common participants, a common victim, and similar methods of commission.

176. The predicate acts are related because they involve the same participants (Monson, Monson Law, Allied, Katherine Monson), the same victim (MMA), similar methods (covert communication of false or misleading information to governmental actors), and a shared enterprise objective (advancing Allied's strategic and financial interests by undermining MMA).

177. Defendants manufactured or misrepresented information, transmitted it covertly, and leveraged the recipient governmental entity's authority to harm MMA. These independent acts consistently reflect the same operational style and enterprise methodology.

178.    The enterprise's coordinated campaign began no later than June 2022 and continued through at least February 2026. The campaign spanned multiple channels and required dozens of independent predicate acts, reflecting sustained criminal conduct rather than a single, naturally ending scheme.

## CAUSATION AND DAMAGES

179.    The pattern of racketeering activity described above was not incidental to MMA's collapse; it was the direct and proximate cause. Each predicate act was designed to prompt a specific governmental or regulatory actor to take a specific adverse action against MMA. The chain of causation is neither attenuated nor speculative. Instead, it is documented, admitted by Monson, and in some instances narrated by him in real time. Intervening governmental actions do not break the chain; each was foreseeable and intended by the Defendants.

180.    Monson monitored and celebrated the effects of each act, including LDI sanctions, adverse judicial rulings, and MMA's bankruptcy, publicly posting them on LinkedIn and discussing them at CLE presentations. These real-time confirmations establish a direct causal link between the predicate acts and MMA's injuries.

181.    As a direct and proximate result of the Enterprise's racketeering activity, MMA suffered concrete, documented injury to its business and property, including:

      a.   **Loss of Client Base:** MMA's representation of approximately 220 Allied clients, each with contingency fee entitlements, was entirely disrupted. The Enterprise's campaign, including court-ordered stays, suspensions, LDI sanctions, and reputational attacks, severed MMA from its entire Louisiana practice.

      b.   **Forced Departure of Attorneys:** Louisiana-licensed attorneys were suspended due to Monson's bar complaints and ODC proceedings, stripping MMA of the

ability to practice law in the state. Vacaturs came too late to prevent the damage.

c. **Adverse Judicial Orders:** Judge Cain's 2023 fee ruling, influenced by Monson's *ex parte* communications, was later reversed, but the reversal came after MMA had already suffered irreparable financial and operational damage.

d. **Regulatory Sanctions:** The LDI's $2 million Fine, later vacated, inflicted reputational harm and disrupted operations. Monson knew the LDI lacked jurisdiction yet pursued the sanctions to maximize harm.

e. **Loss of Contingency Fee Entitlements:** Defendants' campaign deprived MMA of millions in legally entitled fees from nearly all of its clients.

f. **Reputational Destruction:** Public dissemination of false allegations, including LinkedIn posts, the LSP report, and Monson's CLE statements, damaged MMA's standing, prevented client development, and created lasting reputational harm.

g. **Chapter 11 Bankruptcy:** MMA filed for bankruptcy on April 9, 2024, directly resulting from the cumulative effects of court orders, attorney suspensions, LDI sanctions, reputational attacks, and lost fee entitlements. Monson publicly claimed credit for this outcome, confirming intent.

## DAMAGES

182. Under 18 U.S.C. § 1964(c), MMA is entitled to **treble damages**, along with reasonable attorney's fees and costs. Recoverable damages include:

a. Lost contingency fee income across Allied and other affected cases.

b. Costs defending against manufactured regulatory and disciplinary proceedings.

c. Bankruptcy-related costs.

d. Consequential losses resulting from business destruction and reputational harm.

183.    The total damages, prior to trebling, will be established at trial.

## COUNT 2 - RICO CONSPIRACY: 18 U.S.C. § 1962(d)
## AGAINST ALL OF THE DEFENDANTS

184.    MMA incorporates by reference paragraphs 1-140 into Cause of Action No.2.

185.    Each Defendant agreed and conspired to violate 18 U.S.C. § 1962(c) by agreeing that one or more of the conspirators would commit at least two predicate acts of racketeering in the conduct of the Enterprise's affairs.

186.    Monson publicly acknowledged this agreement at a CLE, stating that he and Allied "made the decision" to target MMA because it is "such a bad law firm" that "we want to remove the lawyers out of the equation." He further articulated the explicit financial strategy: Allied and other insurers should "settle every case with everyone else and leave this firm hanging" to "starve the firm of money so that the matter could not proceed." These statements confirm that the agreement was not to defend or protect individual claims but to deploy all available channels against MMA, including judges, regulatory agencies, and law enforcement.

187.    Allied's participation in the conspiracy is further demonstrated by Monson's repeated admissions, both at the CLE and under oath, that his communications with governmental actors— including the LDI, FBI, and others, were undertaken "as a lawyer on behalf of Allied," and that "Allied was on board" with the strategy. Allied provided the financial backing, guidance, and direction necessary to execute the Enterprise's campaign.

188.    Katherine Monson knowingly participated in the conspiracy by filing the manufactured Class Action at Matthew Monson's direction. Her actions provided a false consumer-litigation pretext that served as an instrumental tool in the Enterprise's coordinated scheme against MMA. She acted not as an independent plaintiff but as a participant executing the conspiratorial strategy orchestrated by Monson.

189. As a direct and proximate result of the Defendants' conspiracy, MMA suffered the injuries described herein, including loss of clients, attorneys, fee entitlements, reputational harm, and bankruptcy. MMA is therefore entitled to **treble damages, costs, and reasonable attorney's fees** pursuant to 18 U.S.C. § 1964(c).

## CAUSE OF ACTION NO. 3: TORTIOUS INTERFERENCE WITH EXISTING CONTRACTS AGAINST ALL OF THE DEFENDANTS

190. MMA incorporates by reference paragraphs 1- 140 into Cause of Action No.3.

191. MMA had valid, existing contingency fee agreements with each of the Allied Clients, entitling MMA to a specified percentage of any recovery. Allied had actual written notice of these agreements, as MMA sent Allied a letter of representation in each case expressly requiring that MMA be included as a payee on any settlement payment.

192. Defendants willfully and intentionally interfered with these contractual relationships. Rather than pursue lawful alternatives available to them, including the pre-litigation settlement conference proposed by Mr. Arnold, which offered to resolve 149 Allied Cases through normal commercial negotiation or putting cases in appraisal, the Defendants deliberately rejected that path and embarked on the coordinated campaign described herein with the specific objective of severing MMA from its clients and eliminating MMA's contractual fee entitlements.

193. The intentionality of this interference is confirmed by Monson's own CLE statements. Monson described his response to the Arnold settlement proposal not as a legitimate defense strategy but as the moment "they decided they were going to go on the attack." He further stated the explicit objective: to "settle every case with everyone else and leave this firm hanging" and to "starve the firm of money." He also told others in the insurance industry not to settle cases with MMA, stating the firm was "completely illegal in everything they were doing."

194.    Defendants' interference was accomplished through independently tortious or unlawful means, including *ex parte* communications with federal judges, false statements to regulatory and law enforcement agencies, the filing of a manufactured class action, the public dissemination of confidential disciplinary materials, and the transmission of stolen proprietary business information.

195.    As a direct and proximate result of Defendants' interference, MMA was severed from its clients, lost its entire client base, and was deprived of millions of dollars in contractual contingency fees.  MMA could not pay its creditors and was sued as a result, and filed bankruptcy.

196.    MMA suffered actual damages in an amount to be proven at trial.

### CAUSE OF ACTION NO. 4: TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS AGAINST ALL DEFENDANTS.

197.    MMA incorporates by reference paragraphs 1-140 into Cause of Action No.4.

198.    Beyond its existing contractual relationships, MMA had a reasonable probability of entering into additional business relationships with prospective clients in Louisiana hurricane insurance litigation. MMA was actively operating in Louisiana, had an established client intake process, and was one of the largest volume plaintiff firms handling hurricane claims in the state.

199.    Defendants' campaign was specifically designed to, and did, destroy MMA's ability to maintain or develop any client relationships in Louisiana. The coordinated actions, including the manufactured bar complaints, the resulting license suspensions (later vacated for lack of due process), the LDI sanctions (later reversed for lack of jurisdiction), and the sustained reputational attacks through LinkedIn posts, news media contacts, and CLE presentations which rendered it impossible for MMA to attract or retain clients.

200.    Defendants' conduct was independently tortious or otherwise unlawful, as described

herein. Defendants acted with the specific intent to prevent MMA from operating as a law firm and obtaining future business. Monson admitted this intent at a CLE, describing the purpose of filing bar complaints and insurance complaints as tactical weapons: "If the firm is having to respond to those complaints, then it is worthwhile because it takes them off their game and off their mission."

201.    As a direct and proximate result of Defendants' interference, MMA lost its ability to operate in Louisiana, lost prospective client relationships, and suffered actual damages in an amount to be proven at trial.

**CAUSE OF ACTION NO. 5 ABUSE OF PROCESS - (AGAINST MATTHEW MONSON, THE MONSON LAW FIRM, LLC, AND KATHERINE MONSON)**

202.    MMA incorporates by reference paragraphs 1-140 into Cause of Action No.5.

203.    Defendants Matthew Monson, The Monson Law Firm, LLC, and Katherine Monson initiated and utilized legal processes by filing the Class Action and bar complaints for an ulterior purpose beyond the objectives for which such processes were designed.

204.    The Class Action was not filed to vindicate any genuine consumer injury. Katherine Monson did not act as an unsuspecting consumer but rather with her husband, Matthew Monson, who instructed her to engage with MMA's intake process for the express purpose of manufacturing a basis for litigation.  Monson admitted at a CLE that he was "over my wife's shoulder" directing her to "click on this" and "answer these questions," and that when asked whether she suffered damage, he responded: "I don't know. Maybe we did. Maybe we didn't." He described his wife as not wanting "any part of it" but told her the communications were "amazing" and that "now he knew they had them." The complaint's characterization of Katherine Monson as "confused" was false, and the follow-up communications the complaint characterized as "harassment" were

described by Monson as follow-up so effective that "insurance companies should do this" because "they would make a lot more money."

205. The bar complaints were filed not to address genuine ethical violations but as an acknowledged tactical weapon in the campaign to dismantle MMA.

206. At a CLE, Monson stated the strategic rationale explicitly: that "opportunities such as bar complaints or insurance complaints" are worthwhile because "if the firm is having to respond to those complaints, then it is worthwhile because it takes them off their game and off their mission."

207. The LDI complaint was filed on behalf of individuals Monson had never met or spoken to, using false allegations that MMA was withholding insurance proceeds from the Cafarrels. Monson's own CLE statements establish the falsity: he admitted that when he contacted MMA about the Cafarrel checks, Huye endorsed them. Despite knowing that MMA had facilitated the endorsement, Monson's LDI complaint accused MMA of preventing the Cafarrels from accessing their insurance proceeds.

208. Defendants Matthew Monson, The Monson Law Firm, LLC, and Katherine Monson committed willful acts in the use of these processes that were not proper in the regular conduct of the proceedings. As a direct and proximate result, MMA suffered actual damages including the costs of defending against the manufactured proceedings, reputational harm, and the downstream consequences that flowed from these filings.

### CAUSE OF ACTION NO. 6: BUSINESS DISPARAGEMENT AGAINST MATTHEW MONSON AND THE MONSON LAW FIRM, LLC)

209. MMA incorporates by reference paragraphs 1-140 into Cause of Action No.6.

210. Monson published false and disparaging statements of fact concerning MMA's business to third parties, including but not limited to:

a. Statements to the Louisiana State Police, attributed to Monson in the Initial Complaint Report, that MMA was "deceiving individuals and stealing insurance claim settlement funds," which Monson admitted under oath he had no personal knowledge of and no factual basis to support;

b. The LDI complaint's false accusation that MMA was preventing the Cafarrels from accessing insurance proceeds, filed on behalf of individuals Monson never met or spoke with, and contradicted by Monson's own CLE admission that MMA's counsel did in fact endorse the Cafarrel checks when asked;

c. Public statements on The Monson Law Firm's website characterizing MMA's operations as "the largest insurance and legal scheme ever uncovered".

d. Public dissemination of the LSP Initial Complaint Report on LinkedIn, amplifying and endorsing the false allegation that MMA stole client funds; and

e. Statements at a CLE presentation to an audience of legal professionals characterizing MMA's operations as "the biggest insurance fraud ever" and describing MMA as "completely illegal in everything they were doing," while simultaneously stating his objective to get MMA "bankrupt and in jail".

211. These statements were false. Monson admitted under oath that he had no personal knowledge that MMA had ever stolen a single penny of client funds or insurance settlement proceeds.

212. Monson published these statements with knowledge of their falsity or with reckless disregard for their truth, and with the intent to cause pecuniary harm to MMA or with malice. The malice is further established by Monson's stated objective at the CLE to "starve the firm of money" and to get MMA "bankrupt and in jail."

213.    As a direct and proximate result of these publications, MMA suffered special damages, including the loss of clients, the loss of fee entitlements, reputational destruction, and its ultimate bankruptcy, in amounts to be proven at trial.

**CAUSE OF ACTION NO. 7: CIVIL CONSPIRACY (TEXAS COMMON LAW) - (AGAINST ALL DEFENDANTS)**

214.    MMA incorporates by reference paragraphs 1-140 into Cause of Action No.7.

215.    Defendants had a meeting of the minds on the objective and course of action to destroy MMA. Monson publicly admitted to this agreement at a CLE, stating that he and Allied "made the decision" to "remove the lawyers out of the equation" and that "Allied was on board." He further described the agreed-upon financial strategy: to "settle every case with everyone else and leave this firm hanging" and to "starve the firm of money so that the matter could not proceed." Monson further admitted under oath that his communications with the LDI, the FBI, and other governmental actors were undertaken "as a lawyer on behalf of Allied."

216.    Two or more of the Defendants committed unlawful, overt acts in furtherance of the conspiracy, including the tortious interference, abuse of process, transmission of stolen proprietary documents and other materials to governmental agencies, and business disparagement described in the preceding counts.

217.    As a direct and proximate result of the conspiracy and the overt acts committed in its furtherance, MMA suffered actual damages as described herein.

## PRAYER FOR RELIEF

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff MMA Law Firm, PLLC respectfully requests that this Court enter judgment against Defendants Matthew Monson, The Monson Law Firm, LLC, Katherine Monson, and Allied Trust Insurance Company, jointly and severally, and grant the following relief:

1. On Counts I and II, treble damages pursuant to 18 U.S.C. § 1964(c) in an amount to be determined at trial;

2. On Counts III through VII, actual and compensatory damages in an amount to be determined at trial, including but not limited to damages for lost contingency fee income, loss of client relationships, loss of business goodwill, and all consequential damages flowing from the destruction of MMA's business operations;

3. Exemplary and punitive damages on each state-law claim in an amount sufficient to punish Defendants for their willful, malicious, and intentional conduct and to deter Defendants and others from engaging in similar conduct in the future;

4. Reasonable and necessary attorney's fees and costs of suit pursuant to 18 U.S.C. § 1964(c) and as otherwise permitted by applicable law;

5. Pre-judgment interest at the highest lawful rate from the date each element of damage was incurred through the date of judgment;

6. Post-judgment interest at the rate provided by 28 U.S.C. § 1961;

7. A declaration that Defendants' conduct constituted a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c) and a conspiracy in violation of 18 U.S.C. § 1962(d); and

8.   Such other and further relief, at law or in equity, as this Court deems just and

proper.


Dated: April 8, 2026.




                                        Respectfully submitted,

                                        By: /s/Miriam T. Goott

                                        Miriam T. Goott
                                        SBN #24048846
                                        **COUNSEL FOR DEBTOR**


OF COUNSEL:
WALKER & PATTERSON, P.C.
P.O. Box 61301
Houston, TX 77208-1301
Phone (713) 956-5577
mgoott@walkerandpatterson.com