**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | **CASE NO. 24-31596** |
| **MMA LAW FIRM, PLLC** | § | |
| | § | |
| **DEBTOR** | § | |
| | § | |
| **MMA LAW FIRM, PLLC** | § | **ADV. NO. 26-03107** |
| | § | |
| **Plaintiff** | § | |
| **v.** | § | |
| | § | |
| **MATTHEW MONSON, THE** | § | |
| **MONSON LAW FIRM, LLC,** | § | |
| **KATHERINE MONSON, AND** | § | |
| **ALLIED TRUST INSURANCE** | § | |
| **COMPANY** | § | |
| | § | |
| **Defendants** | § | |

## <u>AMENDED COMPLAINT</u>

MMA LAW FIRM, PLLC, (**"Plaintiff"** or **"Debtor"** or **"MMA"**), files this Amended

Complaint against Matthew Monson, The Monson Law Firm, LLC, Katherine Monson, and Allied

Trust Insurance Company pursuant to FED. R. BANKR. P. 7001, requesting actual and punitive

damages, and respectfully shows the Court as follows:

## <u>INTRODUCTION</u>

This case arises from a coordinated, multi-year campaign by Defendants Matthew

Monson, The Monson Law Firm, LLC (**"Monson Law"**), Katherine Monson, and Allied Trust

Insurance Company (**"Allied"**) to destroy MMA Law Firm, PLLC (**"MMA"**), not through

legitimate litigation, but by improperly and illegally manipulating the systems surrounding it.

In the wake of successive hurricanes that left communities across Louisiana literally and

figuratively underwater, thousands of policyholder lawsuits were filed against insurance companies. Courts and regulatory agencies in Louisiana were called upon to act with urgency to protect the public, and those institutions operated under extraordinary pressure.

The Defendants, Matthew Monson, Monson Law, Katherine Monson, and Allied, recognized that moment not as a shared public burden, but as an opportunity to exploit institutions operating under extraordinary pressure. In response, the federal courts in Louisiana implemented case management orders that streamlined proceedings, sharply limited motion practice, effectively eliminated discovery, and funneled cases into mandatory mediation. The purpose of this framework was to efficiently resolve claims and provide timely relief to affected policyholders. The result was a high-volume system that drove settlements at scale. Nearly every single lawsuit was settled in mediation, and only a handful of cases were ever tried by any party in any federal court.

At the same time, litigation funding backed by hedge fund capital enabled plaintiff firms like MMA to operate at scale, financing marketing efforts to acquire clients and support the resolution of thousands of claims. Monson publicly characterized this combined system of third-party litigation funding and court-ordered mandatory mediation as an "existential threat" to the insurance defense industry, where insurers faced increasing pressure to resolve claims that could no longer be fully litigated due to the constraints imposed by the case management orders.

By mid-2022, MMA had become the largest plaintiff firm in Louisiana hurricane litigation, with approximately 220 clients with claims against Allied. Allied was presented with a lawful and economically rational path to resolve a substantial portion of those claims through a pre-litigation settlement process by an insurance defense firm experienced in these types of cases. Allied rejected that option. Instead, Allied retained Monson and they went on the attack.

What followed was not ordinary advocacy. It was a sustained campaign of fraud, obstruction, coordinated interference with MMA's client contracts, coordinated abuse of regulatory and disciplinary processes, including a manufactured class action filed by Monson's wife, false and misleading regulatory and disciplinary complaints, *ex parte* communications with sitting federal judges, the dissemination of confidential and stolen materials to law enforcement, and sustained public disparagement of MMA's business.

Government institutions, including federal judges, the Louisiana Department of Insurance, the Office of Disciplinary Counsel, the Louisiana State Police, and the FBI, were repeatedly drawn into that campaign and induced and manipulated to act on information that was false, misleading, or strategically incomplete. The consequences for MMA were immediate and severe.

Yet the core actions taken against MMA did not withstand scrutiny. The fee forfeiture ruling entered by the Western District of Louisiana was later reversed by the Fifth Circuit. The attorney suspension was vacated by the Fifth Circuit for lack of due process. The $2 million regulatory penalty imposed by the Louisiana Department of Insurance was vacated for lack of jurisdiction. By the time those reversals occurred, however, the damage had already been done and MMA had been forced into bankruptcy.  The filing of the bankruptcy has not stopped the Defendants' relentless pursuit of MMA.

MMA's claims are directed at the Defendants' conduct, including their sustained efforts to influence judicial and regulatory outcomes through *ex parte* communications, concealed information, and materially false statements made outside the adversarial process and without notice to MMA.

Monson has since promoted MMA's collapse through his commercial website, through a

continuing education presentation titled "How MMA Went Away," and through public statements to insurance industry audiences, treating MMA's destruction as an achievement and as a replicable approach for the insurance defense industry.

MMA brings this action to hold Defendants accountable for that campaign and to recover for the extensive harm it caused. MMA asserts claims for violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 *et seq.,* tortious interference with existing contracts, tortious interference with prospective business relations, abuse of process, business disparagement, defamation, and civil conspiracy. The bankruptcy estate seeks actual damages, treble damages, punitive damages, and recovery of its costs and attorneys' fees.

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334(b). This action arises under federal law, including the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 *et seq.*, and therefore also falls within this Court's jurisdiction under 28 U.S.C. § 1331.

2.      Venue is proper in the Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court"), pursuant to 28 U.S.C. § 1409.

3.      The Plaintiff hereby states that it consents to the entry of final orders or judgments by the Bankruptcy Court if it is determined that the Bankruptcy Court, absent the consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## CHOICE OF LAW

4. The federal claims pleaded in Cause of Action No. 1 (RICO under 18 U.S.C. § 1962(c)) and Cause of Action No. 2 (RICO conspiracy under 18 U.S.C. § 1962(d)) are governed by federal law and by the decisions of the United States Court of Appeals for the Fifth Circuit. 18 U.S.C. §§ 1961–1968, § 1964.

5. The state-law claims plead in this Amended Complaint are governed by Texas law. A federal court sitting in Texas applies Texas choice-of-law rules. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941); *Mayo v. Hartford Life Ins. Co.*, 354 F.3d 400, 403 (5th Cir. 2004). Texas applies the most significant relationship test from Restatement (Second) of Conflict of Laws § 145 to tort claims and Restatement § 6 to all choice-of-law questions. *Gutierrez v. Collins*, 583 S.W.2d 312, 318 (Tex. 1979); *Torrington Co. v. Stutzman*, 46 S.W.3d 829, 848 (Tex. 2000)(citations omitted); *Hughes Wood Prods., Inc. v. Wagner*, 18 S.W.3d 202, 205 (Tex. 2000).

6. Texas has the most significant relationship to the state-law tort claims pleaded herein. MMA is a Texas limited liability company with its principal place of business in Texas. Defendant The Monson Law Firm, LLC is registered to do business in Texas and conducts business in Texas and was served with the Original Complaint and Summons in Texas. Defendant Allied Trust Insurance Company is authorized to conduct business in Texas. The Class Action filed by Defendant Katherine Monson was filed in the United States District Court for the Southern District of Texas. The MMA bankruptcy proceeding in connection with which this adversary proceeding is brought is pending in the United States Bankruptcy Court for the Southern District of Texas. Furthermore, Monson Law's February 24, 2024 LinkedIn post procuring the withdrawal of Phelps Dunbar, a Texas-based law firm, directly affected MMA's contractual relationship with counsel in

litigation pending in Texas. The injuries arising from Defendants' conduct were suffered by MMA in Texas, and the bankruptcy that resulted was filed and is administered in Texas.

7.      Texas law accordingly governs the claims for tortious interference with existing contracts, tortious interference with prospective business relations, abuse of process, business disparagement, defamation, and civil conspiracy pleaded herein.

## **PARTIES**

8.      Plaintiff MMA Law Firm, PLLC (**"MMA"** or **"Plaintiff"** or **"Debtor"**), formerly known as McClenny Moseley & Associates, PLLC is the Debtor in Case No. 24-31596 pending in the Southern District of Texas and can be served through its undersigned counsel.

9.      Defendant Matthew Monson (**"Monson"**) can be served with this Amended Complaint and Summons at 224 Natchez Trace, Covington, LA 70433.

10.      Defendant The Monson Law Firm, LLC (**"Monson Law"**) can be served with this Amended Complaint and Summons through its registered agent Ronald L. Hornback at 900 Rockmead Drive, Suite 141, Kingwood, TX 77339 and Matthew Monson at 5 Sanctuary Blvd. Suite 101, Mandeville, LA 70471.  At all times relevant to this Complaint, Matthew Monson was a principal, member, and/or managing attorney of The Monson Law Firm, LLC, and acted within the course and scope of his authority as an agent, employee, and representative of The Monson Law Firm, LLC. Unless otherwise specified, references in this Complaint to "Monson" refer collectively to Matthew Monson and The Monson Law Firm, LLC, and allegations concerning acts, statements, communications, or omissions attributed to "Monson" are alleged against both Matthew Monson individually and The Monson Law Firm, LLC.

11.      Defendant Katherine Monson can be served with this Amended Complaint and Summons

at 224 Natchez Trace, Covington, LA 70433.

12.     Defendant Allied Trust Insurance Company **("Allied")** can be served with the Amended Complaint and Summons through its registered agent CT Corporation System at 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

## FACTUAL ALLEGATIONS

**I.     RELEVANT BACKGROUND AND HISTORY**

**A.     CASE MANAGEMENT ORDERS: THE LEGAL SYSTEM DEFENDANTS COULD NOT BEAT**

13.     Beginning in 2020, Louisiana was struck by a series of devastating hurricanes, including Hurricane Laura, Hurricane Delta, and Hurricane Ida. These storms caused widespread property damage across the state and generated thousands of insurance claims, many of which resulted in litigation throughout Louisiana.

14.     The volume of cases quickly overwhelmed the traditional litigation system. Courts were faced with managing thousands of substantially similar insurance disputes, while policyholders faced urgent financial pressure to repair their homes and businesses.

15.     In response, the courts in Louisiana implemented coordinated case management orders designed to move cases efficiently toward resolution and to reduce the delays associated with full-scale, case-by-case litigation.

16.     Before describing Defendants' conduct directed at MMA, it is necessary to understand the legal and factual framework in which that conduct occurred.

17.     In December 2021, the Western District of Louisiana entered Case Management Order No. 1 governing all Hurricane Laura and Hurricane Delta insurance cases (the **"CMO"**).[1] The

---

[1] Exhibit 1: Case Management Order in the Western District of Louisiana. A prior CMO was entered by the WDLA in January 2021 related to hurricanes Laura and Delta.

CMO established a Streamlined Settlement Process (**"SSP"**) that fundamentally restructured how hurricane insurance litigation would proceed in the Western District of Louisiana (the **"WDLA"**).[2]

18. Under the CMO, discovery was eliminated during the SSP. Section 3(IV) of the CMO provided that "except for the disclosures pursuant to the Disaster Protocols, there shall be **no formal discovery** for any of the Hurricane Cases during the SSP."[3]

19. Insurance defense attorneys were therefore effectively precluded from taking depositions, serving written discovery, or filing summary judgment motions. The motion practice that traditionally defined insurance litigation was effectively suspended.

20. The CMOs eliminated the traditional litigation sequence. Cases proceeded from initial disclosures directly into mandatory mediation, with no intervening discovery or dispositive motion practice. Mediation attendance was mandatory, and parties were required to appear with full authority to resolve the case and bind their clients.

21. The structure extended further still. The CMO authorized the appointment of special masters and permitted *ex parte* communications with the Court in connection with the administration of the settlement process, without notice to the parties.[4]

22. The system functioned as designed. Judge James D. Cain, Jr. later described the results in open court:[5]

> "I've had hurricane litigation going on for two years. We've gotten through about 3,000 cases, settling the cases, going through my case management order, working the cases up . . . We've had about a **90 percent settlement rate** in the case management order . . . The insurance companies have — I'll commend most of them. I've got a couple that still kind of fight a little bit on some things, but I think for the most part they bought into the system and we've had a good

---

[2] <u>Exhibit 1</u>: Case Management Order in the Western District of Louisiana
[3] <u>Exhibit 1</u>: Case Management Order in the Western District of Louisiana – Section 3(IV)
[4] <u>Exhibit 1</u>: Case Management Order in the Western District of Louisiana
[5] <u>Exhibit 2</u>: Transcript from October 20, 2022 hearing before Judge Cain (Page 5, Lines 2-16)

working relationship on both sides in getting the cases resolved."

23.     The insurance companies that "bought into the system" were settling cases. Those that "still kind of fight a little bit" were the exception and were not commended. Allied was operating within that system. It was required to attend mediations with full settlement authority, exchange disclosures designed to facilitate early resolution, and proceed through a process that had already produced settlement rates of approximately 90 percent across thousands of cases. Within that framework, Allied could not meaningfully litigate its way out of resolution.

24.     The Eastern District of Louisiana (**"EDLA"**) implemented a substantially similar framework for Hurricane Ida cases, which included MMA's largest docket.  In addition, the State Courts in Louisiana also issued case management orders.

25.     On October 25, 2022, the EDLA entered its own amended Case Management Order establishing a Streamlined Settlement Program, the same mandatory mediation structure, and the same elimination of formal discovery (the **"EDLA CMO"**).[6] Section 3(D) provided that *"there shall be no formal discovery for any of the Hurricane Cases during the SSP."*[7]

26.     The EDLA CMO also differed in structure from the Western District model. Rather than a special master, Magistrate Judge Michael B. North (**"Judge North"**) was designated as the judicial officer responsible for administering the settlement process.

27.     Judge North was not merely assigned to individual MMA cases. He also functioned as the day-to-day administrator of the EDLA hurricane settlement program itself, the same program generating the settlement pressure on insurers that Monson publicly describes as an "existential threat" to the insurance defense industry, and under which thousands of MMA's Hurricane Ida cases were proceeding toward mandatory mediation.

---

[6] <u>Exhibit 3</u>: CMO for Eastern District of Louisiana. The original CMO for the EDLA was entered on 8-26-2022.
[7] <u>Exhibit 3</u>: CMO for Eastern District of Louisiana (Section 3(D))

28.     Taken together, the CMO's created the system that Monson later described publicly. In a recorded YouTube interview on January 28, 2025, Monson explained:

> "After the hurricanes we had across the board in Louisiana after the 2020-2021 hurricanes we had case management orders in which you as a defense attorney could not fight. You had to provide your initial disclosures, everybody shows each other what they have and then you go straight to a mediation. The judges did not want the fight. They did not want certain pleadings to be filed. When I started doing what we do after the storms, we were told by the courts to stop filing these motions. These are motions that have won time and time again."[8]

## B.     LITIGATION FUNDERS BACKED BY HEDGE FUNDS

29.     The CMOs described above were designed by the Courts to address a central problem for hurricane victims by creating a streamlined, court supervised process to resolve insurance claims that might otherwise take years to litigate.

30.     That same system, however, created a different problem for insurance carriers. Litigation funders backed by hedge funds and private investment vehicles recognized that, in the wake of a major hurricane, a substantial portion of homeowners in Louisiana could have viable insurance claims. They moved quickly to capitalize on that reality.

31.     These funders began extending large scale, firm level financing to plaintiff law firms, including capital earmarked specifically for marketing. Tens of millions of dollars were deployed to acquire thousands of clients on contingency fee agreements, including some individuals who otherwise would not have retained counsel and filed suit.

32.     In addition to providing marketing funds for client acquisition, litigation funders provided substantial financing for staffing, expert reports, and the infrastructure necessary to prosecute

---

[8] https://www.youtube.com/watch?v=YaZeqtV45FA – Insurance Litigation Frequency: KPMG Moves Into Legal with Matthew Monson and Joseph Petrelli on January 28, 2025.

thousands of cases simultaneously within a system designed to move those cases efficiently toward mandatory mediation.

33.    Matthew Monson gave this model a name. He called it "litigation harvesting," and publicly described it, in combination with the CMO framework, as an "existential threat to the insurance defense industry." [9]

34.    Monson explained that threat in practical terms. After a hurricane, insurers expect a high volume of claims. But when those claims are converted into legal matters, the cost exposure can multiply several times over due to legal fees and defense costs, which he described as rising "astronomically." [10] Monson has publicly identified at least twelve insurance companies that, in his view, became insolvent due to litigation expenses associated with scaled plaintiff side litigation supported by private capital. [11]

35.    In that respect, Monson's core observation was straightforward. A CMO system that severely restricted traditional litigation while enabling plaintiff firms, backed by tens of millions of dollars, to rapidly acquire and mediate large volumes of claims created significant economic pressure on insurers and the attorneys who represent them.

36.    It was within this economic and litigation landscape, where escalating claim volumes, increased litigation costs, and insurer instability were already straining the market, that the broader insurance crisis in Louisiana took hold.

C.    INSURANCE CRISIS IN LOUISIANA

37.    The litigation funding model and the CMOs in federal and state courts did not emerge in a

---

[9] https://www.youtube.com/watch?v=YaZeqtV45FA – Insurance Litigation Frequency: KPMG Moves Into Legal with Matthew Monson and Joseph Petrelli on January 28, 2025.
[10] https://www.youtube.com/watch?v=YaZeqtV45FA – Insurance Litigation Frequency: KPMG Moves Into Legal with Matthew Monson and Joseph Petrelli on January 28, 2025.
[11] https://www.youtube.com/watch?v=YaZeqtV45FA – Insurance Litigation Frequency: KPMG Moves Into Legal with Matthew Monson and Joseph Petrelli on January 28, 2025.

vacuum. They developed against the backdrop of a severe insurance market collapse in Louisiana, a crisis that had already driven multiple major insurers out of the state.

38.	Hurricane Laura in August 2020, Hurricane Delta in October 2020, and Hurricane Ida in August 2021 generated an extraordinary volume of insurance claims across the state. The scale of those losses, combined with what insurers viewed as an increasingly unfavorable litigation environment as a result of the CMOs, led multiple carriers to reduce or abandon their presence in Louisiana.

39.	Smaller regional insurance carriers fared worse. In 2022, numerous Louisiana-domiciled insurance companies became insolvent, leaving the Louisiana Insurance Guaranty Association (**"LIGA"**) to absorb their obligations.[12]

40.	Under Louisiana law, LIGA became statutorily obligated to pay thousands of covered claims that otherwise would have been the responsibility of those insolvent insurers.[13] This shift placed substantial financial and administrative strain on the state system, as it was required to absorb a high volume of hurricane related claims into the guaranty fund structure. It also imposed a significant burden on the Louisiana Department of Insurance and the Insurance Commissioner, who were responsible for managing insurer failures and addressing the broader economic impact on the state and its citizens.

**D.	MMA ENTERS LOUISIANA BACKED BY LITIGATION FUNDERS**

41.	MMA was founded in 2016 by Texas attorneys John Zachary Moseley and James McClenny, who were recent law school graduates at the time. In August 2020, following Hurricane Laura, Moseley and McClenny traveled to Louisiana to assist affected residents, including

---

[12] <u>Exhibit 4</u>: Liga Complaint (Paragraph 7)
[13] <u>Exhibit 4</u>: Liga Complaint (Paragraph 7)

distributing food and water, while also exploring the representation of hurricane victims in insurance disputes.

42.     The firm began representing hurricane victims on a contingency fee basis, consistent with other plaintiff firms handling similar claims. To finance its expansion, MMA obtained approximately $30 million in funding from Equal Access Justice Fund, LP and EAJF ESQ Fund, LP[14] (collectively **"EAJF"**), litigation funders backed by private investment capital. A substantial portion of that capital was allocated to marketing efforts aimed at reaching potential hurricane clients.

43.     MMA deployed this capital across the Louisiana market at an unprecedented scale for hurricane litigation, investing millions of dollars in television, radio, digital advertising, and outdoor media to reach individuals seeking legal representation.

44.     As a result, by 2022 MMA had signed over 11,000 hurricane clients on a contingency fee basis in Louisiana alone. The firm resolved claims with an average settlement value of approximately $104,000 per case, generating average contingency fees of approximately $34,800 per case, and was positioned to generate hundreds of millions of dollars in attorney's fees. MMA's contingency fee agreements were executed by its clients, creating enforceable property interests under Louisiana law.

45.     By any objective measure, MMA became a major participant in Louisiana hurricane insurance litigation, if not the largest. Monson publicly stated that MMA had filed more letters of representation on behalf of policyholders than all other law firms combined.[15]

---

[14] Exhibit 5: EAJF' ESQ Fund, LP's Proof of Claim
[15] Exhibit 6: PowerPoint - Monson's lecture titled, "Litigation Harvesting: How MMA Went Away" (Page 16) – "By June 2022, MMA had filed many more LOR's than all other law firms combined."

E.       **ALLIED TRUST INSURANCE COMPANY**

46.       By May 2022, MMA represented approximately 149 clients (the **"Allied Clients"** or **"Allied Cases"**) asserting hurricane related property damage claims against Allied. Each Allied Client executed a written contingency fee agreement entitling MMA to a percentage of any recovery ranging from 10 percent to 40 percent. These engagements created millions of dollars in contingent fee interests associated with the Allied Cases.

47.       In each Allied Case, MMA provided Allied with written *Letter of Representation and First Notice of Loss*, expressly identifying MMA as counsel and requiring that MMA be included as a payee on any settlement draft or disbursement. [16]

48.       Accordingly, Allied had actual, written, case specific notice that MMA possessed a direct financial interest in each settlement and was required to be included in any distribution of settlement proceeds in the Allied Cases.

II.       **ALLIED AND MONSON AGREE TO TARGET AND ELIMINATE MMA**

A.       **DEVELOPMENT OF A COORDINATED SCHEME DIRECTED AT MMA**

49.       Nicholas Arnold, an insurance defense attorney who did not represent Allied, met with MMA to discuss cases MMA had filed against his insurance carrier clients. During that meeting, William Huye, an MMA attorney, explained that MMA had approximately 149 claims against Allied and asked whether Arnold could assist in resolving those matters.

50.       On June 2, 2022, Arnold, in an effort to obtain Allied as a client and based on a prior relationship with Allied personnel, sent an email to Allied titled "McClenny Moseley & Associates

---

[16] Exhibit 7: Representative sample of letters of representation sent by MMA to Allied in the Allied Cases. This exhibit does not include every letter of representation in the Allied Cases, and is provided as a representative sample only.

— Ida Litigation." In that email, Arnold described MMA as the "largest volume plaintiff firm for Ida claims" and advised that MMA had contacted him regarding approximately 149 Allied cases to explore a pre litigation settlement conference. Arnold proposed assisting Allied in resolving those matters early and reducing anticipated litigation costs.[17]

51. Arnold's proposal presented a conventional and lawful path forward: engage in early settlement discussions and resolve the Allied Cases through ordinary, case-by-case negotiation before litigation costs escalated. Arnold had successfully employed this approach with other carriers.

52. Shortly after receiving Arnold's proposal, Allied discussed it with Matthew Monson, who was representing Allied at the time. By that point, Monson was already familiar with MMA. Two months earlier, in March 2022, Monson attended a Home and Garden Show at the Superdome with his wife, Katherine Monson. There, he observed multiple plaintiff firms, including MMA, marketing their services to potential clients. Monson later described going booth to booth and "messing with them." [18]

53. Rather than pursue Arnold's proposed resolution of the Allied Cases or instruct Monson to comply with the CMOs, Allied and Monson chose a different course. What followed was not a conventional defense strategy focused on resolving individual claims. Instead, Allied and Monson aligned in a course of conduct directed at MMA itself, including its ability to operate, represent clients, recover fees, and continue doing business in Louisiana.[19]

54. Monson later described their approach in a presentation titled "Litigation Harvesting:

---

[17] Exhibit 8: Arnold email to Allied.
[18] Statements made by Monson during a presentation at a 2024 PLRB Claims Conference in Boston, MA, titled "Litigation Harvesting: How MMA Went Away".
[19] Statements made by Monson during a presentation at a 2024 PLRB Claims Conference in Boston, MA, titled "Litigation Harvesting: How MMA Went Away".

How MMA Went Away," delivered by Monson on March 17, 2024, in Boston, Massachusetts at the 2024 Claims Conference and Insurance Services Expo for PLRB (the **"Insurance Conference"**). In his opening remarks, Monson stated:

> "So essentially, really what this is a discussion of how it all came together, how I discovered the two major schemes, how I forced it to the consciousness of the court systems and the Department of Insurance, and especially got them [MMA] out of Louisiana and hopefully soon bankrupt and in jail."

55.     During the Insurance Conference, Monson stated that he and Allied made this decision because MMA was "such a bad law firm," and that they wanted to remove the lawyers from the equation. He further explained that Arnold's proposed settlement approach, even at a modest level, would result in substantial fees to MMA, which he characterized as unacceptable. He instead described a decision to "go on the attack" against MMA and confirmed that "Allied was on board."[20]

56.     Monson further explained that their strategy was to resolve cases with other plaintiff firms while leaving MMA "hanging," with the stated objective of "starving them of money," explaining that depriving MMA of revenue would prevent it from continuing operations. Monson specifically described the use of filing bar complaints and insurance complaints with the LDI as tools to force MMA to divert its resources and attention.[21]

57.     Allied's decision to reject Arnold's proposal and pursue this alternative course was not necessary to defend the Allied Cases, which could have been resolved through ordinary legal

---

[20] Statements made by Monson during a presentation at a 2024 PLRB Claims Conference in Boston, MA, titled "Litigation Harvesting: How MMA Went Away".
[21] Statements made by Monson during a presentation at a 2024 PLRB Claims Conference in Boston, MA, titled "Litigation Harvesting: How MMA Went Away".

processes. Instead, Allied chose to support and continue a course of conduct directed at MMA itself, including its fee interests and ongoing operations. The conduct that followed, as detailed below, included communications and actions directed to courts, regulators, law enforcement, MMA's competitors, employees, counsel, and third parties. These actions went beyond the resolution of individual claims and were intended to impair MMA's ability to operate, meet its financial obligations, and recover fees in its pending Louisiana cases.

58.     Allied and Monson's interests aligned in material respects. Allied had a financial interest in eliminating or reducing MMA's contingent fee entitlements in the Allied Cases and in the broader Louisiana market. Monson, in turn, had identified the litigation funding model supporting firms like MMA as an "existential threat" to the insurance defense industry, including to his own practice, as the failure of insurer clients would directly reduce the availability of defense work.

59.     At the same time, Monson leveraged his actions against MMA as part of a broader public campaign to promote himself and his firm, including repeated online postings and efforts to secure speaking engagements and panel appearances across the country, through which he presented himself as opposing and dismantling what he termed "litigation harvesting," while simultaneously positioning his firm to attract new clients within the insurance defense industry.

60.     Viewed in context, the conduct described in detail below reflects more than aggressive legal advocacy. It reflects a coordinated course of action directed at a common target, undertaken through multiple channels and over an extended period of time, and aimed at eliminating MMA's ability to operate, generate revenue, and satisfy its financial obligations.

**B.**        <span style="font-variant:small-caps">The Show Cause Hearing in the Western District of Louisiana</span>

**1.**        **Show Cause Order**

61.        Before any party filed a pleading against MMA in Louisiana, and before the sequence of actions that ultimately led to MMA's bankruptcy, a series of events occurred that set the process in motion.

62.        On October 12, 2022, MMA was ordered to appear at a show cause hearing before Judge Cain in the Western District of Louisiana on October 20, 2022 (the **"Show Cause Hearing"**). No party had filed any motion or complaint seeking affirmative relief. The stated basis for the hearing was an inquiry into alleged **"duplicate case filings,"** initiated through a *sua sponte* directive reflected only in a docket entry, not a separately issued written order.[22]

**2.**        *Ex Parte* **Meeting Prior to Show Cause Hearing**

63.        In the days immediately preceding the Show Cause Hearing, Monson, counsel for Allied, engaged in undisclosed *ex parte* communications with Judge Cain that materially expanded the scope of the issues to be addressed at the Show Cause Hearing.

64.        While present at the courthouse on an unrelated matter, and without notice to MMA or its clients, Monson met with Judge Cain and provided information and materials concerning MMA, including the following:

> (a) **The Facebook Video**: Monson showed Judge Cain a Facebook video in which MMA attorneys discussed their litigation activity, including remarks suggesting they had "broken" the Court's system by filing a large volume of cases in a single day. The video was presented privately, outside of any proceeding, without notice

---

[22] <u>Exhibit 9</u>: Docket: Entry setting Show Cause hearing (ECF No. 5)

to MMA, and shortly before MMA was required to appear before the Court.[23]

(b) **Specific Allied Cases**. Monson identified and discussed three Allied cases, including case numbers 22-4740, 22-4565, and 22-4961, alleging that MMA had filed suit without a corresponding insurance policy. No pleading raising these allegations had been filed by Allied at that time or prior to the Show Cause Hearing.[24]

(c) **Allegations of Mass Settlements**: Monson represented that MMA was attempting to pursue "mass settlement" procedures for the Allied Cases, characterizing a settlement proposal transmitted through counsel as improper.[25]

(d) **Velawcity Allegations:** Monson further described Velawcity as engaging in improper solicitation practices on behalf of MMA, including alleged unsolicited text messaging to Louisiana residents; and

(e) **Improper Advertising**: Monson alleged that MMA is engaging in improper advertising in Florida, in addition to Louisiana.

65. None of the issues presented by Monson to Judge Cain in the *ex parte* meeting had been raised in any filed pleading or subjected to adversarial testing prior to the Show Cause Hearing.[26]

**3.    The Show Cause Hearing**

66. The Show Cause Order directed MMA to appear and show cause why it should not be sanctioned for alleged "duplicate case filings."[27] However, the vast majority of the Show Cause

---

[23] https://www.facebook.com/watch/?v=884845669159963
[24] Exhibit 10: Dockets from the Allied Cases showing that no motion had been filed prior to the Show Cause Hearing on October 20, 2022.
[25] Exhibit 8: Arnold Letter to Allied
[26] Exhibit 9: Docket in case where Judge Cain entered Show Cause Order showing that no pleadings were filed prior to the Show Cause Hearing.
[27] Exhibit 9: Docket in case where Judge Cain entered Show Cause Order (ECF No. ECF No. 5).

Hearing did not address that issue or the conduct for which MMA had been placed on notice.[28]

67.     At the Show Cause Hearing, there were only two general references to "duplicate case filings." First, Judge Cain made a broad statement and admonished MMA for having filed "hundreds" of duplicate lawsuits.[29]

68.     This issue of hundreds of duplicate lawsuits involved a misunderstanding arising from a separate procedural issue in an unrelated matter that MMA was unaware of at the time of the Show Cause Hearing. Specifically, on August 12, 2022, approximately two months before the Show Cause Hearing, MMA filed a single lawsuit in Judge Cain's court on behalf of 80 clients against State Farm (the **"State Farm Complaint"**).[30]

69.     The State Farm Complaint expressly alleged that the joinder of the 80 plaintiffs was proper under Federal Rule of Civil Procedure 20(a), stating that the plaintiffs' claims arose out of the same occurrence or series of occurrences and involved common questions of law and fact and the same defendant, State Farm.[31]

70.     On August 19, 2022, without any responsive pleading from State Farm, Judge Cain issued an order that the claims in the State Farm Complaint must be severed (the **"Severance Order"**).[32] Pursuant to the Severance Order, the Court ordered that the State Farm Case be divided into 80 individual lawsuits and directed the *Clerk of Court* to refile the matter accordingly, with filing fees assessed against MMA for each newly created case.

71.     Upon receipt of the Severance Order, MMA misunderstood the order to require *MMA* to

---

[28] Exhibit 2: Transcript from Show Cause Hearing
[29] Exhibit 2: Transcript from Show Cause Hearing (Page 15, Lines 19-23)
[30] Exhibit 11: State Farm Complaint
[31] Exhibit 11: State Farm Complaint (Paragraph 3)
[32] Exhibit 12: Severance Order

refile the 80 cases, and within approximately five days, MMA filed 80 separate cases and paid the associated filing fees as directed by the Court for each case.  Unbeknownst to MMA at the time, the Clerk of Court had already implemented the severance, resulting in the creation of duplicate docket entries for the same claims. This administrative overlap ultimately produced approximately 160 duplicate case entries.

72.     MMA was not aware of this duplication until raised by the Court in general terms during the Show Cause Hearing.  During the Show Cause Hearing, the Court did not identify or reference any case numbers relating to this administrative duplication in the State Farm Case. Instead, the Court made only generalized remarks regarding "duplicate suits" in hundreds of cases.[33]

73.     The other reference to "duplicate case filings" during the Show Cause Hearing involved five specific cases identified by the Court concerning MMA's client, Mr. Joubert (the **"Joubert Cases"**).[34] When the Court identified the Joubert Cases by case number, it acknowledged that these cases were not part of the Show Cause Hearing and stated that these cases were "just sent" to him.[35]

74.     The Court presumed that the Joubert Cases were all duplicate filings and stated that MMA will be sanctioned for having filed duplicate cases for Mr. Joubert.  Presumably, the Court believed the Joubert Cases were duplicate lawsuits because Mr. Joubert is the plaintiff and Foremost Insurance Company is the defendant in each of the cases.

75.     Since MMA had no advance notice that the Joubert Cases would be addressed at the Show Cause Hearing, MMA was unable to respond to the Court's accusations during the hearing.

---

[33] Exhibit 2: Transcript from Show Cause Hearing (Page 15, Lines 19-23)
[34] Exhibit 2: Transcript from Show Cause Hearing (Page 50, Lines 20-25 through Page 51, Lines 1-4)
[35] Exhibit 2: Transcript from Show Cause Hearing (Page 50, Lines 20-21) "They just sent me – I'm – because we're still going through them. I'm telling you we are still going through them. Joubert vs. Foremost Insurance Company…"

However, a subsequent review of the dockets after the Show Cause Hearing, reflects that although Mr. Joubert was the plaintiff in each of the referenced cases, the matters involved four distinct property addresses.

76.      Notwithstanding the lack of evidence, the Court reprimanded MMA for filing duplicate cases and stated that MMA will be sanctioned $200.00 per duplicate. The Court then stated:

> "I'm telling you don't ever come back to my court. God forbid we ever have another hurricane, but I do not ever want to see this again. Hear me.  Tell your partners in Houston to stay the frick out of my court with this kind of trash.  You see this person right over here?  That's Marshall Gallow with the United States Marshal Service."[36]

**4.        The Show Cause Hearing and Expansion Beyond the Stated Basis**

77.      Despite being ordered to appear to address alleged duplicate case filings, the Show Cause Hearing focused almost entirely on issues that were not raised in any motion, pleading, or the Show Cause Order itself.

78.      Instead, at the Show Cause Hearing, Judge Cain questioned MMA extensively on the same subjects discussed during the *ex parte* meeting between Monson and Judge Cain. The Court's inquiries mirrored, the information previously presented to it by Monson, outside the presence of MMA.

> (a) The Facebook Video: "I saw, **somebody sent me** the video off a Facebook page … I did not appreciate your cavalier comments in that video about my court … 'we broke the system, we filed, we set a record' … No, you didn't break our system!"[37]

---

[36] Exhibit 2: Transcript from Show Cause Hearing (Page 51, Lines 8-14)
[37] Exhibit 2: Transcript from Show Cause Hearing (Page 29, Lines 12-20)

(b) <u>Targeting Specific Allied Cases</u>: "22-4740, 22-4565, and 22-4961, there were **brought to my attention by Allied Trust Insurance Company**. They're claiming that they didn't even issue a policy for those people and y'all filed a lawsuit for them. How do you explain that?"[38]

(c) <u>Allegations of Mass Settlements</u>: "This is not a mass tort settlement situation. You're not going to come in here … *I've already heard* that y'all sent letters out with spreadsheets saying here's our cases, we want to do a mass mediation. Not going to happen."[39]

(d) <u>Velawcity Allegations</u>**:** "**My understanding is y'all use** a company called **Velocity** [sic]. Is that correct?" and "Shame on you. Shame on you for trying to prey on people … maybe after today y'all will take a different approach."[40]

(e) <u>Allegations of Improper Florida Advertising</u>: "So you may go try to pull this stunt in Florida because **I've already seen** y'all's advertisements. Shame on you. Shame on you for trying to prey on people."[41]

79.     While Judge Cain's statements reflect his concern for the integrity of the proceedings and the victims of the hurricanes, the record demonstrates that the Court's understanding of the underlying facts was shaped and manipulated by the undisclosed *ex parte* communications and materials provided by Monson outside the adversarial process.

80.     Those communications conveyed materially inaccurate and misleading characterizations, including assertions that MMA was seeking to "mass settle" the Allied cases when no such mass

---

[38] <u>Exhibit 2</u>: Transcript from Show Cause Hearing (Page 48, Lines 14-22)
[39] <u>Exhibit 2</u>: Transcript from Show Cause Hearing (Page 7, Lines 15-21)
[40] <u>Exhibit 2</u>: Transcript from Show Cause Hearing (Page 12, Lines 9-15)
[41] <u>Exhibit 2</u>: Transcript from Show Cause Hearing (Page 8, Lines 4-6)

settlement proposal was being pursued, and that MMA was using Velawcity as an unlawful case runner when no such improper arrangement existed. In fact, MMA's advertising and client solicitation practices in Florida and Louisiana were reviewed and approved by the applicable state bar authorities and ethics counsel.

**5.      Stay and Sanctions Order Entered After Show Cause Hearing**

81.      On October 21, 2022, the day after the Show Cause Hearing, Judge Cain entered an order requiring MMA to (a) produce 1,600 engagement agreements for in camera inspection; (b) impose sanctions of $200.00 per duplicate lawsuit; (c) stay 1,600 cases, including the specific Allied Cases referenced by Monson during the *ex parte* meeting; and (d) prohibit MMA from mass mediating its cases (the **"Stay Order"**).[42]

82.      The Stay Order immediately froze a substantial portion of MMA's active docket in the Western District of Louisiana and materially disrupted its operations. The factual predicates upon which the Stay Order was entered—the Facebook video, the three identified Allied Cases alleged to have been improperly filed without supporting evidence, the allegations of "mass settlement," and the Velawcity allegations—had not been presented to the Court in any filed pleading and had not been subject to adversarial testing (in open court) with notice to the parties.

83.      Instead, the Court required MMA to produce 1,600 engagement agreements in response to Monson's unsubstantiated *ex parte* Velawcity allegations, and made findings suggesting that MMA was engaged in mass mediation of cases, notwithstanding the absence of any evidentiary record supporting those conclusions and their origin in Monson's *ex parte* communications with the Court.

---

[42] Exhibit 13: Stay Order

**6.**        <u>**Subsequent Hearing – Post Show Cause**</u>

84.        On August 8, 2023, at a subsequent hearing before Judge Cain in the same matter in which the Show Cause Order was entered, and at which Monson was present on behalf of Allied, Judge Cain engaged in the following exchange with Mr. Moseley, which reflected reliance on *ex parte* communications regarding MMA and Monson's allegations concerning Velawcity: [43]

> **MMA:**              An imperfect process doesn't equate to a scheme. I know you think that we had nefarious action…" (Judge Cain interrupts Mr. Moseley)
>
> **Judge Cain**:       The reason I think it is my—from **very reliable sources**, and mine are pretty reliable …So yeah, I do think it was an illegal operation.

85.        With no evidence in the record, Judge Cain acknowledged that his belief that MMA had engaged in nefarious conduct derived not from the evidence presented in his court, but from undisclosed extra-judicial sources he described as uniquely reliable.

86.        Judge Cain's ensuing on-the-record acknowledgment, at the August 8, 2023 hearing, that his belief concerning MMA's conduct derived from "very reliable sources" outside the evidentiary record confirms that the Stay Order was the direct product of the information Monson supplied *ex parte* and not the product of an independent investigative or adjudicative process.[44]

87.        The conduct at issue is not the Court's, but Monson's *ex parte* communications with the Court, his presentation of unverified and false factual material to the Court outside the adversarial process, and his use of those communications to secure a judicial outcome he could not have obtained through the CMOs.

---

[43] <u>Exhibit 14</u>: Transcript August 8, 2023 Hearing (Page 159, Lines 2-17)
[44] <u>Exhibit 14</u>: Transcript August 8, 2023 Hearing (Page 159, Lines 2-17)

88.     During a presentation in which Monson discussed his "take down" of MMA, Monson reflected on the *ex parte* meeting with Judge Cain prior to the Show Cause Hearing, described above. Specifically, Monson played the Facebook video for the audience and then made the following remarks:

> "I had the opportunity because I was there for another status conference to show this video to Judge Cain, who was running the show over there, and right before the big hearing that took place on October 20, and when he saw it, he was like, 'that man lied to me'. He was instantly pissed".[45]

**7.      Fee Order and Suspension Orders Entered by Judge Cain – Vacated by Fifth Circuit**

89.     In March 2023, Judge Cain entered an order suspending MMA's lawyers from practicing in the WDLA for 90 days, including Mr. Moseley and Mr. McClenny, who were not licensed in Louisiana, by issuing them a temporary Louisiana license for the purpose of suspending it, referred to as the 90 Day Suspension Order.

90.     On June 8, 2023, Judge Cain extended the 90 Day Suspension Order without providing any of MMA's attorneys an opportunity for a hearing or a chance to be heard before the Article III judges conducted a vote on their suspension as required by the local rules (the **"Suspension Order"**).

91.     On August 8, 2023, after entry of the Suspension Order, Judge Cain conducted a hearing and allowed MMA's suspended attorneys to appear. The following exchange took place between Moseley and Judge Cain:[46]

---

[45] March 17, 2024 Conference: 2024 PLRB Claims Conference in Boston, MA: Monson presented a lecture titled, "Litigation Harvesting: How MMA Went Away

[46] Exhibit 55: Transcript Hearing (Aug. 8, 2023)

| **Moseley:** | The way I read the rule is that a notice requirement is --you have to give me notice for what specific acts I'm being suspended for and then before the suspension is applied I would need a chance to answer the allegations. |
|---|---|
| **Judge Cain:** | That's what you're getting a hearing today. |
| **Moseley:** | Post-suspension. The way I read the rule (Judge Cain interrupts) |
| **Judge Cain:** | Well, I'm not going to let you meddle round in any of these cases without – unsupervised. So yeah, your suspension, you can take it to the U.S. Fifth Circuit if you don't like how it went down. |

92.     One of the MMA attorneys appealed the Suspension Order to the Fifth Circuit, which on November 18, 2024, vacated the Suspension Order, finding that an attorney must have an opportunity to be heard under the WDLA's local rules. The court also noted Fifth Circuit precedent in *Matter of Thalheim*, where it held: "When a court undertakes to sanction an attorney for violating court rules, it is incumbent upon the sanctioning court to observe scrupulously its own rules of disciplinary procedure." *In re Thalheim,* 853 F.2d 383, 390 (5th Cir. 1988).[47]

93.     After the hearings that led to the issuance of the Suspension Order, Judge Cain issued a *sua sponte* order finding that MMA and its attorneys were not entitled to any attorneys' fees, costs, or expenses in any cases pending in the WDLA and that MMA had no property interest or ownership in the proceeds of any such cases (the **"Fee Order"**).

94.     The Fee Order was entered without any motion filed by any party, without a hearing, and without any opportunity for MMA to be heard.

95.     MMA appealed the Fee Order, and on June 7, 2024, the United States Court of Appeals

---

[47] Exhibit 56: Fifth Circuit Order Vacating Suspension Order

for the Fifth Circuit vacated the Fee Order, finding due process violations, specifically that MMA received no notice or opportunity to be heard or defend itself prior to entry of the *sua sponte* Fee Order.[48]

96.     This sequence reflects how Judge Cain's concern for hurricane victims and the integrity of the judicial process was influenced by Monson's *ex parte* communications and misrepresentations. By the time those orders were vacated, MMA had already been driven out of Louisiana and into bankruptcy.

## C.     KATHERINE MONSON'S MANUFACTURED CLASS ACTION LAWSUIT AGAINST MMA, VELAWCITY AND EAJF

97.     Monson has publicly claimed that in July 2022, while attending an insurance industry conference in Galveston, his wife, Katherine Monson, received an "unsolicited" text message advertising legal services relating to hurricane claims that he believed originated from MMA.[49]

98.     Monson later described how his wife responded when she received the text message from MMA:

> "In the hotel room I was over my wife's shoulder… you're gonna click on this… answer these questions… did you get damaged? I don't know? Maybe we did. Maybe we didn't."[50]

99.     As he described, Monson stood over his wife's shoulder in their hotel room and directed her to click the link on the text message and answer the intake questions. After completing the online intake, Katherine Monson received a phone call from MMA within minutes, which she

---

[48] Exhibit 57: Fifth Circuit opinion vacating Fee Order.
[49] Presentation by Monson on March 18, 2024; and https://www.youtube.com/watch?v=O_6acWsU7Hw – YouTube Video on or about February 20, 2024 – "The Unethical Practices Threatening Insurance Claims with Matthew Monson from the Monson Law Firm" presented by Monson.
[50] March 17, 2024 Conference: 2024 PLRB Claims Conference in Boston, MA: Monson presented a lecture titled, "Litigation Harvesting: How MMA Went Away

answered and continued responding to while posing as a prospective client.[51]

100.    Monson then returned to the conference and had breakfast with Louisiana Insurance Commissioner Jim Donelon. During the breakfast, Monson told him about the "unsolicited" text message that his wife received and said, *"This is bad shit. Like, this is illegal!"*.[52]

101.    Monson then instructed his wife not to respond to any further MMA communications, telling her: "baby don't respond" and "we are building a case right now".  In describing this specific interaction at the Insurance Conference, Monson said, that his wife was "now involved" and characterized her receipt of the follow-up email from MMA as "amazing" because "now he had them [MMA]."[53]

102.    Monson procured an attorney for his wife, and on March 14, 2023, Katherine Monson filed a class action complaint, (the **"Class Action"**), seeking $5 million in damages against MMA and Velawcity, the company that provided MMA with marketing services, based on the alleged unsolicited text message.[54]

103.    That allegation, that Katherine Monson received an "unsolicited" text message, is contradicted by sworn testimony from Velawcity. On April 15, 2025, a corporate representative for Velawcity testified that its system does not send text messages unless a recipient affirmatively opts in through a web-based submission process. The witness further testified that Katherine Monson did, in fact, opt in by submitting her information through a web form on a Velawcity-

---

[51] Presentation by Monson on March 18, 2024; and https://www.youtube.com/watch?v=O_6acWsU7Hw – YouTube Video on or about February 20, 2024 – "The Unethical Practices Threatening Insurance Claims with Matthew Monson from the Monson Law Firm".

[52] March 17, 2024 Conference: 2024 PLRB Claims Conference in Boston, MA: Monson presented a lecture titled, "Litigation Harvesting: How MMA Went Away

[53] Presentation by Monson on March 18, 2024; and https://www.youtube.com/watch?v=O_6acWsU7Hw – YouTube Video on or about February 20, 2024– "The Unethical Practices Threatening Insurance Claims with Matthew Monson from the Monson Law Firm".

[54] Exhibit 15: Class Action Complaint filed by Katherine Monson – Case No. 4:23-cv-00928

operated platform:[55]

| | | |
|---|---|---|
| **MMA's Counsel:** | Was it possible to receive a push or a text message without opting to that system? |
| **Velawcity**: | No. |
| **MMA's Counsel:** | Was it – it's- it's not capable of pushing out unsolicited text messages, is it? |
| **Velawcity:** | Impossible, in fact, to my knowledge. |
| **….** | |
| **MMA's Counsel:** | Did you check to see if Ms. Monson had opted in to receiving text communications? |
| **Velawcity:** | She did. |
| **MMA's Counsel:** | She did opt in? |
| **Velawcity:** | Yes. |
| **MMA's Counsel:** | And was it in writing? |
| **Velawcity:** | Opted in via web form submission. |
| **MMA's Counsel:** | She visited a web platform and physically opted in to receiving text communications? |
| **Velawcity:** | That is correct. |

104.    The Class Action complaint alleged that Katherine Monson "was confused" because she "was not familiar with the phone number that texted her," portraying her as a passive and unsuspecting consumer.[56] That allegation was false. Monson was physically present, directed her actions, had already been investigating MMA on behalf of Allied, and immediately recognized the communication as potential evidence.[57]

105.    Katherine Monson further admits in the Class Action complaint that she clicked the link

---

[55] Exhibit 16: Velawcity Deposition Transcript (Page 164, Lines 15 – Page 165, Lines 1-2)

[56] Exhibit 15: Class Action Complaint filed by Katherine Monson – Case No. 4:23-cv-00928 (Paragraph 21): "Upon receipt of this text message, Ms. Monson was confused as she was not familiar with the phone number that texted her."

[57] March 17, 2024 Conference: 2024 PLRB Claims Conference in Boston, MA: Monson made these statements when he presented a lecture titled, "Litigation Harvesting: How MMA Went Away.

on the text message from MMA, answered the intake questions, selected "SEE IF I QUALIFY," and received follow-up communications. She further acknowledged that she was given the option to reply "STOP" to opt out of receiving further communications.[58] Ms. Monson did not opt out. Instead, she continued to receive communications and preserve them as evidence for her manufactured Class Action lawsuit against MMA.

106.    To support the allegations in the Class Action complaint, Ms. Monson relied in part on statements from the Show Cause Hearing, including comments by Judge Cain that were themselves influenced by her husband's prior *ex parte* communications and misrepresentations with the Court.[59]

107.    Monson has subsequently admitted that he immediately recognized the text message from MMA as an opportunity to advance his efforts against MMA. Specifically, at an industry conference where Monson was presenting about how he "destroyed MMA", he described the same communications his wife received with professional admiration:

> "She's getting follow-up emails—the follow-up is amazing… insurance companies should do this… they would make a lot more money."[60]

108.    Monson studied the follow-up emails, preserved them as evidence, and used them to build the case he and his wife were constructing against MMA.  The Class Action was not a genuine consumer dispute. It was part of a coordinated effort designed to interfere with MMA's business and operations and formed one component of a broader pattern of conduct.

109.    The allegations in the Class Action closely mirrored those asserted in bar complaints Monson filed against MMA which are discussed in greater detail below. Numerous paragraphs

---

[58] Exhibit 15: Class Action Complaint filed by Katherine Monson (Paragraph 31-32)
[59] Exhibit 15: Class Action Complaint filed by Katherine Monson (Paragraph 79)
[60] March 17, 2024 Conference: 2024 PLRB Claims Conference in Boston, MA: Monson made these statements when he presented a lecture titled, "Litigation Harvesting: How MMA Went Away.

were identical to those bar complaints—complaints that Monson had previously described as tools to burden and distract MMA—further demonstrating that the Class Action repackaged the same allegations for use in a separate forum as part of a broader, coordinated effort. [61]

110.    Monson acknowledged as much during the Insurance Conference, referring to the Class Action as the lawsuit that "we filed," despite the fact that neither he nor Allied was named as a plaintiff.[62]

111.    Viewed in context, the Class Action did not arise independently. It followed Monson's direct involvement in the underlying events, his ongoing investigation of MMA on behalf of Allied, and his public framing of those same communications as evidence of wrongdoing.

112.    Katherine Monson's role was not limited to serving as a nominal plaintiff in the Class Action. She participated in the intake process at Monson's direction, preserved communications, retained counsel, filed a complaint, amended the complaint to add EAJF as a defendant[63], and continued prosecuting the Class Action. All of these acts were undertaken by Katherine Monson in her own name and required her personal affirmative conduct, including a sworn proof of claim.

113.    Katherine Monson also filed a sworn proof of claim in the Debtor's bankruptcy case, seeking "in excess of $5 million" for claims of "unlawful barratry and solicitation" for having received the allegedly unsolicited text message.[64]

114.    MMA objected to Katherine Monson's proof of claim in the bankruptcy proceeding, and she did not file any response or opposition; the claim was subsequently disallowed, further demonstrating that it lacked any substantive basis.[65]

---

[61] Exhibit 17: Bar Complaint filed by Katherine and Matthew Monson.
[62] March 17, 2024 Conference: 2024 PLRB Claims Conference in Boston, MA: Monson presented a lecture titled, "Litigation Harvesting: How MMA Went Away and made the referenced statements.
[63] Exhibit 18: Amended Class Action Complaint adding EAJF as a defendant.
[64] Exhibit 19: Katherine Monson's sworn Proof of Claim filed in MMA's Bankruptcy Case on August 13, 2025, seeking "in excess of $5 million"
[65] Exhibit 20: Order Disallowing Katherine Monson's POC

115.     The Class Action was predicated on material misrepresentations of fact known to be false when made, as described above. No reasonable litigant, including one acting in coordination with her attorney husband, could expect to succeed on the merits of a claim built on the 'confused consumer' allegation when the purported consumer was seated next to counsel who was directing her responses in real time. [66]

116.     On October 1, 2025, the United States District Court for the Southern District of Texas dismissed all of Katherine Monson's claims with prejudice in the Class Action.[67]

117.     Viewed in full context, the Class Action was not a legitimate consumer lawsuit but a manufactured proceeding built on facts orchestrated by Monson and his wife. The Class Action repackaged the same claims Monson and his wife had already deployed through numerous bar complaints, relied on evidence they both helped create, and was prosecuted despite the absence of any factual or legal basis.

118.     The dismissal of the Class Action with prejudice, coupled with the disallowance of Katherine Monson's proof of claim filed in MMA's bankruptcy case, confirms that the Class Action served no bona fide legal purpose and instead functioned as another instrument in the broader effort to burden, discredit, and dismantle MMA.

119.     The Class Action lawsuit was then used in conjunction with other efforts described in this Amended Complaint to increase pressure on MMA through courts, the media, regulators, and disciplinary channels.

---

[66] Exhibit 16: Velawcity Deposition transcript excerpt.
[67] Exhibit 21: Order Dismissing Class Action

**D.      BAR COMPLAINTS AND DISCLOSURE OF CONFIDENTIAL INFORMATION**

120.      While speaking at the Insurance Conference, Monson publicly stated that "opportunities such as bar complaints or insurance complaints, or anything like that" were effective because they force opposing counsel to "respond to those complaints" and take them "off their game and off their mission."[68]

121.      Monson encouraged other insurance defense lawyers to file complaints saying,

> "Don't be afraid to file a complaint. It might not be successful. Who cares! … You have opportunities either bar complaints or insurance department complaints…Anything that you can do and if they're having to respond to those complaints, then it's worthwhile, right? Because you're taking them off their game, and off their mission, right?"[69]

**1.      Monsons' Bar Complaint**

122.      On August 3, 2022, Monson filed a bar complaint with the Louisiana Office of Disciplinary Counsel (**"ODC"**) against MMA and nearly all MMA attorneys, including William Huye allegedly on behalf of himself and his wife, Katherine Monson (the **"Monsons' Bar Complaint"**).[70]

123.      The Monsons' Bar Complaint asserted that Katherine Monson had received an "unsolicited" text message advertising MMA's services and that this purportedly unsolicited contact constituted barratry and improper solicitation by MMA and its attorneys. That representation was materially false. Matthew Monson was physically present with his wife when she received the text message, directed her to click the link, directed her to complete the intake

---

[68] Presentation by Monson on March 18, 2024; and https://www.youtube.com/watch?v=O_6acWsU7Hw – YouTube Video on or about February 20, 2024– "The Unethical Practices Threatening Insurance Claims with Matthew Monson from the Monson Law Firm"

[69] Presentation by Monson on March 18, 2024; and https://www.youtube.com/watch?v=O_6acWsU7Hw – YouTube Video on or about February 20, 2024– "The Unethical Practices Threatening Insurance Claims with Matthew Monson from the Monson Law Firm"

[70] Exhibit 17: Bar Complaint filed by the Monsons.

questionnaire, directed her to continue the engagement after follow-up communications were received, and admitted at the 2024 PLRB Insurance Conference that he stood "over [his] wife's shoulder" and instructed her to interact with the intake process.

124. The corporate representative of Velawcity testified under oath on April 15, 2025 that Katherine Monson **affirmatively opted in** to text communications by submitting her information through a Velawcity web form, and that the system was "impossible" to use to send unsolicited text messages.

125. Monson publicly stated that the disciplinary action obtained against MMA's lead Louisiana counsel, procured in part through this complaint, led directly to MMA's removal from the Western District of Louisiana.

### 2. The Caffarels' Bar Complaint

126. On August 26, 2022, Monson filed a bar complaint against Mr. Huye and MMA on behalf of the Caffarels (the "Caffarels' Bar Complaint"). Monson's conduct in connection with the Caffarels' Bar Complaint was unusual and inconsistent with his ordinary practice, which is devoted exclusively to representing insurance companies. He nonetheless submitted the complaint purporting to act as counsel for individual claimants against an insurer, despite not typically representing individuals in such matters.

127. In the Caffarels' Bar Complaint, Monson falsely asserted that MMA prevented the Caffarels from using insurance proceeds to repair their home. He further alleged that the Caffarels were unable to negotiate their settlement checks because MMA was listed as a payee, preventing them from proceeding with necessary roof repairs. He also claimed this was not an isolated incident

and that MMA improperly solicited business from innocent homeowners in a manner unknown to them.

128. These allegations were false. Monson admitted that MMA negotiated the insurance checks at issue, contradicting the assertion that MMA prevented the Caffarels from accessing insurance funds. The claim that the Caffarels were unable to repair their home as a result was therefore also false. Likewise, the assertion that MMA engaged in improper solicitation of innocent homeowners was untrue. Each of these representations in the Caffarels' Bar Complaint was materially false.

129. Monson publicly stated that the disciplinary action obtained against MMA's lead Louisiana counsel, procured in part through this complaint, led directly to MMA's removal from the Western District of Louisiana.

130. The Caffarel Bar Complaint was actually made on Allied's behalf. Monson testified under oath at his Rule 2004 examination that he had filed bar complaints "on behalf of Allied" and that there were "several" such complaints.

131. When questioned by a former MMA attorney and accused of filing the bar complaints for his own purposes, Monson responded in writing and confirmed that the bar complaints were filed on behalf of an insurance carrier client, rather than the Caffarels. The Caffarels were individuals engaged by Monson Law for the purpose of filing the bar complaints. Monson admitted that the Caffarels were paid prior to his involvement, that he represented them on a *pro bono* basis, and that he had never met or spoken with them.

132. Monson inserted himself into the purported representation of the Caffarels, not to advocate for their interests, but to facilitate the filing of another bar complaint against MMA.[71] In his sworn

---

[71] Exhibit 23: Monson's 2004 Exam (Page 79, Lines 8- 24)

2004 Examination (the **"2004 Exam"**) Monson admitted that, at the time he was retained, the Caffarels had already made a claim against their insurance carrier and had been paid in full prior to his involvement.[72]

133.     Monson's stated purpose in representing the Caffarels on a *pro bono* basis was to enable him to file a bar complaint against MMA. During his 2004 exam, Monson admitted that:

    (a)  He never met the Caffarels;[73]

    (b)  He has never spoken to the Caffarels;[74]

    (c)  He represented the Caffarels on a *pro bono* basis because of their connection to MMA.[75]

    (d)  He has "no clue" whether they sustained property damage as a result of the hurricane.[76]

    (e)  Never filed a single legal pleading on the Caffarels' behalf.[77]

### 3.     The Lam Bar Complaint

134.     On August 26, 2022, Lauren Lam, an attorney employed at Monson Law working under Monson's supervision, filed a nearly identical bar complaint against MMA to the complaint filed by the Monsons (the **"Lam Bar Complaint"**).[78]

135.     The Lam Bar Complaint used substantially the same language as the Monsons' Bar Complaint and Ms. Monson's class action, including the assertion that she was "confused" upon receiving the allegedly unsolicited text message.

136.     In summary, two attorneys at Monson Law (Matthew Monson and Ms. Lam) filed

---

[72] Exhibit 23: Monson's 2004 Exam (Page 82, Lines 11-21)
[73] Exhibit 23: Monson's 2004 Exam (Page 73, Lines 8-11) and Page 76 (Lines 17-18)
[74] Exhibit 23: Monson's 2004 Exam (Page 76, Lines 9-14)
[75] Exhibit 23: Monson's 2004 Exam (Page 74, Lines 21 – Page 75, Lines 1-9)
[76] Exhibit 23: Monson's 2004 Exam (Page 75, Lines 8-10)
[77] Exhibit 23: Monson's 2004 Exam (Page 79, Lines 4-7)
[78] Exhibit 58: Lam Bar Complaint

substantially similar bar complaints against MMA. These actions are consistent with Monson's own statements that "opportunities such as bar complaints" against MMA were effective because they required MMA to respond and diverted it off their game and off their mission, done on behalf of Allied.

**4.     All Bar Complaints Filed for Allied**

137.    Although the bar complaints against MMA and its attorneys were filed by Monson on behalf of himself, his wife, and the Caffarels, and Ms. Lam on her own behalf, Monson later testified that several of those complaints were, in fact, filed on behalf of Allied.[79]

> **MMA's Counsel**:          I want to know, did you file a bar complaint on behalf of Allied?
>
> **Monson**:                        Yes, I believe there's several.

138.    This was further confirmed by a text exchange with a former MMA attorney, who asked Monson to dismiss a bar complaint and described the harm it was causing to her and her family. Monson responded, "I appreciate you reaching out to me on this. I ran this by the clients and they are steadfast in their desire to maintain the complaints." When she replied, "You filed these complaints, not the clients," Monson stated, *"I filed the complaints on behalf of clients who were sued when they didn't issue a policy and didn't even write business in Louisiana. They wish for the bar to sort out who is ultimately responsible."* This statement is consistent with Monson's prior testimony and presentation, as Allied was the only insurer he represented in matters involving MMA at the time he filed the complaints.[80]

139.    Despite being filed under the names of different individuals, the bar complaints were

---

[79] Exhibit 23: Monson's 2004 Exam transcript
[80] Exhibit 24: Text messages with former MMA employee

maintained at the direction of Allied, further demonstrating that they were not pursued to advance the interests of the named complainants but to serve Allied's objectives.

**5.      Huye's Confidential ODC Response Obtained and Transmitted Publicly by Monson**

140.    In response to the ODC complaint filed by Monson against Mr. Huye, Mr. Huye submitted a confidential Opposition to Petition for Interim Suspension to the ODC (**"Huye's Confidential Response"**).

141.    Shortly thereafter, Monson publicly disseminated Huye's Confidential Response by posting it on LinkedIn and transmitting it to FBI Special Agent Krista Bradford, with whom he was coordinating his efforts against MMA. [81]

142.    In February 2026, after MMA filed bankruptcy, the Bankruptcy Court ordered Monson to produce all communications with the ODC, as MMA sought to determine how Monson obtained Huye's Confidential Response, which he had publicly posted.

143.    Monson did not produce any written communications showing how he obtained Huye's Confidential Response. When questioned, he stated that a representative of the ODC, emailed him the confidential document. Monson further explained that he deleted the email after Eva Dosier, counsel for Mr. Huye, confronted him about his possession of the confidential document. Monson explained that he "freaked out" upon being confronted by Ms. Dosier and immediately deleted the email, leaving him unable to produce it in response to the Bankruptcy Court's order.

144.    Monson later stated in his presentation at the Insurance Conference regarding his efforts against MMA that his ODC complaint against Mr. Huye led to disciplinary action against Mr. Huye and noted that, shortly thereafter, MMA was "removed" from the Western District of

---

[81] Exhibit 25: LinkedIn Post with Confidential Response by Huye

Louisiana.[82]

## 6.    Dismissed Bar Complaints

145.    In addition to filing multiple bar complaints against Mr. Huye, Monson filed complaints with the ODC against other MMA attorneys, including Claude Reynaud, Robert Killingsworth, Michael Barcus, and Cameron Snowden (the **"Added MMA Attorneys"**).

146.    On January 20, 2023, the ODC informed Monson that it had concluded its investigation into the allegations raised in his complaints against the Added MMA Attorneys. The ODC determined that the evidence presented was not clear and convincing that the identified attorneys had engaged in misconduct in violation of the Rules of Professional Conduct and dismissed the complaints.[83]

147.    Monson's use of the bar complaint process extended beyond the initial filings. He transmitted the bar complaints and related materials to FBI Special Agent Krista Bradford, the Louisiana State Police, and counsel for Morris Bart (MMA's adversary in pending litigation), none of whom had disciplinary authority over bar proceedings.

148.    Monson also publicly promoted the existence and disposition of the bar complaints on LinkedIn and on The Monson Law Firm website to support his characterization of MMA as a "fraud," to attract clients to his firm, and to impair MMA's ability to attract or retain clients. These actions reflect use of the bar complaint process for purposes unrelated to its disciplinary function.

## E.    THE LDI CAMPAIGN

149.    As discussed above, Monson has publicly stated that he viewed the filing of complaints with the Louisiana Department of Insurance (the "**LDI**") as "opportunities" and "worthwhile"

---

[82] March 17, 2024 Conference: 2024 PLRB Claims Conference in Boston, MA: Monson presented a lecture titled, "Litigation Harvesting: How MMA Went Away

[83] Exhibit 26: ODC Dismissing Bar Complaints

because they would take a law firm "off their game and off their mission." [84]

150. On August 26, 2022, Monson submitted a complaint to the LDI, Office of Insurance Fraud, asserting allegations against MMA and Mr. Huye, on behalf of the Caffarels (the **"LDI Complaint"**).[85]

151. As described above, Monson undertook to represent the Caffarels for the purpose of filing complaints against MMA with the ODC and against Mr. Huye, MMA's lead Louisiana counsel, with the LDI. He provided no other services to the Caffarels other than filing the Bar Complaint and the LDI Complaint to burden MMA.

152. During the Insurance Conference, Monson acknowledged that Mr. Huye, who worked on the Caffarel matter, had endorsed the checks necessary for the Caffarels to receive their insurance proceeds. Monson stated, "And Huye, if I could give him any credit for anything, he did endorse those checks."

153. During his 2004 Exam, Monson further admitted that MMA did not retain any of the Caffarels' funds:[86]

| **MMA's Counsel**: | Did MMA keep any of that money from the Caffarrels? |
|---|---|
| **Monson**: | No, they did not. |
| **MMA's Counsel**: | Not a penny, did they? |
| **Monson**: | No. |

154. Furthermore, Monson knew when he filed the LDI Complaint that the LDI did not have jurisdiction over law firms. He acknowledged this at the Insurance Conference, stating that

---

[84] Presentation by Monson on March 18, 2024; and https://www.youtube.com/watch?v=O_6acWsU7Hw – YouTube Video on or about February 20, 2024– "The Unethical Practices Threatening Insurance Claims with Matthew Monson from the Monson Law Firm"
[85] Exhibit 22: LDI Complaint
[86] Exhibit 23: Monson's 2004 Exam (Page 82, Line 14 -21).

Louisiana Insurance Commissioner Donelon, whom he described as a "close and personal friend," told him, "we do not regulate law firms," after Monson urged him to "bust" MMA.

155.     Notwithstanding that understanding, the LDI issued an order on May 1, 2023, imposing $2 million in fines against MMA and its principals (the **"LDI Order"**). [87]

156.     Before the LDI Order was made public, Monson received a copy and forwarded it to FBI Special Agent Bradford via text message, stating, "I don't have to tell you to keep this out of public distribution." When asked why, Monson responded, "Nothing. Someone asked me not to make it public but then he made it public. We're totally and always have been 100%. Things come out stupid over texts. My apologies."

157.     On the same day the LDI Order was issued, Monson texted Commissioner Donelon, "Well done and more to come."[88]

158.     At the Insurance Conference, Monson told the audience that after the issuance of the LDI Order, Judge North contacted him on his cell phone and asked, "what the hell do they [LDI] know that I don't?" Monson recounted this exchange, characterizing Judge North as being "jealous".[89]

159.     On May 2, 2023, Monson publicly claimed credit for the LDI action on LinkedIn, stating: "In direct response to the complaint I filed with LDI in 9-22, the LDI just dropped the hammer on MMA for insurance fraud they committed."[90] On May 4, 2023, Monson reiterated that claim in a text message to a news reporter, stating that the $2 million sanctions resulted from his "constant follow up with Commissioner Donelon." [91]

160.     MMA subsequently moved to challenge the LDI Order on the ground that the LDI lacked

---

[87] Exhibit 27: LDI Sanctions Order
[88] Exhibit 28: Text with Commissioner
[89] Presentation by Monson on March 18, 2024; and https://www.youtube.com/watch?v=O_6acWsU7Hw – YouTube Video on or about February 20, 2024– "The Unethical Practices Threatening Insurance Claims with Matthew Monson from the Monson Law Firm"
[90] Exhibit 29: LinkedIn Post (Page 70)
[91] Exhibit 30: LinkedIn Messages (Page 4)

jurisdiction over law firms. On January 31, 2025, a Louisiana Administrative Law Judge vacated the LDI Order, concluding that the LDI lacked jurisdiction over MMA because it is a law firm and not an insurance company (the **"Order Reversing LDI Sanctions"**).[92]

161.     Monson knew that the LDI lacked jurisdiction over a law firm but pursued the complaint for its coercive and reputational impact rather than its legal merit. This is consistent with his statements that such complaints are effective because they force firms to divert attention and resources, regardless of the ultimate outcome.[93]

162.     On February 1, 2025, the day after the entry of the Order Reversing LDI Sanctions and nearly one year after MMA filed for bankruptcy, Monson sent the order by text to David Caldwell, counsel for the LDI, and the following exchange occurred:[94]

> **Mr. Monson:**    Need AG's office to prosecute this ASAP.
>
> **Mr. Caldwell:**    They are not going to.
>
> **Mr. Monson:**    They should be called out publicly.
>
> **Mr. Caldwell:**    I am still trying to build a case in Tammany because they will prosecute if I get them a good case.  The majority of the MMA filings are in the Eastern District and I'm not sure if I can get the NOLA DA's office to do anything. Let me look at my case files again on Monday and see if I can work something.  Feds have done nothing on this not surprising.

163.     During Monson's 2004 Exam, Monson admitted that he communicated with Mr. Caldwell, counsel for the LDI, regarding sanctions against MMA on behalf of Allied.[95]

---

[92] Exhibit 31:  Order Reversing LDI
[93] Presentation by Monson on March 18, 2024; and https://www.youtube.com/watch?v=O_6acWsU7Hw – YouTube Video on or about February 20, 2024– "The Unethical Practices Threatening Insurance Claims with Matthew Monson from the Monson Law Firm"
[94] Exhibit 32: Email to Caldwell re AG's office
[95] Exhibit 23: Monson's Transcript

**F.      REGULAR COMMUNICATION AND INFLUENCE ON LDI OFFICIALS**

164.    Monson maintained regular communications with Louisiana Insurance Commissioner Jim Donelon, Deputy Commissioners Nathan Strebeck and Thomas Travis, and LDI's legal counsel Mr. Caldwell regarding MMA and his efforts against it.

**1.      Commissioner Donelon**

165.    Monson has publicly referred to Commissioner Donelon as a "close and personal friend."

166.    As noted above, Monson and Commissioner Donelon discussed MMA during the Galveston meeting at which Ms. Monson claims she received the unsolicited text message that formed the basis of the Class Action.

167.    In October 2022, Matthew Monson traveled internationally with Commissioner Jim Donelon to London, including meetings with Lloyd's of London marketplace reinsurance brokers, and then to Bermuda for the same purpose. Monson admitted that MMA was discussed in these meetings.

168.    On September 22, 2023, Monson texted Commissioner Donelon seeking an introduction to Senator Kennedy to discuss MMA and EAJF in connection with proposed Louisiana legislation addressing litigation financing.[96]

169.    Prior to the issuance of the LDI Order, Monson urged Commissioner Donelon to take action against MMA. When Commissioner Donelon stated that the LDI "does not regulate law firms," Monson responded by reframing the issue as "insurance fraud," despite his knowledge of the LDI's jurisdictional limits.[97]

170.    This exchange reflects that Monson knew the LDI lacked jurisdiction over law firms and nonetheless pressed for action under a different characterization. The resulting LDI Order was later

---

[96] Exhibit 28: Text to Commissioner
[97] March 17, 2024 Conference: 2024 PLRB Claims Conference in Boston, MA: Monson presented a lecture titled, "Litigation Harvesting: How MMA Went Away

vacated on January 31, 2025 for lack of jurisdiction.

171. Monson has publicly stated that he brought information about MMA to the LDI and that MMA had been removed from Louisiana and would "hopefully soon be bankrupt and in jail."[98]

### 2. Deputy Commissioner Thomas Travis

172. Monson maintained regular communication with Thomas Travis, Deputy Commissioner for the Office of Financial Solvency at the LDI, concerning MMA, proposed legislation targeting litigation funding, and related allegations.[99]

### 3. Caldwell: Counsel for the LDI

173. Monson also communicated regularly with Mr. Caldwell, counsel for the LDI, including emails and text messages regarding MMA. These communications included coordination related to regulatory matters and requests to facilitate contact with Magistrate Judge North, who was presiding over matters involving MMA at the time.[100]

174. Following the January 31, 2025 order vacating the LDI sanctions for lack of jurisdiction, Monson texted Mr. Caldwell urging further action, stating that the Attorney General's office should prosecute MMA "ASAP" and that the matter should be pursued publicly. Mr. Caldwell responded that prosecution was unlikely but indicated he was attempting to develop a case and explore other avenues, including potential local prosecution.[101]

### 4. Deputy Commissioner Strebeck

175. Monson also maintained regular communications with Nathan Strebeck, Deputy Commissioner for the Office of Insurance Fraud at the LDI, including communications advancing

---

[98] March 17, 2024 Conference: 2024 PLRB Claims Conference in Boston, MA: Monson presented a lecture titled, "Litigation Harvesting: How MMA Went Away
[99] Exhibit 33: Communications with Thomas Travis
[100] Exhibit 32: Email to Caldwell re AG's office
[101] Exhibit 32: Caldwell communications

allegations against MMA, providing documents and pleadings, and asserting that MMA used unlicensed adjusters in "ALL" of their cases.[102]

## G.    EX PARTE COMMUNICATIONS WITH MAGISTRATE JUDGE NORTH IN THE EASTERN DISTRICT OF LOUISIANA

176.    Unlike Judge Cain, with whom Monson had only a single unplanned in-person *ex parte* communication prior to the Show Cause Hearing, Monson communicated regularly with Magistrate Judge North in the Eastern District of Louisiana regarding MMA on an *ex parte* basis, including by text message, telephone, and in-person meetings.

177.    Judge North was responsible for oversight of MMA's entitlement to attorneys' fees in the EDLA pursuant to the EDLA CMO. [103] He selected neutrals, administered the program, and functioned as the operational manager of the court-supervised settlement system governing thousands of MMA Hurricane Ida cases, including those filed by MMA on behalf of its clients. That system generated settlement pressure on insurers that Monson publicly characterized as an "existential threat."

178.    Monson filed pleadings before Judge North on behalf of Allied seeking adverse findings against MMA, including sanctions that were awarded and paid directly to Monson's firm. During the same period, Monson engaged in *ex parte* communications with Judge North concerning MMA.

179.    For example, when the LDI Order and $2 million in fines were entered against MMA on May 1, 2023, Monson publicly stated that he received a phone call on his cell phone from Judge North. According to Monson, during that call Judge North expressed frustration and questioned

---

[102] Exhibit 34: Strebeck Communications
[103] Exhibit 3: EDLA CMO

why the LDI had information about MMA that had not been shared with him. Monson further stated that he described Judge North's reaction during this phone call as "jealous."[104]

180.     On June 12, 2023, Judge North sent Monson an email stating, "This is what we spoke about earlier. Thanks," and attached a lawsuit involving MMA. On June 13, 2023, Monson responded and attached three additional lawsuits involving MMA. [105]

181.     On April 1, 2024, Judge North sent Monson an *ex parte* email referencing a matter pending before him, *Ricks v. Imperial Fire* (No. 23-2844), involving MMA's entitlement to attorneys' fees. Neither Allied nor Monson was a party to that matter. The email, titled "MMA fee issues," described developments in the *Ricks* case (prior to the public entry of any order) and stated that the Court was hopeful that statements made by MMA in that proceeding **"provide everything needed to satisfy settling defendants that they can cut checks without listing MMA as a payee."** [106]

182.     The "settling defendants" referenced in Judge North's email are Allied, as Monson represented Allied in matters before Judge North in which MMA was involved.  Furthermore, when asked during his 2004 Exam, Monson was unable to recall any other insurance companies that he represented in cases where MMA was representing the plaintiffs.

183.     Four days later, on April 5, 2024, Judge North separately emailed Monson a copy of the order entered in the Ricks case finding, among other things, that MMA is not to be listed as a payee on settlement checks issued by defendant insurance companies in cases settled by successor counsel who took over MMA's cases (the **"Ricks Order"**).[107] This email followed and was

---

[104] March 17, 2024 Conference: 2024 PLRB Claims Conference in Boston, MA: Monson presented a lecture titled, "Litigation Harvesting: How MMA Went Away
[105] <u>Exhibit 35</u>: Email from Judge North 6-12-2023
[106] <u>Exhibit 36</u>: Email from Judge North re Ricks findings.
[107] <u>Exhibit 59</u>: Ricks Order

consistent with the subject matter of the prior *ex parte* communication dated April 1, 2024, in which the same issue was discussed before the order's issuance.[108]

184.    MMA's bankruptcy filing did not end the communications between Judge North and Monson regarding MMA. On July 15, 2024, Monson sent Judge North a text message transmitting a pleading filed in MMA's bankruptcy case.[109] At that time, Judge North did not have any pending matters before him in which MMA represented a client or sought attorneys' fees.

185.    On December 18, 2024, Monson texted Judge North to inform him that MMA had filed a lawsuit in its bankruptcy proceeding against a Louisiana law firm. Judge North responded, "The latest. They're about the sixth firm they've sued."[110] This text message indicates that Judge North and Monson were actively monitoring MMA's bankruptcy proceedings.

186.    Later that same day, Judge North emailed Monson identifying two case names and numbers and requesting that Monson investigate and report back on what he found. Monson responded, stating that he "wonder[ed] if this is another MMA/Velawcity special." [111]

**1.    <u>Judge North's Orders: The Ricks Case and The Foskey Case</u>**

187.    As discussed above, four days prior to MMA's bankruptcy filing, Judge North entered the *Ricks Order*. In that order, Judge North found that MMA had waived certain rights to intervene in any cases pending in the EDLA to recover fees and/or costs. In relevant part, the *Ricks* Order said:

> **"This finding is without prejudice to MMA's right to bring whatever claims may exist for breach of contract (or <u>under any other theory</u>) against MMA's <u>successor law firms</u>." [112]**

---

[108] <u>Exhibit 36</u>: Email from Judge North re Ricks Order.
[109] <u>Exhibit 37</u>: Text message from Judge North
[110] <u>Exhibit 37</u>: Text message from Judge North (12-18-2024)
[111] <u>Exhibit 38</u>: Email from Judge North (Velawcity/MMA special)
[112] Exhibit 59: Ricks Order (Page 6)

188.     The *Ricks Order* did not define or limit the term "successor counsel." Judge North made clear that the purpose of the Ricks Order "acts to remove as an impediment to settlement and payment of settlement proceeds the possibility that MMA could, at some point in the future, seek to intervene for fees and/or costs in any case pending here. That possibility is now eliminated."

189.     Judge North further made clear that MMA could not intervene in any former client cases pending in the EDLA and that MMA *could* bring claims against the firms that took over the cases under any theory. MMA understood the terms of the order, did not seek to intervene in any EDLA cases thereafter, and instead complied with its terms.

190.     MMA filed for bankruptcy on April 9, 2024, four days after entry of the *Ricks Order*, and subsequently filed more than 20 lawsuits seeking fee apportionment from firms that took over MMA's cases. One such firm is Morris Bart, LLC ("**Morris Bart**"). MMA filed an adversary proceeding against Morris Bart seeking fee apportionment for cases Morris Bart assumed from MMA (the **"MB Adversary"**).

191.     On July 10, 2024, in the MB Adversary, the Bankruptcy Court entered a preliminary injunction requiring Morris Bart to hold disputed attorneys' fees in trust pending resolution of the litigation (the **"MB Injunction"**).

192.     On July 15, 2024, Monson sent Judge North a text message transmitting a copy of the MB Injunction. [113]

193.      Morris Bart later moved to withdraw the reference to the District Court, and the motion was granted, withdrawing the MB Adversary (the **"Texas District Court"**).

---

[113] Exhibit 37: Text message from Judge North

**2.      The Foskey Case**

194.      One of the matters Morris Bart assumed from MMA was the *Foskey Case* (the **"Foskey Case"**). MMA had not filed suit on behalf of Ms. Foskey prior to Morris Bart's involvement.

195.      Morris Bart filed the lawsuit on behalf of Ms. Foskey which was pending before Judge North.[114]  The docket in the Foskey Case reflects that post-petition, Ms. Foskey and the defendant insurance carrier reached a settlement on November 14, 2024, which Judge North mediated.[115]

196.      On December 3, 2024, the Foskey Case was dismissed with prejudice as a result of the mediated settlement. MMA was not a party to the case, did not seek fees in it, and did not represent Ms. Foskey at the time the lawsuit was filed.

197.      Despite the dismissal and closure of the Foskey Case, on December 9, 2024, the Court *sua sponte* vacated the dismissal order, without any motion filed by any party.

198.      On December 12, 2024, more than seven months after MMA's bankruptcy filing, and after settlement and closure of the case, Judge North entered an order in the Foskey Case that went beyond the scope of the underlying dispute (the **"Foskey Order"**).[116]

199.      In the Foskey Order, Judge North acknowledged MMA's pending bankruptcy and nevertheless concluded that:

(a)  Fees and costs that may have been recoverable by MMA in the Eastern District of Louisiana are not and cannot be part of the bankruptcy estate; and

(b)  The Bankruptcy Court's Injunction against Morris Bart did not apply in his court.

---

[114] Foskey v. American Modern Property and Casualty Insurance Company, No. 23-cv-5316 (E.D. La.)
[115] Exhibit 39: Foskey Case - Docket
[116] Exhibit 40: Foskey Order

200. Although Judge North served as mediator in the Foskey Case, he also issued the Foskey Order as the judge in the Foskey matter.  The day after entry of the Foskey Order, Judge North sent Monson a text message asking him to call. [117]

201. Morris Bart filed the Foskey Order in the Texas District Court. MMA filed a notice in response to the Foskey Order expressing concerns regarding due process and jurisdiction, noting that MMA was not a party to the Foskey Case, received no notice, had no opportunity to file a pleading or be heard, and argued that Judge North lacked authority to adjudicate a determination of property of the bankruptcy estate or the applicability of the Bankruptcy Court's Injunction issued in the Southern District of Texas.

202. On December 19, 2024, the Texas District Court issued an order addressing the Foskey Order (the **"District Court Order"**), stating among other things that: [118]

      (a)  It need not resolve how the Foskey Order came to be issued;

      (b)  It need not rely on or cite the Foskey Order to issue its order; and

      (c)  The Bankruptcy Court's Injunction remained in effect (contrary to the Foskey Order).

203. On December 19, 2024, Monson sent Judge North a text message attaching the District Court Order. Judge North responded, "Thanks." [119]

**3.** **Bankruptcy Court Order Compelling Communications with Judge North**

204. MMA served Monson with a subpoena to produce all communications concerning MMA with numerous parties, including Judge North, pursuant to Rule 2004, and to appear for a sworn examination. Monson objected, citing constitutional grounds and the First Amendment.

---

[117] Exhibit 37: Text with Judge North
[118] Case No. 24-cv-02793 (ECF No. 24)
[119] Exhibit 37: Text with Judge North

205.    MMA filed a motion to compel, and the Bankruptcy Court held a contested evidentiary hearing on February 2, 2026. The Court overruled Monson's objections and ordered him to appear for the Rule 2004 Exam on February 26, 2026, and to produce requested documents in advance of the examination.

206.    Following the hearing, Monson initially produced a single text message with Judge North dated February 2, 2026, reproduced below.



207.    This text message indicates that Monson did not have Judge North's contact information saved and that they had no prior text communications before February 2, 2026. The message was sent at 6:01 p.m. on February 2, 2026, immediately after the Bankruptcy Court's ruling on MMA's motion to compel Monson to produce communications with, among others, Judge North.

208.    Prior to the Rule 2004 Exam, and following a request from MMA, Monson produced additional text messages between himself and Judge North, referenced throughout this Amended Complaint.[120] During the sworn Rule 2004 Exam on February 26, 2026, Monson testified

---

[120] Exhibit 37: Text with Judge North

regarding his communications with Judge North and the deletion of text messages, including the following exchange:[121]

| | |
|---|---|
| **MMA's Counsel:** | You deleted text messages between you and Judge North, didn't you? |
| **Monson:** | No. Well, yes. |
| **MMA's Counsel:** | Yes, you did? |
| **Monson:** | Yes, I did. |
| **….** | |
| **MMA's Counsel:** | Have you communicated with Judge North since January 15th in writing? |
| **Monson:** | In writing, no. |
| **MMA's Counsel:** | In person? |
| **Monson:** | No. |
| **MMA's Counsel:** | On the phone? |
| **Monson:** | **Yes. But not related to MMA.** |
| **MMA's Counsel:** | You told him about the 2004 Exam, didn't you? |
| **Monson:** | That was part of a conversation. |
| **MMA's Counsel:** | And you're saying that's _**not**_ related to MMA? |
| **Monson:** | Okay, sure. |
| **MMA's Counsel:** | Not, okay sure. That's wrong? |
| **Monson:** | That's not wrong, but I've corrected myself. I let him know that there was a Rule 2004 Examination. |
| **…** | |

---

[121] Exhibit 23: Monson's 2004 Exam transcript

| **MMA's Counsel**: | What did he say about me? |
|---|---|
| **Monson:** | He didn't say anything about you. He actually expressed a lot of displeasure, how come I didn't tell him about it, how come I didn't give it to him, whatever. And I didn't really have an answer for him for that. He was very aggravated at me saying, well, essentially if this is involving my communications, don't you think it's important that I know? |

209. Taken together, these communications reflect a continuing pattern of contact and exchange of information concerning MMA between Monson and a sitting federal judge who issued orders attempting to affect MMA's property interests outside MMA's presence and without jurisdiction.

210. Furthermore, Monson has admitted to deleting text messages with Judge North, which is especially troubling given that MMA served Monson with an evidence preservation letter on July 9, 2025.[122]

## H.    THE LOUISIANA STATE POLICE

211. On September 20, 2023, Monson posted on LinkedIn referencing Attorney General Jeff Landry's comments regarding MMA and stated, "excuses, excuses, excuses. Fortunately, I'm at the state police headquarters today. Maybe I can help move things forward."[123]

212. On October 9, 2023, Monson communicated with Louisiana State Police Investigator Daniel Graff to schedule a meeting at Monson's office regarding MMA. In that exchange, Monson stated, "It will be great to assist for efforts in any way possible."[124]

213. Later that day, Investigator Graff emailed Monson under the subject line "LSP MMA Investigation," inviting him to provide any relevant materials, stating: "Feel free to share any

---

[122] Exhibit 41: Evidence Preservation Letter
[123] Exhibit 29: LinkedIn Posts (Page 39)
[124] Exhibit 42: Text with Graff

documents regarding the MMA investigation."[125]

214.     On October 13, 2023, Monson confirmed an in-person meeting with the Louisiana State Police and transmitted pleadings filed against MMA, providing litigation materials to law enforcement in connection with its investigation.[126]

215.     On October 17, 2023, the Louisiana State Police issued an Initial Complaint Report against MMA.[127] The Initial Complaint Report attributed allegations to Monson, stating:

> "Per LDI, allegations were brought to them by Attorney Matthew Monson… Through assisting a customer, Monson discovered irregularities in MMA's practices and determined they were deceiving individuals and **stealing insurance claim settlement funds.**" (emphasis added)[128]

216.     This statement was false. MMA did not steal any insurance claim settlement funds. During his sworn 2004 Exam on February 26, 2026, Monson admitted he had no personal knowledge that MMA misappropriated client funds, confirming this was a false allegation made to the LDI:[129]

| **MMA's Counsel:** | Do you have any personal knowledge of MMA keeping money that doesn't belong to them? That belongs to a client? |
| --- | --- |
| **Mr. Monson:** **…..** | I am unaware personally. |
| **MMA's Counsel:** | And in no instance did you discover on behalf of a client or saw any transfer of money that didn't belong to MMA that went to a client, you didn't observe it, correct? |
| **Mr. Monson:** | I did not observe it. |
| **MMA's Counsel:** | And my question to you is do you have personal knowledge of MMA stealing client money, yes or no? |
| **Mr. Monson:** | No. |

---

[125] Exhibit 43: Email with Graff
[126] Exhibit 42: Text with Graff
[127] Exhibit 44: State Police Complaint
[128] Exhibit 44: State Police Complaint
[129] Exhibit 23: Transcript from Monson's 2004 Exam

217. Despite this testimony, Monson publicly posted the Louisiana State Police Initial Complaint Report on LinkedIn, highlighting the initiation of a criminal investigation into MMA.[130] By doing so, Monson amplified the false allegation contained in the report and emphasized his role in prompting the investigation, including claims that he had reported MMA to the LDI.

218. The statement that MMA was "stealing insurance claim settlement funds" was a factual assertion attributed to Monson in the Initial Complaint Report. Monson knew he lacked personal knowledge of any such conduct. He nonetheless facilitated the dissemination of the statement to law enforcement and republished it on LinkedIn, where he has over 18,000 followers and where the content is publicly accessible to any LinkedIn user.

219. Monson nonetheless caused the statement to be published to the Louisiana State Police and then republished the statement by posting the Initial Complaint Report on LinkedIn, where it can reach thousands of people including MMA's clients, employees, referral sources, co-counsel, financing sources, and prospective clients. Monson has not, at any time, retracted, corrected, or disclaimed the statement.

220. Even after the 2004 Exam and after MMA initiated an adversary proceeding against Monson and his law firm, and despite knowledge that the issue was allegedly false, Monson has not deleted that post from his LinkedIn profile as of April 23, 2026.

221. On December 18, 2023, Investigator Graff informed Monson via text message that the Louisiana State Police was coordinating with the FBI in its investigation of MMA, further evidencing that Monson's disclosures were made with knowledge of their broader investigative impact.[131]

---

[130] Exhibit 29: LinkedIn Post (Page 24)
[131] Exhibit 42: Graff text

**I.     THE FBI INVESTIGATION AND MONSON'S ONGOING COORDINATION**

222.     Beginning in February 2023, Monson initiated and maintained an extensive and continuous relationship with FBI Special Agent Krista Bradford concerning MMA, spanning more than three years and involving hundreds of pages, over 100 communications, including emails, text messages, telephone calls, and in-person meetings.[132] During this period, Monson functioned as a principal source of information for the FBI's developing investigation into MMA, repeatedly transmitting materials and shaping the flow of investigative information.

223.     To be clear, **MMA does NOT challenge the acts of FBI Special Agent Krista Bradford**. The conduct at issue is Monson's communications with Agent Bradford over matters affecting MMA, and Monson's attempts to use those communications to advance the objectives of the Enterprise.

224.     Monson sent dozens of separate communications to Agent Bradford and actively contributed to the investigative narrative regarding MMA. In the 2004 Exam, when asked whether he was communicating with the FBI on behalf of Allied, Monson answered, "generally, yes."[133]

225.     Representative examples of Monson's FBI communications include:

(a) **March 10, 2023:** Monson emailed Agent Bradford a hearing transcript with strategic commentary, noting that "McClenny and Huye are both off of the website," supplying intelligence regarding MMA's internal personnel changes.

(b) **March 14–15, 2023:** Monson received grand jury subpoenas directed to Allied directly from Agent Bradford as a "courtesy," and assured her he would facilitate Allied's "prompt response"—acting as intermediary between federal law enforcement and his own client.

(c) **March 16, 2023:** Monson emailed Agent Bradford a court order with the subject line of a smiley face ":-)," celebrating an adverse ruling against MMA.

---

[132] Exhibit 47: Various emails and text messages between Agent Bradford and Monson
[133] Exhibit 48: Monson's 2004 Exam transcript.

(d) **April 29, 2023:** Monson transmitted the LDI Cease and Desist Order to Agent Bradford and instructed her to "keep [it] out of public distribution."

(e) **May 29, 2023:** Monson sends Agent Bradford a text message that reads, "You never call. You never write. I may have another contact to provide you with re MMA.  Will be vetting shortly".

(f) **August 5, 2023:** Monson emailed Agent Bradford divorce pleadings involving MMA's attorneys, personal information bearing no legitimate relevance to any proceeding in which Monson was counsel.

(g) **April 5, 2024:** Monson forwarded Agent Bradford an *ex parte* communication he had received from Judge North about the Ricks Opinion, writing: "Judge North just stuck it to MMA and the Hedge Funds on the fees", directly linking his undisclosed judicial communications to his ongoing FBI coordination.

(h) **April 29, 2023:** Monson sent a text message and included a Cease & Desist Order from the LDI dated May 1, 2023 and said, "I don't have to tell you to keep this out of public distribution".  When Agent Bradford questioned Mr. Monson as to why he would say that since she never distributes anything, Mr. Monson apologized and said, "We're totally and always have been 100%. Things come out stupid over texts. My apologies.

(i) **June 23, 2023:** Monson obtains a proprietary PowerPoint presentation from MMA regarding its 4-year strategy and business plan and sends it via text message to Agent Bradford and asks her if she would like "to talk to the lady" that sent him the presentation.

(j) **December 11, 2023:** Monson sends copy of Mr. Huye's confidential Response to the ODC Complaint to Agent Bradford, along with a copy of his wife's lawsuit against MMA.

(k) **December 29, 2023:** Monson sent Agent Bradford a copy of MMA's loan agreement with EAJF.[134]

(l) **May 7, 2024:** Monson obtains stolen client spreadsheets from a former MMA employee and forwards them to Agent Bradford.

(m) **May 29, 2024:** Monson obtains audio recordings regarding MMA and forwards

---

[134] Exhibit 45: MMA/EAJF Contract sent to FBI

them to Agent Bradford.

(n) **December 11, 2024:** Monson emailed Agent Bradford under the subject line "Katherine Monson matter," attaching bar complaints, court orders, hearing transcripts, and communications involving his wife, identifying them as "salient".

(o) **February 1, 2025:** After the LDI Order was reversed, Mr. Monson sent a copy of the Order to Agent Bradford and said, "they keep slipping through the legal cracks".

(p) **May 28, 2025:** Monson obtained documents from Morris Bart's counsel related to MMA's litigation in bankruptcy court and forwarded pleadings and transcripts to Agent Bradford.

(q) **January 19, 2026:** Monson texted Agent Bradford a copy of MMA's Rule 2004 Examination Notice seeking his FBI communications, alerting law enforcement that his conduct was becoming the subject of discovery.

226. Text messages between Monson and Agent Bradford are attached as Exhibit 46.[135]

227. The email communications that Monson produced between Monson and Agent Bradford total 2,126 pages.

228. Once the FBI's investigation into MMA became public, Monson posted about it on LinkedIn.[136] Following that post, a reporter from Reuters contacted him on June 7, 2024, asking whether it was the first public acknowledgment of the FBI investigation and stating, "I figured you would know." Monson responded, "Yes ma'am. My post is taking off. Of course it is not news to me, but everyone else is excited." When asked whether there were charges brought against MMA, Monson confirmed, *"No charges."*[137]

229. At the sworn 2004 Exam in February 2026, Mr. Monson admitted that:

(a) Agent Bradford provided him with an open-ended standing invitation to submit

---

[135] Exhibit 46: Text messages with FBI
[136] Exhibit 29: LinkedIn Post
[137] Exhibit 47: Communication with reporter re FBI

any information relating to MMA, which he did continuously over several years;[138]

(b) He obtained deposition transcripts and other materials from third parties, including Morris Bart's counsel, and transmitted them to the FBI; and

(c) His communications with the FBI concerning MMA were undertaken on behalf of Allied.[139]

230. On April 27, 2023, Monson was contacted by Steven Badger, an insurance defense attorney in Texas, who stated, "There's a rumor floating around that Zach [Mr. Moseley] got picked up today by the FBI. I said I doubt it, But I don't know.". Monson responded the same day and said, "My friend has not heard that."[140]

231. In August 2023, Monson was contacted by Steven Badger, an insurance defense attorney in Texas, who requested Agent Bradford's first name and phone number and referenced a recent conversation with Mr. McClenny. Monson provided Agent Bradford's first name but warned: "**HOWEVER, please be careful. The whole thing can get blown up if we are considered to work as an <u>agent of the government</u>.**"[141]

232. This statement reflects Monson's contemporaneous understanding that his coordination with the FBI raised the risk of being viewed as acting as a government agent in connection with MMA. However, during Monson's 2004 Exam, when questioned specifically about this text message regarding *"agent of the government"*, the following exchange took place:[142]

| | |
|---|---|
| **MMA's Counsel:** | What does that mean, an agent of the government? |
| **Mr. Monson:** | I don't know. |

---

[138] <u>Exhibit 23</u>: Monson's 2004 Exam transcript
[139] <u>Exhibit 23</u>: Monson's transcript re: FBI/Allied
[140] <u>Exhibit 48</u>: Communications with Steve Badger
[141] <u>Exhibit 48</u>: Communications with Steve Badger re "agent of the government"
[142] <u>Exhibit 23</u>: Transcript from 2004 Exam.

| | |
|---|---|
| **MMA's Counsel:** | Your words? |
| **Mr. Monson:** | I know. |
| **MMA's Counsel:** | What does that mean? Why would you tell him? |
| **Mr. Monson:** | It's something that I typed. I don't know what. |
| **MMA's Counsel:** | You typed the words, you remember the words, and you don't know what they mean? |
| **Mr. Monson:** | I don't know what an agent for the government. |
| **MMA's Counsel:** | No, I'm asking what you, Mr. Monson, you wrote the words. What do those words mean to you? |
| **Mr. Monson:** | They mean what they say. The document speaks for itself. |
| **MMA's Counsel:** | No, it doesn't speak for itself. Please explain to me what that means or tell me that you're going to refuse to answer the question. |
| **Mr. Monson:** | It means what I said, an agent of the government. |
| **MMA's Counsel:** | Explain that to me. What does that mean? |
| **Mr. Monson:** | There is nothing to explain. |
| **MMA's Counsel:** | You're refusing to answer? |
| **Mr. Monson:** | I meant what I said. |

233. Taken together, these communications reflect a sustained and extensive pattern of coordination with the FBI concerning MMA, through which Monson repeatedly supplied information, materials, and investigative leads.

234. Monson's communications with Special Agent Bradford did not consist of discrete

petitions, complaints, or filings submitted to federal law enforcement. They were a continuous, three-year operational relationship through which Monson functioned as a principal source of investigative information concerning MMA, received non-public information from Agent Bradford (including courtesy notice of grand jury subpoenas directed to Allied, his own client), transmitted confidential materials (including Mr. Huye's confidential ODC response and a stolen MMA PowerPoint obtained from a former employee, MMA loan agreements), and communicated over more than 100 separate occasions by email, text, telephone, and in-person meetings. The email communications and attachments exceed 2,000 pages.

235. Monson's own contemporaneous statement that "the whole thing can get blown up if we are considered to work as an agent of the government" reflects his understanding that the relationship had crossed from ordinary citizen reporting into something categorically different.

## J.    DEPUTY SPECIAL MASTER AND MAGISTRATE JUDGE KAY

236. A Deputy Special Master was appointed in Hurricane Laura and Hurricane Delta litigation in the Western District of Louisiana to oversee cases in which MMA had originally represented plaintiffs, including disputes concerning MMA's entitlement to attorney's fees from successor firms pursuant to the CMO.[143]

237. On April 19, 2023, Monson contacted the Deputy Special Master by telephone and text message regarding a show cause hearing scheduled for April 26, 2023 before Magistrate Judge Kay, at which MMA principal John Zachary Moseley was expected to testify.[144]

238. In a text message to the Deputy Special Master, Monson wrote:

> "Just want to make sure that the 26th includes detailed questions about exactly who is still working in Louisiana. Huey is still working behind the scenes according to

---

[143] Exhibit 1: CMO
[144] Exhibit 49: Text with Deputy Special Master

my sources. His wife also supposedly is being paid increased money as a firm employee according to other former employees."[145]

239.    The transcript of the April 26, 2023 hearing reflects that Judge Kay questioned MMA regarding the subject areas identified in Monson's communications with the Deputy Special Master, specifically including personnel issues and alleged ongoing involvement by former counsel. [146]

240.    On May 4, 2023, following the hearing, Judge Kay entered an order prohibiting MMA from communicating with any of its former clients in the WDLA.

241.    At the time of the hearing before Judge Kay, Mr. Moseley appeared and was represented by counsel. Despite being represented, on May 25, 2023, Judge Kay sent an unsolicited email directly to Moseley without copying counsel. [147] The subject line was a news headline: "In secret audio, lawyer accused of fraud lays out plans to keep Louisiana insurance lawsuits going." The body of the email stated: "Just in case you missed it." Judge Kay copied multiple federal judges who were all presiding over matters affecting MMA's fee entitlements.  In response, Judge North replied to all recipients, including Mr. Moseley, stating, "another one coming tonight."

242.    On March 31, 2024, Monson sent a legislative email to state legislators and the Deputy Special Master titled "Anti McClenny Moseley/Velawcity Legislation—SB 8—HB 336," characterizing MMA's relationship with Velawcity as "unethical" and "unlawful," and stating that he was asked by the Deputy Special Master to provide some suggested language for proposed legislation. Monson thereby invoked his connection to the Deputy Special Master in support of legislative efforts targeting MMA. [148]

---

[145] Exhibit 49: Text message with Deputy Special Master
[146] Exhibit 50: Transcript Judge Kay Hearing (Page 10, Lines 7-23).
[147] Exhibit 51: Email from Judge North to Moseley.
[148] Exhibit 52: Legislative Email

243.     Taken together, these communications reflect a continuing pattern in which information concerning MMA was routed through *ex parte* or informal channels involving individuals actively overseeing or influencing proceedings affecting MMA's fee rights, client relationships, and litigation posture, outside the ordinary adversarial process.

244.     To be clear, **MMA does NOT challenge the acts of the Deputy Special Master**. The conduct at issue is Monson's communications with him over matters affecting MMA, and the use of those communications to advance the objectives of the Enterprise outside the regular adversarial process.

### K.     COMMUNICATIONS WITH FORMER AND CURRENT MMA EMPLOYEES

245.     Monson did not limit his communications to judges, special masters, news reporters, the Louisiana Insurance Commissioner, the LDI, the ODC, the FBI, and the Louisiana State Police. He also devoted substantial time to communicating with MMA's current and former employees.

246.     Former MMA employees who had taken confidential and proprietary information from MMA provided that information to Monson, who in turn forwarded it to the FBI. Former MMA employees also provided Monson with information regarding MMA's internal practices and proprietary business strategies and models.

247.     Former and current MMA employees provided Monson with personal details concerning MMA attorneys, their private lives, their divorces and information about their families.

248.     In one particularly striking instance, Monson met a former MMA employee, in person in Tampa, Florida to discuss MMA, demonstrating that his intelligence-gathering network was not confined to electronic communications but extended to in-person meetings across state lines to further his campaign against MMA.

249.     The materials Monson obtained from former MMA employees included proprietary

information, internal business strategy documents, a proprietary PowerPoint presentation describing MMA's four-year business plan, and audio recordings from MMA's internal business meetings.

250. These materials were not obtained through lawful discovery in any proceeding to which Allied was a party. Monson transmitted these documents to FBI Special Agent Bradford, to the Louisiana State Police, and to Morris Bart's counsel. Monson's receipt and distribution of these materials served no interest of Allied in the defense of the Allied Cases and was undertaken for the purpose of building a multi-forum record against MMA.

### L. LITIGATION FUNDING MODEL AND MONSON'S FOCUS ON EAJF

251. As described above, EAJF provided MMA with approximately $30 million in firm level financing.[149] Those loans funded MMA's statewide advertising and operations, and Monson has publicly identified litigation funding arrangements of this type as the existential threat to the insurance industry.

252. On August 9, 2023, following testimony in open court referencing MMA's receipt of funding from EAJF, Monson posted about the testimony on LinkedIn, characterizing the funding structure as evidence of a broader litigation financing model and questioning the use of the funds in connection with MMA's operations.[150]

253. On September 6, 2023, after EAJF sought to participate in proceedings to protect its financial interest in MMA's fee recovery in Louisiana, Monson published statements on LinkedIn discussing EAJF's involvement in the funding structure and urging further inquiry into the entities and investors behind litigation funding arrangements associated with MMA.[151]

---

[149] Exhibit 5: POC
[150] Exhibit 29: LinkedIn Post
[151] Exhibit 29: LinkedIn Post

254. That same day, Monson transmitted materials concerning EAJF's filing to FBI Special Agent Bradford, incorporating EAJF's participation into his ongoing communications with law enforcement regarding MMA's financing structure.

255. On September 21, 2023, following the denial of EAJF's request to intervene, Monson published a post stating that further "discovery" should be directed to the managing entity behind the funds that financed MMA and questioning the basis for its investment in MMA's operations.[152]

256. Monson's public statements were not limited to isolated commentary on a single ruling but reflect a broader focus on MMA's litigation funding structure as part of its business model.

257. On September 22, 2023, Monson communicated with Louisiana Insurance Commissioner Jim Donelon regarding proposed legislative reforms addressing litigation financing, referencing EAJF in connection with broader statutory discussions concerning litigation funding practices.

258. On November 6, 2023, Monson was quoted in industry media discussing "litigation harvesting" and described concerns relating to investment in firms engaged in mass plaintiff acquisition models.

259. The Amended Class Action included allegations concerning MMA's funding arrangements with EAJF and related entities, extending the scope of the litigation to include MMA's financing structure as part of the asserted claims.

260. On December 19, 2023, Monson transmitted MMA's loan agreements with EAJF to FBI Special Agent Bradford.

261. On December 28, 2023, Monson transmitted additional materials relating to litigation between MMA and EAJF to the same FBI agent as part of his ongoing communications regarding MMA's funding structure.

---

[152] Exhibit 29: LinkedIn Post

262.     On January 23, 2024, Monson communicated with a state legislator regarding MMA's funding arrangements, referencing documentation involving EAJF in connection with proposed legislation addressing litigation financing practices.

263.     On March 22, 2024, Monson published a LinkedIn post discussing MMA's financing structure with EAJF and addressing the economics of litigation funding in mass plaintiff litigation.

264.     On April 2, 2024, Monson transmitted documents concerning litigation between MMA and EAJF to the LDI in connection with ongoing regulatory discussions involving insurance and litigation financing practices.

265.     On April 12, 2024, counsel for EAJF sent Monson a letter disputing certain public statements concerning the funding arrangement between MMA and EAJF. Monson forwarded that correspondence to FBI Special Agent Bradford.

266.     Monson's communications and public statements reflect a consistent focus on litigation funding as a structural component of MMA's operations, which he and Allied viewed as a defining threat of the insurance litigation environment.

267.     Viewed in context, the communications, publications, and filings described above reflect sustained scrutiny of MMA's financing structure, including its relationship with EAJF as a lender, as part of the Defendants' broader efforts to challenge and destroy MMA's business model and operations.

**M.     MORRIS BART: MMA FILED BANKRUPTCY AND MONSON'S CAMPAIGN CONTINUES WITH MORRIS BART**

268.     On April 9, 2024, MMA filed a Chapter 11 bankruptcy petition in the Southern District of Texas. Following the events described above, MMA ceased all operations in Louisiana. That same day, Monson posted on LinkedIn, stating, "BREAKING NEWS! MMA HAS DECLARED

BANKRUPTCY."[153]

269.     Monson publicly stated on his website: "Through investigation and legal action Monson stopped MMA's unethical insurance litigation scheme, resulting in a $150 million bankruptcy filed by the firm."[154]

270.     After MMA's Louisiana licensed attorneys were suspended, MMA closed its Louisiana offices, and MMA filed for bankruptcy, one would reasonably expect the campaign against MMA to have ended. It did not. The Defendants continued their focus on MMA's bankruptcy estate, including its fee entitlements and claims against successor counsel.

**1.   Morris Bart Takes Over 1,600 MMA Cases**

271.     The largest of those successor firms is Morris Bart, LLC (**"Morris Bart"**), which assumed representation of approximately 1,600 of MMA's former clients.

272.     Beginning in early 2023, Morris Bart undertook to acquire MMA clients on a large scale, motivated by the value of MMA's case inventory and the ability to avoid sharing fees.

273.     On April 4, 2023, approximately three weeks after the Suspension Order procured through the bar complaints discussed in the preceding sections of this Amended Complaint, Morris Bart sent letters to MMA Clients claiming that MMA was being investigated for fraud by the federal court in New Orleans and that the federal court had "**frozen all cases**" handled by MMA, urging the MMA's clients to switch representation.

274.     Both representations made by Marks in the April 4, 2023 letter were false. Federal courts do not conduct criminal investigations. And not all of MMA's cases were frozen at that time as the Stay Order applied to 1,600 cases in the Western District of Louisiana, not to MMA's broader Louisiana docket.

---

[153] Exhibit 29 – LinkedIn Posts (Page 1)
[154] Exhibit 53: Website

275.     Morris Bart's April 4, 2023 letter campaign occurred during the same period in which Matthew Monson was actively disseminating false narrative that MMA had committed insurance fraud. Austin Marks', an attorney at Morris Bart, and Mr. Bart's son-in-law, published statements that MMA had "lied, cheated and stole from everyone" and Monson's parallel statements that MMA had committed insurance fraud and was "stealing" settlement funds reinforced and amplified one another.

276.     The combined effect of the false-narrative campaign waged through these multiple channels was to procure the transfer of MMA's clients to Morris Bart during the period in which MMA's lead Louisiana counsel was suspended and MMA was unable to defend against the false narrative.

277.     Approximately 1,600 of MMA's clients switched their representation to Morris Bart. After acquiring those MMA clients, Marks personally drafted termination letters on behalf of those clients to end their representation with MMA. Marks's role was therefore not limited to public commentary; he personally executed the operational steps required to sever MMA from its client contracts.

### 2.     The Monson–Marks Relationship

278.     During the time that Morris Bart took over the MMA Cases, Monson was communicating regularly with Morris Bart regarding MMA in furtherance of his scheme.

279.     The coordination between Monson and Morris Bart was facilitated primarily through Austin Marks. Attached as Exhibit 54 are text messages between Monson and Marks.[155]

### 3.     Morris Bart Sues MMA in Louisiana

280.     As early as March 2023, Marks acknowledged in a text message to Monson that *"most of*

---

[155] Exhibit 54: Morris Bart/Monson Communications

*the MMA cases we're signing up are decent,"* confirming the value of the underlying case inventory MMA had developed.[156]

281.     On March 14, 2023, Monson connected Marks with his contacts at the LDI (Paul Pendley or Charles Plattsmier) to discuss MMA.[157]

282.     In April 2023, Monson and Marks coordinated in gathering and sharing information about MMA for dissemination to media outlets, reflecting efforts to shape public narratives.

283.     On August 1, 2023, during the period in which Matthew Monson was actively coordinating with Marks, Morris Bart filed suit against MMA in the United States District Court for the Eastern District of Louisiana (the "**MB Louisiana Lawsuit**").

284.     The MB Louisiana Lawsuit sought a declaratory judgment that MMA was not entitled to any attorney's fees obtained by Morris Bart in cases formerly handled by MMA. The same day Morris Bart filed the MB Louisiana Lawsuit, Monson coordinated with Marks regarding public dissemination of the filing, which Marks expressly encouraged. Matthew Monson then publicly promoted the MB Louisiana Lawsuit on LinkedIn, stating:

> **"Never before have the most aggressive insurance defense firm (The Monson Law Firm, LLC) and the most successful plaintiff's firm in Louisiana been so aligned on issues."** [158]

285.     Throughout 2023, Monson continued providing Marks with non-public information about MMA's principals, while Marks solicited intelligence for deposition strategy against former MMA personnel.

286.     Monson escalated further by directly recruiting witnesses for Morris Bart against MMA,

---

[156] Exhibit 63: Email with Austin Marks
[157] Exhibit 63: Email with Austin Marks
[158] Exhibit 29: LinkedIn Post (May 1, 2023)

identifying former MMA employees and personally encouraging their participation in litigation adverse to MMA, expressly stating they possessed information that could "help them achieve" the objective of defeating MMA's attorneys.[159]

287.    Upon information and belief, Monson connected Austin Marks with FBI Agent Krista Bradford and Mr. Caldwell, counsel for the LDI, to further the campaign against MMA.

288.    During the pendency of the litigation between MMA and Morris Bart, Marks communicated with Agent Bradford on at least 16 occasions and exchanged at least 8 email communications with the LDI concerning MMA.[160]

289.    Monson also acted as an intermediary between media outlets and Morris Bart, facilitating communications designed to shape public perception of MMA during active litigation.

290.    Throughout 2023, Marks made disparaging public statements concerning MMA that paralleled the false statements being disseminated by Defendant Matthew Monson during the same period. Marks stated in published articles that MMA had "**lied, cheated and stole from everyone**," These statements were false.

291.    Marks's accusation that MMA "stole from everyone" mirrors the false "stealing insurance claim settlement funds" representation Matthew Monson caused to be disseminated to the LDI and incorporated into the Louisiana State Polic's Complaint, which Monson then republished on LinkedIn. The parallelism between Marks's and Monson's public characterizations of MMA reflects the coordinated nature of the public-disparagement track of the Enterprise's activity during 2023.

---

[159] Exhibit 30: Marks (witness assistance)
[160] Exhibit 61: Morris Bart's Privilege Log regarding communications with FBI Agent regarding MMA; and Exhibit 62: Morris Bart's Privilege Log regarding communications with the LDI regarding MMA.

292.     On October 16, 2023, the United States District Court for the Eastern District of Louisiana dismissed all of Morris Bart, LLC's claims against MMA in the MB Louisiana Lawsuit with prejudice.

**4.      MMA Bankruptcy Filing and Litigation Against Morris Bart**

293.     After MMA filed bankruptcy, the same pattern of communications and assistance between Mr. Marks and Monson continued in federal court proceedings involving the bankruptcy estate.

294.     MMA filed a lawsuit against Morris Bart in the Bankruptcy Case (the **"Adversary"**), and Monson covertly inserted himself into the dispute on a sustained basis, aligning himself with Morris Bart, promoting Morris Bart on LinkedIn and most importantly providing advice.

295.     Monson requested access to filings and discovery materials in the Adversary, in which he was not counsel, and transmitted those materials to the same FBI agent that Marks was communicating with regarding MMA.

296.     Specifically, on May 22, 2025, Monson sent Austin Marks an email after having reviewed the Motion for Summary Judgment that Morris Bart filed in the Adversary. In this email, Monson requested the exhibits and a copy of Mr. Moseley's transcript.[161]

297.     On November 30, 2025, Monson sent Austin Marks a message that read,

> "I just wanted to let you know that I personally and deeply appreciate the fight your firm is waging re that Houston law firm.  The rulings that are coming from the judge are preposterous. Glad you are appealing.[162]

298.     On January 23, 2026, Austin Marks provided Monson with a copy of an order from the Adversary which provides that the District Court intends on certifying questions to the Louisiana

---

[161] Exhibit 64: Email with Marks
[162] Exhibit 54: Austin Marks (Morris Bart) Text Messages

Supreme Court (the **"Certification Request"**).[163] The issue before the Court on the Certification Request delt with Morris Bart's request to have the Court determine that all of MMA's contracts with its clients are illegal as a result of its relationship with Velawcity, alleging that Velawcity is a case runner.

299.    On April 27, 2026, Morris Bart appeared before the Louisiana Supreme Court on the Certified Questions and Monson appeared as well.

### 5.    Morris Bart's Strategic Position

300.    Morris Bart operates a high-volume plaintiffs' practice in Louisiana. Unlike many of its competitors in the Louisiana plaintiffs' bar, Morris Bart conducts marketing and intake services in-house rather than through third-party intake vendors of the kind used by MMA and other Louisiana plaintiffs' firms.

301.    Similar to Monson, Morris Bart posts videos on YouTube and other social media platforms, claiming to be the first attorney to advertise in the State of Louisiana.

302.    As discussed above, Morris Bart acquired approximately 1,600 former MMA clients, and Austin Marks's contemporaneous March 2023 communication to Monson that **"most of the MMA cases we're signing up are decent"** reflects Morris Bart's recognition of the value of the case inventory MMA had developed and Morris Bart, LLC's economic interest in acquiring former MMA clients.

303.    Morris Bart's economic interest in MMA's case inventory had two dimensions. First, Morris Bart sought to acquire former MMA clients without sharing fees with MMA on the cases it took over. Second, Morris Bart's broader competitive interest in the Louisiana plaintiffs' market converged with Matthew Monson's stated objective concerning third-party-funded plaintiffs' firms

---

[163] Exhibit 54: Austin Marks (Morris Bart) Text Messages

using vendors like Velawcity.

304.    Monson has publicly characterized the litigation funding and third-party intake model as an "existential threat" to the insurance defense industry. Morris Bart, as a high-volume plaintiffs' firm relying on in-house advertising rather than third-party vendors, occupies the competitive position that benefits if third-party-vendor marketing and intake is prohibited or held to render the resulting client contracts illegal and unenforceable.

305.    In response to the Adversary, Morris Bart alleged that MMA's contracts with its clients are unenforceable claiming they were procured through Velawcity, a third-party vendor, and that MMA is therefore not entitled to any fees or expenses on the cases MMA originated, developed, and in some instances completely resolved during mediation before Morris Bart took over.

306.    The legal theory advanced by Morris Bart in the Adversary, if accepted, would extend beyond MMA. The same theory would, if accepted, render unenforceable the contracts of any Louisiana plaintiffs' firm that uses third-party marketing and intake vendors. As of the filing of this Amended Complaint, MMA is no longer a competitor of Morris Bart in the Louisiana plaintiffs' market because MMA has been driven from that market through the conduct of the Defendants alleged herein. Morris Bart's continued advancement of the legal theory therefore primarily affects competitors of Morris Bart, not MMA.

307.    On April 27, 2026, the Louisiana Supreme Court heard oral argument on certified questions transmitted by the United States District Court for the Southern District of Texas concerning, among other things, the enforceability of contingency fee contracts if procured (as Morris Bart) alleges through third-party vendors who Morris Bart calls "case runners". Monson appeared at the argument before the Louisiana Supreme Court, as did Morris Bart and Austin Marks.[164]

---

[164] The certified questions and any answers thereto are not before this Court in this action, and MMA does not, in this Amended Complaint, address the merits of the certified questions or of the underlying Morris Bart adversary

**The Anticompetitive Character of the Convergence**

308.     The legal theory advanced by Morris Bart, that contingency fee contracts entered into through third-party intake vendors are unenforceable under Louisiana law, operates to the competitive advantage of Morris Bart regardless of its ultimate disposition by the Bankruptcy Court in Texas.

309.     Morris Bart has pursued this theory not only to prevail against MMA in the Adversary, but because of the competitive advantage. It is a win-win situation for Morris Bart. If the theory is accepted, Morris Bart's will drive out its competitors in Louisiana as their contracts will be null. If Morris Bart loses, then he still wins, because he has stated that he can then hire third-party vendors himself.

310.     As late as last week, on April 22, 2026, after this Adversary was filed against Monson, he posted again on LinkedIn (where he refers to himself as the "fraud fighter" and "keynote speaker") and stated that he is "concerned" about the use of lead generators and that lead generation is obtained via massive loans to law firms from private equity firms.

311.     The convergence of Morris Bart 's competitive interest with Monson's stated objective concerning third-party-funded plaintiffs' firms is direct. Both seek the same operational outcome —elimination of the third-party-vendor intake model on which competitor plaintiffs' firms for distinct but compatible reasons. Monson seeks the outcome on behalf of Allied and the broader insurance defense industry he has publicly described as facing an "existential threat" from the

_____

proceeding. The certified-questions argument is identified here solely as evidence of the continuing convergence of Defendant Matthew Monson's interests with those of Morris Bart, LLC, and as evidence that the conduct alleged herein continues as of the date of this Amended Complaint.

model. Morris Bart seeks the outcome to either get rid of its competition or join in and hire companies like Velawcity.

312. The convergence was publicly articulated by Defendant Matthew Monson in his May 1, 2023 LinkedIn post identifying the alignment of Monson Law and Morris Bart referring to Monson Law as the most aggressive insurance defense firm that has aligned with Morris Bart, the most successful plaintiff's firm in Louisiana on the issues.

**N.     PUBLIC ADMISSION OF THE CAMPAIGN AGAINST MMA AND MISREPRESENTATIONS AND FALSE STATEMENTS**

313.    Monson has traveled throughout the country presenting a lecture and accompanying slideshow under the title *"How MMA Went Away."*[165] The cover slide further depicts an image of a boot bearing the Monson Law Firm logo kicking a boot labeled with MMA's logo.



314.    This presentation was not framed as general commentary or industry education. It was presented as a narrative account of Monson's removal of MMA from the marketplace and the events leading to that outcome. In that context, Monson's own materials and public statements

---

[165] Exhibit 6: PowerPoint

serve as a summation of the conduct described throughout this Amended Complaint, and reflect how he himself characterizes the scope and purpose of his actions over time.

315.    Against that backdrop, Monson's website further confirms how he has described the results of his conduct and the objectives he attributes to it. The Monson Law Firm's website prominently features the headline: "Defeating the largest insurance and legal scheme ever uncovered." The website attributes to Monson the following outcomes:[166]

>   (a)  Suspension of bar licenses of MMA attorneys;
>
>   (b)  Imposition of $2 million in fines by the Louisiana Department of Insurance;
>
>   (c)  MMA's $150 million bankruptcy filing; and
>
>   (d)  An ongoing federal investigation by the FBI.

316.    The same website further states that Monson's efforts to "destroy MMA" resulted in savings to the insurance industry measured in the billions of dollars. These statements remain published on Monson's website, and Monson has spent the last several years traveling the country presenting on his role in the "take down" of MMA. However, during his 2004 Exam, Monson gave testimony that is inconsistent with these regular and consistent public representations:[167]

>   **MMA's Counsel:**    You say you are responsible for taking down MMA, right?
>
>   **Monson:**    I did not take down MMA.
>
>   **MMA's Counsel:**    You didn't?
>
>   **Monson:**    No.

---

[166] Exhibit 53: Website
[167] Exhibit 23: 2004 Exam transcript (Page 136, Lines 2-6)

317. Monson's public statements at seminars, on LinkedIn and on his website are not framed as isolated litigation victories or ordinary client representation. Instead, they describe a sustained, multi-year campaign directed at MMA as an entity, and attribute to Monson responsibility for regulatory actions, disciplinary proceedings, judicial outcomes, bankruptcy, and criminal investigation activity affecting MMA.

318. Monson posted extensively about MMA on LinkedIn under his personal account and under The Monson Law Firm's firm account. He gave interviews to industry reporters about MMA. He posted commentary about MMA on The Monson Law Firm's public-facing website, including statements that the firm "destroyed MMA," that the firm "stopped MMA's unethical insurance litigation scheme," and that those efforts generated "savings to the insurance industry measured in the billions of dollars." He presented himself publicly as the person responsible for MMA's regulatory penalties, bar suspensions, bankruptcy filing, and criminal investigation, and he promoted his law firm commercially on that basis.

319. Viewed together with the conduct described throughout this Amended Complaint, these admissions confirm that Monson's actions were not limited to traditional adversarial representation in individual matters, but instead formed part of a coordinated and sustained effort undertaken with Allied's knowledge, with assistance from his wife in filing the Class Action, and pursuant to their collective agreement to target MMA's operations as a whole.

### O. INTERFERENCE WITH MMA'S CONTRACT WITH ITS ATTORNEYS

320. On September 1, 2023, EAJF filed suit against MMA in Texas state court alleging breach of contract arising from a litigation funding loan (the **"EAJF Litigation"**). EAJF sought damages in an amount exceeding $30 million.

321.     Separately, PCG Consulting, LLC, an estimator that had performed work on certain MMA client matters, filed suit against MMA and, on December 19, 2023, obtained a default judgment against MMA (the **"PCG Litigation"**).

322.     MMA retained Phelps Dunbar LLP to represent it in both the EAJF Litigation and the PCG Litigation. Phelps Dunbar LLP appeared as counsel for MMA in both matters.

323.     Monson was closely monitoring the pleadings filed in both the PCG Litigation and the EAJF Litigation and was posting about the cases on LinkedIn.  On February 24, 2024, Monson posted a message on LinkedIn stating: "On February 16, 2024, MMA filed a Motion to Set Aside Default Judgment and For New Trial on the default judgment rendered against them on December 19, 2023 in the lawsuit filed by PCG Consulting. **MMA is represented by the reputable firm Phelps Dunbar LLP, who also represents the insurance industry on many matters**." (the **"Phelps Post"**).[168]

324.     Monson included an embedded hyperlink directing readers to Phelps Dunbar LLP in the Phelps Post.

325.     Within days of Monson's Phelps Post, Phelps Dunbar contacted MMA and apologized profusely stating that they discovered a conflict and needed to withdraw from representation in all cases. On March 5, 2024, Phelps Dunbar filed a pleading to withdraw as MMA's counsel in the PCG Litigation, and on March 18, 2024, Phelps Dunbar filed a motion to withdraw in the EAJF Litigation.

326.     On March 12, 2024, Matthew Monson exchanged text messages with Steven Badger, an insurance defense attorney with whom Matthew Monson continuously corresponded with

---

[168] Exhibit 29: LinkedIn Post

concerning MMA. Mr. Badger wrote: "I was surprised to see Phelps take the assignment to begin with. But any idea why they are actually withdrawing?" Matthew Monson responded: "Yes, I believe they were alerted to the representation by my previous post, which hyperlinked to their firm. I believe they did **not** have a direct conflict, but that politically they knew they couldn't be associated. *Many people in London* see my posts, so it wouldn't surprise me if they had conversations." When Mr. Badger replied, "makes sense," Matthew Monson wrote: "can't say that wasn't my intended result with the hyperlink."[169]

327.     Matthew Monson's reference in the text message with Badger to "people in London" who would "see my posts" tracks Matthew Monson's own prior admission that he had traveled to London, specifically to Lloyd's of London, with Louisiana Insurance Commissioner Jim Donelon, and that MMA was discussed during the course of their meetings at Lloyd's of London.

328.     Lloyd's of London is the historical center of the insurance and reinsurance market, and the London market is a principal source of reinsurance capacity for insurance defense work of the kind performed by Phelps Dunbar LLP for its insurance industry clients.

329.     Matthew Monson's contemporaneous admission that he intended his LinkedIn Phelps Post to cause the withdrawal of Phelps Dunbar as MMA's counsel, his acknowledgment that the post was designed to reach "people in London" who would cause pressure on Phelps Dunbar, and his documented personal presence in the London insurance market reflect Matthew Monson's conscious effort to interfere with MMA's engagement of counsel and to impair MMA's ability to defend itself in pending litigation.

330.     The interference occurred at a period when MMA was facing litigation from its principal

---

[169] Exhibit 48 – Text messages with Badger

litigation funders in an amount exceeding $30 million and was defending against a default judgment entered in favor of PCG Consulting, LLC. MMA does not, by this pleading, allege any improper conduct by Phelps Dunbar LLP, and the allegations set forth herein are directed at the Defendants' intentional interference with MMA's engagement of counsel.

331.     Following Phelps Dunbar LLP's March 18, 2024 withdrawal in the EAJF Litigation, MMA was unable to afford and timely secure replacement counsel. EAJF thereafter filed a motion for summary judgment against MMA in the EAJF Litigation seeking judgment in an amount exceeding $30 million (the **"MSJ"**).

332.     The hearing on EAJF's MSJ was set for April 9, 2024. MMA, without counsel to oppose the MSJ and facing the imminent entry of a judgment in excess of $30 million, was forced to file bankruptcy on April 9, 2024. The timing and emergency posture of MMA's chapter 11 filing were the direct and proximate result of Monson's interference with MMA's engagement of Phelps Dunbar LLP, and of the resulting loss of MMA's counsel at a moment when continuity of counsel was indispensable to MMA's defense of the EAJF Litigation.

**P.     FALSE AND INTENTIONALLY MISLEADING STATEMENTS REGARDING MMA**

**1.     LinkedIn Post**

333.     On April 29, 2023, Monson posted on his public LinkedIn, stating that USAttorneys.com appeared to be an attorney referral service and shared the same physical address as MMA. Later that same day, Monson sent a text message to Badger, stating, "I just posted. The questions I raised were carefully worded based on a conversation with one of their key employees today."[170]

334.     Monson's post intentionally suggested a connection between MMA and USAttorneys.com

---

[170] Exhibit 48: Text Message with Badger; and Exhibit 29: LinkedIn Post from April 29, 2023

(a marketing firm that appears to be similar to Velawcity); however, MMA had no affiliation with that company. The only apparent overlap was that both entities maintained offices in the same building, which housed numerous unrelated tenants. Monson's statement to Badger that he had "carefully worded" the post after speaking with one of the company's key employees confirms that Monson had information clarifying the lack of any actual relationship between MMA and USAttorneys.com at the time he made the post. Monson intentionally crafted the post to create a misleading impression and to harm MMA's reputation.

## 2.    **False Campaign Bribe Allegations**

335.    On February 20, 2025, three weeks after the Order Reversing LDI Sanctions, Matthew Monson publicly stated that the then-Attorney General of Louisiana had taken no action against MMA because he was running for governor at the time, had received $155,000 in campaign donations from MMA, and had "looked the other way." [171]

336.    Matthew Monson then referred to the current Governor of Louisiana, stating: "**even the new attorney general has not taken any action, unfortunately that person is now our governor and has shown that essentially is very close with the plaintiff's community and we're talking about a conservative MAGA type governor.**" [172]

337.    Monson's statement was false. MMA did not pay the Louisiana Attorney General, or any other public official, $155,000, and MMA has never made any payment of any amount to any public official in exchange for favorable treatment in any regulatory, disciplinary, or prosecutorial matter. MMA's lawful political contributions to the former Attorney General did not exceed $5,000 in the aggregate, a fraction of the figure Monson publicly asserted and well within ordinary,

---

[171] https://www.youtube.com/watch?v=O_6acWsU7Hw (19:46 through 20:24)
[172] https://www.youtube.com/watch?v=O_6acWsU7Hw (19:46 through 20:24)

publicly disclosed campaign activity. Monson made the statement to a public audience, and he made it with knowledge of its falsity or with reckless disregard for the truth.

**3.      False Allegations of Biggest Insurance Fraud**

338.    On March 17, 2024, at the Insurance Conference, Monson stated as a fact that MMA *"is the biggest insurance fraud that has ever been busted.*" That statement was false when made.

339.    In 2025, Monson was interviewed on YouTube by the InsurTech Geek Podcast for an episode titled, *"The Unethical Practices Threatening Insurance Claims with Matthew Monson from the Monson Law Firm"*. During this interview, Monson again stated, that he "busted one of the biggest insurance and legal schemes in US history".[173] That statement was false when made. Matthew Monson made the statement for the purpose of disparaging MMA's business and of promoting his own firm commercially.

340.    At the same Insurance Conference, Monson stated as a fact that his bar complaints had resulted in the <u>disbarment</u> of MMA attorney William Huye.[174] That statement was false when made. Mr. Huye has never been disbarred by the Louisiana Office of Disciplinary Counsel or by any other state bar authority. The disciplinary action procured in part through Matthew Monson's bar complaints resulted in an interim suspension, not a disbarment.

341.    Monson, as the attorney who had personally filed the underlying bar complaints and who had coordinated extensively concerning the disciplinary proceedings, had actual knowledge of the true disposition of the proceedings at the time he made the false statement. Furthermore, Monson

---

[173] Presentation by Monson on March 18, 2024; and https://www.youtube.com/watch?v=O_6acWsU7Hw – YouTube Video on or about February 20, 2024 – "The Unethical Practices Threatening Insurance Claims with Matthew Monson from the Monson Law Firm".

[174] March 17, 2024 Conference: 2024 PLRB Claims Conference in Boston, MA: Monson presented a lecture titled, "Litigation Harvesting: How MMA Went Away

is a licensed attorney and presumably knows the difference between suspension and disbarment.

## Q.      DAMAGES

342.      As a direct result of the conduct described in this Amended Complaint, MMA has suffered the following concrete and quantifiable injuries to its business and property:

(a)  Loss of the full value of MMA's contingent fee entitlements in the Allied Cases;

(b)  Loss of the full value of MMA's contingent fee entitlements in the cases affected by the Stay Order;

(c)  Loss of the full value of MMA's contingent fee entitlements and *Saucier*/*O'Rourke* apportionment rights in all of the Louisiana hurricane cases (approximately 11,000) assumed by other successor counsel, including but not limited to Morris Bart;

(d)  Loss of the value of MMA's Louisiana law practice, including its investment in marketing, intake, case development, and client acquisition;

(e)  Loss of MMA's funding relationship with EAJF and related entities;

(f)  Loss of co-counsel, referral, and lender relationships in both Louisiana and Texas;

(g)  Attorneys' fees and costs incurred in defending the bar complaints, the LDI Complaint, the Class Action, the lawsuits filed by various creditors including EAJF, and the related regulatory and disciplinary proceedings;

(h)  Inability to pay its creditors, including but not limited to EAJF, and the remaining creditors who have filed proofs of claim in the Debtor's bankruptcy case in the approximate amount of $90 million;

(i)   Attorneys' fees and costs incurred in MMA's chapter 11 bankruptcy proceeding and in this Adversary Proceeding arising from the conduct described above;

(j)   Loss of goodwill and business reputation of a magnitude that destroyed MMA's ability to continue its Louisiana operations and forced its chapter 11 filing on April 9, 2024; and

(k)   Future revenue in an amount to be determined at trial through expert testimony.

## CAUSE OF ACTION NO. 1: VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATION ACT, 18 U.S.C.  1962(c)

## I.   SPECIFIC FACTS INCORPORATED INTO CAUSE OF ACTION NO. 1

343.   MMA incorporates by reference the following factual allegations and exhibits as if fully set forth herein in support of Cause of Action No. 1.

(a)   The Louisiana Case Management Orders and Streamlined Settlement Process;[175]

(b)   Allied's rejection of Nicholas Arnold's lawful pre-litigation settlement proposal in favor of Matthew Monson's campaign to "go on the attack" and Monson's admissions that he was working with Allied to accomplish its goals;[176]

(c)   The October 20, 2022 Show Cause Hearing in the Western District of Louisiana, the preceding *ex parte* communications between Matthew Monson and Judge Cain, and the resulting Stay Order;[177]

(d)   The Suspension Order and Fee Order, both later vacated by the Fifth Circuit;[178]

---

[175] See Paragraphs 15 -28
[176] See Paragraphs 49 – 60
[177] See Paragraphs 61- 88
[178] See Paragraphs 89 -96

(e)  Katherine Monson's manufactured Class Action and her sworn proof of claim in this bankruptcy case;[179]

(f)  The various bar complaints filed with the Louisiana Office of Disciplinary Counsel against MMA and its attorneys by Monson and a second attorney at Monson Law;[180]

(g)  False allegations made to the LDI that MMA was deceiving individuals and stealing insurance claim settlement funds, the LDI Complaint and the May 1, 2023 LDI Order, later vacated for lack of jurisdiction;[181]

(h)  *Ex Parte* communications with Magistrate Judge North in the Eastern District of Louisiana;[182]

(i)  Matthew Monson's communications with the Louisiana State Police and the FBI;[183]

(j)  False public statements concerning MMA, including the "biggest insurance fraud" statements, and the false "disbarment" statement;[184]

(k)  The damages described in the Amended Complaint; and[185]

(l)  The strategic convergence of Morris Bart, LLC's competitive interest in eliminating Louisiana plaintiffs' firms that use third-party intake vendors with Monson's stated objective concerning the same model; Marks's published

---

[179] See Paragraphs 97-119
[180] See Paragraphs 120 – 139, 145-148
[181] See Paragraphs 149- 175
[182] See Paragraphs 176-210
[183] See Paragraphs 211-235
[184] See Paragraphs 338-341
[185] See Paragraph 342

statements concerning MMA, including statements that MMA had "lied, cheated and stole from everyone"; Morris Bart, LLC's April 4, 2023 letter campaign to MMA Clients containing materially false representations and procuring approximately 1,600 client transfers; and the coordinated communications and activities between Defendant Matthew Monson and Austin Marks, on behalf of Morris Bart, LLC, identified herein.[186]

## II.   RICO CLAIM UNDER 18 U.S.C. § 1962(c)

### A.   STATUTORY FRAMEWORK

344.   RICO makes it unlawful for any person employed by or associated with any enterprise engaged in, or whose activities affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity. 18 U.S.C. § 1962(c).

345.   RICO further provides that any person injured in his business or property by reason of a violation of § 1962 may bring a civil action and recover treble damages. 18 U.S.C. § 1964(c).

346.   To state a claim under § 1962(c), a plaintiff must allege that a defendant engaged in (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985).

### B.   RICO PERSONS

347.   A RICO person includes "any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3).

348.   Matthew Monson is a natural person and a RICO "person" within the meaning of 18 U.S.C. § 1961(3) and is an individual capable of holding a legal or beneficial interest in property.

---

[186] Paragraphs 268-312

349.   Monson Law is a Louisiana limited liability company with its principal place of business in Louisiana and is a RICO "person" within the meaning of 18 U.S.C. § 1961(3).

350.   Allied is an insurance company authorized to conduct business in Louisiana and is a RICO "person" within the meaning of 18 U.S.C. § 1961(3).

351.   Defendant Katherine Monson is a natural person and a RICO "person" within the meaning of 18 U.S.C. § 1961(3).

## C.     THE ENTERPRISE

352.   An "enterprise" is defined as including any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity. 18 U.S.C. § 1961(4)

353.   An association-in-fact enterprise requires only three structural features: a purpose, relationships among those associated with the enterprise, and sufficient longevity to pursue that purpose. *Boyle v. United States*, 556 U.S. 938, 946 (2009).

354.   Matthew Monson, Monson Law, Katherine Monson, and Allied, together with other persons known and unknown, formed and operated an association-in-fact enterprise (the **"Enterprise"**) within the meaning of 18 U.S.C. § 1961(4).

### 1.     Non-Defendant Participants in the Association-in-Fact Enterprise

355.   Under *Boyle v. United States*, 556 U.S. 938, 946 (2009), an association-in-fact enterprise may include persons who are not named as defendants.

356.   The Enterprise alleged in this Amended Complaint includes the four Defendants and certain non-defendant participants whose conduct is alleged as part of the operation of the Enterprise's affairs. Among the non-defendant participants are Austin Marks and the law firm of Morris Bart, LLC. The factual allegations concerning Marks and Morris Bart, LLC set forth in this

Amended Complaint are pled to describe the operation of the Enterprise's affairs and the pattern of activity through which the Enterprise has operated. They are not pled as factual or legal conclusions of culpability against Marks or Morris Bart, LLC. MMA does not, in this Amended Complaint, assert any claim against Austin Marks or Morris Bart, LLC.

357.     MMA's claims against Morris Bart, LLC for fee apportionment under Louisiana law and for violations of the automatic stay are pending in a separate adversary proceeding (Adv. No. 24-03127) and are not before this Court in this action. The merits of that separate proceeding, including the certified questions transmitted to the Louisiana Supreme Court (No. 2026-CQ-00161), are not before this Court in this action and the allegations in this Amended Complaint do not address the merits of those questions.

D.     **COMMON PURPOSE OF THE ENTERPRISE**

358.     The members of the Enterprise shared the common purpose of impairing MMA's ability to function as a plaintiffs' firm. That common purpose is reflected in, among other things: Monson's public characterization of third-party litigation funding and court-ordered mandatory mediation as an "existential threat" to the insurance defense industry; Allied's strategic decision, made in coordination with Monson, to pursue a course of conduct directed at MMA itself rather than at the resolution of individual hurricane-claim cases where MMA represented the plaintiffs; Monson's lecture titled "Litigation Harvesting: How MMA Went Away," in which he described the campaign with Allied to dismantle MMA as a model for the insurance defense industry; and the coordinated use of bar complaints, complaint filed with the LDI, *ex parte* court communications, social and traditional media attacks, reports and misrepresentations to law enforcement, and the class action filed by Katherine Monson to apply pressure across multiple forums.

## III.  PATTERN OF RACKETEERRING ACTIVITY

### A.   STATUTORY DEFINITIONS AND REQUIREMENTS

359.    "Racketeering activity" includes the predicate acts listed in 18 U.S.C. § 1961(1), including mail fraud, wire fraud, and obstruction of justice. 18 U.S.C. § 1961(1).

360.    A "pattern of racketeering activity" requires at least two predicate acts within ten years. 18 U.S.C. § 1961(5).

361.    Congress intended a fairly flexible concept of a pattern in mind. *H.J., Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239, (1989).

362.    As set forth below, Defendants committed numerous predicate acts of mail fraud, wire fraud, and obstruction of justice in furtherance of the Enterprise's common purpose.

### B.   MAIL FRAUD - 18 U.S.C. § 1341

363.    Each mailing identified below was made by Defendants, or caused to be made by Defendants, in furtherance of their scheme.

### i.   **Monsons' Bar Complaint**

364.    Matthew Monson publicly admitted that filing numerous bar complaints against MMA were valuable not because they have merit, but because they forced MMA to respond and take MMA "off their game and off their mission."

365.    On August 3, 2022, Monson, individually and on behalf of Katherine Monson, caused a written disciplinary complaint against MMA and substantially every MMA attorney, including William Huye, to be sent by certified United States mail to the Louisiana Office of Disciplinary Counsel in Baton Rouge, Louisiana (the **"Monsons' Bar Complaint"**) (Certified Mail No. 7021-1970-0001-1175-0879).

366.    Monsons' Bar Complaint asserted that Katherine Monson was confused when she received

an "unsolicited" text message advertising MMA's services and that this contact constituted barratry and improper solicitation.

367. That representation was materially false. As alleged herein, Matthew Monson was present when the message was received, directed Katherine Monson to click the link, complete the intake questionnaire, and continue the engagement, and later admitted at the 2024 PLRB Insurance Conference that he stood over his wife's shoulder and instructed her throughout the intake process.

368. On April 15, 2025, the corporate representative of Velawcity testified under oath that Katherine Monson affirmatively opted in to receive text communications by submitting her information through a website, and that the system could not be used to send unsolicited text messages.

369. The Monsons' Bar Complaint was a foundational instrument of the scheme. Monson publicly stated that the disciplinary action obtained against MMA's lead Louisiana counsel, procured through this complaint, led directly to MMA's removal from the Western District of Louisiana.

370. The mailings described above were essential to achieving that disciplinary outcome and advancing the scheme to deprive MMA of its Louisiana law practice and contingent fee interests.

371. The Monsons' Bar Complaint mailings were made on behalf of Allied within the meaning of 18 U.S.C. § 1341. Matthew Monson testified under oath at his Rule 2004 examination that he filed bar complaints on behalf of Allied and that there were several such complaints. In written communications responding to a former MMA attorney, Monson confirmed that the complaints were filed on behalf of an insurer client that was steadfast in its desire to maintain them.

372. Allied is liable for each of the bar complaint mailings because Matthew Monson and The Monson Law Firm, LLC acted as its agents and in furtherance of the joint scheme.

373.     Katherine Monson is liable for the mailing of the Monsons' Bar Complaint. The complaint was submitted in her name and relied on representations regarding her purported confusion upon receiving a text message. Those representations were false and known to be false at the time, as she had affirmatively opted in to the communication and acted under the direction of Matthew Monson with no confusion. The Monsons' Bar Complaint served as a foundational step in the scheme, which she later expanded by filing the Class Action and Amended Class Action described below.

ii.     **The Lam Bar Complaint**

374.     On August 26, 2022, Lauren Lam, an attorney then employed by The Monson Law Firm, LLC and working under the supervision of Matthew Monson, caused a written disciplinary complaint against MMA to be deposited in the United States mail, addressed to the Louisiana Office of Disciplinary Counsel in Baton Rouge, Louisiana (the **"Lam Bar Complaint"**). The Lam Bar Complaint was sent via certified mail No. 7021-1970-0001-1175-2095.

375.     The Lam Bar Complaint was substantially identical in form and substance to the Monsons' Bar Complaint, including the assertion that Ms. Lam was "confused" upon receiving an allegedly unsolicited text message from MMA.

376.     That assertion was materially false. As set forth above, the Velawcity corporate representative testified under oath that recipients affirmatively opt in to receive such communications and that the system cannot be used to send unsolicited text messages. The falsity of the "unsolicited text" narrative is further confirmed by Matthew Monson's own admissions regarding the intake process.

377.     The Lam Bar Complaint was the third nearly identical disciplinary complaint filed within a matter of weeks. It was generated from within The Monson Law Firm and was intended to create

the appearance of independent complaints when, in fact, each bar complaint was part of the same coordinated scheme directed by Matthew Monson.

378.    For the same reasons set forth above, the Lam Bar Complaint mailings were made on behalf of Allied within the meaning of 18 U.S.C. § 1341. Matthew Monson testified under oath at his Rule 2004 examination that he filed multiple bar complaints on behalf of Allied. Allied is therefore liable for these mailings because Matthew Monson and The Monson Law Firm, LLC acted on Allied's behalf and in furtherance of the joint scheme.

### iii.    The Caffarel Bar Complaint

379.    On August 26, 2022, The Monson Law Firm, LLC filed a disciplinary complaint on behalf of the Caffarels (the **"Caffarel Bar Complaint"**) by depositing it in the United States mail addressed to the Louisiana Office of Disciplinary Counsel in Baton Rouge, Louisiana. The complaint was sent via certified mail/return receipt requested No. 7021-1970-0001-1175-0091.

380.    The Caffarel Bar Complaint alleged that MMA prevented the Caffarels from using insurance proceeds to repair their home, that MMA's inclusion as a payee on insurance checks prevented negotiation of those checks, and that the Caffarels were therefore unable to proceed with necessary roof repairs. It further alleged that this was not an isolated incident and that MMA engaged in improper solicitation of unsuspecting homeowners.

381.    Each of these allegations was materially false. Monson admitted that MMA negotiated the checks at issue, directly contradicting the claim that MMA prevented the Caffarels from accessing or using the insurance proceeds.

382.    The allegations regarding a pattern of improper solicitation are likewise false.

383. As with the other bar complaints, the Caffarel Bar Complaint was part of the same coordinated scheme. Matthew Monson has publicly stated that the disciplinary action against MMA's lead Louisiana counsel, procured in part through these complaints, led to MMA's removal from the Western District of Louisiana. The mailings were essential to advancing that objective and to depriving MMA of its Louisiana practice and contingent fee interests.

384. The Caffarel Bar Complaint mailings were made on behalf of Allied within the meaning of 18 U.S.C. § 1341. Matthew Monson testified under oath that he filed bar complaints on behalf of Allied and that there were several such complaints. In written communications, he confirmed that the complaints were filed on behalf of an insurer client rather than the individual complainants.

385. Monson further admitted that the Caffarels had been paid prior to his representation, that he represented them on a pro bono basis, and that he had never met or spoken with them. These facts further demonstrate that the Caffarel Bar Complaint was not an independent grievance, but part of the broader scheme.

### iv. LDI Complaint (Louisiana Department of Insurance)

386. On August 26, 2022, Matthew Monson, acting on behalf of and with the authorization of Allied, caused a written complaint concerning MMA to be transmitted by United States mail to the Louisiana Department of Insurance (the "LDI Complaint"). The complaint was purportedly filed on behalf of the Caffarels and was sent via certified mail/return receipt requested No. 7021-1970-0001-2838-8690.

387. In the LDI Complaint, Monson represented that, as a result of MMA's misrepresentations to an insurance company, the Caffarels were prevented from using insurance proceeds to repair their home. That representation was materially false.

388. Monson knew the statement was false when it was made. Monson has also testified under

oath that MMA received and endorsed the insurance check, confirming that the statements in the LDI Complaint were false when made.

389.     Monson further knew at the time he filed the LDI Complaint that the Louisiana Department of Insurance lacked jurisdiction over law firms, yet filed it anyway to harass MMA.

390.     On May 1, 2023, the Louisiana Department of Insurance issued an order imposing a $2 million fine on MMA based in material part on the misrepresentations in the LDI Complaint. On January 31, 2025, that order was vacated by Louisiana state courts for lack of jurisdiction.

391.     In the LDI Complaint, Monson falsely represented that as a result of MMA's misrepresentations to an insurance company, the Caffarels were prevented from using insurance claim funds to repair their home. This was a false statement.

392.     Monson knew it was a false statement when it was made in the LDI Complaint, and Monson has stated that the LDI Complaint (although written on behalf of the Caffarels) was actually filed for Allied's benefit to further their stated purpose described above.  Furthermore, Monson has testified under oath that MMA endorsed the settlement check for the Caffarels.

393.     Monson knew when he filed the LDI Complaint that the LDI had no jurisdiction over law firms. On May 1, 2023, the LDI issued an order imposing a $2 million fine on MMA based in material part on those misrepresentations. The LDI Order was vacated for lack of jurisdiction by the Louisiana state courts on January 31, 2025.

**v.      Conclusion as to Mail Fraud Predicate Acts**

394.     The foregoing bar complaints and the LDI Complaint constitute a series of coordinated mailings made in furtherance of Defendants' scheme to defraud MMA. Each was transmitted through the United States mail, contained materially false statements, and was intended to trigger regulatory and disciplinary action against MMA in order to disrupt its business and deprive it of

its legal practice and contingent fee interests.

395.     The lack of merit underlying these submissions is confirmed by their ultimate disposition: the $2 million sanctions order issued by the LDI, premised on the LDI Complaint, was vacated for lack of jurisdiction, and the bar complaints against the majority of MMA's attorneys were dismissed for insufficient evidence.

396.     These outcomes further demonstrate that the mailings were not legitimate grievances, but instruments of a coordinated scheme carried out through the use of the mails in violation of 18 U.S.C. § 1341.

**C.      WIRE FRAUD (18 U.S.C. § 1343)**

397.     Defendants devised and executed a scheme to defraud MMA and, in furtherance of that scheme, transmitted or caused to be transmitted numerous communications by interstate wire, including emails, electronic court filings, text message, social media publications, and other digital transmissions containing materially false representations.

**1.      Bar Complaints and LDI Complaint (Electronic Transmission)**

398.     The Bar Complaints described above, including the Monsons' Bar Complaint, the Lam Bar Complaint, and the Caffarel Bar Complaint, together with all related factual allegations related to mail fraud discussed above, are incorporated herein as predicate acts of wire fraud.

399.     The LDI Complaint described above, together with all related factual allegations, is likewise incorporated herein as a predicate act of wire fraud.

400.     In addition to being transmitted by United States mail, the Bar Complaints and the LDI Complaint were transmitted by interstate wire, including email, on or about the same dates they were mailed.

401.     In addition, on August 26, 2022, Matthew Monson transmitted the LDI Complaint by email

to Nathan Strebeck of the Louisiana Department of Insurance at Nathan.strebeck@ldi.law.gov.

402.     Monson further transmitted replies and supplemental communications concerning the Bar Complaints and the LDI Complaint by email, which repeated and reinforced the materially false allegations contained in the original submissions.

**2.      Electronic Filing of Class Action and Amended Complaint**

403.     On March 14, 2023, Katherine Monson, through counsel and in coordination with Matthew Monson, caused to be transmitted by interstate wire through the PACER/CM-ECF system a Class Action complaint in *Katherine Monson v. McClenny Moseley & Associates, PLLC, et al.*, Case No. 4:23-cv-00928 (S.D. Tex.), seeking damages in excess of $5,000,000 (the **"Class Action"**).

404.     Matthew Monson participated in and orchestrated the filing of the Class Action in coordination with Katherine Monson, including securing counsel for Katherine Monson.

405.     The Class Action complaint contained materially false representations that Katherine Monson received an unsolicited text message from MMA and was confused by the communication. As established by Velawcity testimony, she affirmatively opted in to receive the message.

406.     On April 3, 2024, Katherine Monson later caused to be transmitted by interstate wire an Amended Class Action Complaint against MMA, adding EAJF (MMA's lender) as an additional defendant, and repeating the same materially false representations.

407.     Each subsequent filing in the Class Action, including motions, briefs, and pleadings transmitted by interstate wire from March 14, 2023 through dismissal with prejudice on October 1, 2025, that repeated or relied upon the false "unsolicited text" narrative constitutes a separate predicate act.[187]

---

[187] Exhibit 65: Docket from Class Action with each filing made by Katherine Monson

### 3.      Katherine Monson's Sworn Proof of Claim

408.      On August 13, 2025, Katherine Monson transmitted by interstate wire a sworn Proof of Claim (the **"POC"**) in MMA's bankruptcy proceeding seeking damages in excess of $5 million based on alleged unlawful solicitation.

409.      The Proof of Claim repeated under oath the same materially false representations contained in the Class Action and the Amended Class Action. These were false representations as established above with respect to the Class Action, and are incorporated herein with respect to the POC.

### 4.      The "Stealing Settlement Funds" Misrepresentation

410.      The Louisiana State Police Initial Complaint Report dated October 17, 2023 attributes to Matthew Monson the statement that MMA stole insurance settlement funds. This statement was false.

411.      Monson admitted at the 2004 Exam that he has no personal knowledge of MMA stealing a single penny from any client.

412.      However, Matthew Monson republished this accusation by interstate wire through a LinkedIn post to a nationwide audience exceeding 18,000 followers. The post remains publicly available as of April 27, 2026, and each day of continued publication constitutes a continuing transmission in furtherance of the scheme.

### 5.      False Communications to LDI Officials

413.      Matthew Monson transmitted by interstate email and text message to LDI officials, including Nathan Strebeck, the materially false assertion that MMA used unlicensed adjusters in all of its cases.

414. That statement was false and made with reckless disregard for the truth.

415. Between August 2022 and May 1, 2023, Matthew Monson transmitted additional communications by interstate wire to LDI officials characterizing MMA's conduct as insurance fraud, despite his knowledge that the underlying factual assertions were untrue and that the LDI lacked jurisdiction over law firms.

**6.     False Public Statements and Commercial Self-Promotion**

416. On May 2, 2023, Matthew Monson transmitted by interstate wire a LinkedIn post stating that MMA had committed insurance fraud and that the LDI had taken action in response to his complaint. That statement was false. The LDI lacked authority to adjudicate such claims, and its order was later vacated for lack of jurisdiction.

417. On March 17, 2024, at the PLRB Insurance Conference, Matthew Monson stated that MMA was the largest insurance fraud ever uncovered. This statement was transmitted by interstate wire and later disseminated through online platforms. It was false. At the same conference, Matthew Monson falsely stated that his bar complaints resulted in the disbarment of MMA attorney William Huye, when in fact no disbarment occurred.

418. On February 20, 2025, Matthew Monson transmitted by interstate wire a statement that falsely claimed he had exposed one of the largest insurance and legal schemes in United States history.

**7.     Transmission of Confidential and Misappropriated Materials**

419. Matthew Monson transmitted confidential disciplinary materials and proprietary MMA documents obtained through improper means by interstate wire, including through email and social media.

420. Monson admitted that he received Huye's confidential response to the ODC from the ODC and then published it on LinkedIn.

421. In addition, Monson sought out former MMA employees and obtained confidential and proprietary business information regarding MMA, its business model and its relationship. Monson then transmitted these material via email to the FBI, referring to these documents as evidence of fraud.

422. On June 23, 2023, Matthew Monson transmitted by interstate text message to FBI Special Agent Krista Bradford a proprietary MMA PowerPoint regarding MMA's four-year strategy and business plan, obtained from a former MMA employee outside any lawful discovery process. The transmission was made in furtherance of a scheme to procure federal investigative scrutiny of MMA on the basis of materials misrepresented as evidence of fraud, when in fact the document was a confidential business strategy document of no fraudulent character.

423. On May 7, 2024, Matthew Monson transmitted by interstate e-mail to Special Agent Bradford client spreadsheets obtained from a former MMA employee — confidential, proprietary client data not obtained through lawful discovery in any matter to which Allied was a party. The transmission was made in furtherance of a scheme to misrepresent MMA's confidential client data as evidence of fraud.

424. Each transmission of such materials was made in furtherance of a scheme involving deception, including mischaracterizing confidential documents as evidence of fraud.

**8.      "LDI Just Dropped the Hammer" LinkedIn Post**

425. On May 2, 2023, Matthew Monson transmitted by interstate wire a LinkedIn post stating: "In direct response to the complaint I filed with LDI in 9-22, the LDI just dropped the hammer on

MMA **for insurance fraud they committed.**" The factual assertion that MMA had "committed" insurance fraud was false. The Louisiana Department of Insurance had no authority to adjudicate "insurance fraud" by a law firm, and the resulting LDI Order was vacated for lack of jurisdiction on January 31, 2025.

426.     The transmission was made by interstate wire to a nationwide professional audience for the purpose of disparaging MMA's business and amplifying the false narrative.

### 9.     Conclusion as to Wire Fraud Predicate Acts

427.     The foregoing interstate wire transmissions were not isolated communications, but part of a coordinated and ongoing scheme to defraud MMA. Defendants repeatedly used email, electronic court filings, social media platforms, websites, and other interstate communication channels to disseminate materially false statements, advance fabricated narratives, and trigger regulatory, judicial, and public pressure against MMA.

428.     Each transmission was made in furtherance of the Enterprise's objective to impair MMA's business operations, damage its reputation, and deprive it of its legal practice and contingent fee interests. The volume, repetition, and consistency of these misrepresentations demonstrate both continuity and relatedness, satisfying the pattern requirement under RICO and constituting multiple predicate acts of wire fraud in violation of 18 U.S.C. § 1343.

### D.     OBSTRUCTION OF JUSTICE (18 U.S.C. § 1503)

429.     In furtherance of the Enterprise's scheme, Defendants corruptly endeavored to influence, obstruct, and impede the due administration of justice in a pending federal judicial proceeding.

### 1.     Judge Cain – Ex Parte Communications

430.     On October 12, 2022, the United States District Court for the Western District of Louisiana initiated a Show Cause proceeding before Judge James D. Cain, Jr. concerning MMA. This was a

pending federal judicial proceeding within the meaning of 18 U.S.C. § 1503, and Matthew Monson had knowledge of it.

431.    In the days immediately preceding the October 20, 2022 hearing, Matthew Monson engaged in an undisclosed *ex parte* communication with Judge Cain regarding MMA. This communication occurred outside the adversarial process, without notice to MMA, and without any corresponding filing.

432.    During that *ex parte* communication, Matthew Monson presented multiple materially false factual representations concerning MMA, including allegations regarding improper mass settlements, unlawful solicitation practices through Velawcity, and improper advertising.

433.    Each of these representations was false and was made with knowledge of falsity or reckless disregard for the truth. Each was presented as established fact, without evidentiary support and without opportunity for adversarial testing.

434.    The *ex parte* communication was undertaken with corrupt intent to influence the Court's handling of the Show Cause proceeding and to procure adverse judicial action against MMA.

435.    The following day, during the Show Cause hearing, Judge Cain repeated and relied upon the same factual narratives introduced by Matthew Monson, using language reflecting information obtained outside the record, including statements such as "I've already heard," "my understanding," and similar phrasing.

436.    On October 21, 2022, the Court entered a Stay Order imposing sanctions, requiring production of materials, and staying approximately 1,600 cases. The *ex parte* conduct had a direct nexus to the pending proceeding and had the natural and probable effect of influencing the Court's actions, which it did.

437.    Matthew Monson later admitted that he used the *ex parte* interaction to present materials

to the Court and to influence the Court's perception of MMA and referred to it as "an opportunity".

438.     This conduct constituted a corrupt endeavor to influence and impede the due administration of justice in violation of 18 U.S.C. § 1503. At all relevant times, Matthew Monson acted within the course and scope of his role at The Monson Law Firm, LLC and on behalf of Allied. His conduct is therefore attributable to both.

439.     Each materially false representation made during the *ex parte* communication constitutes a separate predicate act of obstruction of justice.

440.     The resulting Stay Order led directly to subsequent orders, including the Suspension and Fee Orders, both of which were later vacated by the Fifth Circuit for lack of due process.

**2.     Monson's "Agent of the Government" Admission Establishes Corrupt Intent**

441.     Matthew Monson's contemporaneous understanding of the obstructive character of his conduct is established by his own admission, transmitted by interstate text message in August 2023 to attorney Steven Badger. Mr. Badger had asked Matthew Monson for FBI Special Agent Krista Bradford's contact information. Matthew Monson provided it, accompanied by the following warning:

"**HOWEVER, please be careful. The whole thing can get blown up if we are considered to work as an agent of the government.**"

442.     That admission is independently significant on each element of obstruction of justice. **First**, on **corrupt intent** under *United States v. Aguilar*, 515 U.S. 593, 599 (1995): Matthew Monson's recognition that his conduct could be characterized as that of "an agent of the government" reflects his own understanding that his coordination with federal law enforcement and his *ex parte* judicial communications had moved beyond ordinary citizen reporting and beyond ordinary adversarial advocacy. He understood that the conduct required concealment from MMA,

from the public, and from third parties, and he warned Mr. Badger, a fellow defense attorney accordingly.

443.    **Second**, on **consciousness of wrongdoing**: Matthew Monson's warning that the conduct could "get blown up" if recognized for what it was reflects his contemporaneous understanding that exposure of the conduct would have adverse consequences for the Enterprise's objectives. That understanding forecloses a defense of good faith. A party who acts in good faith does not warn a third party that the conduct must be concealed to succeed.

444.    During Matthew Monson's February 26, 2026 Rule 2004 Exam, conducted under oath in the pending Bankruptcy Proceeding,  Matthew Monson was questioned specifically about this text message and was asked to explain what he meant by "agent of the government." Matthew Monson refused to answer. He testified, in succession: "I don't know"; "I know" (when reminded the words were his own); "It's something that I typed. I don't know what"; "They mean what they say. The document speaks for itself"; "It means what I said, an agent of the government"; and "There is nothing to explain." His refusal under oath to explain his own contemporaneous warning further confirms his consciousness of the obstructive character of the conduct.

445.    Accordingly, the corrupt intent required for obstruction of justice under *18 U.S.C. § 1503* is established not only by the substance of the materially false representations Matthew Monson made to Judge Cain, by his *ex parte* presentation of materials outside the adversarial process, by his admitted strategic objective of taking MMA "off their game and off their mission," and by his admitted coordination with Allied — but also by his own contemporaneous warning that the conduct would "get blown up" if recognized for what it was.

## IV.    <u>RELATIONSHIPS AMONG THOSE ASSOCIATED WITH THE ENTERPRISE</u>

446.    Each Defendant (Matthew Monson, The Monson Law Firm, LLC, Katherine Monson, and

Allied Trust Insurance Company) conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through the pattern of mail fraud, wire fraud, and obstruction of justice predicates pleaded herein.

### A.    MATTHEW MONSON

447.    Matthew Monson was the principal operator and directing force of the Enterprise. He selected targets, designed and executed the predicate acts, coordinated participants, and publicly took credit for the results. His admissions in public presentations and on his firm's commercial platforms confirm his central role in the Enterprise's activities.

448.    Matthew Monson personally caused or directed the execution of the predicate acts, including the bar complaint mailings, the LDI Complaint, interstate communications with regulators and law enforcement, *ex parte* communications with the Court, and public dissemination of materially false statements. He also used these acts to interfere with MMA's operations and legal representation.

### B.    MONSON LAW FIRM

449.    The Monson Law Firm, LLC served as the institutional vehicle for the Enterprise. Its personnel, resources, letterhead, and commercial infrastructure were used to carry out the predicate acts.

450.    Attorney Lauren Lam, acting under Monson's supervision, filed the Lam Bar Complaint. The firm's website and communications also disseminated false and disparaging statements forming part of the scheme. The firm's participation is further evidenced by its public attribution of credit for "defeating" MMA's alleged scheme.

### C.    KATHERINE MONSON

451.    Katherine Monson participated in an essential component of the Enterprise involving the

creation and prosecution of manufactured claims against MMA. She is the named complainant or claimant in multiple predicate acts, including the Monsons' Bar Complaint, the Class Action, the Amended Class Action, and the sworn Proof of Claim in MMA's bankruptcy case.

452. Katherine Monson's role required affirmative conduct at each stage, including participation in the initial intake process, retention of counsel, execution of pleadings and sworn filings, and continued prosecution of claims premised on the same allegedly "unsolicited text" narrative that "confused her".

453. Katherine Monson's participation was knowing and intentional. The factual premise of her claims—that she was confused and did not consent to communications—was contradicted by her opt-in conduct and by contemporaneous involvement directed by Matthew Monson.

## D.    ALLIED

454. Allied directed and controlled the Enterprise's affairs whose financial and strategic interests were advanced through its conduct. Allied considered a lawful, ordinary pre-litigation settlement proposal for approximately 149 cases but rejected it and instead authorized Matthew Monson to pursue an aggressive strategy against MMA to dismantle it outside of Court. Matthew Monson confirmed that Allied was "on board" with this approach.

455. Allied's authorization was ongoing throughout the relevant period. Matthew Monson acted on Allied's behalf in filing bar complaints, communicating with regulators, and coordinating strategy. He has admitted under oath and in writing that his actions concerning MMA were undertaken on Allied's behalf and that Allied was the only insurer he represented in these matters.

456. The Enterprise's predicate acts directly benefitted Allied. The *ex parte* procurement of the Stay Order halted litigation activity in Allied cases and judicial actions influenced by Monsons' misrepresentations provided strategic and financial advantage to Allied in the underlying claims.

457. The Enterprise also advanced Allied's broader financial interest in reducing or eliminating MMA's contingent fee recovery in Louisiana hurricane litigation. The coordinated conduct alleged herein was consistent with Allied's strategic objective to counteract MMA's litigation funding model and limit its role in the market.

458. In summary, Allied directed and operated the Enterprise's affairs as the principal whose financial and strategic interests the Enterprise was created to advance, and on whose continuing authorization Matthew Monson and The Monson Law Firm, LLC undertook the predicate acts identified herein. Allied's role in directing the Enterprise's affairs satisfies the operation-or-management test, in multiple independent respects.

(a) In June 2022, Allied was presented with a lawful, ordinary, economically rational alternative — the pre-litigation settlement conference proposal made by Nicholas Arnold, an experienced insurance defense attorney with a track record of successfully employing the same approach with other carriers. Allied considered the Arnold proposal in consultation with Matthew Monson and affirmatively rejected it. Instead, Allied authorized Matthew Monson to "go on the attack" against MMA. Matthew Monson confirmed this affirmative strategic decision at the 2024 PLRB Insurance Conference, stating that "**Allied was on board**." That decision, to forgo conventional defense practice in favor of a coordinated campaign to dismantle MMA as an entity, is the foundational operational decision of the Enterprise, and it was Allied's decision to make.

(b) Allied's authorization was not a single decision in June 2022; it was continuous over the four-year period of the Enterprise. Matthew Monson admitted under oath at his February 26, 2026 Rule 2004 examination that, throughout the relevant period: (i) he filed bar complaints against MMA "on behalf of Allied"; (ii) his communications with the FBI concerning MMA were undertaken "generally" on behalf of Allied; (iii) his communications with LDI counsel David

Caldwell concerning sanctions against MMA were undertaken on behalf of Allied; and (iv) Allied was the only insurer he represented in matters involving MMA. Matthew Monson confirmed in writing, in a text message to a former MMA attorney, that the bar complaints were filed "on behalf of clients" — at all relevant times, only Allied — and that the client was "steadfast in their desire to maintain the complaints" notwithstanding the personal harm being inflicted on the bar-complaint respondents.

(c)      Throughout the relevant period, Allied retained the authority to terminate Matthew Monson's representation, to instruct him to discontinue the conduct undertaken on its behalf, and to redirect the defense of the Allied Cases through ordinary litigation channels. Allied did not exercise that authority at any time. Allied continued to retain Matthew Monson and The Monson Law Firm, LLC, continued to pay their fees, and continued to receive Matthew Monson's reports of the conduct undertaken on its behalf, including throughout the period during which the conduct became increasingly public — Matthew Monson's national CLE presentations, his commercial website attributing credit to his firm for "destroying MMA," and his public dissemination of confidential disciplinary materials and stolen MMA documents.

(d)      Although Allied was not a party to the case where the Show Cause Order was entered, Allied directly received the financial and strategic benefits of the predicate acts. The Stay Order procured through Matthew Monson's *ex parte* misrepresentations to Judge Cain froze the very Allied Cases that Allied had refused to settle through the Arnold proposal.  Judge North's April 1, 2024 *ex parte* e-mail to Matthew Monson concerning the *Ricks* Order stated the Court's hope that the order would "satisfy **settling defendants** that they can cut checks without listing MMA as a payee" directly benefiting Allied as a settling defendant in cases pending before Judge North. Furthermore, Matthew Monson's contemporaneous text message to FBI Special Agent Bradford

stating that "Judge North just stuck it to MMA and the Hedge Funds on the fees" reflects Matthew Monson's contemporaneous celebration of an outcome that benefited Allied.

459. The pattern of racketeering activity pleaded herein is not built on protected litigation conduct of the kind the Fifth Circuit found insufficient in *In re Burzynski*, 989 F.2d 733 (5th Cir. 1993).

460. The conduct alleged is overwhelmingly extrajudicial and was undertaken outside the adversarial process, outside any pending case to which Allied was a party represented by Monson Law, By way of example and not limitation:

(a)     Matthew Monson's *ex parte* misrepresentations to Judge Cain in October 2022 were undertaken without notice to MMA in connection with a Show Cause Proceeding to which Allied was not a party.

(b)     Matthew Monson's continuing *ex parte* communications with Judge North concerning matters in which neither Allied nor Matthew Monson was a party, including the *Ricks* e-mails of April 2024 and the post-bankruptcy *Foskey* exchanges, were undertaken outside the adversarial process and outside any case in which Defendants had standing to be heard;

(c)     Matthew Monson's three-year operational relationship with FBI Special Agent Krista Bradford — comprising more than 100 communications, more than 2,126 pages of e-mail, and the transmission of stolen MMA materials, confidential ODC submissions, and EAJF loan agreements — was not litigation activity. It was an extrajudicial intelligence-gathering operation, the character of which Matthew Monson himself recognized when he warned attorney Steven Badger that "the whole thing can get blown up if we are considered to work as an **agent of the government**";

(d)     Matthew Monson's communicating with former MMA employees, obtaining stolen MMA materials, his receipt of a proprietary MMA PowerPoint regarding MMA's four-year strategy and business plan, and his receipt and republication of Mr. Huye's confidential ODC response — each obtained outside lawful discovery and outside any proceeding to which Defendants were parties — were extrajudicial acts of corporate espionage and dissemination of confidential materials, not litigation conduct;

(e)     Matthew Monson's continuing publication of materially false statements on his firm's commercial website, on LinkedIn, on YouTube, in podcast interviews, and in CLE presentations across the country, including the false "stealing settlement funds," "insurance fraud," "disbarment," "$155,000 in campaign donations," is commercial defamation and self-promotion, not protected petition activity;

(f)     Matthew Monson's February 24, 2024 LinkedIn post procuring the withdrawal of Phelps Dunbar as MMA's counsel — an act undertaken outside any adversarial proceeding, designed and admitted by Matthew Monson to procure the withdrawal of MMA's counsel through deceptive use of an embedded conflict signal — is extrajudicial interference with MMA's engagement of counsel.

461.    To the extent any predicate act involves litigation conduct (the filing of bar complaints, the LDI complaint, the Class Action, or the Proof of Claim), each falls within the sham exception. *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.*, 508 U.S. 49, 60–61 (1993) citing *Eastern Railroad Presidents Conference v. Noerr Motor Freight*, Inc., 365 U.S. 127, 144 (1961). Each was objectively baseless — as established by, among other things, Matthew Monson's sworn admissions of no factual basis, the dismissal with prejudice of the Class Action, the disallowance of Katherine Monson's Proof of Claim, the dismissal of bar complaints against

multiple MMA attorneys, the vacating of the LDI Order for lack of jurisdiction, and the April 15, 2025 Velawcity sworn testimony directly contradicting the factual premise of multiple filings. And each was undertaken with the subjective ulterior motive expressly admitted by Matthew Monson, to take MMA "off their game and off their mission" through coercive use of governmental process, rather than to obtain legitimate institutional adjudication.

**Summary of The Relationships**

462. Each Defendant knowingly participated in the operation or management of the Enterprise through the pattern of racketeering activity alleged in this Amended Complaint. Their conduct was interrelated, coordinated, and directed toward a shared objective.

463. Accordingly, each Defendant is liable under 18 U.S.C. § 1962 for conducting or participating in the conduct of the Enterprise's affairs through a pattern of racketeering activity.

## E.   LONGEVITY SUFFICIENT TO PURSUE THE COMMON PURPOSE AND RELATEDNESS

464. The predicate acts identifies above are related to one another and constitute long-term criminal activity. Each predicate act shares the same purposes, results, participants, victims, methods of commission, and is otherwise interrelated by distinguishing characteristics.

465. Each act was undertaken to deprive MMA of its money and property by procuring institutional action against MMA on the basis of materially false representations, and each act was undertaken by one or more of the same Defendants in coordination with the others, using the same channels (disciplinary complaints, regulatory complaints, *ex parte* judicial communications, federal-law-enforcement coordination, sham litigation, and continuing public dissemination of false statements by interstate wire) to advance the same end.

466.    The Enterprise has operated continuously from no later than March 2022 through the present, a period of nearly four years. Its activities span the period from Allied's 2022 retention of Monson and Monson Law through the filing of this Amended Complaint. The materially false statements published on The Monson Law Firm's commercial website that Monson Law "stopped MMA's unethical insurance litigation scheme," and obtained "savings to the insurance industry measured in the billions of dollars", remain published and accessible by interstate wire as of the filing of this Amended Complaint. Furthermore, Matthew Monson's LinkedIn republication of the Louisiana State Police Initial Complaint Report (which contains the false "stealing insurance claim settlement funds" attribution to Matthew Monson) remains publicly accessible on Monson's LinkedIn page. Each day of continued publication is a continuing transmission in furtherance of the scheme.

467.    Additional acts evidencing the threat of continuing activity include: (a) Matthew Monson's January 19, 2026 transmission to FBI Special Agent Bradford of MMA's Rule 2004 Examination Notice, alerting federal law enforcement that his conduct was becoming the subject of compulsory process; (b) Matthew Monson's continuing communications with Judge North through at least January 2026, including the call disclosed in the February 26, 2026 Rule 2004 examination and discussion of the order requiring production from the Bankruptcy Court; and (c) Matthew Monson's continuing CLE presentations and YouTube interviews promoting the campaign against MMA as a replicable model for the insurance defense industry. The Defendants' conduct gives every indication of continuing into the future.

468.    Either form of continuity, closed-ended or open-ended, is independently sufficient to establish a pattern of racketeering activity. Both are present here.

469. The predicate acts span the entire period and were undertaken at regular intervals throughout: (a) October 2022 — Matthew Monson's *ex parte* misrepresentations to Judge Cain procuring the Stay Order; (b) August 2022 through January 2023 — the bar complaint mailings to ODC; (c) August 2022 — the LDI Complaint mailing; (d) March 2023 — the Class Action filing; (e) February 2023 through January 2026 — the FBI coordination relationship; (f) October 2023 — the false "stealing settlement funds" representation transmitted to Louisiana State Police; (g) February 2024 — the Phelps Dunbar interference; (h) March 2024 — the false "biggest insurance fraud" and "disbarment" representations at the PLRB Insurance Conference; (i) August 2025 — Katherine Monson's sworn Proof of Claim filed after the Velawcity testimony directly contradicted its factual premise; and (j) February 2026 — Matthew Monson's false sworn testimony at the Rule 2004 examination concerning his communications with Judge North. The substantial period and the repeated, regular commission of predicate acts throughout that period independently satisfy closed-ended continuity.

470. This sustained course of conduct demonstrates a cohesive and continuing enterprise rather than isolated acts. The repeated use of coordinated tactics across multiple forums—disciplinary bodies, regulatory agencies, federal court proceedings, and public communications—reflects an organized effort designed to advance a single, continuing objective.

471. Accordingly, the Enterprise possesses the longevity required to sustain an association-in-fact enterprise under 18 U.S.C. § 1961(4).

## V.    STANDING

### A.    REQUIREMENTS

472. Only those who suffer injury to their "business or property by reason of a violation of section 1962" have statutory standing. 18 U.S.C. § 1964(c). Standing has two primary elements:

injury and causation. *Price v. Pinnacle Brands, Inc.,* 138 F.3d 602, 606 (5th Cir. 1998)*(per curiam).*

473. A RICO injury must affect the plaintiff's "business or property," which ordinarily means that there must be "concrete financial loss." 18 U.S.C. § 1964(c).

474. The Fifth Circuit has approved RICO causation where the injury was "either a direct result or a reasonably probable consequence" of the defendant's conduct. *Allstate Ins. Co. v. Plambeck,* 802 F.3d 665, 676 (5th Cir. 2015).

## B. INJURY TO BUSINESS OR PROPERTY

475. MMA suffered concrete, non-speculative financial injury to its business and property as a direct result of Defendants' predicate acts. These injuries are cognizable under 18 U.S.C. § 1964(c).

## 1. Loss of Contingent Fee Interests

476. MMA held enforceable contingent fee interests in approximately 220 Allied Cases and approximately 11,000 additional hurricane insurance matters. These interests constitute property under Louisiana law. *Saucier v. Hayes Dairy Prods., Inc.*, 373 So. 2d 102 (La. 1979).

477. The Stay Order entered on October 21, 2022, which was procured through Matthew Monson's *ex parte* misrepresentations to Judge Cain (Obstruction Predicates Nos. 1–5), froze 1,600 of MMA's cases.

478. The Suspension Order entered against MMA's lead Louisiana counsel, procured through the Bar Complaint mailings (Mail Fraud Predicates Nos. 1–7), removed MMA from the Western District of Louisiana.

479. The Fee Order entered by Judge Cain was based entirely on the Suspension Order.

480.     The LDI Order was issued through the predicate acts directly impaired MMA's ability to recover those contractual fees, resulting in substantial financial loss.

481.     On average, MMA obtained approximately $30,000 in attorney's fees per case. Based on 220 Allied Cases, MMA's total contingent fee value from those matters is approximately $6.6 million, of which MMA was contractually entitled to at least one-third. The 1,600 cases stayed as a result of the Stay Order represent approximately $48 million in total fees, of which MMA was entitled to at least one-third. In addition, MMA's total Louisiana hurricane docket exceeds approximately $330 million in aggregate attorney's fees, of which MMA was entitled to at least one-third pursuant to its contingent fee agreements.

**2.     Loss of MMA's Louisiana Law Practice**

482.     Prior to October 2022, MMA operated an active Louisiana law practice generating substantial revenue. Following the Stay Order, the Suspension Order, the Fee Order, and the LDI Order (later vacated for lack of jurisdiction), and the public-disparagement campaign waged through the wire fraud predicates, MMA's Louisiana practice was effectively destroyed.

483.     The injury is concrete: MMA's revenue from Louisiana operations declined to zero, its Louisiana attorneys were suspended or removed, and its Louisiana clients were transferred to successor firms.

484.     Finally, the destruction of an operating law practice constitutes injury to business and property within the meaning of § 1964(c).

**3.     Loss of MMA's Counsel**

485.     As a direct and intended result, Matthew Monson's February 24, 2024 LinkedIn post regarding Phelps Dunbar, Phelps Dunbar withdrew as MMA's counsel in the EAJF Litigation and

the PCG Litigation at a critical period in MMA's defense of approximately $38 million in pending litigation with EAJF and $11 million with PCG.

486. Matthew Monson admitted by interstate text message: "can't say that wasn't my intended result with the hyperlink."

487. MMA was unable to retain replacement counsel under emergency conditions and filed bankruptcy. Specifically, EAJF had filed a Motion for Summary Judgment and Phelps Dunbar would not file a response. MMA had no option and filed a Chapter 11 bankruptcy case the day of the hearing of EAJF's Motion for Summary Judgment.

**4.      Defense Costs Caused by Sham Litigation and Manufactured Disciplinary Process**

488. MMA was forced to expend substantial resources defending the sham Class Action and responding to the bar complaints procured through the Bar Complaint mailings, and the LDI Complaint, the appeals to the Fifth Circuit. MMA's defense costs were a direct result of the predicate acts and are concrete financial loss.

**5.      Loss of Funding Relationships and Business Capital**

489. The Enterprise's targeting of MMA's funding relationship with EAJF — through the Amended Class Action adding EAJF as a defendant (Mail Fraud Predicate No. 10; Wire Fraud Predicate No. 2), Matthew Monson's transmission of MMA's confidential loan agreements with EAJF to the FBI (Wire Fraud Predicate concerning EAJF disclosures), Matthew Monson's coordinated public attacks on EAJF on LinkedIn, and his coordination with state legislators on legislation targeting litigation funding — directly impaired MMA's ability to access the operating capital necessary to continue its operations. The destruction of access to operating capital is concrete financial injury.

**6.      Forced Bankruptcy and Loss of Going-Concern Value**

490.      On April 9, 2024, MMA was forced to file an emergency chapter 11 petition (Case No. 24-31596, S.D. Tex.). The bankruptcy filing was the foreseeable, intended, and direct result of the cumulative effect of the predicate acts pleaded herein.

491.      Matthew Monson publicly claimed credit for that result on the same day, transmitting by interstate wire a LinkedIn post reading: "**BREAKING NEWS! MMA HAS DECLARED BANKRUPTCY**." Matthew Monson and The Monson Law Firm, LLC further claimed credit on their commercial website that the firm "stopped MMA's unethical insurance litigation scheme, **resulting in a $150 million bankruptcy filed by the firm**." The destruction of MMA's going-concern value and the costs of the bankruptcy proceeding itself are concrete financial injury under § 1964(c).

**7.      Damage to MMA's Goodwill and Business Reputation**

492.      The defamatory wire fraud predicates — including the false "stealing settlement funds" representation, the false "insurance fraud" representation , the false "biggest insurance fraud" representation, the false "disbarment" representation, the false "$155,000 in campaign donations" representation, and the continuing publication of false representations on The Monson Law Firm's commercial website — caused concrete and ascertainable damage to MMA's business reputation, goodwill, and ability to retain and acquire clients, lenders, co-counsel, and referral sources.

493.      Damage to business goodwill and reputation, where it produces concrete and ascertainable financial loss, is cognizable injury under § 1964(c).

## C. PROXIMATE CAUSATION

494.     Each of the injuries identified in Section B above, are the direct result, or a reasonably probable consequence, of the predicate acts pleaded herein. The intended targets of the false representations were MMA's clients, MMA's co-counsel, MMA's lenders, MMA's regulators, MMA's federal courts, and the public.

495.     The intended *victim* of the scheme, and the party against whom the resulting institutional action was procured, was MMA.  The directness of the causal chain is established by the predicate acts themselves and by Defendants' own statements taking credit for the resulting injuries.

496.     Matthew Monson's *ex parte* misrepresentations to Judge Cain directly procured the entry of the Stay Order on October 21, 2022. The Stay Order directly impaired MMA's contingent fee interests in the Allied Cases and was the foundational injury from which MMA's broader losses flowed. The causal chain is single-step and direct.

497.     The Bar Complaint mailings directly procured the disciplinary proceedings against MMA's Louisiana counsel that resulted in the Suspension Order. Matthew Monson stated publicly at the 2024 PLRB Insurance Conference that the disciplinary action obtained against MMA's lead Louisiana counsel "led directly to MMA's removal from the Western District of Louisiana." That public admission of direct causation establishes the causal chain.

498.     The LDI Complaint and the false "insurance fraud" representations transmitted to the LDI directly procured the May 1, 2023 LDI Order imposing $2 million in fines against MMA. The LDI Order was the direct, intended result. Matthew Monson publicly claimed credit on LinkedIn the next day: "In direct response to the complaint I filed with LDI in 9-22, the LDI just dropped the hammer on MMA for insurance fraud they committed." The Order was thereafter vacated for lack

of jurisdiction, but it caused concrete reputational and financial injury to MMA during the period it was in effect.

499.    The Class Action and Amended Class Action filings directly caused MMA to incur defense costs in the Class Action Proceeding. The causal chain is direct: the false representations were submitted to the federal court, the federal court was required to maintain the case until dismissal, and MMA was required to defend it.

500.    Matthew Monson's February 24, 2024 LinkedIn post directly procured Phelps Dunbar's withdrawal as MMA's counsel within days. Matthew Monson admitted by interstate text message that the withdrawal was the intended result. The causal chain — single-step, direct, and admitted — establishes proximate cause.

501.    When Phelps Dunbar withdrew, MMA had no counsel and had to file bankruptcy, the one step Monson was constantly waiting for and planning for. Matthew Monson and The Monson Law Firm, LLC publicly took credit for that result on the day of the filing and continue to publish that representation on the firm's commercial website. The causal chain is established by Defendants' own admissions.

502.    The intended-victim character of the predicate acts is established by Defendants' own statements taking credit for procuring action against MMA: "destroyed MMA," "resulting in a $150 million bankruptcy," "led directly to MMA's removal," "BREAKING NEWS! MMA HAS DECLARED BANKRUPTCY."

## VI. DAMAGES AND RELIEF

### A. STATUTORY TREBLE DAMAGES UNDER 18 U.S.C. § 1964(C)

503. RICO authorizes any person injured in business or property by reason of a § 1962 violation to recover "threefold the damages he sustains." 18 U.S.C. § 1964(c). As a result of the predicate acts pleaded herein, MMA has suffered actual damages including, but not limited to, the categories of injury described above. Each Defendant is jointly and severally liable for treble the actual damages sustained by MMA.

### B. Categories of Actual Damages

504. MMA's contingent fee interests in the Allied Cases and the broader Louisiana hurricane case inventory. The aggregate amount of lost fees will be established by evidence of the cases at issue, the settlement values realized by successor counsel, and the contingent fee percentages established by MMA's contractual arrangements. MMA seeks recovery of all such impaired fees as actual damages.

505. MMA's Louisiana law practice, as an operating business with established client relationships, professional infrastructure, and revenue streams, possessed a quantifiable going-concern value at the time of the predicate acts. That value was destroyed by the cumulative effect of the predicate acts. MMA seeks recovery of the destroyed going-concern value of its Louisiana practice as actual damages, to be established by expert valuation evidence.

506. MMA seeks recovery of attorneys' fees and costs incurred in addressing and/or defending: (a) the Class Action; (b) the bar complaints procured through the Bar Complaint mailings; (c) the LDI proceedings procured through the LDI Complaint and the false "insurance fraud" and "unlicensed adjusters" representations; (d) the Louisiana State Police investigation procured through the false "stealing settlement funds" representation; and (e) the related federal litigation in

which MMA was forced to defend against orders procured through Defendants' *ex parte* misrepresentations.

507. As a direct and admitted result of the Phelps Dunbar withdrawal, MMA was unable to retain replacement counsel under emergency conditions.

508. As a direct and admitted result of the cumulative effect of the predicate acts, MMA was forced into chapter 11 bankruptcy on April 9, 2024. The costs of the bankruptcy proceeding, including professional fees, administrative expenses, and the diminution in value caused by the bankruptcy filing itself, are recoverable as actual damages caused by the predicate acts.

509. As a direct result of the Enterprise's targeting of MMA's funding relationships, MMA was deprived of the operating capital necessary to continue its operations. MMA seeks recovery of the value of impaired funding relationships and the incremental cost of replacement capital, to the extent such replacement was available.

510. MMA seeks recovery, to the extent permitted under § 1964(c), of damages for the concrete financial consequences of the destruction of its goodwill and business reputation — including lost client relationships, lost referral sources, and lost lender relationships — caused by the defamatory wire fraud predicates and their continuing publication.

511. Section 1964(c) entitles MMA to recover three times the amount of its actual damages. MMA accordingly seeks treble damages in an amount to be established at trial. Section 1964(c) further entitles MMA to recover "the cost of the suit, including a reasonable attorney's fee." MMA seeks recovery of its reasonable attorneys' fees, expert witness fees, and costs incurred in the prosecution of this action, in an amount to be established by separate application following entry of judgment.

512.     Each Defendant is jointly and severally liable for the full amount of actual damages, treble damages, attorneys' fees, and costs awarded to MMA.  MMA seeks pre-judgment interest on its actual damages from the date of accrual, and post-judgment interest on the full amount of the judgment from the date of entry until paid in full, at the rates established by 28 U.S.C. § 1961 and applicable law.

### CAUSE OF ACTION NO. 2: RICO CONSPIRACY UNDER 18 U.S.C. § 1962(d) AGAINST ALL DEFENDANTS

513.     MMA incorporates by reference all factual allegations identified in the footnote for Cause of Action No. 1, and the predicate acts of mail fraud, wire fraud, and obstruction of justice pleaded in Cause of Action No. 1, as if fully set forth herein in support of Cause of Action No. 2.[188]

### A.     STATUTORY FRAMEWORK

514.     Section 1962(d) of RICO makes it unlawful for any person to conspire to violate any of the substantive provisions of § 1962, including § 1962(c). *18 U.S.C. § 1962(d)*

515.     To state a claim under § 1962(d), a plaintiff must allege: (1) two or more persons; (2) agreed to commit a substantive RICO offense; and (3) at least one of the conspirators committed an overt act in furtherance of the conspiracy. *Salinas v. United States*, 522 U.S. 52, 61-65 (1997)(citations omitted); *Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 239 (5th Cir. 2010) (citations omitted).

516.     A § 1962(d) defendant need not personally commit a predicate act, agree to commit a predicate act, or satisfy the operation-or-management test of *Reves v. Ernst & Young*, 507 U.S. 170 (1993). It is sufficient that the defendant knowingly agreed that **someone** would commit the

---

[188] Paragraphs identified in Footnote 175-187

predicate acts. *Salinas*, 522 U.S. at 64–65; *United States v. Posada-Rios*, 158 F.3d 832, 857 (5th Cir. 1998)("To prove a RICO conspiracy the government must establish (1) that two or more people agreed to commit a substantive RICO offense and (2) that the defendant knew of and agreed to the overall objective of the RICO offense"), citing *United States v. Marmolejo*, 89 F.3d 1185, 1196-97 (5th Cir. 1996). "A conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor." *Salinas*, 522 U.S. at 65.

**B.      THE AGREEMENT**

517.     Defendants Matthew Monson, The Monson Law Firm, LLC, Katherine Monson, and Allied Trust Insurance Company knowingly agreed with one another that the substantive RICO offense pleaded in Cause of Action No. 1 would be committed.

518.     The agreement is established by Defendants' own admissions:

(a)      Allied and Matthew Monson. Monson admitted at the 2024 PLRB Insurance Conference that he and Allied "made the decision" to "go on the attack" against MMA, and confirmed that "Allied was on board." In a written communication with a former MMA attorney, Matthew Monson confirmed that the bar complaints filed against MMA were filed on behalf of an insurer client, and that the client was "steadfast in their desire to maintain the complaints."

(b)      Matthew Monson testified under oath at his Rule 2004 Exam that he filed bar complaints "on behalf of Allied," that his communications with the FBI concerning MMA were undertaken "generally" on behalf of Allied, and that his communications with LDI counsel concerning sanctions against MMA were undertaken on behalf of Allied. Allied retained authority throughout the relevant period to terminate Matthew Monson's representation and discontinue the conduct undertaken on its behalf, and did not do so.

(c)      <u>Matthew Monson and The Monson Law Firm, LLC</u>. At all relevant times, Matthew Monson acted within the course and scope of his authority as a principal, member, and managing attorney of The Monson Law Firm, LLC. The firm's letterhead, e-mail accounts, website, infrastructure, and personnel, including attorney Lauren Lam, who filed a substantively duplicative bar complaint while working under Matthew Monson's supervision, were used to execute the predicate acts. The firm's commercial website affirmatively claims credit, on the firm's behalf, for the results of the predicate acts: that **"the firm"** "destroyed MMA," "stopped MMA's unethical insurance litigation scheme," and procured outcomes "measured in the billions of dollars."

(d)      <u>Matthew Monson and Katherine Monson</u>. Matthew Monson and Katherine Monson acted in coordination from the inception of the scheme. Matthew Monson admitted at the 2024 PLRB Insurance Conference that he stood "over [his] wife's shoulder" and instructed her to interact with the MMA intake process for the purpose of generating the factual basis for subsequent claims against MMA. Katherine Monson then served as named complainant on the August 3, 2022 Monsons' Bar Complaint, named plaintiff on the March 14, 2023 Class Action and the Amended Class Action, and sworn claimant on the August 13, 2025 Proof of Claim filed in MMA's bankruptcy case — each repeating the same materially false "unsolicited text" and "confused consumer" representations contradicted by the April 15, 2025 Velawcity testimony and by Matthew Monson's own admissions.

(e)      <u>Non-Defendant Participants Morris Bart, LLC and Austin Marks</u>: The agreement among the Defendants extended through coordinated activity with non-defendant participants in the Enterprise. Monson coordinated with Austin Marks, on behalf of Morris Bart, LLC, in the dissemination of information concerning MMA, the connection of Marks to Defendants' regulatory and law-enforcement contacts, the recruitment of witnesses against MMA, the public framing of

litigation adverse to MMA, and the ongoing post-bankruptcy litigation directed at MMA's bankruptcy estate.

(f)     Marks's parallel public statements concerning MMA — including statements that MMA had "lied, cheated and stole from everyone" — reinforced and amplified the false narrative being disseminated by Defendant Matthew Monson concerning MMA. Morris Bart, LLC's April 4, 2023 letter campaign to MMA Clients procured the transfer of approximately 2,000 MMA Clients to Morris Bart, LLC during the period in which MMA's lead Louisiana counsel was suspended through the disciplinary action procured by the bar complaint mailings.

(g)     Matthew Monson publicly characterized the resulting alignment in his May 1, 2023 LinkedIn statement that "the most aggressive insurance defense firm (The Monson Law Firm, LLC) and the most successful plaintiff's firm in Louisiana" had been brought into alignment on the issues. The continuing nature of that alignment is reflected in Defendant Matthew Monson's appearance, alongside Morris Bart, LLC, at the April 27, 2026 Louisiana Supreme Court argument on the certified questions.

(h)     The coordinated activity with Marks and Morris Bart, LLC is pled as evidence of the operation of the Enterprise and the agreement among Defendants to commit the predicate acts; it is not pled as a claim against Marks or Morris Bart, LLC, against whom no claim is asserted in this action.

## C.     KNOWLEDGE AND INTENT

519.    Each Defendant knew of the essential nature and scope of the substantive RICO offense and adopted the goal of furthering it.

520.     Each Defendant knew that the scheme involved (a) the procurement of regulatory, disciplinary, judicial, and law-enforcement action against MMA, (b) on the basis of materially false factual representations, (c) for the purpose of depriving MMA of its money and property, including its contingent fee interests in the Allied Cases, its broader Louisiana law practice, its funding relationships, its goodwill, and its business and contractual relationships.

521.     Matthew Monson's contemporaneous text-message warning to attorney Steven Badger that "the whole thing can get blown up if we are considered to work as an agent of the government" reflects Matthew Monson's contemporaneous understanding that the joint endeavor had moved beyond ordinary citizen reporting and required concealment from MMA and from the public to succeed.

### D.     OVERT ACTS IN FURTHERANCE

522.     Each predicate act of mail fraud, wire fraud, and obstruction of justice pleaded in Cause of Action No. 1 was an overt act in furtherance of the conspiracy. By way of example and not limitation, the following overt acts were undertaken in furtherance of the conspiracy by one or more of the Defendants:

(a)     the bar complaint mailings to the Louisiana Office of Disciplinary Counsel between August 3, 2022 and January 2023;

(b)     the LDI Complaint mailing of August 26, 2022;

(c)     Matthew Monson's *ex parte* misrepresentations to Judge Cain in October 2022, made on Allied's behalf, procuring the October 21, 2022 Stay Order;

(d)     the March 14, 2023 electronic filing of the Class Action complaint and the subsequent electronic filing of the Amended Class Action complaint, each repeating the false "unsolicited text" and "confused consumer" representations;

(e)     Matthew Monson's continuing transmissions to FBI Special Agent Krista Bradford from February 2023 through January 2026, undertaken on Allied's behalf, including the transmission of stolen MMA materials, confidential ODC submissions, and EAJF loan agreements;

(f)     Matthew Monson's interstate wire transmissions of materially false statements concerning MMA, including the false "stealing settlement funds," "insurance fraud," "disbarment," and "$155,000 in campaign donations" representations, and the continuing publication of materially false statements on The Monson Law Firm's commercial website;

(g)     Matthew Monson's February 24, 2024 LinkedIn post procuring Phelps Dunbar's withdrawal as MMA's counsel; and

(h)     Katherine Monson's August 13, 2025 sworn Proof of Claim filed in MMA's bankruptcy case, repeating under oath the same false "unsolicited text" and "confused consumer" representations contradicted by the April 15, 2025 Velawcity testimony.

## F.     DAMAGES

523.    MMA seeks the same actual damages, trebled, and attorneys' fees and costs, on Cause of Action No. 2 as on Cause of Action No. 1, in the alternative.

524.    Each Defendant is jointly and severally liable for the full amount of damages recoverable under § 1962(d) for the conspiracy pleaded in this Cause of Action No. 2.

## CAUSE OF ACTION NO. 3: TORTIOUS INTERFERENCE WITH EXISTING CONTRACTS – AGAINST ALL DEFENDANTS

525.     MMA hereby incorporates by reference the preceding paragraphs into Cause of Action No. 3, as set forth in the accompanying footnote.[189]

526.     Under Texas law, tortious interference with an existing contract requires: (1) an existing contract subject to interference, (2) a willful and intentional act of interference with the contract, (3) that proximately caused the plaintiff's injury, and (4) caused actual damages or loss *Prudential Ins. Co. of Am. v. Fin. Review Servs.*, 29 S.W.3d 74, 77 (Tex. 2000); citing *ACS Inv'rs, Inc. v. McLaughlin*, 943 S.W.2d 426, 430 (Tex. 1997).

### A.     ALLIED CONTRACTS

527.     MMA had valid, written contingency fee agreements with each of the 220 Allied Clients (the **"Allied Contracts"**). Each contract entitled MMA to a percentage of the recovery in a hurricane-related insurance claim against Allied.

528.     Each contract is identified in the records of MMA's bankruptcy estate by client name, claim number, and corresponding Allied policy number.

529.     MMA transmitted to Allied a written Letter of Representation and First Notice of Loss for each of the 220 Allied Cases, expressly identifying MMA as counsel and requiring that MMA be included as a payee on any settlement draft or disbursement. Allied had actual, written, case-specific notice that MMA possessed a direct contractual financial interest in each settlement and was required to be included in any distribution of settlement proceeds.

---

[189] Paragraphs 527-532 (Allied Contracts); Paragraphs 61-96 (Judge Cain); Paragraphs 120-148 (Bar Complaints); Paragraphs 149-175 (LDI); Paragraphs 176-210 (Judge North); Paragraphs 49-60 (Arnold); and Paragraphs 320-332 (Phelps Dunbar)

530.     Defendants willfully and intentionally interfered with each of the 220 Allied Client contracts. Rather than pursue the lawful path of pre-litigation settlement negotiation proposed by Nicholas Arnold, Allied authorized Matthew Monson to "go on the attack" against MMA. The interference was accomplished through the predicate acts pleaded in Cause of Action No. 1, including: (a) Matthew Monson's *ex parte* misrepresentations to Judge Cain procuring the Stay Order, which expressly froze  a portion of the Allied Cases identified by case number *ex parte* by Matthew Monson; (b) the bar complaint mailings procuring the Suspension Order against MMA's lead Louisiana counsel and removing MMA from the Western District of Louisiana; (c) the LDI Complaint procuring the LDI Order falsely characterizing MMA's conduct as "insurance fraud"; and (d) Matthew Monson's *ex parte* communications with Magistrate Judge North procuring the *Ricks* Order directing settling defendants — including Allied — that MMA was not to be listed as a payee on settlement checks issued in cases handled by successor counsel.

531.     Defendants' specific intent to interfere with the 220 Allied Client contracts is established by Matthew Monson's own admissions: that he and Allied "**made the decision**" to forgo the Arnold settlement proposal and to pursue a course of conduct designed to "settle every case with everyone else and leave [MMA] hanging"; that the strategy was to "**starve [MMA] of money**"; and that the bar complaints and LDI complaints were undertaken to take MMA "off their game and off their mission." Each of these admitted strategic objectives required the severance of MMA from the 220 Allied Client contracts as its operational core.

532.     Defendants' interference proximately caused MMA actual damage in the form of lost contingent fees on each of the 220 Allied Client contracts. The losses are quantifiable based on the settlement values realized in each case and the contingency percentage established by each contract.

B.      ALL HURRICANE CONTRACTS

533.    In addition, MMA pleads tortious interference with its valid contingency fee contracts with the broader docket of approximately 11,000 Louisiana hurricane clients. Each of those contracts was a valid contract subject to interference. Each was a written agreement entitling MMA to a percentage of the recovery. Each is identified in the records of MMA's bankruptcy estate.

534.    Defendants knew of the existence of MMA's broader contractual relationships through, among other things, MMA's public advertising and operations in Louisiana, Matthew Monson's monitoring of MMA's filings and operations, Matthew Monson's transmission of MMA's loan agreements with EAJF to FBI Special Agent Bradford, and Matthew Monson's public characterization of MMA's litigation funding model as a market-wide phenomenon and existential threat.

535.    Defendants willfully and intentionally interfered with MMA's broader contractual relationships through the same predicate acts identified above, including the Suspension Order procured through the bar complaints (which removed MMA's licensed Louisiana counsel from practice in the Western District of Louisiana) and the public-disparagement campaign waged through interstate wire (which destroyed MMA's standing in the Louisiana market),

536.    Defendants' interference proximately caused MMA actual damage in the form of lost contingent fees on the broader docket, in amounts to be established at trial through evidence of the cases at issue, the settlement values realized by successor counsel, and the contingent fee percentages established by MMA's contractual arrangements.

537.     The intentionality of this interference is confirmed by Monson's own admissions. He described rejecting the Arnold proposal not as a legitimate defense strategy but as the moment "they decided they were going to go on the attack."

538.     Furthermore, Monson specifically told other attorneys who represent insurance companies at the Insurance Conference not to settle cases with MMA, stating the firm was completely illegal in everything they were doing.

539.     Defendants' interference was accomplished through independently tortious or unlawful means, including *ex parte* communications with federal judges, false statements to regulatory and law enforcement agencies, the filing of a manufactured class action, the public dissemination of confidential disciplinary materials, and the transmission of stolen proprietary business information.

## C.     PHELPS DUNBAR CONTRACT

540.     On September 1, 2023, EAJF filed suit against MMA in Texas state court alleging breach of contract arising from a litigation funding loan (the **"EAJF Litigation"**). EAJF sought damages in an amount exceeding $30 million.

541.     Separately, PCG Consulting, LLC, an estimator that had performed work on certain MMA client matters, filed suit against MMA and, on December 19, 2023, obtained a default judgment against MMA in the approximately amount of $11 million (the **"PCG Litigation"**).  MMA never received notice of the Complaint filed in the PCG Litigation and needed counsel to litigate this issue.

542.     MMA retained Phelps Dunbar LLP to represent it in both the EAJF Litigation and the PCG Litigation. Phelps Dunbar LLP appeared as counsel for MMA in both matters.

543.     Monson was closely monitoring the pleadings filed in both the PCG Litigation and the EAJF Litigation and was posting about the cases on LinkedIn.  On February 24, 2024, Monson posted a message on LinkedIn stating: "On February 16, 2024, MMA filed a Motion to Set Aside Default Judgment and For New Trial on the default judgment rendered against them on December 19, 2023 in the lawsuit filed by PCG Consulting. **MMA is represented by the reputable firm Phelps Dunbar LLP, who also represents the insurance industry on many matters**." (the **"Phelps Post"**).[190]

544.     Monson included an embedded hyperlink directing readers to Phelps Dunbar LLP in the Phelps Post.

545.     Within days of Monson's Phelps Post, Phelps Dunbar contacted MMA and apologized profusely stating that they discovered a conflict and needed to withdraw from representation in all cases. On March 5, 2024, Phelps Dunbar filed a pleading to withdraw as MMA's counsel in the PCG Litigation, and on March 18, 2024, Phelps Dunbar filed a motion to withdraw in the EAJF Litigation.

546.     On March 12, 2024, Matthew Monson exchanged text messages with Steven Badger, an insurance defense attorney with whom Matthew Monson continuously corresponded with concerning MMA. Mr. Badger wrote: "I was surprised to see Phelps take the assignment to begin with. But any idea why they are actually withdrawing?" Matthew Monson responded: "Yes, I believe they were alerted to the representation by my previous post, which hyperlinked to their firm. I believe they did **not** have a direct conflict, but that politically they knew they couldn't be associated. *Many people in London* see my posts, so it wouldn't surprise me if they had

---

[190] Exhibit 29: LinkedIn Post

conversations." When Mr. Badger replied, "makes sense," Matthew Monson wrote: "can't say that wasn't my intended result with the hyperlink."[191]

547.     Matthew Monson's reference in the text message with Badger to "people in London" who would "see my posts" tracks Matthew Monson's own prior admission that he had traveled to London, specifically to Lloyd's of London, with Louisiana Insurance Commissioner Jim Donelon, and that MMA was discussed during the course of their meetings at Lloyd's of London.

548.     Lloyd's of London is the historical center of the insurance and reinsurance market, and the London market is a principal source of reinsurance capacity for insurance defense work of the kind performed by Phelps Dunbar LLP for its insurance industry clients.

549.     Matthew Monson's contemporaneous admission that he intended his LinkedIn Phelps Post to cause the withdrawal of Phelps Dunbar as MMA's counsel, his acknowledgment that the post was designed to reach "people in London" who would cause pressure on Phelps Dunbar, and his documented personal presence in the London insurance market reflect Matthew Monson's conscious effort to interfere with MMA's engagement of counsel and to impair MMA's ability to defend itself in pending litigation.

550.     The interference occurred at a period when MMA was facing litigation from its principal litigation funders in an amount exceeding $30 million and was defending against a default judgment entered in favor of PCG Consulting, LLC. MMA does not, by this pleading, allege any improper conduct by Phelps Dunbar LLP, and the allegations set forth herein are directed at the Defendants' intentional interference with MMA's engagement of counsel.

551.     Following Phelps Dunbar LLP's March 18, 2024 withdrawal in the EAJF Litigation,

---

[191] Exhibit 48 – Text messages with Badger

MMA was unable to afford and timely secure replacement counsel. EAJF thereafter filed a motion for summary judgment against MMA in the EAJF Litigation seeking judgment for approximately $38 million (the **"MSJ"**).

552.     The hearing on EAJF's MSJ was set for April 9, 2024. MMA, without counsel to oppose the MSJ and facing the imminent entry of a judgment in excess of $30 million, was forced to file bankruptcy on April 9, 2024. The timing and emergency posture of MMA's chapter 11 filing were the direct and proximate result of Monson's interference with MMA's engagement of Phelps Dunbar LLP, and of the resulting loss of MMA's counsel at a moment when continuity of counsel was indispensable to MMA's defense of the EAJF Litigation.

553.     Post-petition, PCG filed a proof of claim in the amount of $10,952,426.20, and EAJF filed its proof of claim in the approximate amount of $38 million.[192]

### CAUSE OF ACTION NO. 4: TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS — AGAINST ALL DEFENDANTS

554.     MMA hereby incorporates by reference the preceding paragraphs into Cause of Action No. 4, as set forth in the accompanying footnote.[193]

555.     Beyond its existing contractual relationships, MMA had a reasonable probability of entering into additional business relationships with prospective clients in Louisiana hurricane insurance litigation. MMA was actively operating in Louisiana, had an established client intake process funded by EAJF's approximate $30 million financing, and was one of the largest volume plaintiff firms handling hurricane claims in the state.

---

[192] Case No. 24-31596: PCG (Claim No. 46-1); EAJF ESQ Fund (Claim No. 51 in the amount of $19,187,499.24); and Equal Access Justice Funds (Claim No. 50-1 in the amount of $18,360,133.07)

[193] Paragraphs 527-532 (Allied Contracts); Paragraphs 61-96 (Judge Cain); Paragraphs 120-148 (Bar Complaints); Paragraphs 149-175 (LDI); Paragraphs 176-210 (Judge North); Paragraphs 49-60 (Arnold); and Paragraphs 320-332 (Phelps Dunbar)

556. Defendants' campaign was specifically designed to, and did, destroy MMA's ability to maintain or develop any client relationships in Louisiana. The coordinated actions — manufactured bar complaints, license suspensions (vacated for lack of due process), LDI sanctions (reversed for lack of jurisdiction), and sustained reputational attacks through LinkedIn, news media, and CLE presentations — rendered it impossible for MMA to attract or retain clients. Velawcity's corporate representative confirmed under oath that Katherine Monson opted into receiving MMA's text communications, establishing that the intake process Defendants attacked was lawful.

557. Defendants acted with the specific intent to prevent MMA from operating as a law firm and obtaining future business, and but for Defendants' interference, MMA had a reasonable probability of continuing to develop client relationships in Louisiana hurricane litigation. Monson admitted this intent at a seminar: bar complaints and insurance complaints are worthwhile because "it takes them off their game and off their mission."

558. As a direct and proximate result of Defendants' interference, MMA lost its ability to operate in Louisiana, lost prospective client relationships, and suffered actual damages in an amount to be proven at trial.

**CAUSE OF ACTION NO. 5: ABUSE OF PROCESS —
AGAINST ALL DEFENDANTS**

559. MMA hereby incorporates by reference the preceding paragraphs into Cause of Action No. 5, as set forth in the accompanying footnote.[194]

560. Defendants Matthew Monson, The Monson Law Firm, LLC, and Katherine Monson initiated and utilized legal processes by filing the Class Action for an ulterior purpose beyond the

---

[194] Paragraphs 120-148 (Bar Complaints); and Paragraphs 97-119 (Class Action); Paragraphs 222-235 (FBI)

objectives for which such processes were designed.

561.     The Class Action was not filed to vindicate any genuine consumer injury. Katherine Monson acted under Matthew Monson's direct physical supervision throughout the intake process. Monson admitted at a CLE that he was "over my wife's shoulder" directing her to "click on this" and "answer these questions," and that when asked whether she suffered damage, he responded: "I don't know. Maybe we did. Maybe we didn't." The complaint's characterization of Katherine Monson as "confused" was false. The follow-up communications were described by Monson with professional admiration as follow-up so effective that "insurance companies should do this" because "they would make a lot more money."

562.     Moreover, Velawcity's corporate representative confirmed under oath that Katherine Monson had voluntarily opted into receiving text communications via web form submission, directly contradicting the complaint's characterization of those communications as unsolicited.

563.     Specific post-filing acts of process misuse include: the filing of a $5 million complaint Monson knew rested on false factual allegations; the amendment of the complaint on April 3, 2024 to add EAJF as a defendant, characterizing MMA's litigation funder as a co-conspirator in a "barratry" scheme, on the eve of MMA's bankruptcy filing, for the purpose of subjecting MMA's lender to litigation pressure and discrediting the financing relationship; the use of the Class Action proceeding and its associated discovery as an intelligence-gathering tool against MMA coordinated with the FBI; and the transmission of Class Action materials to Agent Bradford on December 11, 2024 under the subject line "Katherine Monson matter," confirming that the litigation was used as an instrument of the broader Enterprise campaign rather than genuine consumer advocacy.

564.     The bar complaints were filed not to address genuine ethical violations but as

acknowledged tactical weapons. At a CLE, Monson stated explicitly: "opportunities such as bar complaints or insurance complaints" are worthwhile because "if the firm is having to respond to those complaints, then it takes them off their game and off their mission." These complaints were done on behalf of Allied. The LDI complaint was filed on behalf of individuals Monson had never met or spoken to, using false allegations that MMA was withholding insurance proceeds from the Caffarels, allegations Monson knew to be false when made and filed on behalf of Allied.

565.    As a direct and proximate result, MMA suffered actual damages including the costs of defending against the manufactured proceedings, reputational harm, and the downstream consequences that flowed from these filings.

### CAUSE OF ACTION NO. 6: BUSINESS DISPARAGEMENT AGAINST MATTHEW MONSON AND THE MONSON LAW FIRM, LLC

566.    MMA hereby incorporates by reference the preceding paragraphs into Cause of Action No. 6, as set forth in the accompanying footnote.[195]

567.    Monson published false and disparaging statements of fact concerning MMA's business to third parties, including but not limited to:

    (a) Statements to the Louisiana State Police, attributed to Monson in the Initial Complaint Report, that MMA was "deceiving individuals and stealing insurance claim settlement funds," which Monson admitted under oath he had no personal knowledge of and no factual basis to support;

    (b) The LDI complaint's false accusation that MMA was preventing the Caffarels from

---

[195] Paragraphs 211-221 (State Police); Paragraphs 149-175 (LDI); Paragraphs 211- 221 (State Police); and Paragraphs 315, 417-418 (Largest insurance scheme)

accessing insurance proceeds — filed on behalf of individuals Monson never met, contradicted by his own CLE admission that MMA's counsel endorsed the Caffarel checks;

(c) Public statements on The Monson Law Firm's website characterizing MMA's operations as "the largest insurance and legal scheme ever uncovered";

(d) Public dissemination of the LSP Initial Complaint Report on LinkedIn, amplifying and endorsing the false allegation that MMA stole client funds; and

(e) Statements at CLE presentations characterizing MMA's operations as "the biggest insurance fraud ever" and describing MMA as "completely illegal in everything they were doing," while stating his objective to get MMA "bankrupt and in jail".

568.   These statements were false. Monson admitted under oath that he had no personal knowledge that MMA had ever stolen a single penny of client funds.

569.   Monson published these statements with knowledge of their falsity or with reckless disregard for their truth, and with the intent to cause pecuniary harm to MMA or with malice. The malice is further established by Monson's stated objective to "starve the firm of money" and to get MMA "bankrupt and in jail," and by his public statement that his campaign against litigation-funded plaintiff firms reflects his personal ideological convictions — not merely his client's interests.

570.   As a direct and proximate result of these publications, MMA suffered special damages, including the loss of clients, loss of fee entitlements, reputational destruction, and its ultimate bankruptcy, in amounts to be proven at trial.

<u>**CAUSE OF ACTION NO. 7: DEFAMATION AND DEFAMATION PER SE**</u>
<u>**AGAINST MATTHEW MONSON AND THE MONSON LAW FIRM, LLC**</u>

571.     MMA hereby incorporates by reference the preceding paragraphs into Cause of Action No.

7, as set forth in the accompanying footnote.[196]

**A.     <u>ELEMENTS</u>**

572.     Under Texas law, the elements of defamation are: (1) the defendant published a statement

of fact; (2) the statement referred to the plaintiff; (3) the statement was defamatory; (4) with the

requisite degree of fault — at least negligence for a private-figure plaintiff and actual malice where

the plaintiff is a public figure; and (5) damages, unless the statement was defamatory *per se*.

*WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998); *In re Lipsky*, 460 S.W.3d 579,

593 (Tex. 2015).

573.     Statements that injure a person in his office, profession, or occupation are defamatory *per*

*se*, and damages are presumed without proof of special harm. *Hancock v. Variyam*, 400 S.W.3d

59, 63–64 (Tex. 2013); *Lipsky*, 460 S.W.3d at 596. Statements falsely accusing a person of a crime

or of conduct injurious to a business are defamatory *per se*. *Hancock*, 400 S.W.3d at 64.

**B.     <u>DEFAMATORY STATEMENTS PUBLISHED BY MATTHEW MONSON AND THE MONSON</u>**
**<u>LAW FIRM</u>**

**1.     <u>False "Stealing Client Funds" Statement</u>**

574.     Matthew Monson caused to be published to the LDI, and the Louisiana State Police

thereafter published in its October 17, 2023 Initial Complaint Report, the false factual statement

attributed to Matthew Monson that MMA was **"deceiving individuals and stealing insurance**

**claim settlement funds."** The statement is a direct accusation of theft and criminal conduct. It is

---

[196] Paragraphs 211-221 (Stealing Client Funds); Paragraphs 577-578 (Disbarment); Paragraphs 579-582 (Campaign Donation); Paragraphs 583-592 (False Statements)

defamatory *per se* because it accuses MMA of a crime and of conduct injurious to MMA's business and profession.

575. Matthew Monson republished the Louisiana State Police Initial Complaint Report, and the false "stealing insurance claim settlement funds" statement attributed to him therein, by posting the Initial Complaint Report on his LinkedIn account, where Matthew Monson has more than 18,000 followers and where the post was publicly accessible to any LinkedIn user. The republication is independently actionable. *Stephan v. Baylor Med. Ctr., 20 S.W.3d 880, 890 (Tex. App.—Dallas 2000, no pet.)* ("Parties who reasonably foresee that their defamatory statements will be repeated to third parties may be held responsible for republications.") The post remains published as of April 23, 2026, and Matthew Monson has not, at any time, retracted, corrected, or disclaimed the statement, notwithstanding his subsequent admission under oath at the 2004 Exam that the underlying factual representation is false.

576. Matthew Monson knew when he caused the statement to be made to the Louisiana State Police that he had no factual basis for the accusation. He admitted under oath at his February 26, 2026 Rule 2004 examination that he had **no personal knowledge** that MMA had retained any client funds, that he had never observed any unlawful transfer of client funds, and that he had no personal knowledge of MMA "stealing client money." Matthew Monson's continuing republication of the statement on LinkedIn after his sworn admission of no factual basis establishes actual malice and reckless disregard for the truth.

**2.    The False Disbarment Statement**

577. On March 17, 2024, at the PLRB Insurance Conference in Boston, Massachusetts, Matthew Monson stated as a fact that his bar complaints had resulted in the **disbarment** of MMA attorney William Huye. The statement is false. Mr. Huye has not been disbarred by any state bar authority.

578. The disciplinary action procured in part through Matthew Monson's bar complaints resulted in an interim suspension. As the attorney who personally filed the underlying bar complaints and a licensed attorney familiar with the difference between suspension and disbarment, Matthew Monson made the statement with actual knowledge of its falsity. The statement is defamatory *per se* because it accuses MMA's attorney of conduct injurious to his profession.

### 3. The False $155,000.00 Campaign Donation

579. On or about February 20, 2025, in a YouTube interview transmitted to a nationwide audience, Matthew Monson stated as a fact that the former Louisiana Attorney General had taken no action against MMA because he had received **"$155,000 in campaign donations from MMA"** and had "looked the other way."

580. The statement is false. MMA never paid $155,000 to the former Attorney General or any public official.

581. MMA's lawful, publicly disclosed political contributions to the former Attorney General did not exceed $5,000 in the aggregate.

582. The statement falsely accuses MMA of bribery — a crime — and is defamatory *per se*.

### 4. The "Biggest Insurance Fraud" Statement

583. On March 17, 2024, at the PLRB Insurance Conference, Matthew Monson stated as a fact that MMA **"is the biggest insurance fraud that has ever been busted,"** and on or about February 20, 2025, that he had "busted one of the biggest insurance and legal schemes in U.S. history."

584. Each statement is false.

585.     MMA has not been adjudged to have committed insurance fraud, and the regulatory action alleging such fraud was vacated for lack of jurisdiction on January 31, 2025. Each statement falsely accuses MMA of fraud and is defamatory *per se*.

**5.     Continuing Publications on The Monson Law Firm Website**

586.     Matthew Monson and The Monson Law Firm, LLC continue to publish on the firm's commercial website the materially false factual representations that the firm **"destroyed MMA"**; that the firm "stopped MMA's unethical insurance litigation scheme, resulting in a $150 million bankruptcy filed by the firm"; that Matthew Monson "defeat[ed] the largest insurance and legal scheme ever uncovered"; and that Matthew Monson's actions resulted in savings to the insurance industry **"measured in the billions of dollars."**

587.     Matthew Monson admitted under oath at his February 26, 2026 Rule 2004 Exam that he **"did not take down MMA,"** directly contradicting the public representations on the firm's commercial website. Each day of continued publication on the website is a continuing publication. Each statement falsely accuses MMA of fraud and unethical conduct and is defamatory *per se*.

**6.     FAULT**

588.     To the extent MMA is a private figure, Matthew Monson and The Monson Law Firm, LLC published each of the foregoing statements with at least negligence as to truth or falsity.

589.     To the extent MMA is or may be deemed a public figure or limited-purpose public figure, Matthew Monson and The Monson Law Firm, LLC published each of the foregoing statements with **actual malice** — that is, with knowledge of falsity or with reckless disregard for the truth. *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964).

590.    Actual malice is established by Matthew Monson's sworn admissions of no factual basis for the underlying assertions, by his admitted strategic motive of taking MMA "off their game and off their mission," and by his commercial promotion of his firm on the basis of the false statements.

**7.    DAMAGES**

591.    Because the statements are defamatory *per se*, damages are presumed and need not be proven by special harm. *Hancock*, 400 S.W.3d at 64.

592.    In addition, MMA has suffered actual damages including loss of contingent fee entitlements, loss of going-concern value of its Louisiana practice, loss of co-counsel and lender relationships, and reputational injury producing concrete financial loss, in amounts to be proven at trial. MMA further seeks exemplary damages on this Cause of Action under Texas Civil Practice and Remedies Code Chapter 41 based on Defendants' actual malice.

## PRAYER FOR RELIEF

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff MMA Law Firm, PLLC respectfully requests that this Court enter judgment against Defendants Matthew Monson, The Monson Law Firm, LLC, Katherine Monson, and Allied Trust Insurance Company, jointly and severally, and grant the following relief:

1. Treble damages in an amount to be determined at trial;

2. Actual and compensatory damages in an amount to be determined at trial including but not limited to damages for lost contingency fee income, loss of client relationships, loss of business goodwill, and all consequential damages flowing from the destruction of MMA's business operations;

3. Exemplary and punitive damages for all state court causes of action, not RICO;

4.   Reasonable and necessary attorney's fees and costs for bringing this Adversary Proceeding;

5.   Pre-judgment interest at the highest lawful rate from the date each element of damage was incurred through the date of judgment;

6.   Post-judgment interest at the rate provided by 28 U.S.C. § 1961;

7.   A declaration that Defendants' conduct constituted a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c); and

8.   Such other and further relief, at law or in equity, as this Court deems just and proper.

Dated: April 29, 2026.

Respectfully submitted,

By: /s/Miriam T. Goott

Miriam T. Goott
SBN #24048846
COUNSEL FOR PLAINTIFF

OF COUNSEL:
WALKER & PATTERSON, P.C.
P.O. Box 61301
Houston, TX 77208-1301
Phone (713) 956-5577
mgoott@walkerandpatterson.com

### CERTIFICATE OF SERVICE

I, Miriam T. Goott, hereby certify that on April 29, 2026, a true and correct copy of the Amended Complaint was served on the Defendants by U.S. Mail at the addresses identified above in the "Parties" section of the Amended Complaint.

By: /s/Miriam T. Goott
Miriam T. Goott