IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| HILLARY WEATHERALL | * | Docket No. 2:22-cv-3096 |
| | * | Docket No. 2:22-cv-4322 |
| | * | |
| | * | |
| VERSUS | * | October 20, 2022 |
| | * | |
| | * | |
| | * | |
| SCOTTSDALE INDEMNITY CO. | * | Lake Charles Division |

----------------------------------------------------------------

| | | |
|---|---|---|
| MICHAEL POULLARD | * | Docket No. 2:22-cv-4032 |
| | * | Docket No. 2:22-cv-4724 |
| | * | |
| | * | |
| VERSUS | * | October 20, 2022 |
| | * | |
| | * | |
| | * | |
| LIBERTY MUTUAL INSURANCE CO. | * | Lake Charles Division |

----------------------------------------------------------------

| | | |
|---|---|---|
| PATRICIA LEDAY | * | Docket No. 2:22-cv-4169 |
| | * | |
| | * | |
| VERSUS | * | October 20, 2022 |
| | * | |
| | * | |
| INTEGON NATIONAL INSURANCE CO. | * | Lake Charles Division |

----------------------------------------------------------------

| | | |
|---|---|---|
| JOE MORSE | * | Docket No. 5:22-cv-4970 |
| | * | |
| | * | |
| VERSUS | * | October 20, 2022 |
| | * | |
| ALLSTATE VEHICLE & PROPERTY | * | |
| INSURANCE CO. | * | Shreveport Division |

----------------------------------------------------------------

Deidre D. Juranka, CRR
United States Court Reporter
Western District of Louisiana

**McClenny Moseley Motion Hearing** 2

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| MICHAEL HATAWAY | * | Docket No. 1:22-cv-4740 |
| | * | |
| | * | |
| VERSUS | * | October 20, 2022 |
| | * | |
| | * | |
| ALLIED TRUST INSURANCE CO. | * | Alexandria Division |

-----------------------------------------------------------------

| | | |
|---|---|---|
| ABIGAIL ZENO | * | Docket No. 6:22-cv-4565 |
| | * | |
| | * | |
| VERSUS | * | October 20, 2022 |
| | * | |
| | * | |
| ALLIED TRUST INSURANCE CO. | * | Lafayette Division |

-----------------------------------------------------------------

| | | |
|---|---|---|
| BOBBY DYER | * | Docket No. 5:22-cv-4961 |
| | * | |
| | * | |
| VERSUS | * | October 20, 2022 |
| | * | |
| | * | |
| ALLIED TRUST INSURANCE CO. | * | Shreveport Division |

-----------------------------------------------------------------

| | | |
|---|---|---|
| NATHAN JOUBERT | * | Docket No. 6:22-cv-5497 |
| | * | Docket No. 6:22-cv-5500 |
| | * | Docket No. 6:22-cv-5501 |
| | * | Docket No. 6:22-cv-5503 |
| | * | Docket No. 6:22-cv-5510 |
| | * | |
| | * | |
| VERSUS | * | October 20, 2022 |
| | * | |
| | * | |
| FOREMOST INSURANCE CO. | * | |
| GRAND RAPIDS, MICHIGAN | * | Lafayette Division |

Deidre D. Juranka, CRR
United States Court Reporter
Western District of Louisiana

```
*************************************************************
```

OFFICIAL TRANSCRIPT OF MOTION HEARING
HELD IN LAKE CHARLES, LOUISIANA
BEFORE THE HONORABLE JAMES D. CAIN, JR.,
UNITED STATES DISTRICT JUDGE

```
*************************************************************
```

**A P P E A R A N C E S**

FOR THE PLAINTIFFS: R. WILLIAM HUYE, III
GRANT P. GARDINER
McClenny Moseley & Associates
1820 St. Charles Avenue, Suite 110
New Orleans, LA 70130


REPORTED BY:        DEIDRE D. JURANKA, CRR
USDC - Western District of LA
611 Broad Street
Lake Charles, LA 70601

**COURT PROCEEDINGS**

THE COURT: All right. This is not my courtroom so it's going to take me a minute. Okay. If I could have you gentlemen make your appearances for the record while I get myself situated.

MR. HUYE: Yes, Your Honor. William Huye on behalf of the plaintiff, Mr. Hillary Weatherall.

THE COURT: I'm sorry. What's the other gentleman's name?

MR. GARDINER: Grant Gardiner.

THE COURT: Okay.

MR. HUYE: And, Your Honor, we have all three sets of clients sitting in the --

THE COURT: Okay. Great. I'm going to want to hear from them in a minute.

MR. HUYE: Yes, Your Honor.

THE COURT: The reason for the -- let me call these cases first. This is, for the record, 22-03096, Weatherall versus Scottsdale. I think I'm saying that right. Am I saying that name right, Weatherall?

MR. HUYE: Yes, Your Honor.

THE COURT: Then there's a second Weatherall, 22-04322. Poullard versus Liberty Mutual, this one's 22-04032. Leday versus Integon National Insurance is 22-04169. Then the second Poullard case is 22-04724.

Let me preface this by this. I have not seen you guys in my court. I've had hurricane litigation going on for two years. We've gotten through about 3,000 cases, settling the cases, going through my case management order, working the cases up. And it's been a very, I think, efficient process. We've had about a 90 percent settlement rate in the case management order. We have law firms from around primarily in this area. We have some from southeast Texas. They've all done a very good job of working their cases up, taking them through the case management order. The insurance companies have -- I'll commend most of them. I've got a couple that still kind of fight a little bit on some things, but I think for the most part they bought into the system and we've had a good working relationship on both sides in getting the cases resolved.

I expected a surge of cases at the end of the day. Most of the law firms that Special Master Juneau contacted, several of the law firms that have been filing a lot of cases, they were told -- we were told we would have maybe 200 from some firms, 300 as they were wrapping up getting the last ones in. Most firms stopped taking cases at least a week to two weeks out knowing they had to prepare those lawsuits and get them filed. Then here come you guys and you file 1629

**McClenny Moseley Motion Hearing**                                    6

lawsuits in two days, and I'm -- you have clogged up the system.  You have wasted judicial resources having to deal with your mess because you didn't do your job on the front end, the way the Court sees it.  You're not going to clog up my system.

I have questions.  I'm going to let you have an opportunity to explain yourself and tell me how this happened.  I'm open, but I'm trying to give you a preview of what the problem I have.  The other problem I have is I question to a great extent based on what I've seen and what my clerk's office has given me that, one, do you even represent some of these people and, if you do represent them, before you filed their lawsuits did you meet with them, did you talk to them, did you vet out as officers of this court.  And under Rule 11, one rule, not necessarily the only rule, as officers of the court you signed pleadings, you filed them into this court with the understanding that you as officers of the court did a good faith attempt to verify the allegations you made in the pleadings.  And if you did not, that's sanctionable.  And I will sanction you over and over and over again in each case because I don't think --

You know, I think that's what's wrong with the world today a little bit.  There's no consequences. People run around going I don't have to -- I do what I

**McClenny Moseley Motion Hearing**                                                  7

want.  Listen, you're fixing to have a child, I think.

MR. HUYE:  Yes, Your Honor.

THE COURT:  Congratulations.

MR. HUYE:  Thank you.

THE COURT:  Hardest thing to do in the world is discipline your kid because you love them; but God knows we need to discipline them so they learn and they don't make the mistakes down the road, they take responsibility for their actions.  I think that's part of the problem today.  So I'm really here to try to help you guys learn this is not the way to do business, this is not the way to practice law.  That may be your firm's business model and y'all see dollar signs and you're going to come in --

This is not a mass tort settlement situation.  You're not going to come in here -- I'm just going to warn you now.  I've already heard that y'all sent letters out to some of the insurers with spreadsheets saying here's our cases, we want to do a mass mediation.  Not going to happen.  You're not going to mass settle these cases.  These people are individuals.  They have individual claims.  Each of them is different.  Each of them's problems are different.  And you have a duty as lawyers to them to represent their interest, work their claim up individually, and get them the best result

possible. My job is to administer justice and to protect the public, protect the bar, and protect the judicial process.

So you may go try to pull this stunt in Florida because I've already seen y'all's advertisements. Shame on you. Shame on you for trying to prey on people. I think personally that's what you do, but maybe after today y'all will take a different approach. I know your firm's some Texas firm, and y'all look like good young lawyers. And I'm trying to -- I want you to know now if you get a bar complaint against you, you get sanctions against you, it follows you as lawyers. It follows you.

I'm the luckiest person in the world to have this job. This is the greatest job in the world as a lawyer and I'm blessed to have it, but I can tell you if I had a bar complaint or I had the kind of things that y'all are -- I wouldn't be sitting here. That would have been a nonstarter for the United States Senate, probably for the President. You got -- the only thing you got going forward in this world is your reputation, and as lawyers your reputation follows you. You get a bad one, it's really hard to shake it. And y'all are some young probably smart lawyers, but I'm telling you y'all got to tighten up. And if you don't tighten up, I'm going to tighten it up for you.

So I don't -- look, I've lectured more to y'all than I do to criminal defendants. I don't lecture people usually, but I want you to understand where I'm coming from. I really want to understand how this happened and what y'all are trying to do because it really bothers me. I've talked to the Chief Judge of the Western District, my Chief Judge. I've talked to my other colleagues in this district. All your cases are going to be assigned back to me. I'm going to monitor y'all, and I'm really doing it to protect the public back here.

So explain to me, first of all, how you end up with 1600 cases and file them in three days, because what everyone else has been doing is they tried to settle the case pre-suit. If they couldn't, they filed a suit right then and they'd get them in the process. It was a continual process. Yes, I had a few firms file 100, 200 suits because they had to wrap up. I get that. That happens. But 1600? And I hadn't really seen y'all. I seen y'all filed a few maybe last year. Explain to me how this -- how this happens.

MR. HUYE: Yes, Your Honor. We definitely take it with great responsibility. We're trying to help people. These are hurricane victims. We take that very seriously, and we're trying to do our best to help our

**McClenny Moseley Motion Hearing** 10

state and our community in the best way that we can.

THE COURT: Can you hear him, DD? You may need to turn that mic. You can stay at the table if you want, if you'd just turn that mic around just so she can hear. I'm having a little trouble hearing you. I'm getting old. I can't hear as good as I used to.

MR. HUYE: Is that better, Your Honor?

THE COURT: Yeah, that's perfect.

MR. HUYE: All right. Yeah, I mean, we take this very seriously. We're trying to help people. There's a whole lot of people that need help, and I think we're trying to do our best to scale. Because obviously if no attorney would have signed up these hurricane victims, they would have lost out on their rights because of the statute. So we were put under a lot of pressure to try to rise to the occasion to help people.

Regarding why it was at the last second, Your Honor, we had an extensive pre-suit mediation program. We settled thousands of claims through that program.

THE COURT: So you're saying to me that these 1600 suits you filed, you already had them for a while?

MR. HUYE: Some of them, Your Honor, but not all of them. We did sign up a vast majority of these claims kind of leading up to the statute of limitations.

THE COURT: How many you think? Ballpark it. Out

of the 1600, is it 29, Toni, I don't know, 1629, how many do you think you got in the last couple of days before the prescriptive period?

MR. HUYE:  I'm not sure on the last couple of days. I certainly could give a better figure on the last couple of months if that would be helpful.  In the last couple of days it was something about 40, 50 a day in the last three days was really what I was --

THE COURT:  Let me ask you, I'd never even heard of y'all.  I'll be honest.  Never heard of your firm. How'd you get these cases?

MR. HUYE:  Yes, Your Honor.  Through a vast source of advertising sources.  What we found is that it's not necessarily that these hurricane victims are weighing lots of different types of firms.  That's not what we saw in the market.  What we saw is there's lots of people, especially underserved communities, who didn't know there was an opportunity to get help.  They didn't know there was an avenue to be able to sign up.  And so when we educated these hurricane victims about their opportunities --

THE COURT:  And how did you go about doing that?

MR. HUYE:  Yes, Your Honor.  There's -- we sent out mailers, flyers that would have come to people's homes. We have billboards.  We've had buses.  We had radio ads.

I'm not privy to all of the details of what our advertising department went through.  We certainly ran everything by the bar.  But it's an extensive source of --

THE COURT:  So you got signed off by the bar on the advertisements?

MR. HUYE:  Yes, Your Honor, we do submit to the bar.

THE COURT:  My understanding is y'all use a company called Velocity.  Is that correct?

MR. HUYE:  For some of the advertising we do, Your Honor.

THE COURT:  How did you then make contact with the client at that point or how did they contact you and enter into a contract to retain your firm?

MR. HUYE:  Yes, Your Honor.

THE COURT:  How did that happen?

MR. HUYE:  Yes, Your Honor.  It depends a little bit on the advertising source.  But just for example, the flyer, the flyer on the bottom that included kind of a portal, if you will, a URL code where the client or the potential new client could go online, read about us, get some information.  If they would like to receive a retainer agreement to review, there's an opportunity to click a button and have one sent to them via e-mail.

THE COURT:  And then how would -- then if they wanted to retain you, what would they do?  Was there like a DocuSign or electronic signature?

MR. HUYE:  There was, Your Honor.

THE COURT:  Okay.  But then at that point then they've retained you.  They're your responsibility.  We can agree on that?

MR. HUYE:  Yes, Your Honor.

THE COURT:  At that point you represent them.

MR. HUYE:  Yes, Your Honor.

THE COURT:  So what was your firm's process, then, for meeting with these individuals prior to filing a suit for them?

MR. HUYE:  Yes, Your Honor.  We used a DocuSign platform called AssureSign that we can launch out of our CRM platform.  And the one that we sent out in advance of the lawsuit, it was a document that basically would ask the client to confirm certain policy information to make sure that it was accurate and then to ask permission from our clients to invoke appraisal and also to file a lawsuit.  And so a client, if they wanted us to file a lawsuit, would click yes.  And if they did not want us to file a lawsuit, then they would say no and sign it.

THE COURT:  And you have all this data?

Case 6:22-cv-04565-DTC-DLA Document 72-2 Filed TXSD 11/24/23 Page 14 of 55 Page 55 PageID #: 134

MR. HUYE:  Yes, Your Honor.  There were a percentage of the clients who we sent out the DocuSign letter to and we simply couldn't get in touch with them. We called dozens and dozens of times.  We sent dozens of e-mails and texts.  And in those instances we sent out a follow-up letter that said we've desperately tried to get in touch with you with the contact information you provided, we can't get in touch with you.  Your Honor, as we were discussing before, they're our responsibility.  So in those instances we did elect to file suit to protect their rights as we continue to follow-up with them.  But, Your Honor, this is the minority of the claims.  The majority responded very positively to the opportunity to fill out the DocuSign letter.

THE COURT:  Okay.  And so the DocuSign letter, is that your contract of retention with them?

MR. HUYE:  No, Your Honor.

THE COURT:  That's a separate --

MR. HUYE:  Yes, Your Honor.

THE COURT:  You sent them a separate contingency -- I'm assuming you're working on a contingency fee.

MR. HUYE:  The second letter doesn't necessarily talk about any sort of professional fees or anything like that.  It's only collecting additional information

almost like a questionnaire.

THE COURT: You do that first?

MR. HUYE: No, Your Honor. They sign the retainer first.

THE COURT: First?

MR. HUYE: Yes, Your Honor. Sometime thereafter we send the additional --

THE COURT: How does the retainer agreement get to them?

MR. HUYE: Also through the DocuSign system. It just would have come prior --

THE COURT: They get that first. I'm sorry. I'm slow sometimes. Then you send the questionnaire to them, and then you would file the suit?

MR. HUYE: Yes, Your Honor.

THE COURT: My concern is this all happened so fast. That's why I'm trying to understand how these cases got into your firm and in what timeframe did they get into your firm where I have hundreds of duplicate suits being filed. I have some suits that I've already identified that have already been either dismissed by this Court or they've settled and you filed another suit for them. And that is very troublesome to me because that, to me, gives me a lot of indication that there's not been the adequate client-attorney communication

**McClenny Moseley Motion Hearing** 16

because if you would have talked to these people you would know better. You would have asked them that. That is the Court's concern. So I'm trying to understand your process because it's not one, it's not two, it's a lot.

MR. HUYE: Yes, Your Honor.

THE COURT: So I'm trying to gather how you guys met with 1629 plaintiffs before you filed suit because I think, personally, you have a duty and obligation to meet with them. Maybe you can't meet with them in person, but you should at least talk to them on the phone.

MR. HUYE: Yes, Your Honor.

THE COURT: I think, personally, you should meet with them personally; but I can't sit here and tell you that every client, every retain me -- you know, because I had companies that would call me from out of state saying, hey, we'd like to retain your services and a lot of stuff would happen initially on the phone. So I'm not saying that can't be done, but the biggest -- when were you admitted to the bar?

MR. HUYE: 2018, I believe, Your Honor.

THE COURT: When?

MR. HUYE: 2018.

THE COURT: When were you admitted?

MR. GARDINER:  Last year.

THE COURT:  Okay.  So y'all are two relatively young lawyers.  2022, so you've been in the bar four years, you've been in the bar less than a year.  One of the biggest -- knock on wood.  I never had a bar complaint filed against me in 30 years of practicing law.  But the number one bar complaint filed against young lawyers, lawyers in general, all lawyers, is lack of communication with the client.  Happens a lot.  So I'm trying to understand.

Also, I'm hoping y'all take something from today.  I'm not here, really -- I am here to fuss a little bit.  I'm not going to lie to you.  But I'm also here hoping that you'll learn because I'm going to tell you if your firm's business practice and your business model is to do it this way, if I was you two I'd go find a different firm to work for because this is not the way to do it.  I still don't think this is the way to do this.  So I'm trying to understand out of 1600 suits how did you communicate with this many people over that short period of time?

MR. HUYE:  Yes, Your Honor.  This is not easy.  We're trying to help people that need help.  We're having to move very quickly as individuals and as an organization to try to rise to the occasion.  We bought

**McClenny Moseley Motion Hearing**                                    18

a call center so that we could handle volume of calls. We have --

THE COURT:  Who do you have manning the call center, lawyers?  Because non-lawyers cannot give legal advice.

MR. HUYE:  Yes, Your Honor.

THE COURT:  Illegal practice of law.

MR. HUYE:  Yes, Your Honor.  Everything is things that I've scripted specifically, and we're very careful about how we give communications to the clients; but we answer a thousand calls or more a day.  We send out hundreds of text messages every day, hundreds of e-mails every day.  We process --

THE COURT:  What you're telling me is you're giving generalized pre-scripted responses.  You're not giving the individual attention to the client where the client has a question about his case, how would this affect it. You're giving text messages.  You're telling me you're giving pre-scripted responses from a call center to people.  So how are they really informed?

MR. HUYE:  Yes, Your Honor.  So it depends on the type of question from a client.  If the client is calling in to say have you assigned an estimator on my claim yet to come out to my home, right -- and my firm fronts the money to have that expert come out.  We put

together an individual investigation with a photo report and an estimate on every single claim, and we do it very quickly. So sometimes the client may call in to say, hey, have you assigned my claim to an estimator yet. And in that case, Your Honor, it would be appropriate for someone in a call center to read a script. And we have a very sophisticated technology platform, a CRM system which has a status, which as my team goes out and assigns estimators it would change the status from need to assign estimator to estimator assigned. In that instance, Your Honor, we've made the decision that it would be appropriate for someone in a call center to be able to help us with communication and to read that status and then confirm yes, an estimator has been assigned, just as an example.

THE COURT: So of the 1600 suits you filed, how many of them have had estimators go out to these people's homes and do a report?

MR. HUYE: Your Honor, the answer should be 100 percent. However, some of our clients have been difficult to get in touch with. Hundreds of times we've reached out communicating with them. The last step will be a knocking campaign with clients that we've signed. But it is the vast minority that don't have estimates yet. Usually it's about within 21 days of signing, is

our average of receipt of an estimate back.

THE COURT:  So if you're going to go to all that trouble, which I think is a good process to do, to individually go out to these people's homes, if that's what you're doing, that's good.  I think that's the right way to do it.  So I guess what I'm having trouble, then, connecting that dot to the dot that I'm hearing from some insurers that y'all are sending out spreadsheet letters saying, hey, we got this many cases, we want to do a mas mediation.  How do you mass mediate when everybody has an individualized claim?  How do you do that?

MR. HUYE:  Yes, Your Honor.  I've been doing it for years and years.  I started with Superstorm Sandy, Harvey with Judge Edison.  So the way that we do it is we have a spreadsheet that attaches to a position paper.  In the spreadsheet you have to enter in the individualized information, right.  You have to enter in the amount of the estimate from an estimator that went out there.  We have to go through the insurance company's claim file, have to pull out the prior payments, right, and then find the remaining in dispute.  We then go out and find the timings of their payments.  Our belief is that the law supports if they didn't pay within 30 days of their initial inspection then

Deidre D. Juranka, CRR
United States Court Reporter
Western District of Louisiana

penalties are due.

THE COURT:  I agree with you.  I'm not disputing that.  What I'm trying to understand, though, is when you send the spreadsheet to the insurer and you want to do a mass mediation of these claims --

MR. HUYE:  Yes, Your Honor.

THE COURT:  -- what I'm hearing when I hear that is that you want to do, hey, I'm randomly, XYZ insurance company, we got a hundred of your insured claims, we want to mass mediate them, is what I'm understanding this letter to -- I'm paraphrasing what it says.  That tells me you're looking for a lump sum fee or a lump sum settlement and you're going to have to figure out how you're going to divvy that up among your clients.

MR. HUYE:  Absolutely not.

THE COURT:  Well, then you can't mass mediate them.

MR. HUYE:  Your Honor, if I may.

THE COURT:  Yeah, please.  That's why we're here.  I want to hear, I want to understand ethically how you can do it this way.

MR. HUYE:  Yes, Your Honor.  So it's an extensive document production in advance of this mass mediation.  So we would say -- for example, we have Scottsdale on this list today.  Let's say we have 200 claims with Scottsdale.  If we can find a counsel that will agree to

set a mediation in maybe 45, 60 days so we have a deadline and then to say five weeks before provide to me your claim file. All right. I'm going to go through your claim file and do the exact analysis we're talking about with an estimate that we had done independently and comparing it to the insurance company's estimate. We're going to fill out a spreadsheet. We're going to fill out a position paper. And we're going to have all of this information which we're going to send to you, the insurance company, at least two weeks prior to the mediation. We're then going to show up fully prepared, fully prepared, and say, look, our position is if we tried this case our best day in court is $375,000, right. We would like to go through the estimate very quickly. And, Your Honor, since we specialize in these claims, we are excellent at reviewing estimates exceptionally --

THE COURT: Guess what, I specialize in them too.

MR. HUYE: Yes, Your Honor.

THE COURT: I've got 7,000 of them. I'm pretty savvy on them myself. But my question is how do you go through a hundred of them in a day at a mediation if you're going to mass mediate?

MR. HUYE: Yes, Your Honor. We haven't done a hundred in a day yet. The most that --

Deidre D. Juranka, CRR
United States Court Reporter
Western District of Louisiana

THE COURT: I'm just picking a number.

MR. HUYE: Sure. Your Honor, we have been able to do 50 in a day, right. And the way that we did that was this process. It takes a special defense counsel or an adjuster that they may have hired who can keep up with the pace and basically --

THE COURT: You know, look, you've got the insurance company here on their heels a little bit because -- and I think that's part of your business model. You know that. That's why I told you I know you dumped these cases on me at the last minute on purpose. That's your business model. I'm sorry. You can deny it, but it's what you did because you get the insurer on their heels. And they want closure, man. They want out of here. You come to them and go, hey, you got authority to get rid of 50 cases and we can do it for 60¢ on the dollar, they'll take that deal all day long and you can't blame them. They're a business. They're running a business. But the people you represent, I'm afraid, are disserved.

MR. HUYE: We will not be mediating or negotiating claims in that fashion. I can --

THE COURT: Here's what we're going to do.

MR. HUYE: Yes, Your Honor.

THE COURT: We're going to talk about some other

cases in a second.  You're going to go through my case management order.  You're going to use my mediators that I've assigned in the case management order through the special master so I can be assured that that process is going to work as you've just described it because there will be no mass settlements.  You can't do it in a hurry.  Everybody's claims are too individualized.  I'm not going to allow it.  It's just not going to happen. I have a duty to protect the public.

I grew up in southwest Louisiana.  I went to McNeese.  I saw this community torn apart.  And if I leave this bench with one legacy, it's that I protected the public the best I could.  I can't protect everybody, but I want to give everybody their day in court.  I want to be sure they get adequate -- some of the insurers have been horrible, haven't paid people.  I agree they need counsel, but I got to be sure it's done right.

MR. HUYE:  Yes, Your Honor.

THE COURT:  So if that's the way you're doing it, I can see it.  But my other question for you, then, is as you go to this mass mediation, so to speak, you have to have authority from your client to settle the case.  You can't settle a case without your client's permission. What do you do prior to -- I'm trying to understand your business here.  How do you get your client's

permission --

MR. HUYE:  Yes, Your Honor.

THE COURT:  -- to settle that case?  Most people bring their clients to my mediations.  You're not bringing that many people, I'm assuming, to these mediations because you couldn't do it.  I'm trying to understand how -- I think you should inform them that they have a right to be at the mediation.

MR. HUYE:  We do.

THE COURT:  So how do you communicate with your client in terms of getting authority to settle the case?

MR. HUYE:  Yes, Your Honor.  About two weeks before mediation -- the clients obviously already know that their claim is up for mediation, but we inform them that -- two weeks before, once we have the position papers all put together, we kind of have that final evaluation complete, we give each and every one of our clients a call and we go through what are the best cases at trial, how long kind of we're expecting it would take to get there, what involvement it would take from them to get to that level.

These are normal people.  They have jobs that they would have to take off.  Most of our clients, I would say almost every client, has no interest in showing up to a mediation.  If there's an opportunity to

**McClenny Moseley Motion Hearing**                              26

participate by phone and stay at work, they absolutely want to do that. They've been through enough. They need every penny they can get to keep their life running. So what we do is we get advance authority on every single --

THE COURT: No, I understand you'd get advance authority. I agree. But I just want to be assured that you're communicating with these people and they're adequately informed about the good parts of their case, the problems they may have with the case, if there's any coverage issues. I mean, the biggest issue in most of these cases is not coverage, it's more about scope and cost. And some things aren't covered, some things are. That's why there's just no way you can settle these in mass because every policy can -- I've seen thousands of them. They're all a little different, different insurers. Even within insurers there's different types of policies with different provisions depending on what the customer paid for. So it seems to me to be -- you jammed all this in at the last minute and it just seems very difficult to me how you managed your ethical duty to your client. It concerns me. I'm not going to lie to you. I'm hearing what you're saying, but I'm being honest with you. I'm not a hundred percent convinced it's the exact right way. I can't say. I don't know.

Deidre D. Juranka, CRR
United States Court Reporter
Western District of Louisiana

MR. HUYE: Yes, Your Honor. Regarding some of the CMO mediators, we've mediated previously with Mr. Jeff Cole. I've done several rounds with him. I think he's a fantastic mediator, one of the best we have in the state.

THE COURT: He is.

MR. HUYE: And he's seen the exact model that we've used before on -- I think the most that we've ever done with Mr. Cole is perhaps 10 or 12 in a day. We never got --

THE COURT: I could actually see that.

MR. HUYE: Yes, Your Honor.

THE COURT: That would be the max, though, I think you could legitimately get through in a day.

MR. HUYE: And, Your Honor --

THE COURT: I know some of the local lawyers for some of the insurers with the local firms I've had dealings with, you know, they'll say, hey, look, we've got six State Farm claims, let's try to get these six with one firm, so for efficiency they get the mediator there. So I think that's a reasonable number. I don't think you can do more than that in a day.

MR. HUYE: Yes, Your Honor. We try to be as efficient as we can. We want to help people. We understand timing is of the essence. They need the

money now to be able to get their lives repaired, and we're doing what we can to try to help with that.

THE COURT:  So far -- so I told you when you were here last time and I'm going to tell my mediator, you're not charging 40 percent.  That's a ridiculous fee.  I practiced law for 30 years and I only charged 40 percent in two types of cases, medical malpractice and products liability.  That was it.  I think most lawyers in this community are charging 25 percent if the case settles. I've had two hurricane trials and penalties and attorney's fees were awarded by the jury, but I determined the penalties and attorney's fees under the statute.

MR. HUYE:  Yes, Your Honor.

THE COURT:  One firm had a 25 percent contingency contract.  I gave it to them.  Other firm had a third. I think that was very reasonable.  They tried the case all the way to verdict.  I gave them their third.  But if you're settling these pre-suit like this, there's no way in a hurricane situation you should charge people 40 percent.  That's highway robbery and I'm not going to allow it.

MR. HUYE:  Yes, Your Honor.

THE COURT:  We're going to get to that in a minute because the history and what I've seen -- I've seen an

order out of the Southern District of Alabama against your firm where there was a restraining order against your firm, I have it here somewhere, by some attorney that worked for y'all's firm. I'm just telling you, y'all don't have -- and I'm going to be honest with you --

MR. HUYE: Your Honor, if I may.

THE COURT: Yeah.

MR. HUYE: That was a dispute between a partner --

THE COURT: Yeah, I know; but clearly -- I know it was a dispute with a partner, but here's what else I'm going to tell you. I saw -- somebody sent me the video off a Facebook page from some company called Disaster Solutions. I don't know if you're in it, but you're in it.

MR. HUYE: Yes, Your Honor.

THE COURT: I did not appreciate your cavalier comments in that video about my court, we broke the system, we filed, we set a record. No, you didn't break our system. Our system is set up to not allow more than $24,000 in any one day on one account. Y'all called my clerk's office and said, hey, we can't file any more suits. We said, yeah, because there's a $24,000 cap in a 24-hour period on any one account. So you didn't really say the truth. You know, my curiosity is will

you go back on Facebook and say, hey, I made a mistake, we didn't break the system. I doubt it, but my point is --

MR. HUYE: (Indiscernible.)

THE COURT: And then I see a bunch of people in your office drinking daiquiris while you're claiming you're filing suit. Court doesn't appreciate that. To me you're not doing the profession of practicing law any favors, not doing yourself any favors, popping out on Facebook about how you're doing it. It doesn't look good.

MR. HUYE: Yes, Your Honor.

THE COURT: Why I don't do social media. So I have concerns. I have concerns. And the reason I really have concerns is I'm not -- for example, let's get to this one here. Is your client in the Leday versus Integon here?

MR. HUYE: They are, Your Honor. Ms. Leday's in the back.

THE COURT: Ms. Leday, would you mind coming up. Let me tell you, Ms. Leday, y'all are not in trouble. Don't worry about it. Come up. Relax. I'm here really to protect you-all. Ms. Leday, if you'd give your name for the record, ma'am.

MS. LEDAY: Patricia Leday.

THE COURT:  My understanding, Ms. Leday, is that you had a case in my court already filed where you'd retained the Baggett McCall firm.

MS. LEDAY:  Yes.

THE COURT:  And that case was dismissed because -- voluntarily because you didn't have a cause of action. Were you aware of that?

MS. LEDAY:  Yes.  Can I --

THE COURT:  Yes, please.

MS. LEDAY:  Okay.  Now, what happened is that I didn't quite understand.  When they communicated with me they told me about the force --

THE COURT:  Force-placed.

MS. LEDAY:  -- yeah, force-placed policy.  I honestly didn't understand that.  All I knew is that I was paying through my escrow for the insurance.  And I explained to them the reason why I had a force-placed policy is because I was with Geico before and at the time when Geico did their yearly inspection they came to my property, I was having some work done at my house and there was debris all over my yard and part of the wall was torn down.  And I explained to them I had, like, so many days to get all that stuff done and the contractor failed to do that so Geico dropped me.  And that's when Midland Mortgage decide that they would put that policy

on me, but I -- because my understanding wasn't -- I didn't understand, but I didn't know I was not going to be the insurer on the policy but yet I knew I had to pay it because they told me that my --

THE COURT:  Your lender.

MS. LEDAY:  -- my lender said it would go up.  So I understood that because it's coming through my mortgage. And so went Baggett McCall presented to me what happened about the case being dropped they said that they had one that was very similar to mine that didn't go through because of the force policy.  So here I'm trying to get in touch with my lender, mortgage company.  So what happened is that because they talked to me, I don't have documented proof, they said, "Ms. Leday, if you go ahead and pay off your mortgage, you won't deal with us.  You deal directly with the insurance company.  You skip the middleman."  That's the only reason why I paid off my -- oh, I get emotional.

THE COURT:  Did you pay off your mortgage?

MS. LEDAY:  Yeah.  (Crying.)

THE COURT:  Take your time.  So you were able to pay off your mortgage?

MS. LEDAY:  Yes.  When the insurance company gave me the mortgage they asked me to go ahead and pay off my house and that way it would kill them and I'd deal

directly with the insurance company.

THE COURT: So when did you pay off your mortgage? Did you pay it off after Baggett McCall dismissed your suit?

MS. LEDAY: That was right before. That was before because I didn't understand. I thought --

THE COURT: Here's the issue with force-placed insurance. You had a loan and you're required to have homeowner's insurance when you have a loan because if something happens to the house it's the collateral for the loan. The lender makes it a condition that you have insurance. And if you don't keep insurance on the house, then they will go and force-place it, they'll buy it, which is usually more expensive. But the problem with the force-placed -- and I've had this issue and I think it's a terrible situation for people. I don't make the laws. Congress makes the laws. You don't have a right of action against the force-placed insurer. That's very settled in the U.S. Fifth Circuit. Only the lender can bring a lawsuit against a force-placed insurer. You don't have that right of action. Because they bought the policy, they're the named insured on the policy. You're not. So that's why Baggett McCall dismissed the suit. I don't know the particulars of now you're telling me you paid off the loan, then you can

keep that insurance and you become the named insured. I don't know. I guess that's to be vetted out. My concern was this case was dismissed.

And what I was trying to understand is did you communicate with her and did you know that she had a prior suit?

MR. HUYE: Your Honor, at time of filing we did not know that. We've had extensive conversations with Ms. Leday since. What we're going to try to work together and do is to try to get an assignment of benefits.

THE COURT: Good luck. I hadn't had that happen yet with a force-placed insurer. I'm sorry. I'm just going to be honest with you. They usually come in -- I'll see if I have it here.

MR. HUYE: Your Honor, Ms. Leday and I did discuss if we're not able to get that then we would be working together to get her permission to go ahead and voluntarily dismiss. We do agree that the force-placed letter rules are well-settled law, but I wanted to see if there was anything that I could do to vet and investigate a little further anything I can do to help her.

THE COURT: I have it here. I wanted to see what the insurance company told me. They moved to dismiss

the suit on October 15, 2021.  They make no mention in here -- and I don't doubt you.  I'm just saying they don't make any mention in here that you paid off the mortgage.  But then I don't even know under their policy would it transfer to you.  I don't know that.  Your lender, I guess, told you that; but I don't know that I would really on that from the lender, you know, to tell you that.

MS. LEDAY:  They told me that so that's why I was okay to pay it off.  They used the money from the insurance to pay my mortgage off and some of the balance and that was it.  I really thought I would be dealing with the insurance company.

THE COURT:  That's the unfortunate thing I've had with these force-placed policies.  People don't realize when you get the force-placed insurance you don't really -- the insurance is not yours.  It only belongs to the bank.

MS. LEDAY:  Even though you're paying it out of escrow?

THE COURT:  Even though you're paying it because it was the term of your loan that you would keep insurance.  And when you fail or let it lapse or drop, then the bank has the right to force-place the policy.  And you still have to pay for it, but it's more expensive usually.

**McClenny Moseley Motion Hearing** 36

You know, it's the collateral for their loan.  You know, if something was to happen to the house, the insurance pays the bank and the loan's paid off.  So that's the purpose of it.  My concern was did you discuss this with your lawyers.

MS. LEDAY:  Well, when I spoke with him after the fact, when they contact me, and that's when he told me he was going to see about trying to go toward the lender to see we can get them to put my name or get somehow I can deal with the insurance company through the approval.

THE COURT:  Well, you can try that.  I hadn't seen it happen yet.  My concern was, to be honest with you, why I wanted you here since you'd already had a suit, did you retain this firm, McClenny Moseley, to represent you?

MS. LEDAY:  Yes, sir, I did.

THE COURT:  I'll give y'all a chance to try to vet this out.  Unfortunately, I'm not hopeful for you, I'm afraid; but, you know, who knows.  It might happen.  Okay.  Thank you, Ms. Leday.

MS. LEDAY:  Thank you.

THE COURT:  Thank you for coming in.

MS. LEDAY:  Yes, sir.  Thank you.

THE COURT:  Now, let's look at -- let's talk about

Weatherall versus Scottsdale.  Is Mr. or Mrs. Weatherall --

MR. HUYE:  Weatherall.

THE COURT:  -- here?

MR. HUYE:  Mr. Weatherall, would you mind coming up.

THE COURT:  How you doing, Mr. Weatherall.

MR. WEATHERALL:  Doing okay.

THE COURT:  Give your name for the record.

MR. WEATHERALL:  Hillary Weatherall.

THE COURT:  Where you from, sir?

MR. WEATHERALL:  Lake Charles.

THE COURT:  Scottsdale Insurance, they usually are a commercial carrier.  Is this a business policy?

MR. WEATHERALL:  It's a homeowner insurance.

THE COURT:  How did you go about retaining this firm to represent you?

MR. WEATHERALL:  Oh, this firm?  I seen an ad and I replied to it.  I talked to, I guess, a representative on the phone and they set up an appraisal estimator. After they came by they said they would get back with me after -- (indiscernible.)

THE COURT:  Did you review -- did you sign a contract to retain them?

MR. WEATHERALL:  Yes.

THE COURT: Do you know what the terms of that contract is? That's okay if you don't remember. It's not a test today. I just want to know if you knew.

MR. WEATHERALL: Not really, I don't.

THE COURT: I'm really -- I told them the other day I was going to randomly pull their cases because I had concerns. Unfortunately, y'all got pulled. I know I'm taking your time; but I have to know to protect you, the public, and everyone else because I'm not happy about the way this all went down. So that's why I wanted to verify that you retained them.

MR. WEATHERALL: Yes, sir.

THE COURT: Thank you. Have you been satisfied so far?

MR. WEATHERALL: Uh-huh.

THE COURT: Very good, then. Thank you.

My question to you -- you can go ahead. How is it I got two lawsuits for the same claim?

MR. HUYE: Yes, Your Honor. Our team was moving too quickly and we made a mistake. We're going through our docket right now to try to find any mistake that may have been made. We're triple checking. We're in a process of kind of contacting our clients and fixing all the mistakes that we may have discovered. But here, Your Honor, it was a simple mistake. We have filed the

motion to dismiss on Civil Action ending in 04322, and we're going to continue filing those as quickly as possible to try to do anything we can to clean this up.

THE COURT: Yeah, I think that's a good idea. The problem is what y'all don't understand by your sloppiness and the way you did this, I think Tina would agree, my courtroom deputy, you have created a tremendous amount of resources from my court to deal with this mess. We're still docketing these cases. Now we have to docket dismissals. You don't understand. It's not simply filing a piece of paper. People in our clerk's office have to stop, they have to manually go in, docket it into the Pacer system. It's not just -- takes time. In addition to all the other cases the Western District -- we're the largest district in the state. We have 42 parishes covered from Monroe to Lake Charles, Lafayette to Shreveport. And so we have to use our court resources to clean up your mess, and we're not going to do it because I'm going to tell you now what's going to happen.

You're going to be sanctioned $200 per case that's a duplicate and you're going to pay it to the United States District Court because the taxpayers of the United States should not have to expend resources to clean up your mess that you should have taken care of

beforehand.  That will be the order of the Court.

There will also be in the order you are not to -- there will be no mass settlements.  These cases will be looked at individually.  I'm ordering you, you look at them individually.  I'm not saying you can't go to mediation with a multitude of cases on a given day because that happens, but you better not go over there -- I'm going to tell the special master there won't be any 50 cases settled in a day.  Not going to happen.

Ms. Poullard, Mr. Poullard, you here?  How you doing?  Where y'all from?  Come on up.  Thank you for coming.  If I could -- give your name for the record, ma'am.

MRS. POULLARD:  Keatha Poullard.

THE COURT:  And, sir, your name for the record?

MR. POULLARD:  Michael Poullard.

THE COURT:  Where y'all from?

MR. POULLARD:  Lake Charles.

THE COURT:  Lake Charles.  I played college basketball at McNeese and there was an Anthony Poullard from DeQuincy.

MR. POULLARD:  He working at Firestone.

THE COURT:  Yeah.

MRS. POULLARD:  We're related.

MR. POULLARD:  We're related.

THE COURT:  I was wondering y'all related to Anthony.  He's a good guy.  He's a good basketball player, too.

MR. POULLARD:  He's a pastor now.

THE COURT:  Is he really?

MRS. POULLARD:  Yes, sir.

THE COURT:  Very good.  He was at Firestone, wasn't he?

MR. POULLARD:  He still is.  He has a church in Fenton.

THE COURT:  No kidding.  You see him, please tell him I said hello.

MR. POULLARD:  I sure will.

THE COURT:  He's a good guy, really good basketball player too.  How did you come to retain this law firm?

MRS. POULLARD:  Seen the ad on social media.  I was looking for someone to help us deal with the situation of the insurance.

THE COURT:  And did they communicate with you and get the information they needed for your claim?

MRS. POULLARD:  Yes, sir.

THE COURT:  Okay.  Well, I just wanted to be sure because I've got -- I'm going to get on some other cases in a minute, but I just needed to verify.  I told them

**McClenny Moseley Motion Hearing**                    42

the other day I was going to call in some of their clients.  I wanted to be sure they were doing this the correct way.  I want to be sure you're protected, the public's protected, and that you're informed about your case and they keep you in the loop.  Okay.

MR. POULLARD:  Yes, sir.

THE COURT:  You had a lot of damage from the storm?

MRS. POULLARD:  Yes, sir.

MR. POULLARD:  Yes.

THE COURT:  I understand.  I did too.  It's tough. It's been very tough.  I think I have post-traumatic stress.  Every time I hear about a storm in the gulf now, I'm telling you, me and my wife just tense up.

MRS. POULLARD:  Yes, sir.

MR. POULLARD:  Me too.

THE COURT:  It's stressful.  And I just got back in my house after a year and a half.  I mean, I had half my roof blown off.  Fortunately, I was able to resolve it; but it's very stressful so I feel for you.  This building, we're just back in this building.  That's why I'm not in my courtroom today.  We're still fixing this building.  This building was totally damaged from the hurricane.

Okay.  Well, I appreciate you coming in.  I apologize for the inconvenience, but I felt like it was

my duty to just verify some of these things.  And so y'all have anything you'd like to tell me?  Or you don't have to.  Who's your -- yeah, go ahead.

MR. POULLARD:  We've been back in our house since June 1st.

THE COURT:  Yes, sir.

MR. POULLARD:  And all our furniture was damaged. I was about to get the check from Liberty Mutual, but now they holding it because of this lawsuit.

THE COURT:  Yeah.  Once you file the lawsuit, unfortunately, you got counsel now and they're not going to turn it over to you.  They're going to turn it over to your attorneys.

Now, I'm going to tell you two guys something. That money was already coming probably before y'all were retained.  Y'all should not take a fee on that contents claim.  I can't tell them they can't, but they really shouldn't.  Y'all should not take a fee on their contents.  Y'all didn't do any work to help them get that contents money.  Hopefully, maybe, y'all can get -- they can contact Liberty Mutual and go ahead and get the contents claim resolved for you and get that money to you so you can at least get your furniture and stuff done.

MR. POULLARD:  Yes, sir.

**McClenny Moseley Motion Hearing**                    44

THE COURT:  Where's your house at?

MR. POULLARD:  1314 Virginia Street.

THE COURT:  Lake Charles or Sulphur.

MR. POULLARD:  Lake Charles, yes, sir.

MRS. POULLARD:  It's been so stressful.

THE COURT:  Ma'am, I feel for you, I really do. Listen, I'm going to tell you something.  That is why I'm on top of this.  I really want to get these cases resolved for you people.  The people of this town have been through enough.  But I also have an obligation to be sure you're not being taken advantage of.  I'm being satisfied today, but I have to do my due diligence because I live here.  I live with you.  I'll see you at the grocery store.  Okay.  If you do see me at the grocery store, please come say hello.

MRS. POULLARD:  Yes, sir.

THE COURT:  So we're going to get you -- I think you're going to get your case resolved now.  Be a little more patient.  It's getting there.

MR. POULLARD:  One more thing I want to mention.

THE COURT:  Yes, sir.

MR. POULLARD:  Being that the insurance company took so long, I had a stroke.  I was stressed out.  And, you know, I'm doing a whole lot better now but --

MRS. POULLARD:  He tried to go back to work; but

with the job that he does -- was doing at Firestone, he made a mistake because the stroke affected him so.  So they told him, well, either you take early retirement or you're fired.  (Crying.)  And my husband has never been fired from a job --

MR. POULLARD:  No.

MRS. POULLARD:  -- so he decided to take the early retirement, and the insurance took so long.  Now, they did pay for the rental.

THE COURT:  Have they paid for the rental?

MRS. POULLARD:  They paid, what, how many months?

MR. POULLARD:  Up to a year.  But then after the year we had to pay ourselves.

MRS. POULLARD:  We had to pay out of pocket over $3,000 a month and pay all the bills for at the house that was being worked on.

THE COURT:  Well, I can't get into the merits too much right now; but I appreciate the info, okay, because Liberty Mutual's going to need an opportunity, you know, to respond to the lawsuit and -- but I will tell your attorney --

I'm going to tell you, this is a case where there might be a 1973 claim; and that's why I'm very concerned about mass settlements of these lawsuits.  These people -- I don't know all the facts.  I got to wait for

**McClenny Moseley Motion Hearing**                                        46

the other side of the story. But this is a case that shouldn't go in there with 30 other cases. They might potentially have a 1973 claim for mental anguish and it shouldn't be botched in there with a bunch of other cases. Really, this is where talking to your clients and getting to know your clients and understanding what their case is about is so important as attorneys. You have a duty to these people, and I hope y'all get what I'm telling you and y'all are going to take these people's cases seriously.

Listen, I've got an expedited process in place to try to move these cases. I'm sorry your case got filed so late. It probably, maybe should have been filed a year ago, I don't know, and you'd already be halfway through the -- probably already have it settled. But know the Court, we're working diligently to move these cases. You're not going to be waiting three years to get a trial date with me. You'll get one pretty quick, and I don't continue hurricane cases. This is why I don't continue them because y'all need to get these things resolved. I really do empathize with you and sorry you've had to go through this; but it's an unfortunate part of life, you know.

MR. POULLARD: Yes, sir.

THE COURT: But know I'm on top of it.

MR. POULLARD:  All right.  Thank you, Judge.

MRS. POULLARD:  Thank you so much.

THE COURT:  Thank y'all.

MS. BENOIT:  How do you spell your first name?

MRS. POULLARD:  K-E-A-T-H-A.

MS. BENOIT:  Thank you.

MRS. POULLARD:  You're welcome.

THE COURT:  Maybe while y'all are all here in town maybe you ought to sit down and really visit with these people, since we're here, after.  We got witness rooms out there.  Give you a chance to really sit down, talk to these people and find out more about their case while you're here.  Save you another trip to Lake Charles.  Talk to your lawyers, really maybe take an opportunity to really get to know them.  I always found I was a better lawyer when I really knew my clients and, you know, I could empathize.  That's probably my problem.  I was too empathetic.  Y'all almost got me to cry here.  I'm sorry.

MRS. POULLARD:  Thank you so much, Your Honor.

THE COURT:  Thank you.  God bless you.  Okay.  Meet with them.  Y'all need to talk to them.

MR. HUYE:  Happy to, Your Honor.

THE COURT:  I'm just about done, but I do have a couple more questions.  I want you to write this down.

**McClenny Moseley Motion Hearing** 48

I want you to look at a case, Docket No. 22-4970. My concern about this case, I'm going to tell you, is the residential address in this case is New Orleans and it was filed in the Western District. There's no way -- I have yet to see a Hurricane Laura claim in the New Orleans area. Y'all need to find out what's going on, why this happened. To me, again, sloppiness. It shouldn't have ever been filed, probably, unless there was some tornado that got thrown over to New Orleans, which I doubt very seriously. And what I'm telling y'all is I'm going to continue -- obviously we're going to continue to go through these cases, and we've got to clean this mess up. It has to be cleaned up.

The other thing I want you to look at is these couple of cases right here. Write these docket numbers down. I'm not here today on a rule to show cause on these because I found these since then. 22-4740, 22-4565, and 22-4961, these were brought to my attention by Allied Trust Insurance Company. They're claiming that they didn't even issue a policy for those people and y'all filed a lawsuit for them. How do you explain that?

MR. HUYE: Yes, Your Honor. We're going through this with some other counsel as well. They're communicating directly to us. So, Your Honor, what

happened in those situations is we were approached by a hurricane victim, they told us that they had a policy with Allied or whatever other insurance company, and they asked us to file a lawsuit. So some of these other counsel are reaching out to us and saying, hey, there was no policy in effect. It had recently expired or whatever it may be. We're immediately getting in touch with our clients and saying, "Hey, this is what we're hearing. We need a copy of your dec. page. I understand that you may not have it. I know you may have been through a lot between the hurricane and now, but can you please get with your agent. It's incredibly important." And we're rolling through that, Your Honor, as quickly as possible. So if there was not a policy, we will immediately get their permission to do a voluntarily dismissal. And if there is a policy, then we're working with defense counsel to say, "Hey, I'm sorry you may have missed it." There may have been an issue. They're moving fast, too. "Here's a copy of declarations page."

THE COURT: And this is the lesson to be learned. This is why you don't wait till the last minute. You know, this is why most of the firms that I've dealt with over the last two years that have done a lot of this, most of them inform the special master that they quit

**McClenny Moseley Motion Hearing** 50

taking cases the week, even some -- I know one firm locally quit two weeks before the deadline because they needed time to say, hey -- you know, because of their ethical obligations, they needed time to talk to the client, get the suit filed, make sure they weren't -- you're the only ones that I got duplicate cases. Not one other firm out of 7,000 cases have filed a duplicate lawsuit but you guys. So that's why you don't wait till the last minute. And the way it appears to me, I mean you may take issue with it -- okay. This is why at the last minute you get yourself in trouble and you create a lot of problems for you, for the Court. And the way it appears on the surface, y'all are coming in at the bottom and just trying to scoop up the bottom of the barrel like a bunch of bottom feeders. I'm going to be honest with you. That's the way it looks. You can take issue with it. I'm not saying that's -- I'm just telling you the way it looks on the surface. It doesn't look good because it's sloppy.

They just sent me -- I'm -- because we're still going through them. I'm telling you we're still going through them. Joubert versus Foremost Insurance Company, Grand Rapids, Michigan, filed on October 4th. Is that right, filed on -- how can it be filed on October 4th? Well, probably got docketed, maybe.

Here's the docket numbers. You write these down. 22-5497, 22-5500, 22-5501, 22-5503, and 22-5510. Y'all filed six lawsuits for the same people six times. Six times you filed that same lawsuit. They just --

We're going through them. You'll be sanctioned $200 per duplicate. So that will be -- well, if the first case is valid, so it'll stay. The other ones you're going to be sanctioned on. I'm telling you don't ever come back to my court. God forbid we ever have another hurricane, but I do not ever want to see this again. Hear me. Tell your partners in Houston stay the frick out of my court with this kind of trash. You see this person right over here? That's Marshal Gallow with the United States Marshal Service.

By the way, when I set the rule to show cause I had three calls from your office on why you could not appear today. One was, "We have a trial."

I said, "Give me the name of the judge." I don't know who was it that called. Do you remember the name? Somebody in your office. I said, "Give me the name of the judge so I can call him and verify you got a trial."

"Oh, let me call you back." Called back, "Oh, he doesn't have a trial. It's not a trial. We have a mediation. We got mediation today."

I said, "I don't care. You either go to your

Deidre D. Juranka, CRR
United States Court Reporter
Western District of Louisiana

mediation or follow a federal court order."

Then I was told, "Oh, well, it's got to be exceptional circumstances.  We just can't show up next week."

Let me tell you, you ever call my chambers again and tell them you can't show up for a hearing Marshal Gallow, she's your Uber.  She will be coming to New Orleans and dragging you out of whatever you're in and driving you over here.  It'll be the worst Uber ride of your life probably.  Don't ever do that again.  You're going to drop whatever you got going on.  Now, a trial I might; but I'm going to call the judge you tell me you got a trial.  I'm going to say, "Hey, you got a trial. Go do your trial."

I got too many of these to work around your schedule.  I don't work around your schedule.  You work around the Court's schedule.  You file in this court, you're going to live with them.  If you got to come to Lake Charles a hundred times, you come a hundred times, because I don't do Zoom.  Don't ever ask me to do Zoom. I do not do Zoom.  Zoom is the worst thing I think ever happened to this fricking country.  I didn't even have a cell phone when I started practicing law.  We showed up for everything.  School, that's the worse thing, school, Zoom school.  People -- kids need to be in the

classroom. You need to be in the courtroom. Just hear me on that and tell your partners the same thing. If I rule you into court, you show up.

Now, there are exceptional circumstances. Death of a family member, I'd move the hearing and I will do that all day long. Family's important. You needed to go to an appointment, I think. That was an exceptional circumstance. I don't want to hear about I got mediation, I got a hearing, I got all that. Federal court takes precedence over all that. I don't care about your mediations. I only care about the cases in my court. You filed them and you're going to live with them. You're going to do it. Listen, just hear me now. If you think you're going to play games, you play them but just remember one very important thing: I make the rules. Okay. So go forth, clean this mess up.

In the interim, here's what's going to happen. I'm staying all your cases. They will be stayed until we get all of this sorted out. The duplicates have to be out. We got to clean it all up because I'm not sending these through the case management order with multiple cases. It's more work for the special master than he needs, more work for the Court. So we got to get all this cleaned up. So an order will be signed today or probably, maybe tomorrow, going to stay all 1600 cases

until further notice, until we can get all this sorted out and cleaned up. And then I will start releasing your cases, probably in batches, for you to go forth and start working them up.

You're also putting a tremendous burden on some of the insurers trying to answer all these because my deadlines don't know the difference. We already had the meeting with State Farm and I tried to give them some relief. And I'll tell you State Farm has been an excellent company in trying to resolves cases. They started off a little rough, did want to settle at first. We had a couple, I don't want to be sacrilegious, come to Jesus meetings and they got right. And State Farm has done an excellent job of settling cases. They'll work with you and they're trying to do the right thing. That's why I was able -- why I was willing to give them some relief from y'all because you dumped them on them and that wasn't fair to them. So until we get it sorted out, I'll be doing a written order on that, we're going to stay them. Are we clear? All right.

Thank y'all for coming. I'm sorry for the inconvenience for y'all having to come today but I needed to hear from y'all, okay, because this ain't about me, ain't about the lawyers, it's about y'all. Okay. That's my primary concern, is those people and

the insurance companies.  They have a right to vet out these claims.  You know, I'm not going to sit here and tell you there's been some people trying to take advantage of the claims process.  That's just the nature of it, and we try to vet that out too.

But with that, we're adjourned.  Go forth and do better.  Okay.  I want y'all to do better.  Y'all are young lawyers.  Y'all got a long career.  I don't want you to muck it up this early in your career.  Okay.  All right.  Y'all can go.  Thank y'all.

MR. HUYE:  Thank you, Your Honor.

MR. GARDINER:  Thank you, Your Honor.

(Proceedings adjourned.)


* * * * * *


**CERTIFICATE**


I hereby certify this 28th day of October, 2022 that the foregoing is, to the best of my ability and understanding, a true and correct transcript of the proceedings in the above-entitled matter.


*Deidre D. Juranka*
Deidre D. Juranka, CRR
Official Court Reporter

Deidre D. Juranka, CRR
United States Court Reporter
Western District of Louisiana