Tighe Wilhelmy   April 15, 2025

Page 161

related. According to the invoices, several months.

MS. VEITH: I might be done, if we can just go off the record for a second, I'm going to step out and --

THE VIDEOGRAPHER: We are off the record. Time is 2:43.

(Recess taken from 2:43 p.m. to 2:44 p.m.)

THE VIDEOGRAPHER: We are back on the record. Time is 2:44.

MS. VEITH: Okay. Mr. Wilhelmy, that's all I have for you. Thank you very much for your time today.

THE WITNESS: Thank you.

EXAMINATION

BY MR. PATTERSON:

Q. I've got a few questions.

If you would -- I'm going to give you a minute to re-stack your exhibits. We're going to go through them, but I think you have them in backwards order. It's going to be quicker if you take a minute and just put them back in numerical order starting with 1, going -- You see what I'm saying? You want to just do it that way.

A. All right.

Q. And I'm going to jump around a little bit if you

Page 162

don't mind, so stay with me.

Does Velawcity as an entity still exist?

A. Yes.

Q. And are they operating?

A. Winding down.

Q. Winding down.

They're not taking any new business?

A. No.

Q. And they're not conducting any ongoing business, are they?

A. No.

Q. And how long have they been winding down?

A. Since February of 2023.

Q. Okay. Yeah, since -- okay.

A. Yeah.

Q. And I think you said you oversaw marketing for Velawcity while you were there?

A. I was the CEO.

Q. CEO. For what years? What was the time period?

A. Since the inception of Velawcity.

Q. What was -- When was that?

A. Perhaps 2019. I can't be entirely positive.

Q. All right. And you recall talking about the text messages, the -- I won't go through it, but the text messaging platform and the exhibits related to that, do

Page 163

you recall that discussion you had?

A. Twilio?

Q. Yes.

A. Yes.

Q. Was it possible to receive a push or a text message without opting in to that system?

A. No.

Q. Was it -- It's -- It's not capable of pushing out unsolicited text messages, is it?

A. Impossible, in fact, to my knowledge.

Q. Right. And is that the only platform you used in relation -- in your -- in Velawcity's arrangement with MMA?

A. No.

Q. And which other platform was utilized?

A. A company called Drips.

Q. Drips. Did they provide the capability to send unsolicited text messages?

A. No. They were used exclusively when claimants or potential claimants became unresponsive during the intake process only.

Q. All right. But had already opted in to receiving text communications?

A. That's correct.

Q. All right. And do you know what's required to

Page 164

opt in to receive text communications from either the Twilio platform or the Drips platform.

MS. VEITH: Objection to the form.

THE WITNESS: One more time, please.

BY MR. PATTERSON:

Q. Do you know what's required to opt in to receiving text messages under either the Twilio platform or the Drips platform?

MS. VEITH: Same objection.

THE WITNESS: It's got to be a form submission expressed for consent in the form of a web form, inbound call with a verbal, verbal confirmation during that intake call.

BY MR. PATTERSON:

Q. Is that something that Velawcity would have kept a record of?

A. Absolutely.

Q. Did you check to see if Ms. Monson had opted in to receiving text communication?

A. She did.

Q. She did opt in?

A. Yes.

Q. And was it in writing?

A. Opted in via web form submission.

Q. So she visited a web platform and physically

41 (Pages 161 to 164)

Tighe Wilhelmy  April 15, 2025

## Page 165

opted in to receiving text communications?

A. That is correct.

Q. Right. And so her allegations that it was unsolicited are just not founded, right?

MS. VEITH: Objection to the relevance of this to this lawsuit and deposition.

BY MR. PATTERSON:

Q. Right?

A. I can't be certain.

Q. Well, she opted in to receive it, right?

A. Correct.

MS. VEITH: Objection.

BY MR. PATTERSON:

Q. And so if she said that it was unsolicited, that would be incorrect?

MS. VEITH: Objection.

BY MR. PATTERSON:

Q. Right?

MS. VEITH: Objection.

THE WITNESS: Her comments about receiving e-mails and phone calls for no good reason, per the recording we just listened to, are clearly erroneous.

BY MS. VEITH:

Q. Right. Because Velawcity does have a record of her opting in to receiving text communications, correct?

## Page 166

MS. VEITH: Objection to the relevance --

THE WITNESS: Yes.

MS. VEITH: -- of this to this deposition or this litigation.

MR. PATTERSON: Well, we have the exhibit that you provided from the Monsons, right? We can talk about it.

MS. VEITH: Are you asking a question?

MR. PATTERSON: Yeah.

MS. VEITH: What's the question?

MR. PATTERSON: You saw the exhibit, right?

MR. HILTON: Well, before we get into another one of these counsel things, I mean, I guess you're entitled to object on relevance, but that's -- it's a deposition. We can stipulate that you keep your relevance objection, but it doesn't -- it doesn't do anything. Relevance isn't a ground for objection in a depo.

MS. VEITH: Mr. Patterson's going to be very surprised by that fact.

MR. HILTON: Well, you know, some people are active in that capacity, but . . .

MR. PATTERSON: You all done?

THE WITNESS: I'm not getting out of here at 3:00, am I?

## Page 167

BY MR. PATTERSON:

Q. So, pull up Exhibit Number 52, if you would.

MR. HILTON: Which exhibit?

MR. PATTERSON: Five, two. Five, two. It's Bates stamped MMA-20.

THE WITNESS: Yes, sir.

BY MR. PATTERSON:

Q. Oh, okay. So, this is -- this had -- I've handed you this exhibit. And if you'll turn to Page 3 specifically. Ms. Monson's husband's a lawyer. You know that, right?

A. An insurance lawyer, yes.

Q. Yeah. And so he posted "McClenny Moseley & Associates solicited," all caps, so he's screaming electronically --

MS. VEITH: Objection.

BY MR. PATTERSON:

Q. -- "soliciting clients using unsolicited text messages." That's just false, right?

MS. VEITH: Objection to the commentary?

BY MR. PATTERSON:

Q. Right?

A. Can't be certain.

Q. Well, with respect to Mrs. Monson, that's not true, correct?

## Page 168

MS. VEITH: Objection.

BY MR. PATTERSON:

Q. It's not unsolicited. She opted in, right?

MS. VEITH: Objection.

THE WITNESS: She would have, in order to receive a Twilio text message, would have needed to opt in, yes.

BY MR. PATTERSON:

Q. Right. And you know that Mrs. Monson and Mr. Monson have embarked on a campaign to sue MMA and everyone related to MMA, correct?

MS. VEITH: Objection.

BY MR. PATTERSON:

Q. Right?

MS. VEITH: Objection.

THE WITNESS: I'm aware.

BY MR. PATTERSON:

Q. Right. And, in fact, that's why you preserved the recording of Ms. Monson's phone call with Velawcity, right?

MS. VEITH: Objection.

THE WITNESS: We preserved many recordings.

BY MR. PATTERSON:

Q. Right. But that's why you had it, because of the pending litigation? The Monsons have sued everyone,

42 (Pages 165 to 168)