In the Matter of:

*MMA Law Firm, LLC     Debtor*

---

**Matthew Monson**
**Rule 2004 Examination**
February 26, 2026

---

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

MMA LAW FIRM, PLLC              NO. 24-31596
   Debtor

                               CHAPTER 11

Rule 2004 Examination of MATTHEW MONSON, taken on Thursday, February 26, 2026, at the Sternberg, Naccari & White law firm, 935 Gravier Street, Suite 1800, New Orleans, Louisiana, beginning at 9:29 a.m. and ending at 4:31 p.m.

REPORTED BY:

JAN I. SCHMIDT, CCR
Certified Court Reporter

**Matthew Monson**
**February 26, 2026**

A P P E A R A N C E S

FOR THE MMA LAW FIRM, PLCC:

    WALKER & PATTERSON
    (BY:  MIRIAM T. GOOTT, ESQ.)
    4815 Dacoma
    Houston, Texas 77092
    mgoott@walkerandpatterson.com

FOR THE MONSON LAW FIRM:

    STERNBERG, NACCARI & WHITE
    (BY:  M. SUZANNE "SUZY" MONTERO, ESQ.)
    935 Gravier Street, Suite 1800
    New Orleans, Louisiana 70112
    suzy@snw.law

 ALSO PRESENT ON ZOOM:

    Zach Moseley
    Charlie Shelton
    Jayne Wabeke
    Cristobal Galindo
    Johnie Patterson
    Katy Ohlsson
    Carlos Rodriguez, paralegal

**Matthew Monson**
**February 26, 2026**

E X H I B I T   I N D E X

PAGE

Exhibit 1 - Notice & Subpoena             9

Exhibit 2 - Bar complaint 8/3/22         41

Exhibit 3 - Bar complaint 8/26/22        43

Exhibit 4 - Reply to Bar complaint       61

Exhibit 5 - Text messages               115

Exhibit 6 - E-mail                      173

Exhibit 7 - Linked In document          185

Exhibit 8 - Monson document (Attached)

Exhibit 9 - LSP repot (Attached)

Exhibit 10 - E-mail                     191

Exhibit 11 - Text messages (Attached)

**Matthew Monson**
**February 26, 2026**

S T I P U L A T I O N


It is stipulated and agreed to by and between counsel that the deposition of MATTHEW MONSON is hereby being taken pursuant to notice under the Federal Code of Civil Procedure for all purposes permitted under law.

All formalities, including those of sealing, certification, reading, signing, and filing, are hereby waived.

All objections, except those as to the form of the question and/or the responsiveness of the answer, are reserved until the time of the trial of this case.  All objections are to be considered under C.C.P. Article 1443, Paragraph D.


                    *  *  *  *  *


JAN I. SCHMIDT, CCR, State of Louisiana, officiated in administering the oath to the herein witness.

**Matthew Monson**
**February 26, 2026**

Page 5

MATTHEW MONSON, 5 Sanctuary Blvd.,
Suite 101, Mandeville, Louisiana, on
Thursday, February 26, 2026, after having
been first duly sworn to tell the truth,
the whole truth, and nothing but the
truth, was examined and testified as
follows:

BY MS. GOOTT:

Q    What is your full name?

A    Matthew Monson.

Q    And where are you employed?

A    The Monday Law Firm.

Q    Are you employed anywhere else?

A    No.

Q    Any source of income currently other than the Monson Law Firm?

A    No.

Q    I can't hear you.  You need to speak up.

A    No.

Q    And how long, what is your interest in the Monson Law Firm, if any?

A    I guess you would say I'm a member of the law firm.

Q    Okay.  Anyone else a member?

**Matthew Monson**
**February 26, 2026**

A     Yes.

Q     Who?

A     There's an attorney Lindsay LoBello.

Q     Okay.  Anyone else?

A     No.

Q     And when was the Monson Law Firm created?

A     In January, February of 2011.

Q     And who created the Monson Law Firm?

A     I did.

Q     All right.  And have you continuously worked for the Monson Law Firm since 2011?

A     Yes.

Q     And have you had employment at any other place since 2011?

A     No.

Q     Any source of income other than --

MS. MONTERO:

Miriam, this is an examination of the Monson Law Firm.  His sources of income, Mat Monson's sources of income, are not relevant to this.

MS. GOOTT:

All right.  Are you going to

**Matthew Monson**
**February 26, 2026**

instruct him not to answer?

MS. MONTERO:

Yes.

BY MS. GOOTT:

Q    You're going to take your lawyers instruction and not answer?

A    Yes.

Q    How many lawyers work for the Monson Law Firm?

A    Approximately 16.

Q    Where does the Monson Law Firm have offices?

A    We have four offices.  We have an office in Kingwood, Texas, we have an office in Mandeville, Louisiana, we have an office in Tampa, Florida, and an office in Coconut Creek, Florida.

Q    Are there attorneys that work in the Kingwood, Texas location of the Monson Law Firm?

A    Yes.

Q    How many?

A    Four.

Q    Now, you understand you're here for a 2004 examination?

**Matthew Monson**
**February 26, 2026**

A    Yes.

Q    And did you read the subpoena for the Rule 2004 Examination?

A    I believe so, yes.

Q    Do you believe so or you did?

A    I believe so.  Talking about the subpoena?  I know I saw the notice, the Rule 2004 Examination Notice.

Q    Yes, sir.  All right.  And did you read the 2004 Examination Notice?

A    Yes.

Q    Hand you --

MS. MONTERO:

Is this Exhibit 1?

BY MS. GOOTT:

Q    Yes.  Take a look at this Exhibit 1. You'll see after the subpoena there's the debtors notice of the 2004 examination of the Monson Law Firm?

A    Okay.

Q    This is the 2004 Examination Exhibit 1 that you reviewed, the notice?

A    I didn't review this one, but I did review something similar.

Q    You did not review this?

Matthew Monson
February 26, 2026

A    Did not review what you just handed to me.  You just handed it to me.

Q    So this 2004 Examination of the Monson Law Firm, and if you look at the top it says document 1266.  Do you see that?

A    Yes, I do see that.

Q    You're telling me you did not review this document prior to today?

A    No.  What I'm telling you quite literally is that I did not review what you handed to me until you handed it to me. I'm talking about this document, this piece of paper, I did not review this particular piece of paper until you handed it to me.

Q    Oh.

A    It was a bad question.

Q    Okay.  So what you're saying is that you've reviewed the notice, you just didn't review these specific pieces of paper?

A    Yes, ma'am.

Q    So those are the games we're going to play today, Mr. Monson; is that right?

A    I'm uninterested in any games.

Q    So when I asked you if you read this 2004 Examination notice before, your answer

is no, you've never read this specific one, that's your answer?

A   My answers are on the record already.

Q   I'm asking you again.

A   I'm not going to answer the same questions over and over again.

Q   You're going to answer my question.

MS. MONTERO:

It's been asked and answered.

MS. GOOTT:

You're going to answer my question.  You can make your objection.

BY MS. GOOTT:

Q   Is your testimony, so I know how we're going to go today, so when I hand you the 2004 Notice that was filed on the docket and I ask you if you've read it, your answer was no, you haven't seen these specific pieces of paper, but you've seen the identical pieces of paper of the 2004 exam, haven't you?  Or you haven't?

A   I'm not sure what you're asking. You've asked me three questions in a row. Can you please be more specific?

Matthew Monson
February 26, 2026

Page 11

Q    Yes.  Did you review a 2004 Examination in preparation for today?

A    Yes.

Q    All right.  And did you comply with it?

A    Comply with what?

Q    With the requirements of the 2004 Examination?

A    I'm unfamiliar with which requirement that you're asking when you say compliant with.

Q    All of them.  Do you believe as you sit here today that you complied with the Court's order related to this 2004 examination?  You don't need to look at anything, Mr. Monson.  I'm asking you as you sit here today, are you aware of --

A    You asked me if I complied with the entirety of this?

Q    Please don't interrupt.

A    I'm confused by your question.

Q    Please don't interrupt.

A    I'm confused by your question.

Q    Please do not interrupt me.

A    I'm confused by your question.

Matthew Monson
February 26, 2026

Q   You keep talking.  You're going to wait until I'm finished and I'm going to let you answer and not interrupt you.  Do you understand?

A   Yeah.  You're really making me feel uncomfortable with the combative nature with what you're doing.

Q   Oh, I'm so sorry.  I will try to be sweeter to you.

A   Just professional, that would be nice.

Q   All right.  I'm very professional.

A   And I will be happy to be professional with you if you'll be professional with me.

Q   Okay.  Right now your job today is only to answer questions.  Your job is not to give me instruction.  You have a lawyer here.  Please do not interrupt me again. We have a court reporter.  She's trying to do her job.  I know this is funny to you, this is humorous, I get it, and I know you didn't want to be here, but listen to my question.  Without having to review the 2004 Notice in front of you, my question is

**Matthew Monson**
**February 26, 2026**

simple.  Are you aware of any requests for documents that were ordered to be produced that you did not produce?

A   I am not aware of things that we did not produce that we were ordered to produce.

Q   All right.  Did you review the topics for discussion today?

A   By topics you're referring to Exhibit A?

Q   Correct.

A   Yes, I did review the topics.

Q   And are you prepared to testify on the topics listed on Exhibit A of the 2004 Exam, which is Exhibit 1 of this deposition?

A   Yes.

Q   All right.  Are you an attorney?

A   Yes.

Q   Where are you licensed?

A   I'm licensed in Louisiana and Texas.

Q   Not Florida?

A   Not Florida.

Q   When were you licensed in Louisiana?

A   In 1997.

**Matthew Monson**
**February 26, 2026**

Q    And Texas?

A    2006.

Q    Where did you go to law school?

A    Tulane.

Q    When did you graduate?

A    1997.

Q    Was Judge North in your class?

A    Yes, he was.

Q    Were you friends?

A    No, we were not.

Q    Acquaintances?

A    Yes.

Q    All right.  When I say MMA Law Firm, do you know who I'm referring to?

A    Yes.

Q    And do you understand that when I say or can we have an agreement that when I say MMA Law Firm that that refers to the firm also formerly known as McClenny Moseley & Associates?

A    Yes.

Q    All right.  So I will say either MMA or MMA Law Firm and you know what I'm talking about, right?

A    That's fair.

**Matthew Monson**
**February 26, 2026**

Q    Isn't it true, Mr. Monson, that you have had conversations with employees of the FBI related to MMA?

A    No.

Q    Who is Krista Bradford?

A    That's why I'm making the distinction of your question.  An employee of the FBI.  I did not talk to multiple employees.

Q    Who did you speak to at the FBI who held themselves out to be --

A    Krista Bradford.

Q    All right.  And you spoke to Ms. Bradford at the FBI about MMA, right?

A    Yes.

Q    And you generally told Ms. Bradford things that you thought MMA did wrong?

A    No.  I provided her with the answers to her questions.

Q    You also provided her with unsolicited information, too, didn't you?

A    No.

Q    Never?  That's your sworn testimony?

A    I'm confused by your question.

Q    Your testimony was you only answered

Matthew Monson
February 26, 2026

her questions.  And my followup was isn't it true that you provided Ms. Bradford with information that she didn't request from you?

A     Yes.

Q     All right.  And you e-mailed with Ms. Bradford, correct?

A     Yes.

Q     And you spoke to her on the telephone?

A     Yes.

Q     And you and Ms. Bradford exchanged text messages?

A     Yes.

Q     And did you ever meet with her in person?

A     Yes.

Q     How many times?

A     Once.  No, I'm sorry, twice.

Q     And what was the purpose of you communicating with Ms. Bradford about MMA?

A     She reached out to me originally.

Q     All right.

A     About MMA.

Q     What was the purpose of your

**Matthew Monson**
**February 26, 2026**

continual conversations, e-mails, text messages, and meetings with Ms. Bradford?

A    It was about largely about McClenny Moseley & Associates.

Q    For what purpose?

A    To provide her with information.

Q    Provide her with information that you wanted her to have, correct?

A    Yes.

Q    For what purpose?

A    To provide her with information.

Q    What did you want her to do with that information?

A    Nothing.

Q    Nothing.  That's your sworn testimony?

A    I think I stated it quite clearly.

Q    And you didn't want --

A    I'm not.

Q    I just need you to listen and answer my questions.  Do you understand?

A    I do understand.

Q    All right.

A    But I'm not here to argue with you.

Q    That's good.  That's not your job.

Matthew Monson
February 26, 2026

A    Nor is it yours.

Q    So your sworn testimony is that the only purpose for communicating with Ms. Bradford at the FBI related to MMA was just to answer her questions?

A    It was to provide information as to her investigation.

Q    Okay.  Did you have any other, did you want any result to happen from her investigation?

A    No.

Q    Did you want Mr. Moseley to go to prison?

A    No.

Q    Did you want anyone at MMA to go to prison?

A    No.

Q    Did you want anyone at MMA, Mr. Moseley, Mr. Huye, any of them, to go to jail?

A    No.

Q    All right.  We're going to go back to that, but we're going to go big topics first so we can figure out everybody you talked to about MMA.  But before we leave

**Matthew Monson**
**February 26, 2026**

Ms. Bradford, did Ms. Bradford ask you to provide her with information regarding anyone other than MMA?

A    We did discuss other people other than MMA.  And when it comes to --

Q    In connection with the MMA investigation?

A    No, not necessarily.

Q    So Ms. Bradford communicated and needed help from you for other investigations that she was handling?

A    I'm unfamiliar if there's other investigations, but MMA was not the only law firm that we spoke about.

Q    Listen to my question.

A    Okay.

Q    Are you aware, did Ms. Bradford tell you that she was investigating anyone other than MMA when she was seeking your assistance in providing information or answering her questions?

A    I don't know.  There are other law firms that were discussed in connection with this overall investigation.

Q    That's not my question.

A     Right.  So the answer to your question, that one, is no.

Q     So the answer is no, Ms. Bradford did not tell you that she was conducting a separate investigation other than MMA that she needed information from you?

A     Not a separate investigation to my recollection.

Q     All right.  How did you meet Ms. Bradford?

A     I met her for the first time I believe in August of 2023.

Q     How were you first introduced to Ms. Bradford?

A     I was not introduced to her.

Q     Tell me about the first time you ever communicated with her in any way?

A     She called me.

Q     All right.  And when was that?

A     Around February 16th of 2023.

Q     And what did she say in that introductory call?

A     So I was not expecting the call. She said that, she introduced herself, and she said that she was with the FBI.  I was,

**Matthew Monson**
**February 26, 2026**

of course, not expecting the phone call. I was like why are you calling me? And she said that she had been presented with some of the pleadings in the Franatovich case.

Q And that was February 16th, 2023, you remember the date?

A I believe so on that one, yeah.

Q All right. And then --

A It could have been the 15th.

Q Mid February?

A Yes, ma'am.

Q And right at that time did you start communicating with her by text, e-mail?

A I don't know. I don't remember, but we were communicating. A lot of it was over the phone.

Q And by text?

A Yeah, there were texts, there were e-mails that we exchanged.

Q Did you communicate with Ms. Bradford in any other way other than e-mail or text message?

A No. E-mail, text, and phone.

Q All right. No other apps?

A No.

**Matthew Monson**
**February 26, 2026**

Page 22

Q    Not through Linked In?

A    I don't believe she has a Linked In.

Q    All right.  So it's fair to say that you first became acquainted with Ms. Bradford because she reached out to you related to the MMA case?

A    Yes, ma'am.

Q    And she never represented to you that she was asking you questions or seeking information regarding any other investigation other than MMA?

A    Correct.

Q    All right.  Tell me why you redacted and did not produce all of your communications with Ms. Bradford.

A    So you requested things that involved McClenny Moseley & Associates, right, so there are things that did not involve McClenny Moseley & Associates.

Q    What would you be discussing with an FBI, with Ms. Bradford from the FBI, other than MMA and if we know that there was no other investigation that she was communicating with you?

A    So there were other things involving

**Matthew Monson**
**February 26, 2026**

another group called ATA Loss Consultants in Alabama and generally things like that that were also of some sort of questionable things that I thought that she might be interested in knowing about.

Q   You shared that information with her about ATA?

A   Yeah.

Q   You provided that?

A   Yeah.

Q   She didn't ask you about ATA.  You willingly provided that information?

A   Yes.  So --

Q   Hold on.  ATA, so you redacted or did not produce information regarding ATA, correct?

A   Yes.

Q   What else did you redact or fail to produce?

A   I did not fail to produce anything.

Q   What else did you redact?

A   I redacted whatever else that was not related to MMA.

Q   What are those topics?

A   I don't know off the top of my head

Matthew Monson
February 26, 2026

talking right here.  What I did do is provide everything involved with MMA that was responsive to the request.

Q   So you sent all of this information over to your lawyers that was produced to me within the last week, right?

A   Yes.

Q   And you recall specifically that you talked to Ms. Bradford on February 16th, 2023, but you can't recall what you redacted from text messages and communications within the last week.  Is that your testimony?

A   That is my testimony.

Q   All right.  And do you and Ms. Bradford exchange photographs?

A   Yes, we did.

Q   Of what?

A   So there was some photographs of Halloween costumes.  At some point there was also photographs that I screen shotted. I'm happy to go through like some of the things on all the text messages.  Sometimes some of the things that aren't showing up, I might be able to remember, so I'm happy

Matthew Monson
February 26, 2026

to go through that with you.  I sent screen shots of I believe it was Ms. Ohlsson, who's on there now, at one point they put the furniture up for sale.

Q    Yeah.  And why wasn't that picture produced?

A    Because it doesn't exist.

Q    You deleted it?

A    No, I did not delete it.  It just doesn't exist.  Like the, when you pull it up, those links are no longer active.

Q    We're talking about screen shots?

A    No, we're not talking about screen shots.

Q    Did you take, you have produced documents of communications with Ms. Bradford where there are screen shots that have no pictures?

A    It's not a screen shot.

Q    Are there any pictures between you, that you exchanged between you and Ms. Bradford that you did not produce to me?

A    I don't have them to produce to you.

Q    Why not?

A    I don't know the technical reasons,

Matthew Monson
February 26, 2026

but I don't have the, I produced to you what I have.

Q   Do you have a cell phone?

A   I do own a cell phone.

Q   And did you communicate with Ms. Bradford on the cell phone that you currently have?

A   Yes, I did.

Q   All right.  And did you delete any of those communications?

A   No, I did not.  I think one of the things that I can help you with is that prior to your thing, my cell phone did not retain things forever.  My cell phone retained things for 30 days.

Q   30 days?

A   So I was actually surprised I was able to find the text messages on the link, whatever, on my computer.

Q   Do you have an icloud account?

A   I believe so.

Q   Did you look through it?

A   Yes, I did.

Q   So why did you say I believe so if you looked through it?

**Matthew Monson**
**February 26, 2026**

Page 27

A    Because I believe so.

Q    Why are you hedging?  Did you or did you not --

A    Please don't argue with me.

MS. MONTERO:

Object to the mischaracterization of his testimony.

BY MS. GOOTT:

Q    Did you or did you not go through your iCloud account?

A    Yes, I did.

Q    And what is that account?  What name is it, your iCloud address?

A    It would be my e-mail I believe, yeah.

Q    That's your testimony?

A    Yes, that's my testimony.

Q    What's your e-mail?

A    My e-mail is matthew@monsonfirm.com.

Q    Do you have any other e-mails?

A    I do have other e-mails, but not associated with the iCloud account.

Q    What other e-mail addresses?

A    I have one other.  I don't really use it.  It's MDMonson@charter.net.

**Matthew Monson**
**February 26, 2026**

Q    So you have MDMonson@charter.net?

A    Uh-huh (affirmative).

Q    You've got Matthew Monson?

A    Matthew@monsonfirm.com.

Q    What else?

A    That's it.

Q    Have you had any other e-mail addresses since 2022 that you use?

A    No.

Q    What do you use MDMonson@charter.net for?

A    Really nothing.  It's just it's an old e-mail address.

Q    When was the last time you used it?

A    I don't recall like really truly using it.

Q    Did you search that account in order to make sure that you complied with the 2004 request?

A    No, absolutely not.

Q    Absolutely not?

A    Correct.  Because there's nothing there.  I truly haven't used that thing.

Q    Since when?

A    I don't know.  It's an e-mail

address that came when I signed up with Charter from years and years and years ago.

Q   So you haven't used that account since at least 2021.  Is that a fair statement?

A   I can't state that as an absolute, but I can tell you that I did not use anything like that with any of the people that you reference in this exam.

Q   You didn't use that e-mail account for anything related to MMA.  That's your sworn testimony?

A   Yes.

Q   All right.  Before we move on, and we're going to go back into some detail with Ms. Bradford, but I'm going to close these blinds.  I can't see.

MS. MONTERO:

Yes.

BY MS. GOOTT:

Q   I'm going to get the players down and then we'll go back through each one of them.  So we know that you communicated with the FBI about MMA through Ms. Bradford, correct?

Matthew Monson
February 26, 2026

A    Yes, ma'am.

Q    Anyone else at the FBI that you communicated with regarding MMA?

A    No, ma'am.

Q    Mr. Moseley?

A    Have I communicated with Mr. Moseley?

Q    Is there anyone else at the FBI other than Ms. Bradford that you communicated with about Mr. Moseley?

A    No.

Q    Same question for Mr. Huye?

A    No.

Q    All right.  Let's talk about big picture LDI, Louisiana Department of Insurance.  Who did you communicate with at the LDI?  Do you understand when I say LDI that I'm referring to the Louisiana Department of Insurance?

A    I do.

Q    Who at the LDI did you communicate with about MMA?

A    I communicated with Commissioner Donelon.

Q    Okay.  Who else?

A    With David Caldwell.

Q    Who's that?

A    I believe he, I don't know his exact title, but he's an attorney with the LDI.

Q    Who else?

A    And then Nathan Strebek.

Q    Who else?

A    I believe that's it.

Q    All right.  And what's Mr. Strebek's position?

A    I don't know his official title, but he's the head of their insurance fraud investigation or whatever.

Q    And did you meet with Mr. Donelon in person ever and discuss -- let me rephrase my question.  Did you ever have in-person conversations with Mr. Donelon about MMA or any of its attorneys?

A    No.

Q    Did you e-mail with Mr. Donelon regarding MMA?

A    No.

Q    Did you have phone calls with Mr. Donelon?

A    Yes.

Matthew Monson
February 26, 2026

Q   How many?

A   I can recall one.

Q   Only one?

A   Yeah.

Q   So other than this one phone call, do you have any other communications, written or oral, with Mr. Donelon about MMA or its attorneys?

A   Not that I recall.

Q   And did you search and look for that information in response to the Court's order in this 2004 Examination?

A   Yes.

Q   All right.  And you have nothing to produce?

A   No.

Q   All right.  And your testimony is there's nothing to produce because it never existed and never happened?

        MS. MONTERO:

            Objection to form.  That's a mischaracterization of his testimony.

        THE WITNESS:

            So I am unaware of anything that's in my possession that would be responsive

Matthew Monson
February 26, 2026

to your request.

BY MS. GOOTT:

Q    Have you ever had a written communication between you and Mr. Donelon with the LDI?

A    About MMA?

Q    Yes.

A    No.

Q    Have you communicated with Mr. Donelon about other matters in writing?

MS. MONTERO:

Other matters in general?

MS. GOOTT:

Yeah, anything else?

THE WITNESS:

Just in general?  Yes, I believe something may have been produced, yes.

BY MS. GOOTT:

Q    And your testimony is that it had absolutely nothing to do with MMA?

A    Yes.

Q    Or its attorneys?

A    Yes.

Q    And Mr. Caldwell, how did you communicate with him about MMA?

**Matthew Monson**
**February 26, 2026**

Page 34

A    I know that there was some e-mails.

Q    What else?

A    I know at least one conversation.

Q    Any in-person meetings with Mr. Caldwell about MMA or its attorneys?

A    No.

Q    So you've got e-mails, one in person meeting?

A    I think it was one conversation.

Q    So how did that happen?  Phone call?

A    I'm sorry, I'm getting confused. Who are you referring to?

Q    Mr. Caldwell.

A    There was no in-person meeting with Mr. Caldwell.

Q    Did you have phone calls with Mr. Caldwell about MMA or its attorneys?

A    I believe so, yes.

Q    Text messages?

A    I don't believe so.

Q    All right.  Strebek, did you have communications with Mr. Strebek whether in person, in writing, on the phone, any kind of communication with Mr. Strebek about MMA or its attorneys?

**Matthew Monson**
**February 26, 2026**

Page 35

A    I don't believe so.

Q    Zero communication?

A    I don't believe so.

Q    You have no recollection?

A    I don't recall any -- the short answer is no, I don't recall having things about MMA.  There's been plenty other things I've spoke to Mr. Strebek about.  I don't believe MMA was one of them.

Q    All right.  And who is your, you made a complaint to the LDI, correct, about MMA?

A    The complaint I believe might have been addressed to Mr. Strebek I believe.  I mean, I know we submitted it.

Q    All right.  So you did communicate with Mr. Strebek about MMA?

A    It was addressed to Mr. Strebek.

Q    You understand when I say communicate in writing that that would mean a letter addressed to Mr. Strebek?

A    I can understand that, but I don't recall whether the e-mail was sent to a general address.  It was addressed to him, but yes, I appreciate that question that

**Matthew Monson**
**February 26, 2026**

you just asked.

Q    No, no, I don't need you to appreciate it.  I just need you to answer honestly, okay?

A    I'm answering to the best of my ability.

Q    You're an attorney.  You understand like what communication means, right?

A    Yes, I do.  What you're doing, I'm happy --

Q    There's no pending question. There's no pending question.

A    You're confusing.

Q    There's no pending question.

A    Now your bullying me.

Q    Your job is to listen quietly while I speak and answer my question.

A    I'm not your little boy.  Stop treating me like that.

Q    You're going to listen quietly while I speak and I'm going to listen quietly when you speak.  It's courtesy.

A    I don't appreciate you staring me down like you're doing.

Q    I don't mean to you scare you or

Matthew Monson
February 26, 2026

intimidate you.

A    You don't scare me or you don't intimidate me.

Q    Then please listen to my question. It will go a lot faster.  All right.  So you did communicate in writing with Mr. Strebek regarding MMA, correct?

A    Correct.  The complaint that I filed was addressed to him.

Q    Other than the complaint that you filed, were there any other communications that you had with Mr. Strebek since January 1st of 2022?

A    Not that I can recall.

Q    And did you search for them?

A    Yes, I did.

Q    All right.  Do you delete e-mails from your matthew@monsonfirm.com?

A    I'm confused by that question.

Q    Do you regularly delete e-mails?

A    The short answer is from time to time I have deleted e-mails from that account.

Q    Do you have a process of intentionally deleting communications from

**Matthew Monson**
**February 26, 2026**

Page 38

your e-mail at Monsonfirm.com?

MS. MONTERO:

Objection to form.

THE WITNESS:

I don't have a process.  There's no process in place.

BY MS. GOOTT:

Q    No?  All right.  You received an evidence preservation letter from MMA, correct?

A    Yes, I did.

Q    Since that point, have you deleted any communications?

A    No.

Q    E-mails or anything related to MMA?

A    No.

Q    All right.  So we know you communicated with the FBI about MMA, we know you communicated with the LDI, you filed a complaint, right?

A    Yes.

Q    State Bar of Louisiana, did you file a complaint against MMA against the State Bar of Louisiana?

A    Not against MMA.

Matthew Monson
February 26, 2026

Q    Not against MMA?

A    No, there's a distinction.  You can't file complaints against entities.  You can file against individuals.

Q    Okay.  So who did you file complaints against, you personally, Mr. Monson?

A    So I filed complaints against, I believe the first complaint was around early August of 2026.

Q    2026?

A    I'm sorry, 2022.  And I believe on that complaint that I did not know who to address it to because, again, you can't file against firms.  I believe I listed the people that were on there that had Louisiana licenses.

Q    All right.  Do you recall who that was?

A    No.

Q    Why would you -- so let's look at this.  In August of 2022, is this what you're referring to?  Let me put a sticker on it.

MS. MONTERO:

2?

BY MS. GOOTT:

Q    2.

A    Thank you.

Q    Is this what you're referring to?

A    Yes.

Q    And this Exhibit 2 is dated August 3rd, 2022, and it is written by you, correct?

A    Yes, ma'am.

Q    And it is, if we go to the top it's addressed to the Louisiana Office of Disciplinary Counsel, correct?

A    Yes, ma'am.

Q    And you listed it as regarding McClenny Moseley & Associates?

A    Yes.

Q    And entity?

A    Thank you for refreshing my recollection.

Q    So it was against MMA?

A    MMA is listed there.

Q    Right.  And this is your complaint?

A    Yes.

Q    Who is Lauren Lam?

A    Lauren Lam is an attorney who used to work at our firm.

Q    She worked for you?

A    She worked at, not for me personally.  She worked for the Monson Law Firm.

Q    Were you her supervisor?  Were you in charge?

A    Sure.

Q    She reported to you?

A    No, she didn't.

Q    Could you have fired her?

A    Yes.

Q    Did you have the authority?

A    Yes.

Q    All right.  And Ms. Lam was working for you in August of 2022, correct?

A    Yes, ma'am.

Q    And she also filed a bar complaint against MMA law firm and its lawyers, right?

A    I believe so, yes.

Q    Did you tell her to do it?

A    No.

Q    Did you know that she did it?

Matthew Monson
February 26, 2026

Page 42

A    Yes.

Q    Did y'all talk about it?

A    Not much but, yes.

Q    Look at this Exhibit 3.  That's her bar complaint, right?  And Ms. Lam sends this Bar complaint a couple weeks after you sent yours, right?  Right?

A    I'm looking at the dates.

Q    Look at the first page.

A    Yes.

Q    And I'd actually like you to put Exhibit 2 and Exhibit 3 right next to each other.

A    Okay, I have them.

Q    All right.  You would agree with me that the first paragraph of your Bar complaint is identical to the first paragraph of hers, right?

A    I do not agree.

Q    You don't?

A    They speak for themselves.

Q    Look at it.  Tell me what words are different.

A    There are many words are different.

Q    Other than it's on behalf of

Matthew Monson
February 26, 2026

Page 43

Katherine Monson is yours, right?  Right?

Your bar complaint says that pursuant to

Rule 8.3 of the Louisiana Rules of

Professional Conduct, you see that?

A    I do see that.

Q    Same as hers, right?

A    I do see that.

Q    And yours says that, the last

sentence, attempting to solicit

representation in a manner that evidences

violation of the Louisiana Rules of

Professional Conduct, right?

A    I do see that.

Q    That's the same as Ms. Lam's, right,

same words?

A    I see that.

Q    All right.  Second paragraph of your

Exhibit 2 of your complaint starts out the

same, at approximately, gives the time and

the date, right, just like Ms. Lam's?

A    I see that.

Q    Allegations that they received an

unsolicited text message from a number

identified as, do you see that?

A    I do see that.

Matthew Monson
February 26, 2026

Q   Next sentence, the unsolicited text message a, copy of which is attached for your review, states as follows.  Identical, right?

A   Yes.

Q   Your complaint Exhibit 2 says, upon receipt of this text message Ms. Monson was confused as she was not familiar with the phone number that texted her, right?

A   It does say that.

Q   And Ms. Lam said, upon receipt of this text message, I was confused as I was not familiar with the phone number that texted me?

A   It does say that.

Q   Right?  Did you provide Ms. Lam with a copy of the complaint that you had filed against MMA a few weeks before?

A   I don't know that I provided her with a copy of my complaint.  I don't recall that.

Q   How would she have gotten it?

A   I don't know.  You have to ask her.

Q   You have no idea?

A   I don't know.

Matthew Monson
February 26, 2026

Page 45

Q    What do you think, how do you think Ms. Lam, who worked for your firm, happened to draft a letter to the same Louisiana Office of Disciplinary Counsel about MMA with very similar language?  And you have no idea how she got it?

A    You're asking me to speculate.

Q    No, I'm asking you -- that's exactly what I'm asking you.

A    I'm not going to speculate.

Q    No, you're going to answer my question.  I'm asking --

A    The answer to your question is I don't know.

Q    And I didn't ask you, I'm going to take your testimony, I got it, but you have no idea?

A    No, I have no recollection as we sit here today.

Q    I'm asking you do you have any idea how Ms. Lam, who works for your firm, sent a letter that was so similar to the same party making the same allegations, you have any idea how she got your letter?

A    I don't.

**Matthew Monson**
**February 26, 2026**

Q    No idea?

A    No.

Q    Did you talk to her about your letter?

A    I don't recall.

Q    It's possible then?

A    I don't know.  I said I don't recall.

Q    I understand.  So if you don't recall, it means that it is possible that you did and it is possible that you did not, right?

A    You just asked like three questions. I don't know what you're talking about.

Q    It is possible -- it is one question.  I don't mean to confuse you, just please focus.  It is possible that you instructed Ms. Lam to file this letter?

A    No, I did not instruct her to file that letter.

Q    Did you share your letter with her as a draft so that she could draft her own?

A    I don't recall doing that.

Q    So it is possible that you did?

A    I don't recall doing that.

Matthew Monson
February 26, 2026

Q    I didn't ask you if you recall.  I'm asking is it possible that you did?

A    No.

Q    Why is it not possible if you can't recall?

A    You're playing word games with me.

Q    No.  I need you to listen to my question.  Tell me why it's not possible?

A    I don't know how she did it.  I don't know that I sent it.  I don't know that I didn't send it.

Q    So it is possible that you did?  You just said under oath I don't know that I did, I don't know that I did not?

A    I don't know.  And you're trying to get me to say something that you're trying to trick me into some kind of answer saying it's possible that you did this.  I'm not saying --

Q    Mr. Monson, let me ask you a question.  Is it possible that you sent me a copy of this Bar complaint in August of 2022?  Is that possible?

A    No, it's not.

Q    No, it's not possible because you

Matthew Monson
February 26, 2026

didn't know me and you wouldn't have sent it to me.  That would be impossible in your mind, right?

A    Correct.

Q    My question was is it possible that you shared a copy of your complaint to the Louisiana Office of Disciplinary Counsel with your co-worker, Ms. Lam, who sent a nearly identical letter to the same party three weeks later?  Is it possible?

A    No.

Q    Why is it not possible when you just testified that maybe you did and maybe you didn't?

A    I did not do it.

Q    Who did?

A    I don't know.

Q    Who could have?

A    Anybody in my whole law firm.

Q    And why would they?

A    I don't know.

Q    Does she have access to your files?

A    Ms. Lam?

Q    Yes, Ms. Lam?

A    Currently?

**Matthew Monson**
**February 26, 2026**

Q   Really, Mr. Monson?

A   Well, you said --

Q   In August of 2022, did Ms. Lam have access to your computer files?

A   Yes.

Q   Are your files on a server?

A   No.

Q   Did you communicate with Ms. Lam in any way about MMA?

A   Yes.

Q   And this disciplinary complaint?

A   No.

Q   There's not a single e-mail communication between you and Ms. Lam regarding the Bar complaint?

A   No.

Q   Text message?

A   No.

Q   Where does Ms. Lam work today?

A   I don't know.

Q   When did she leave?

A   A year and a half, two years ago.

Q   Why?

A   The amount of work our firm had had decreased.

Matthew Monson
February 26, 2026

Q    Okay.  What kind of work does your firm do?

A    Represent insurance companies.

Q    Anything else?

A    Not generally, no.  I mean, the vast, vast, vast majority is representing insurance companies.

Q    What does the Monson Law Firm do other than represent insurance companies?

A    From time to time we will represent individuals or a couple of businesses, some corporate advice.

Q    All right.  So since January of 2022, who has the Monson Law Firm represented other than insurance companies?

A    I don't know because those aren't my clients.  They're clients of the firm, but in general, there's some businesses.

Q    That's fine, let's limit it to you, your Mr. Monson clients that you worked on for the Monson Law Firm?

A    Yeah, it's insurance companies.

Q    Anything else?

A    No.

Q    Nothing else other than insurance

Matthew Monson
February 26, 2026

companies from January 1, 2022?

A    Generally, yes, 99.9 percent.  That .1 percent, I'm sure we'll talk about it, as far as the Cafarrels.

Q    Other than the Cafarrels?

A    No, it's insurance company.

Q    And the Cafarrels are clients who had claims against an insurance company?

A    Yes.

Q    How many people did you represent, individuals, since January of 2021, that had claims against their insurance company other than the Cafarrels?

A    I'm thinking about not in Louisiana, maybe one in Florida or actually maybe three or four.

Q    How many in Louisiana?

A    I think three of them are in Louisiana.

Q    Do you know their names?

A    No, I don't.

Q    Are the Cafarrels the only individuals that you represented since 2021 that had any connection to MMA?

A    I believe that's correct.

Q   Did you instruct Ms. Lam to go onto an MMA or any website to opt in to receive this text message?

A   No, ma'am.

Q   Are you aware that she did?

A   No, ma'am.  And let me ask you --

Q   I don't have a pending question. Today's not my day to answer questions.

A   I was confused by your question.

Q   Did you instruct Ms. Lam to go on line and search for anything related to MMA that resulted in her opting in for services from MMA?

A   Where I'm confused the question in part is what do you mean by opt in?

Q   Do you know what opt in means?

A   No.

Q   That means nothing to you?

A   Not --

Q   You've never used that term, opt in?

A   Not in the way that you're asking it, no.  You're talking about a website and opting into services, so I don't understand what you mean by opt in.

Q   Did you tell Ms. Lam to go on line

**Matthew Monson**
**February 26, 2026**

and search in any way to sign up for MMA to represent her?

A   No, I did not.

Q   Are you aware that she did?

A   No, I'm not.

Q   Did you ever do that, personally?

A   No, I did not.

Q   Did you have somebody do it on your behalf?

A   No, I did not.

Q   Did you do it for your wife?

A   No, I did not.

Q   Did your wife do it?

A   No, she did not.

Q   And so if Velawcity has the evidence that someone logged in with your e-mail address and opted in for these text messages, that would really surprise you, wouldn't it?

A    It would because the nature of your question is that somebody asked MMA to represent them.  To my knowledge that none of the Velawcity websites, whether it was the one that's referred to by Ms. Lam or the one here, none of those websites

mentioned McClenny Moseley & Associates at any point.

Q    Okay.  So what was this website that you're referring to?

A    This one, DisasterClaimHelp.com.

Q    Did you log onto that website?

A    At some point I'm sure that I did, yes.  But that website doesn't refer to MMA.

Q    I understand.  Did you log onto this website, we're going to call it disaster website, this DisasterClaimHelp.com, did you personally log onto that website and fill out information on your wife's behalf?

A    Not on my wife's behalf, no.

Q    Did you do it with her?

A    No.

Q    Did she do it?

A    I believe so, yes.

Q    She did it?

A    Yes.

Q    Why did she do that?

A    So I think it explains in the --

Q    No, no, no, I don't need you to read for me.

A    Well, I'm referring to it to refresh my recollection.

Q    I don't need you to read it.  If you don't remember something, I'd like for you to flip that over and I will ask you questions.

A    No, I'm not doing that.

Q    You're not going to read from a piece of paper in front of you.

A    I'm going to enjoy reading this piece of paper.

Q    No, you're not.  No, you're not.

A    You presented it to me.

Q    I don't have a question right now.

A    Ask you question.

Q    Mr. Monson, put it down and listen to my question.

A    No.

Q    No, you're not going to answer my question?

        MS. MONTERO:

            Let's --

        THE WITNESS:

            You're telling me what to do.  You don't even have a question on the table.

**Matthew Monson**
**February 26, 2026**

Page 56

BY MS. GOOTT:

Q     All right.  Mr. Monson, isn't it true that you logged onto DisasterClaimHelp.com before a text message was ever received by your wife on July 17th, 2022?

A     Absolutely categorically no.

Q     And your wife?

A     No.

Q     And so if there is evidence that your e-mail address or her e-mail address was entered, that would shock you, right?

A     I don't know what you mean by shock.

Q     It would surprise you.  Because you said categorically no, right?

A     It didn't happen.

Q     That's what I'm asking you.

A     It did not happen.

Q     You did not do it?

A     Did not do it.

Q     And you didn't have someone do it for you?

A     No.

Q     And your wife didn't do it?

A     No.

Q    And so both your wife, what's her name?

A    My wife's name is Katherine.

Q    Katherine, is she an attorney?

A    No, she's not.

Q    What does she do?

A    She doesn't do anything.  She's a registered nurse, but she's retired from that.

Q    In August of 2022, what was she doing for work?

A    She was not working.

Q    So in August of 2022, you represent to the Louisiana Office of Disciplinary Counsel that your wife received a text message at 7:01 a.m. on July 17th, 2022, right?

A    Yes.

Q    And is that her phone number ending, 4307032100?

A    No, that is not her phone number.

Q    Whose phone number is that?

A    I don't know.

Q    That's the number that she received it from?

**Matthew Monson**
**February 26, 2026**

A    Yes, ma'am.

Q    What is her phone number?

A    Her phone number is 9857890259.

Q    And is that where she received this text message on July 17th, 2022?

A    Yes.

Q    And it says she was surprised -- no, excuse me, she was confused, right?

A    That's what it says, yes.

Q    Were you confused?

A    I don't understand your question.

Q    Were you confused when the message came in on July 17th?  Your wife was confused clearly.  You told the Office of Disciplinary Counsel.  My question was were you confused?

A    I don't recall being confused.

Q    Because you knew, you knew at this time that this was related to MMA, didn't you?

A    No.

Q    You didn't?

A    Not a clue.

Q    Not a clue?

A    No, ma'am, not a clue.

Matthew Monson
February 26, 2026

Q    Not a clue.  You had no idea that MMA could possibly have sent that text message, not a clue?

A    So in your exhibit -- to answer your question --

Q    No.

A    You asked a question, you said not a clue, you said it 10 times.  I didn't have a clue because on Monson 005309, here's a text message, it does not identify itself as McClenny Moseley & Associates at all in any way, shape or form.

Q    I got you.  Not a clue.  Stay with that.  I'm going to go back to this in one second.  Not a clue that it was related to MMA.  And then separate from your wife's August of '22 complaint to the Louisiana Office of Disciplinary Counsel against MMA and separate from your co-workers similar complaint the same month, also you provided a reply, correct, you drafted a reply and sent it to the Louisiana Office of Disciplinary Counsel, correct?

A    I believe so, yes.

Q    And this time, and let's look at

that, this is Exhibit No. 4, this time the complaints are you and your wife, right?

A    I don't know what you mean by this time.

Q    You're looking at Exhibit 4?  Mr. Monson, are you looking at Exhibit 4?

A    I am looking at Exhibit 4, yes.

Q    Okay.  Now you see this is your letterhead, look at the top, you see it?

A    Yes, I see that that is my letterhead.

Q    All right.  And you see November 14th, 2022 is the date?

A    I see the date is November 14th, 2022.

Q    All right.  And then keep going down, you see it lists Mr. Huye, Reynaud, Killingsworth, Barcus, Snowden, and then who is it listed as the complainants?

A    The complainants are listed as Katherine Monson and Matthew Monson.

Q    And so you and your wife are the complainants, right?

A    Yes.

Q    Who's David Hammer?

Matthew Monson
February 26, 2026

A    David Hammer is a WWL News reporter.

Q    You communicate with him often about MMA, don't you?

A    Not often, but I have communicated with him.

Q    More than once?

A    I've communicated with him more than once about MMA.

Q    You communicated with him more than five times about MMA?

A    Yes.

Q    Did you communicate with him more than 10 times about MMA?

A    I don't know.

Q    Did you produce all your communications with Mr. Hammer?

A    Yes, I've produced with you all the communications.

Q    And has Mr. Hammer been to your office?

A    Yes, he has.

Q    Did he come in there and take a photograph of you or someone from his office?

A    I don't know that he took a

Matthew Monson
February 26, 2026

photograph.

Q    Did he come interview you?

A    Yes, he interviewed me.

Q    And you were part of a news article that he wrote, right?

A    Yes, I was.

Q    And the article was about MMA, correct?

A    Yes, it was.

Q    And there is a picture of you in it, right?

A    I don't know that that's what you're referring to.  If you can show me, I'd be happy to look at it.

Q    Is that a photo of you?

A    I don't know that that's a photo. It could be a screen shot of a video.

Q    Does it look like you?

A    It does look like me.

Q    All right.  Is that your office in the background?

A    That is my office.

Q    All right.  Do you have any reason to believe that's not you depicted in this?

A    It is.  I was confused with you

saying a photo.  I don't think any photos were taken.

Q   That's right, that's right.  But this is an image of you in his article, right?

A   Yes.  I don't know that that's his article though.  I've just seen the image.

Q   All right.  Just making sure you can recognize yourself in this picture, that's all.  And he interviewed you about this text message that your wife was very confused about, right?  Do you remember that?

A   I remember him interviewing me.

Q   But he interviewed you specifically about your allegations that your wife received an unsolicited text message and she was confused, right?

A   I don't recall.

Q   You don't recall.  Did you answer his questions?

A   I answered questions that he posed to me, yes.

Q   Were you honest when you answered his questions?

Matthew Monson
February 26, 2026

A    I believe so, yes.

Q    You believe so or you were?

A    I believe I was honest with him when I answered the questions.

Q    Why are you hedging?

A    I'm not hedging.  Why are you arguing with me?

Q    Not your day to ask questions. You've got a lawyer here.  You're not a lawyer today.

A    I'm a lawyer every day.

Q    Not a lawyer here.

A    Yes, I am.

Q    Today is your job to answer questions.  You are being deposed?

A    But you're telling me I'm not a lawyer when I am.

Q    I didn't mean to hurt your feelings. All right.  Mr. Hammer in this article says the Monsons decided to click the link in the text to see if MMA was involved.  The first link went to hurricanedamagelawsuits.com.  A web page that mentions no specific law firm and asked users to provide information to

receive a free case evaluation.  They

clicked a, quote, see if I qualify button,

which had them follow three easy steps to

file a claim.  Only when they were asked to

auto sign the document did they see

something indicating it was to hire MMA.

Does this sound familiar?

   A   His reporting or what do you mean by

this sounds familiar?  You mentioned a

number of sentences.

   Q   The Monsons decided to click the

link in the text to see if MMA was

involved.  Is that a false statement by Mr.

Hammer?

   A   It's not 100 percent accurate

because there's two text messages.

   Q   The Monsons decided to click the

links in text to see if MMA was involved?

   A   Your questioning me on something

that you're reading that you're not showing

me, but where that's not --

   Q   I'm going to object as

nonresponsive.  I'm asking you --

   A   I'm trying to respond to your

question.

Matthew Monson
February 26, 2026

Q   Listen to my question.

A   You're asking me if it's accurate, and I'm telling you that it's not 100 percent accurate.

Q   All right.  So this reporting by Mr. Hammer when he interviewed you in your office and he reports, the Monsons decided to click the link in the text to see if MMA was involved.  So your prior testimony that you didn't have a clue that it had anything to do with MMA is contrary to what at least Mr. Hammer reports, correct?

A   No, not even close.

Q   Not even close.  Did you not click on the link to see if MMA was involved?

A   To which link are you referring?

Q   Any text from hurricanedamagelawsuit?

A   There is no text received from hurricanedamagelawsuit.

Q   The first link went to hurricanedamagelawsuit.com.

A   Your question was was a text from hurricanedamagelawsuit.com.  I did not receive a text from

hurricanedamagelawsuit.com.

Q    This is great.  I'm good with this.
Surprised.  Weren't surprised.  You were
looking for it, weren't you, Mr. Monson?

A    I don't know what you're referring.

Q    You were investigating MMA?

A    I don't know what you're referring
to.

Q    When did you first start
investigate, when did you first even become
familiar with MMA?

A    Probably around April of 2022.

Q    And how did you become familiar with
MMA in April of 2022?

A    So without revealing attorney-client
privilege information, the clients were
starting to realize that MMA was I guess a
firm that was filing claims.

Q    Insurance companies?

A    Yes.

Q    So insurance, your insurance company
clients told you who MMA was because MMA
was representing homeowners?

A    Actually there was a question as to
whether or not they were actually

representing the homeowners.  That was the issue.

Q    And who first brought that issue to your attention?

MS. MONTERO:

Wait, wait, stop.

BY MS. GOOTT:

Q    I'm not asking for any communications.  I want to know, I asked you how you first became familiar with MMA, and your response was from your insurance clients.

A    Yes, ma'am.

Q    And there was a concern that MMA didn't represent the people they said they represented?

A    Yes, ma'am.

Q    All right.  And that concern was first brought to you by your insurance clients?

A    Yes, ma'am.

Q    All right.  And that is Allied?

A    It's more than just Allied.

Q    Who?

A    I represent a number of insurance

**Matthew Monson**
**February 26, 2026**

Page 69

companies.

Q   I didn't ask who you represent.  I want to know who in, what month did you say of 2022?

A   Around April of 2022.

Q   In April of 2022, more than one of your clients, other than Allied, brought the matter to your attention that there was a concern that MMA wasn't actually representing their clients, right?

A   Yes.

Q   And who other than Allied brought it to your attention?

A   I don't recall.

Q   What other insurance companies did you represent in April of 2022?

A   In April of 2022, in Louisiana?

Q   Yes.

A   Limit it to that.  So I represent Louisiana Citizens, we represented Allied, and what you call it, I'm literally drawing a blank.  We represent a lot.  We represented, there are others and I'm literally just drawing a plank.

Q   Did LIGA have the same concerns that

Allied did?

A    Yes.

Q    Did Louisiana Citizens have the same concerns that Allied did --

A    Yes.

Q    -- in this time period of April of 2022?

A    Yes.

Q    Who first brought it to your attention?

A    Again, it would be Allied.

Q    Allied?

A    Allied Trust Insurance Company.

Q    So in April of 2022, you were familiar with MMA?

A    Yes.

Q    And between April of 2022 and July of 2022, had you investigated how MMA was obtaining clients?

A    No.

Q    What had you done, if anything, to learn about MMA?

        MS. MONTERO:

            This gets into his work product and I'm going to instruct him not to

Matthew Monson
February 26, 2026

answer that.

MS. GOOTT:

Let me ask you this.

MS. MONTERO:

Because he's working on behalf of his clients.

BY MS. GOOTT:

Q    So if you will just answer this question, I will be done.  Is everything that you did related to MMA, investigation, communications with the LDI, the FBI, the State Bar, the judges, was that all done on behalf of Allied?

A    Allied and Cafarrels, yeah.  We had filed one of the Bar complaints on the Cafarrel's behalf.

Q    All right.

A    So their --

Q    Listen to my question.  Is all of the work that you did?

A    The answer --

Q    One second.  This is interesting. How did the Cafarrels find you since you're an insurance defense lawyer that's 99 percent of what you do?

A    Their son was acquainted with one of the lawyers in my office.

Q    Their son was --

A    The son of the Cafarrels.

Q    Yes.

A    He was acquainted with one of the lawyers in my office.

Q    You had never met them before then?

A    No, ma'am.

Q    All right.   When did you represent the Cafarrels?

A    It would have been roughly starting July of 2022.

Q    To when?

A    I don't know that it ended or that there was an end to the relationship or anything like that.

Q    Well, was there an engagement agreement?

A    Yes, there was.

Q    Did they pay a retainer?

A    No, they did not.

Q    Did they pay you anything?

A    No, they did not.

Q    You did the work for free?

Matthew Monson
February 26, 2026

Page 73

A    Yes, I did.

Q    It was pro bono?

A    Yes, it was.

Q    Could they not afford your services?

A    That's none of your concern, but I don't know if they could or couldn't.

Q    You wanted to work for them for free?

A    I agreed to represent them pro bono.

Q    And they were the 99 percent.  It was 1 percent of what work you did.  This wasn't what you do.  You don't represent homeowners, right?

A    Again, we do to a certain degree.

Q    You, Mr. Monson, that's not what you do.  You represent insurance companies, right?

A    I do represent insurance companies.

Q    That's 99 percent of what you do?

A    It is.

Q    But you represented one homeowner in Louisiana in 2022 pro bono against MMA?

A    Yes.

Q    All right.  And did you -- they had hurricane damage to their home?  Is that

Matthew Monson
February 26, 2026

Page 74

Q     why they hired you?

A     No, that's not why they hired me.

Q     Did they have damage to their property?

A     I don't know.

Q     Did you ever go to their property?

A     No, I did not.

Q     So you don't even have a clue if they had damage to their property?

A     No, I don't.

Q     All right.  So what was the intended purpose?  What was the goal?

A     There was no goal, but I guess what you're getting to --

Q     I'll ask a better question.

A     The precipitating factor --

Q     No, not my question, but I appreciate the help.  Client hires you because they need you to accomplish something, right?

A     Yes.

Q     To represent their interests?

A     Yes.

Q     And as a lawyer you tell them here's what I can do for you, right?

Matthew Monson
February 26, 2026

Page 75

A    Yes.

Q    And when you complete that job, whatever it may be, is the representation over?

A    In general, yes.

Q    Are you representing them pro bono indefinitely?

A    No.

Q    When was the last time you spoke to the Cafarrels?

A    I never spoke to the Cafarrels.

Q    You've never spoken to the Cafarrels?

A    I believe that's what I just said.

Q    Never?

A    Never.

Q    You never saw them?

A    No.

Q    You never talked to them on the phone?

A    No, I did not.

Q    You never communicated with them in writing?

A    We did communicate with them.

Q    No, you?

A    Me, personally, yes, we communicated with them in writing, meaning letters and things like that were sent.

Q    Did you ever send an e-mail communication?

A    Me, personally?

Q    Yes, you.  You were their lawyer, right?

A    I did not send an e-mail communication to them personally.

Q    You have no personal communications between you and the Cafarrels?

A    Talking about me as an individual or the Monson Law Firm?

Q    No, no, no.  You, Mr. Monson?

A    No.

Q    Who signed the engagement agreement between the law firm and the Cafarrels?

A    I don't recall.

Q    Was it you?

A    I don't recall.

Q    Is there an engagement agreement?

A    There is an engagement agreement.

Q    And you can find it.  You have access to it?

A    Yes.

Q    And it's possible you signed it?

A    That is possible.

Q    And you signed it and you never met them?

A    I never met them in person, no.

Q    And you never talked to them on the phone?

A    No.

Q    How do you explain the terms of the engagement agreement that you signed?

A    We had that attorney that I mentioned, John Mineo.

Q    Who is it?

A    John Mineo.

Q    Spell that for me, please.

A    M-I-N-E-O.

Q    Okay.

A    He was the contact for the Cafarrels.

Q    Did Mr. Mineo go on court on behalf of the Cafarrels?

A    There was no court proceeding to go to.

Q    You've never attended court on

**Matthew Monson**
**February 26, 2026**

Page 78

behalf of the Cafarrels?

A    I don't think there's a litigation proceeding.

Q    Did you file any pleadings on behalf of the Cafarrels?

A    No, I don't think we filed any pleadings on behalf of the Cafarrels.

Q    You filed the State Bar complaint or any other complaint on behalf of the Cafarrels?

A    Yes, we did.

Q    That's what they hired you to do?

A    That was part of the representation.

Q    No.  What did they hire you to do? What was the goal?

A    That was part of the representation. I'm not trying to confuse you here.  It's part of the representation.  It's also to represent them going forward.

Q    On what?

A    On their insurance claim.

Q    Against whom?

A    Their insurance company I believe was Masson Insurance Company.

Q    And tell me the name of the lawyer

Matthew Monson
February 26, 2026

that they communicated with?

A    John Mineo.

Q    Mineo.  And did Mr. Mineo regularly represent homeowners and insurance claims against their insurance companies?

A    No, he does not.

Q    Has he ever represented anyone other than the Cafarrels as an employee of Monson Law Firm?

A    I believe he may have, yeah.

Q    You don't know?

A    I believe he has actually.

Q    Is that part of his regular practice?

A    No, it's not.

Q    Because your firm represents insurance companies, right?

A    Correct.

Q    Did he come to you and ask you if the firm was -- how many pro bono clients does Monson Law Firm have?

A    I don't know.

Q    How many have you had this year?

A    I think we just signed somebody -- no, they're not pro bono.  We have

**Matthew Monson**
**February 26, 2026**

represented homeowners though but not pro bono.

Q   In the last year, how many pro bono clients have you had?

A   I don't know.

Q   You can't think of one?

A   I'm unfamiliar with any.

Q   Can you think of any --

A   No, I can't.

Q   -- pro bono clients that the Monson Law Firm has had that you worked on other than the Cafarrels since 2022?

A   No.

Q   Whose decision was it to represent them pro bono?

A   That would have been a joint decision between me and Mr. Mineo.

Q   You were involved in that decision?

A   Yes, I was.

Q   And you knew when you entered into this pro bono representation that the Cafarrels were involved with MMA, right?

A   I know that MMA was on the checks that were sent to them.

Q   Exactly. So did you assist the

Cafarrels and resolve their insurance
claim?

A     Yes.

Q     Did they get -- why did they make an
insurance claim?  Roof damage, what kind
of, what was the issue that they needed
help with?

A     They needed, what they needed help
with when they approached us you mean by
the time it got to us?

Q     You said insurance claim against
Masson?

A     Masson.

Q     Masson.  Did you get them the money
for --

A     No, they already had the money.

Q     They already had the money.  Did MMA
keep any of that money from the Cafarrels?

A     No, they did not.

Q     Not a penny, did they?

A     No.

Q     Are you aware of a single client
personal knowledge, personal, you
understand as a lawyer what I mean by
personal knowledge?

Matthew Monson
February 26, 2026

A   Yes, I understand what you mean by personal knowledge.

Q   All right.  Do you have any personal knowledge of MMA keeping money that doesn't belong to them that belongs to a client?

A   I am unaware personally.  I believe some people have made allegations of that, but personally I'm not familiar.

Q   You have no personal knowledge that MMA kept one penny of money that really belonged to the client, right?

A   Which client are you referring to?

Q   Any client in Louisiana?

A   I believe that there were allegations --

Q   I didn't ask about allegations.  I'm asking you, Mr. Monson, you know what personal knowledge is as a lawyer, right?

A   Yes.

Q   And you have none, correct?

A   The distinction between personal knowledge and things that I know about, that's what you're confusing me with.

Q   Okay.  Well, then let's talk about what personal knowledge is.  First of all,

Matthew Monson
February 26, 2026

let's back up.  You've been an attorney since, I wrote it down.

A    1997.

Q    1997?

A    Yes.

Q    How many trials have you actually litigated yourself?

A    I don't know.

Q    More than one?

A    Yes.

Q    More than five?

A    Yes.

Q    More than 10?

A    Yes.

Q    More than 20?

A    Likely not as far as a trial.

Q    Yeah, a trial.  As far as a trial. We understand what a trial is?

A    We do.

Q    Either in front of a jury or a judge and you're representing a client, right, and there's a decision that's made with the judgment.

A    Is that a question?

Q    Well, you said --

**Matthew Monson**
**February 26, 2026**

A    Is that a question?

Q    I'm trying to make sure you understand because when I said trial, you said like trial and you looked around and it seemed confusing.  So I want to make sure that you understand because we're having issues on understanding what personal knowledge is which is why I asked you if you have litigated before.  So you believe you have litigated less than 20 trials in your career?

A    Yes.

Q    Okay.  So let's talk about personal knowledge because that is something that comes up in trial.  When was the last time you tried a case, litigated?

A    I don't know.

Q    Last year?

A    No.

Q    Two years ago?

A    No.

Q    Five years ago?

A    No.

Q    10 years ago?

A    Might be getting there.

Matthew Monson
February 26, 2026

Q    Maybe 10 years ago you litigated?

A    I litigate all the time.

Q    But not a trial?

A    Correct.

Q    And when you say you litigate all the time, does that include evidence, presenting evidence, offering it into the record, someone making objections to the evidence?

A    I don't understand your question. You're talking about all kind of things. Is there a question?

Q    Yeah, I am talking about, I'm talking about evidence.  My question is, I'll be real specific.  In the last 10 years, what experience, let's keep it just for working for the Monson Law Firm which is when, 2011, right, right?

A    Yes.

Q    So since 2011, have you gone to trial?

A    Yes.

Q    All right.  And have you gone and litigated a case at trial in a court in the last five years?

A     No.

Q     Then let's clarify and make sure we understand what personal knowledge means. You understand that personal knowledge doesn't mean that you read it somewhere, right?  If you read on a piece of paper that somebody says MMA stole money, that that's not personal knowledge, correct?

A     That's your definition of it?

Q     No, no, no, no.  I'm talking about the rules of evidence, right?

A     If that's your definition.  If you want me to understand if that's your definition of it, then I'll be happy to work --

Q     Tell me your definition of personal knowledge.

A     I don't have a definition of personal knowledge.

Q     You don't know what that means?

A     I don't have a definition of personal knowledge.

Q     So when you testified earlier under oath that you have no personal knowledge of whether or not MMA has ever taken a penny

Matthew Monson
February 26, 2026

of client funds and you said I don't have personal knowledge of that, you didn't know what you meant when you said it?

A    Your questions are confusing.

Q    Okay.  Let's start over.

A    And the way that you talk down to me is really not necessary.

Q    Mr. Monson, do you, you don't understand what the word personal knowledge, the term personal knowledge is as an attorney?

A    I'm asking you to define it to me.

Q    No, I'm asking do you know?

A    So that I can understand and answer your question accurately.

Q    Do you have any knowledge that MMA took money that belonged to a client?

A    Of any knowledge?

Q    Any knowledge?

A    There are instances in which those allegations have been made.

Q    Who made those allegations?

A    I don't know the name of the individual.  It was the one that was involved with the Court services.

Q    So you are aware that MMA took clients' money based on something that someone said and you don't know who they are; is that fair?

A    It was in open court that I witnessed an examination.

Q    Okay.  So you didn't have personal knowledge, you did not see MMA take money that belonged to a client, correct?

A    In that instance or any other instance, no.

Q    In no instance, right?

A    Correct.

Q    And in no instance did you discover on behalf of a client or saw any transfer of money that didn't belong to MMA that went to a client, you didn't observe it, correct?

A    I did not observe it.

Q    Other than hearing someone in court make a statement, right?

A    Uh-huh (affirmative), yes.

Q    In a case that you were not a party to, correct?

A    I was not a party to that case, no.

Matthew Monson
February 26, 2026

Q    All right.  So we would agree that that's hearsay, right?

A    No.

Q    Because you were in a courtroom?

A    I'm not arguing with you over terms.

Q    Okay.  So other than hearing somebody in a courtroom, who is that person?

A    There was an examination.

Q    Do you know the name of the person?

A    As I sit here I do not know the name of the person.  Actually, I do.  Kermit Sonnier (phonetic).

Q    So other than this person and you were not involved in that case, right?

A    I was not involved in that case.

Q    You were just sitting in a courtroom?

A    I was in the courtroom.

Q    Not your case?

A    Not my case.

Q    You heard an allegation being made against MMA?

A    Yes, I did.

Q    By Sonnier?

**Matthew Monson**
**February 26, 2026**

A    Yes.

Q    All right.  Other than that, do you have any knowledge, I won't even say personal because I don't want to get you confused, any other knowledge where MMA took money, stole money, that was really the clients' money?

A    I believe there were 11 instances that were admitted to by MMA in relation to the Apex Roofing matters.

Q    11 instances.  Tell me when that happened.  Your sworn testimony is that MMA admitted to 11 instances of stealing client money?

MS. MONTERO:
         Objection, mischaracterization.

THE WITNESS:
         I did not say that.  I did not say that.

MS. MONTERO:
         Objection.

MS. GOOTT:
         Tell me what you said.

THE WITNESS:
         I said I believe there were 11

Matthew Monson
February 26, 2026

instances in which MMA resolved cases with Apex Roofing that involved people that they may have admitted to not actually representing.

BY MS. GOOTT:

Q   Okay.  And that was not my question.  My question was --

A   Your questions are confusing on this issue.

Q   They're very simple.  Do you have any knowledge of MMA stealing client money?

A   And so the answer to that, and I'm not saying stealing.

Q   No, no, no, that's what I'm asking.

A   Stealing?

Q   Stealing?

A   No, I do not have that other than what we talked about before, Mr. Sonnier's testimony.

Q   Okay.  So other than somebody, other than something that you heard from some person, do you know Mr. Sonnier?

A   Yes, I do.

Q   Okay.  And so in what context?  Do you represent him?

Matthew Monson
February 26, 2026

A    No.

Q    All right.  So in the context of a case you had no involvement in sitting in the galley, right, in the courtroom?

A    Uh-huh (affirmative).

Q    You heard somebody make a statement, other than that, do you have any knowledge of MMA stealing money from a client?  Yes or no.  I don't understand what all the delay is because --

A    Please stop harassing me.  You're being unprofessional, stop harassing me.

Q    You don't need to stare at me with your big eyes like that.

A    Like you're doing to me the entire time.  I'm thinking about it and you're haranguing me.

Q    I'm what?

A    You're haranguing me.  I'll leave that definition up to you.  You can look it up.

Q    Yes.  Tell me, it's yes or no.

A    It's my understanding, and I'm not going to characterize it as stealing --

Q    That's all I'm asking.  I'm not

Matthew Monson
February 26, 2026

asking about anything else.  It's a yes or no question.  Do you have any, we can move on from this, do you have any personal knowledge as a lawyer of more than 20 years, more than 25, I don't even know how long you've been practicing, for 25 years at least you've been a lawyer.  You run a law firm.  And my question to you is do you have personal knowledge of MMA stealing client money, yes or no?

A    No.

Q    Thank you.

MS. MONTERO:

Can we take a quick break.

(Short break taken.)

BY MS. GOOTT:

Q    Why didn't you want Zach Moseley, why did you specifically stipulate that Mr. Moseley couldn't be at your deposition?

A    There's really no reason to it other than to try to take what is already a contentious relationship and not have it be so contentious.

Q    You ever had a conversation with Mr. Moseley?

**Matthew Monson**
**February 26, 2026**

A     Not once.

Q     Not once?

A     No, ma'am.

Q     But it's contentious?  You just assumed it was going to be problematic, you don't want him in here?

A     Yeah.

Q     All right.  Did you speak to any judge about the Cafarrels?

A     About the Cafarrels?

Q     Uh-huh (affirmative).

A     I don't recall except if the Cafarrels were brought up within the Franatovich hearing.

Q     Other than in the Franatovich hearing, would you have communicated with any judge about the Cafarrel's insurance claim?

A     No.

Q     Did you settle the Cafarrel's insurance claim?

A     By settle, I just want to talk about the word settle, talk about that.  Settle it with the insurance company?

Q     Did you settle their insurance

Matthew Monson
February 26, 2026

claim?

A    We resolved the disputed part of the claim, actually with McClenny Mosely & Associates.

Q    Did you resolve the insurance claim with their insurance company?  Why is that a difficult question?  You represent insurance companies.

A    It's a difficult question because the checks had already been paid.

Q    All right.

A    So the communication with the insurance company was, in fact, we weren't seeking any additional funds from the insurance company.

Q    Okay.  So what were you hired to do for the Cafarrels?

A    So the Cafarrels received checks.

Q    Right.  Two checks?

A    When the checks came to them and they had McClenny Moseley's name on those checks.

Q    Right.

A    And the fact that they never did hire McClenny Moseley and that McClenny

**Matthew Monson**
**February 26, 2026**

Moseley was wrongfully on those checks.

Q    Got it.  So what were you hired to do?  To remove MMA from the checks?

A    We were hired --

MS. MONTERO:

Object to the form.

THE WITNESS:

We were hired to represent their interests as it relates to that which included getting McClenny Moseley to endorse the checks.

BY MS. GOOTT:

Q    Okay.  What else?

A    We also filed Bar complaints on their behalf.

Q    That was what they asked you to do?

A    That was what we had agreed to do for them, yes.

Q    Right.  And that was your decision to file a Bar complaint, right?

A    That's actually my duty to file a Bar complaint.

Q    All right.  How many Bar complaints do you need to file against the same person to comply with your duty?

Matthew Monson
February 26, 2026

A    In general it depends on what was done.

Q    No, no, no, in this case.  No, this case.

A    For the Cafarrels?

Q    So you filed the Bar complaint against Moseley, the firm, and multiple lawyers on your behalf, correct?

A    Not against Moseley.

Q    Against the MMA law firm?

A    Yes.

Q    Against the lawyers that worked for the MMA Law Firm, you did that, you were a complainant, right?

A    Yes.

Q    And you did the same thing on behalf of your wife against lawyers that worked for MMA, correct?

A    Yes.

Q    And your associate also within the same month did it, right?

A    Yes, she did.

Q    And you suggested to the Cafarrels that they should also do it, correct?

A    Yes.

Matthew Monson
February 26, 2026

Q   All right.  When you filed the Bar complaint on behalf of the Cafarrels, you did that for them, right?

A   Yes.  But also I filed it pursuant to Rule 8.3 I believe.

Q   Did you file a Bar complaint on behalf of Allied?

A   I believe I did.

Q   Okay.  Any other insurance companies?

A   Maybe.  I'm just trying to recall. Maybe Homeowners of America.

Q   Okay.  Were you made, you filed a complaint against MMA to the LDI, right?

A   Yes, I did.

Q   Were you doing that as Mr. Monson doing it on your behalf, on your wife's behalf, on your firm's behalf, or on behalf of a client?

A   So I believe subject to whatever it says, right, I believe I filed it on my behalf and as well as the Cafarrels.

Q   Okay.  So LDI complaint was done on behalf of yourself and the Cafarrels?

A   Yes, I believe so, subject to

whatever it says.

Q    You don't remember?

A    No, I don't.

Q    All right.  And the Bar complaints were filed on behalf of Allied, right, and maybe HOA?

A    Yeah, Homeowners of America, HOAIC might be the way to say it.

Q    HOAIC, all right.  Thank you.  And when you were communicating with Ms. Bradford at the FBI and providing her with information, were you doing that to help your wife and her lawsuit or were you doing that because you represent insurance companies?

MS. MONTERO:

Object to the form of the question.

THE WITNESS:

Subject to that, I was doing that as part of cooperating with the FBI's investigation.

BY MS. GOOTT:

Q    Voluntarily providing the FBI with information that they did not request,

correct?

A    I know we discussed that earlier, but the information that they --

Q    Ms. Bradford?

A    Ms. Bradford was open to receiving any information about MMA.

Q    Right.  And without a request from her you would send her information about MMA, correct?

A    In general when you say without a request from her, there is kind of an open ended request, please send whatever you have.

Q    Tell me about that open ended request.  Help me investigate this?

A    No.  If there's other information that you have that you think might be useful, to provide that.

Q    At any time that was general, you send me anything you have about MMA?

A    Yes.

Q    So without her asking for a document or requesting, having specific questions, you voluntarily provided her with everything that you thought was relevant to

**Matthew Monson**
**February 26, 2026**

MMA?

A    As things developed.

Q    Did your insurance company clients like Allied, were you compensated for all of the time that you spent -- let me back up.  You spent a significant amount of time communicating with the FBI about MMA, correct?

MS. MONTERO:

Object to the form.

THE WITNESS:

Subject to that, I don't know what you mean by significant, but it was more than one conversation clearly, right.

BY MS. GOOTT:

Q    No, no, no, no, let's be clear.  How many communications, phone calls do you think you had with --

A    No idea.

Q    Couldn't count?

A    No, I just don't have any idea.

Q    More than five?

A    Certainly.

Q    More than 10?

A    Yes.

Q    More than 20?

A    Yes.

Q    More than 50?

A    I don't know.

Q    But a lot in your mind with an FBI agent, right?

MS. MONTERO:

Object to the form.

THE WITNESS:

A lot in my mind, I don't know what you mean by that.

BY MS. GOOTT:

Q    Have you ever communicated this much with an FBI agent about anybody else?

A    No.

Q    No.  So would you consider Ms. Bradford became your friend that you communicated so much?

MS. MONTERO:

Object to the form.

THE WITNESS:

No.

BY MS. GOOTT:

Q    No?

A    No.

**Matthew Monson**
**February 26, 2026**

Q    Did she send you pictures of herself on vacation?

A    Yes, she did.

Q    And you believe that that is part of a professional relationship of you reporting to an FBI agent is sharing personal details about your life?

MS. MONTERO:

Object to the form.

THE WITNESS:

I didn't say that.  That's your characterization.

BY MS. GOOTT:

Q    No?  This is strictly professional, FBI seeking information from you, yet she's sharing vacation pictures with you?

MS. MONTERO:

Object to the form.

THE WITNESS:

You'll have to ask her about the characterization.

BY MS. GOOTT:

Q    No, I'm asking what is your characterization of your relationship?

A    I provided her with information,

**Matthew Monson**
**February 26, 2026**

someone who I know I communicated with, that's it.

Q   That's it?  And this someone from the FBI shared photographs of her vacation, right?

A   Yes.

Q   And did you share family photographs with her?

A   I don't recall.  Perhaps.

Q   Send her pictures of your kids?

A   Perhaps.

Q   Is she married?

A   I don't know.

Q   Does she have children?

A   I don't know.

Q   Is she an aunt?

A   I don't know.

Q   You don't remember or you don't know?

A   I don't remember.

Q   All right.  So you communicate with, you communicate with Ms. Bradford at the FBI at least 30 times by phone; is that fair?

A   Sure.

**Matthew Monson**
**February 26, 2026**

Q    And this request that you say that Ms. Bradford from the FBI had, general send me whatever you have, was that in writing?

A    I don't believe so, no.

Q    One of the phone calls that you had?

A    Yes.

Q    Or maybe an in-person meeting?

A    No.  There's no in-person meetings.

Q    Where did you see her?

A    I saw her in courthouses during open court sessions twice.

Q    And you would communicate with her in advance, I'm going to see you, right?

A    Yes.

Q    All right.  It's important for you today, isn't it, that you answer these questions so that it doesn't look like you were working for her, right?

MS. MONTERO:

Object to the form of the question.  That is argumentative.  That's argumentative.

BY MS. GOOTT:

Q    Isn't that important?

MS. MONTERO:

Matthew Monson
February 26, 2026

Object to the form of the question.  It's important that he answers questions honestly.

MS. GOOTT:

That's right.

BY MS. GOOTT:

Q    And I'm asking you --

A    You're referring to the text message with Steve, right.

Q    You know exactly what I'm talking about.

A    I do.

Q    You know exactly.  You know because you warned him, right?

A    What page is it?

Q    It's not in there.  We'll get to that.  But you warned him, Mr. Badger, who is Mr. Badger?  He's a lawyer, right?

A    Yeah, he's a lawyer.

Q    He kind of does what you do, right, in terms of legal work?

A    He represents insurance companies.

Q    And he posts on line all the time about his successes like you do, right?

A    He posts about a lot of things.

Q   Right?  And you guys send each other your posts in advance of posting them, right?

A   I don't know about in advance, but we might send information to each other that later becomes posted.

Q   You congratulate each other on the posts?

A   That's in there, yeah.

Q   And he asked you to communicate with Ms. Bradford, right?

A   Yes, I believe, uh-huh (affirmative).

Q   Not I believe.  You know?

A   Yeah, yeah, it's in there.

Q   Not I believe.  You know, right?

A   I believe it's consistent with that. I'm not trying to, you keep saying I'm trying to characterize, I'm not trying to characterize.  I believe so, yes.

Q   So I'm going to ask you not to say I believe so if you know that it is a yes or no question.

A   I'm going to answer the question how the way like I normally talk.

**Matthew Monson**
**February 26, 2026**

Q    No, no, no.

A    And I'm not going to have you answer my questions for me.

Q    We'll spend a lot more time.  So when I said to you that you communicated with Mr. Badger and he asked you to connect him to Ms. Bradford at the FBI, isn't it true that you had that discussion?  Yes or no?

MS. MONTERO:

What discussion?

THE WITNESS:

Yeah, can you refer to it?

MS. GOOTT:

No.  Listen to my question.

MS. MONTERO:

What discussion are we talking about?

MS. GOOTT:

I'm not talking about any discussion.

BY MS. GOOTT:

Q    Mr. Badger asked you to connect him to Ms. Bradford at the FBI.  It's not in that file.  You're not going to find it in

**Matthew Monson**
**February 26, 2026**

there.

A    You're asking me about what's in those other text messages?

Q    No, I'm asking you a question.

A    And I'm telling you I don't know exactly what he asked and so I'm asking you because you're referring to something that I've produced, I'd like to be able to see it so I can refresh my recollection.

Q    Okay.  Now answer my question.

A    The question is I don't know.

Q    You don't know?

A    I don't know.

Q    But you knew, you knew when I brought up this topic what I was referring to, that there was a text message where you warned Mr. Badger to be careful, right?

A    I don't know that that's the words I said, but there's communications about something to the effect of being an agent of the government.

Q    That's right.

A    If that's the one you're referring to.

Q    What does that mean, an agent of the

**Matthew Monson**
**February 26, 2026**

government?

A    I don't know.

Q    Your words.

A    I know.

Q    What does that mean.  Why would you tell him?

A    It's something that I typed.  I don't know what --

Q    You typed the words, you remember the words, and you don't know what they mean?

A    I don't know what an agent for the government, some official --

Q    No, I'm asking what you, Mr. Monson, you wrote the words.  What do those words mean to you?

A    They mean what they say.  The document speaks for itself.

Q    No, it doesn't speak for itself. Please explain to me what that means or tell me that you're going to refuse to answer the question.

A    It means what I said, an agent of the government.

Q    Explain that to me.  What does that

mean?

A    There's nothing to explain.

Q    You're refusing to answer?

A    I meant what I said.

Q    You need to answer my question.

A    I did.

Q    When you told --

A    You just don't like my answer.

Q    When you told Mr. Badger to be careful so it doesn't look like you're an agent of the government, what did you mean by that?

A    I just wrote that down.  I literally don't know what it means, an agent of the government.

Q    What did you mean when you wrote it?

A    I meant I don't want you acting whatever it says, an agent of the government.

Q    Why don't you want him acting as an agent of the government?

A    I don't know.

Q    That's your sworn testimony under oath that you wrote -- how often do you tell people be careful, don't be an agent

**Matthew Monson**
**February 26, 2026**

of the government.  Is that a common thing?

A    No, that's not.  That's why I'm laughing at it.  Because it's like I look back at it, I go what the hell.  I'm asking the same question that you're asking, like, what did I even mean.

Q    Oh, so confusing.  It didn't mean that you just didn't want all of the evidence that you had been sending to Ms. Bradford over and over to not be able to be used because you were working for her?

MS. MONTERO:

Objection to the form of the question.

MS. GOOTT:

Is that why?

MS. MONTERO:

That is argumentative.

MS. GOOTT:

It is argumentative because he's lying.

THE WITNESS:

I'm not.  You can use all of that stuff I had with Ms. Bradford.  You can do all of that.  None of that stuff is

hidden. You can take it and you can do whatever you want with it.

Q Have any charges been brought against anyone at MMA by the FBI?

A I'm unfamiliar with any charges that's been brought.

Q You've asked before to find out, right?

A No.

Q You've never asked Ms. Bradford if charges were brought against anyone at MMA?

A No.

Q Anybody ever ask you?

A People ask me all the time.

Q Yeah. And you tell them I would know, my friend would have told me, huh?

A No.

Q All right. We'll get to that.

A You're just making stuff up now. You're being ridiculous. It's funny.

Q I'm glad you're having a good time. Let's focus on Ms. Bradford and then we will go back to nobody asked you about status of FBI and you did not say that your friend would have told you. Okay.

MR. MOSELEY:

Can we get a better connection? It's breaking up.

MS. MONTERO:

It's plugged in.  Well, actually, I don't know that it's plugged in.  This may be a line to the TV.  Hang on just one second.  The person who I would rely upon to do this is not here right now.  Hang on, let me see if someone else can help.  Off the record.

(Whereupon a discussion was held off the record.)

BY MS. GOOTT:

Q   Mr. Monson, please try to speak up. We are on Exhibit 5.  So these are text communication that you produced between you and Ms. Bradford, correct?

A   Yes.

Q   All right.

MS. MONTERO:

Can I get a copy?

MS. GOOTT:

Oh, I'm sorry, yes.

BY MS. GOOTT:

Q   We'll look at the first page, 024055, you send a little smiley face to her March 16th, 2023.  You see that?

A   Yes, ma'am.

Q   And then bottom of the page, go to the next page.  You are here on March 20th bringing witnesses to Ms. Bradford, right?

A   Yes, ma'am.

Q   You have an ex MMA secretary who I need to chat with before turning her over to you.  You're bringing her witnesses, right?

A   Yes, ma'am.

Q   Bottom of Page 024056, that's the second page, you tell Ms. Bradford, today's conference in Orlando.  I don't have a problem with all felons.  Who are you referring to here?

A   I don't know, March of 2023.

Q   Are you referring to Mr. Moseley or any of the lawyers as felons?

A   No.

Q   So you and Ms. Bradford talked about other things besides the MMA case?

Matthew Monson
February 26, 2026

A    Yes.

Q    And on Page 24057, why can't I see any of these screen shots?

A    I can't see them either.

Q    I know, none of us can see it.

A    To answer your question why, I don't know.

Q    You don't have it on a iCloud?

A    When I pull it up, I can't click on them.  I mean, I can click on them, but they don't open up.

Q    How do you pull them up?

A    I would pull them up by clicking on them.

Q    Your cell phone?

A    No, they're not on my cell phone.

Q    Why aren't they on your cell phone?

A    I told you earlier that my cell phone was set a long time ago for not maintaining the messages for 30 days.  They were on the, they are on the thing that's --

Q    They were on what thing?

A    The iCloud or whatever.  I was able to pull it up through my Mac.

**Matthew Monson**
**February 26, 2026**

Q    Okay.

A    So these things, these are inert links if you will.  So anything that was available, I think we provided.

Q    So are you saying that what's on 024057 is a link?

A    No.  I don't know what it is.  I mean obviously it shows little paper type thing or whatever, but when I click on that, nothing happens.

Q    All right.  And did you ask anyone to assist you in finding this information?

A    No.

Q    You didn't ask, do you have someone in your office that does tech?

A    Not officially, no.  I mean, there's some more people who are more techy.

Q    Did you ask the more techy people to help you?

A    No.  I right clicked on these things to try to get them to come up.

Q    Right.  Do you consider yourself techy?

A    No.

Q    No.  So other than clicking on this,

you didn't do anything else?

A    No.

Q    And you didn't ask any techy people in your office?

A    No.

Q    And you didn't ask your lawyers to help you find the service to help you get this information?

A    No.

Q    Did you turn your auto delete off?

A    Yes.

Q    When?

A    I don't know.

Q    How do you know you turned it off?

A    Because I remember turning it off, but I don't remember when.

Q    Did you turn it off after you received the preservation letter?

A    Yes.

Q    How long after?

A    I don't know.

Q    So it was still on while you had -- after you had received the preservation letter?

A    At the time I received the

preservation letter it was on.  And so that's why I went to this other thing that had, fortunately had the text messages.

Q    That's not the question I asked you.

A    I don't know when I did it.

Q    So when you received the evidence preservation letter from MMA, you didn't then take any proactive steps to make sure that your messages weren't being deleted?

A    I did not realize even at that time that that's how it was, that that's what the setting was.

Q    How did you realize it?

A    I realized it at some point later.

Q    How?  What were you doing that made you suddenly realize that you had this auto delete on?

A    I went to look for the messages.

Q    What messages?

A    The messages, the text messages that you were requesting.

Q    So not until the 2004 Examination did you realize that you had the auto delete on?

A    Yes.

Matthew Monson
February 26, 2026

Q    So that means it's been deleting for months, correct?

A    No.  Because I have them here.

Q    Well, no, you don't.  You don't have all of it here, right?  We can't click, you click on these things and they're gone, right?

A    Yeah, I'm not going to have a tech argument with.

Q    It's not a tech argument.  I'm asking you, you received the preservation letter more than six months ago from MMA, correct?

A    Yes.

Q    And you did nothing at that time and until you were served with a 2004 to remove this auto delete, is that your testimony?

A    The testimony is that I did not realize that that was the case.

Q    All right.

A    So I did not take any active steps to not comply.  As a matter of fact, I did comply.

Q    You didn't take any active steps to comply?

A    I did not take active steps to not comply.

Q    I understand.  But you didn't do anything to make sure, and let me clarify.  What, if anything, did you do when you received the preservation letter in terms of making sure that all of the evidence would be preserved, if anything?

A    I did not delete things like you're talking about.

Q    I didn't ask you what you didn't do.  I'm asking you what you did do?

A    What I did do is not delete.

Q    Listen to my question.  Did you do anything proactively as the Monson Law Firm to make sure that evidence would be preserved, anything proactive?

A    Yes.  The proactive thing that I did was to not delete, right, not take any steps to do things like I was instructed.

Q    Is that it?

A    Yes.

Q    And you're saying that you didn't check to see if your messages were being deleted?

**Matthew Monson**
**February 26, 2026**

A    I didn't realize the setting was like that.

Q    So you're saying that your text messages delete every 30 days?

A    That was the setting.

Q    Up until a few weeks ago, I heard you, when you got the 2004 --

A    I didn't realize that that was the setting.

Q    So you've never searched for an old text message that's more than 30 days in your phone?

A    No.

Q    Never?  You've never gone back to look for a communication?

A    No.

Q    Ever?

A    No, not to my recollection at all. Just no.

Q    You've never gone back to look for a picture that somebody sent you?

A    No.

Q    You've never gone back to look for an address?

A    No.

**Matthew Monson**
**February 26, 2026**

Q   You've never gone back to look for somebody's phone number?

A   No.

Q   Never?

A   No.

Q   You deleted messages automatically, didn't you?

A   No, I did not.

MS. MONTERO:

Object to the form of the question.

BY MS. GOOTT:

Q   Never?

A   No.

Q   You have not deleted any messages personally?  That's my question.  From you and Ms. Bradford?

A   No.  For me and Ms. Bradford, no.

Q   You and anybody?

A   I've deleted text messages before.

Q   You deleted text messages between you and Judge North, didn't you?

A   No.  Well, yes.

Q   Yes, you did?

A   Yes, I did.

**Matthew Monson**
**February 26, 2026**

Q   Why did you delete text messages with you and Judge North?

A   I was very aggravated with Judge North.

Q   So you deleted text messages with him?

A   I actually blocked him from being able to contact me on my cell phone.

Q   Why?

A   So this goes back to late 2023 and Mr. Galindo is listening, he was part of the thing.  There was an instance in which we had a conference, Mr. Galindo, Judge North, and I, and Judge North told me to back off of the issue that we were discussing, Steven Ripoll case.  In that case Mr. Galindo had filed an answer.  It was a case where MMA claimed to be counsel for Mr. Ripoll and Mr. Ripoll, you can look at it, it's on the record where Mr. Ripoll said no, MMA was not his attorney.

Q   When was this conference?

A   November 2023.

Q   All right.  So where was this conference?

A    In Judge North's courtroom.

Q    In his chambers or in his courtroom?

A    Courtroom.

Q    So it's on the record?

A    Actually, it's not.  I requested it be on the record, but it was not put on the record.

Q    So there is a meeting in Judge North's courtroom?

A    About the Steven Ripoll case.

Q    Where MMA is at issue?

A    No, MMA was not an issue.

Q    MMA was not at issue.  Who's representing the plaintiff?

A    Mr. Galindo's firm is representing the plaintiff.  I believe the attorney was Mark Ladd, L-A-D-D.

Q    And you were representing who?

A    It was another Allied case.

Q    All right.  So you have a meeting off the record.

A    It was an official status conference for the case, but it was not put with a court reporter.

Q    Is that normal?

A     Yes.

Q     In Federal District Court there are meetings in the courtroom with the judge and it's not on the record?

A     There are hundreds of those meetings.

Q     With the judge acting as the judge?

A     Yes.

Q     Taking evidence?

A     No, not necessarily.

Q     But sometimes?

A     Magistrate judges in the Eastern District of Louisiana are also heavily involved in also settlement conferences and status conferences.

Q     I'm not talking about a role as a mediator.  I'm saying when this meeting that you had with Galindo and Judge North, would he -- let me just ask a basic question.  Is Judge North a magistrate judge in the Ripoll case?

A     Yes, I believe he was.

Q     All right.  So tell me what happens at this off the record meeting with you, Judge North, and Galindo?

Matthew Monson
February 26, 2026

A    So I'm going to set it up for you and we'll get into it.  So what ended up happening was there was a 19 paragraph I believe, 18, 19, 20 paragraph order that dismissed Mr. Ripoll's case originally.  This is before we get to Mr. Galindo's firm's involvement.  And that case was dismissed, right.  Take it back a little bit further.  Really into that June, July of 2022 time, there was a number of lawsuits that our firm started first to compel the appraisal process with MMA.  So MMA never did in the court record represent Mr. Ripoll.  Are you familiar with the appraisal process?

Q    I am.

A    So what happened was those lawsuits were to compel appraisal.  Mr. Ripoll was one of the defendants to that original suit.  Mr. Ripoll replied and contacted us directly and he said, hey, look, MMA does not represent me in that the estimate that was submitted, I believe Disaster Solutions, same people that did that video, Disaster Solutions wrote an estimate, he

generally stated that that estimate wasn't accurate and that he did not seek to pursue any claims against Allied.  So the judge, the original judge, not Judge North, the original Article 3 judge signed an order dismissing all claims, right, where he acknowledged that he wasn't pursuing a claim against Allied.  So that case was over and done with.  Then towards the end of the prescriptive period the statute of limitations Galindo files another suit on behalf of Mr. Ripoll, right.  We answered and said, hey, look this thing was already dismissed, something to that effect.  We asked for a status conference with the Article 3 judge, Suzy Morgan I believe, I could be wrong.  The Article 3 judge scheduled a status conference on that case. If I'm remembering right, that status conference was canceled.  We had filed an answer to the second suit in Federal Court. You can't dismiss a case except with prejudice whatever the case is if we filed an answer.  So there was a motion to --

Q    That's all right.  So tell me why

Matthew Monson
February 26, 2026

you were so mad at Judge North.

A    What ended up happening is we had a meeting, a long meeting, for which, you know, I was particularly concerned about this case because it was supposedly an MMA case to begin with and now it's a Galindo case and I'm seeing evidence with similar type behavior that I complained about.

Q    And during that meeting, you're talking to him, you --

A    Mr. Galindo.

Q    Mr. Galindo?

A    Mr. Ladd.

Q    And Judge North?

A    Me, Mr. Galindo, Mr. Ladd.

Q    Tell me the frustration or the anger that you're expressing?

A    The frustration that came up, I'm saying, wait, we're seeing the same sort of stuff.

Q    MMA, here we go again?

A    Yes, ma'am.  I think I might have used a phrase like MMA 2.0 or 1.5 with Mr. Galindo.

Q    Right.

A    Something to that effect.

Q    And why were you angry?

A    Because I was essentially told to back off.

Q    Judge North told you to back off Galindo?

A    Yes, ma'am.  So it was back off and, okay, you're going to back off, you're going to remove your objection to the dismissal, and the case is just going to get dismissed.  There was a conversation about the Addendum No. 1 to the case management order that referred to the MMA files.

Q    So this is November of '23 in the Ripoll case?

A    Yes, ma'am.

Q    And you, Galindo, and Judge North off the record are talking about MMA, right?

A    Only tangentially.

Q    Well, MMA 2.0, here we go again, right?

A    Right.  That was really about Mr. Galindo, not MMA.

Matthew Monson
February 26, 2026

Q    And the addendum, right?

A    Yes, ma'am, we talked about the addendum.

Q    All right.

A    Are you familiar with the addendum?

Q    So you were so angry with Judge North that you deleted his text messages?

A    I blocked the contact.  I'm like, yeah, if you want to contact me, contact me through my office.

Q    So you were expecting him to contact you?

A    No.  I was preventing any contact.

Q    How often would he communicate with you by your cell phone?

A    Not often.

Q    How often?

A    Over time it would be in relation to -- I can't put it in terms of how often.

Q    But he texted you enough --

A    It might be once every several months.

Q    He texted, this judge, who you appear in front of on behalf of Allied, right?

Matthew Monson
February 26, 2026

A    On behalf of many different clients.

Q    He text you enough that you thought you needed to delete and block him so that he couldn't communicate with you?

A    I wouldn't say it's enough.  I wouldn't characterize it like that.

Q    Why do you need to block a judge from your cell phone?

A    Because I was aggravated at him.  I didn't need to.  I wanted to.

Q    Did you express your anger?

A    I think I expressed my anger very clearly during that meeting.

Q    Did you text him after and express your anger?

A    No.

Q    Do you ever meet with Judge North?

A    No.  It's not like I ask him to go out for drinks or anything like that.

Q    Have you ever sat and had drinks with him?

A    No.

Q    You ever had a meal with him?

A    Never.

Q    Never.  But you text with him?

A    So the magistrate judge including Judge North --

Q    Listen to my question.  I don't have a -- it was a yes or no.  But you text with Judge North, correct?

A    Yes.

Q    And then you blocked Judge North in November of '23?

A    Yes.

Q    And then you unblocked him?

A    At some point, yes.

Q    Why did you decide to unblock him?

A    The ice had melted if you will of me being pissed off went away.

Q    All right.  We're going to get to Judge North in a little bit.  We're going to go back to Ms. Bradford with the document in front of you.  Third page of this 24057 here you go again telling her I have someone that you really need to talk to and soon, right, bringing her another witness, right?

A    Yeah.

Q    Throughout this whole page you believe you're doing research on MMA,

significant research, right?

A    What are you referring?

Q    I'm not referring to anything specific.  I'm asking you, you spent a significant, you spent hours and hours every week in 2023 investigating MMA?

A    I wouldn't say every week.

Q    How often would you say that you spent time either posting about MMA, communicating with somebody about MMA, researching something about MMA on average?

A    I have no idea.

Q    More than one hour a week?

A    I have no idea.

Q    You have no clue?

A    No.

Q    Do you think it was something that was important to you?

A    How much time I spent?  No, it was not important to me.

Q    No, it was going after -- you take credit, right, you take credit publicly that you were the one that brought down MMA, right?

A    What I take credit for is providing

information to people.

Q    You say you are responsible for
taking down MMA, right?

A    I did not take down MMA.

Q    You didn't?

A    No.

Q    Who did?

A    The Louisiana Supreme Court, the
Louisiana Department of Insurance, the
Louisiana State Bar Association.

Q    LDI, the State bar, who else?

A    Louisiana Supreme Court.

Q    Supreme Court, okay.

A    The Eastern District of Louisiana,
the Western District of Louisiana, the
Middle District of Louisiana, the other
court orders.  You just heard that issue.
I don't have the power to take somebody
down.

Q    No.  But you were the one that
provided the information, right?

A    So when we talk about the Louisiana
State Bar --

Q    Let's go one by one and let's start
with what you actually said.  Let me finish

real fast, you would agree with me that from -- why are your communications that you've produced between you and Ms. Bradford only start in March of 2023?

A    I don't know.  I know the first phone call was just shortly before that.

Q    And have you communicated with her in writing since January the 19th?

A    Of this year?

Q    This year?

A    I don't know.  I know we've spoken on the phone.

Q    In the last five weeks, you've spoken to her?

A    Yes.

Q    Have you communicated with her in writing in the last five weeks with Ms. Bradford?

A    I don't recall.

Q    It's possible?

A    It's possible.

Q    Did you search?

A    I did not search for something over the last five weeks.

Q    Why would you haven't searched for

something in the last five weeks when you were ordered to produce all communications?

A     Everything up until January 15th is what the order said, doesn't it?

MS. MONTERO:

The notice says up to January 15th.

THE WITNESS:

I think the notice is up to January 15th talking about the relevant time period.

BY MS. GOOTT:

Q     Because that was the original.  Got it.  So you have withheld --

MS. MONTERO:

No.

THE WITNESS:

I did not withhold --

BY MS. GOOTT:

Q     Let me rephrase, that is correct. You have communicated in writing with Ms. Bradford since January 15th?

A     Yes.

Q     You have communicated with, have you communicated with anyone from the LDI since

**Matthew Monson**
**February 26, 2026**

January the 15th?

A    Yes.

Q    Have you communicated with Judge North since January 15th in writing?

A    In writing, no.

Q    In person?

A    No.

Q    On the phone?

A    Yes.  But not related to MMA.

Q    You told him about the 2004 Exam, didn't you?

A    That was part of a conversation.

Q    And you're saying that's not related to MMA?

A    Okay, sure.

Q    Not okay sure.  That's wrong?

A    That's not wrong, but I've corrected myself.  I let him know there was a Rule 2004 Examination.

Q    Did he ask you what was in it?

A    No.

Q    Did you send him a copy?

A    No.

Q    What did he say about me?

A    He didn't say anything about you.

**Matthew Monson**
**February 26, 2026**

Page 139

He actually expressed a lot of displeasure, how come I didn't tell him about it, how come I didn't give it to him, whatever. And I didn't really have an answer for him for that. He was very aggravated at me saying, well, essentially if this is involving my communications, don't you think it's important that I know?

Q   Did he say why didn't you come to me and file a motion here?

A   No.

Q   So what was he angry with you for, for just not letting him know?

A   Yes.

Q   Did he tell you don't produce everything?

A   No.

Q   Did you tell him you deleted stuff?

A   No.

Q   How long was this call?

A   Two minutes maybe.

Q   Two minutes?

A   Yeah.

Q   And when did it happen?

A   It happened, I produced the thing.

So the call was ultimately about another case.  There was a case called Robertson.  So I produced passed January 15th, Judge North, where he messaged me.  Again, he's not even in my phone, right, as a contact.  So he said please call me ASAP.  I think you have it.

Q    That was the same day that we had the hearing with Judge Rodriguez over the 2004 Exam, that night he text you?

A    Yes, he did.

Q    He knew that that hearing was happening?

A    Not to my knowledge.  That was not the point of the call.

Q    So he just happens to call you after the hearing?

A    He called me about the Robertson case, a case that we have going on.

Q    He texted you and said call me ASAP?

A    Yes.

Q    What was the urgency?

A    It was about the Robertson case what's going on.  I'm happy to discuss it with you.

Q    No, I don't need to know about the
other case.  So you talked to him that
night?

A    Yes, I did.

Q    And did you tell him, hey, Judge, we
had a hearing today?

A    I didn't say hearing.  I just said
that there is a request for whatever.

Q    You didn't tell him that you
objected, that we had a hearing?

A    No.

Q    That it probably didn't go so good
for you?

A    No.

Q    You didn't tell him anything?

A    No.

Q    And then when Judge Rodriguez
entered the order, did you tell him?

A    No.

Q    You didn't tell Judge North that you
entered into a stipulation agreeing to
produce communications?

A    No.

Q    Turn to Page 24060 from your
communications with Ms. Bradford, Exhibit

Matthew Monson
February 26, 2026

5.  April 29th, 2023, you send her a document and you say, I don't have to tell you to keep this out of public distribution.  Do you know what that is?

A    Let me look.  I don't know.

Q    Did you get the cease and desist letter from the LDI in advance?

A    No, I did not.

Q    Did you share it with Ms. Bradford?

A    Okay.  When you talking about cease and desist, there's two.  There was one that was back on February 17th.

Q    There's a letter that the LDI issued on May the 1st, 2023.

A    Yes.

Q    This text message is April the 29th.

A    Uh-huh (affirmative).

Q    How did you have it to send it to her?

A    I didn't.

Q    I want to be clear.

A    I did not receive anything from the LDI prior to anything being issued.

Q    Where did you get the letter?

A    That's not a letter.  I'm saying

**Matthew Monson**
**February 26, 2026**

you're presupposing what something is and it's just not --

Q   Right.  But we'll get there.  I just want to know right now, your sworn testimony is that you did not send Ms. Bradford a communication from the LDI to MMA telling her I don't have to tell you to keep this out of public distribution?

A   Correct.

Q   And you don't know what that document is?

A   Correct.

Q   All right.

A   Because that same day I said nevermind, it's now public.

Q   I'll show you.  We'll get there. How is it that some things you're able to find and other things that you can't in production?

A   I don't know what you mean by that. Can you be more specific?

Q   Yeah.  There are some things when you first produced said were unavailable and then maybe came available?  How does that happen?

**Matthew Monson**
**February 26, 2026**

A    I don't know what you're referring to.  Can you be more specific?  If you can be specific about it, I'm happy to talk about any particular instance.

Q    You can't think of one instance in the last three or four days -- you produced documents timely, right, on the 19th when they were due?

A    Yes.

Q    And then after that you received communications from me through your lawyer saying this is missing, this is missing, this is missing, right?

A    Yes.

Q    And then you produced?

A    Yes.

Q    How did you find those documents?

A    I don't know which documents to which you're referring.

Q    Pick one.

A    You need to pick one.

Q    Can't pick one?

A    No, I can't.

Q    Can't pick a single one?

A    I'm not going to.  I don't know.

**Matthew Monson**
**February 26, 2026**

Q    You're not going to?

A    I don't know.

Q    Oh, you're refusing?

MS. MONTERO:

That's not what's happening.

THE WITNESS:

You're a fucking idiot.

MS. MONTERO:

Hey, hey.

MS. GOOTT:

What did you just say?  Can you repeat what he just said?  Did he just call me a fucking idiot?

COURT REPORTER:

That's what I wrote, you're a fucking idiot.

MS. GOOTT:

I'm a fucking idiot.

MS. MONTERO:

Stop that.

MS. GOOTT:

Nope, Nope.  I'm moving on.  I'm moving on.  I'm a fucking idiot.

MS. MONTERO:

I don't care about that one.  What

I'm talking about is the list of things
that you gave as deficiencies and I had
him go look for them.  So if you give him
that list, maybe he can explain what he
did to find those specific documents.

MS. GOOTT:

Suzy, I appreciate that.  I'm
asking him.

MS. MONTERO:

He's not refusing to answer.  He
just doesn't know what it is that you're
specifically talking about.

MS. GOOTT:

I got you.  I will do this.  Let's
keep going.  Stop actually for a second.

BY MS. GOOTT:

Q    Not only am I a fucking idiot,
you've also written before that I get
whatever I want from the bankruptcy judge.
Do you remember those comments, you and
Badger?

A    I don't remember.  Can you show me?

Q    Don't remember.  Short-term memory.
Do you believe that, that I get whatever I
want from the judge?

A    I believe that you're quite successful in front of Judge Rodriguez.

Q    Did you mean something by that other than I'm a really good litigator?  Are you implying something else?

A    No, I'm not implying anything.

Q    24065, bottom of the page, June 1st, 2023?

A    Yes.

Q    7700 feet, I'll take the elevator, thanks.  What does that mean?

A    So she's mentioning on there that she's hiked Mount Pico.  It's a mountain somewhere.

Q    So this is just friendly talk?

A    This is just her telling me that, her responding to I guess the May 30th communications.  And so it's her responding, she says, Glad you're holding things down.  I hiked Mount Pico.  I think there was some photographs of her, I'm guessing the photo showed 7700 feet or something like that.

Q    So she's sharing vacation pictures, Ms. Bradford?

**Matthew Monson**
**February 26, 2026**

A    Yes, ma'am.

Q    And then the next page, 24066 of Exhibit 5, enjoy the water slides this morning.  Do you recognize this logo?  Is that a picture of her on a water slide?

A    It could be.  Or I don't think it's a picture of her on the water slide.  I think there was a conversation that I had while I was at a conference that was, if I can remember, Orlando or something like that, it was a place that had water slides.  So I think I mentioned to her on the phone, oh, yeah, I'm going to go try the water slides.  So it wasn't her at a water slide.  It would have been me at a water slide.

Q    All right.  Did you get documents from Rebekka Veith?

A    Yes.

Q    What did she give you?

A    Two deposition scripts I believe.

Q    How did she give them to you?

A    She sent those via e-mail.

Q    Why didn't you produce them?

A    We produced it.

Q    You produced a communication between

Matthew Monson
February 26, 2026

Rebekka and you?

A    Yes.

MS. MONTERO:

I know that the e-mails, I know the documents, the depositions were included.

MS. GOOTT:

I have not seen any e-mail communication between Rebekka and Monson.

MS. MONTERO:

It may have come from Rebekka's secretary, but I'll find those for you.

THE WITNESS:

Yeah, I believe it was one or two e-mails and it would have had the deposition transcripts of Ty Willie (phonetic) and also Zach.

BY MS. GOOTT:

Q    All right.  What else did she send you?

A    That's it.

Q    Did you have a phone call with her?

A    I don't think so.

Q    You don't remember talking to Ms. Veith on the phone?

A    I'm not saying I did or didn't.  I just don't recall.

Q    Don't remember.  You don't remember her talking to you and telling you about Zach's testimony?

A    I don't.  I'm not saying it didn't happen or it did happen.  I just, I don't.

Q    Because Austin Marks told you call Rebekka?

A    He may have.  Well, not call, but he may have asked, said, hey, if you want the deposition testimony, request it from her. That's why I'm thinking it's two e-mails. I e-mailed her saying, hey, do you have these and she replied with the transcripts.

Q    What else did she give you other than --

A    That was it.

Q    Anyone from her office send you anything else?

A    No, ma'am.

Q    Look at 24067.  Look at the bottom. You send to Ms. Bradford a presentation MMA 4 year strategy to multi-network brand dominance?

Matthew Monson
February 26, 2026

A    Yes, ma'am.

Q    Where did you get that?

A    That's on the internet.  That's available right now.

Q    You pulled that from the internet and sent it to her?

A    Yeah.

Q    Did she ask you for it?

A    I don't know if she did.

Q    I don't see it here.  Is this one of those voluntarily research things you did for her?

MS. MONTERO:

Objection to form.

THE WITNESS:

Yeah, I don't necessarily agree with the characterization.  It's something I did send to her.  I don't know if it's something we talked with on the phone or anything like that.

BY MS. GOOTT:

Q    All right.  Look above that, just e-mailed you a present.  What did you e-mail her?

A    I don't know.

**Matthew Monson**
**February 26, 2026**

Q    So we should have an e-mail from June 22nd, right?

A    There could be, yeah.

Q    No, no, no.  There should be?

A    I don't know that there should.  It would stand to reason.

Q    Next page, would you like to talk to the lady that sent me this?

A    Yes.

Q    Connecting her with another witness for her investigation?

A    Yes.

Q    All right.  24069, you refer to a Dropbox link, right?

A    Yes.  And that goes from that earlier conversation from the page before.

Q    It is in my Dropbox which I have to look at.  Do you currently have a Dropbox?

A    No, that -- no.  So the Dropbox link that's here and I believe in one of the other ones, it's a link that was sent to me.  It's not my Dropbox if you will.  I know it says it's in my Dropbox or whatever.  It's a Dropbox link that Edna Luther sent to me, the lady we were talking

**Matthew Monson**
**February 26, 2026**

about above.

Q    So when you say it is my Dropbox, that's not accurate?  You don't have a Dropbox account?

A    I don't know if I have one or not. It's not something that I use.  This is a link to a Dropbox account of Edna Luther.

Q    Hold on.  You don't know if you have a Dropbox account?

A    Correct.  Because I have not used Dropbox.  I'm not saying ever, but this is a Dropbox link to Edna Luther's Dropbox.

Q    So is it possible that you have documents in a Dropbox link?

A    No.  This is, I'm telling you this is a video.

Q    No, I'm not talking about this.  I'm not talking about this.

A    The short answer is no.

Q    You don't have any documents in the cloud?

A    No.

Q    Where do you keep all of your documents related to MMA?

A    I keep my documents in our system.

Q    Where?

A    It's called, of the top of my head, it's called basis CARET Legal.

Q    Do you have paper or anything or is it all uploaded?  When you go and find an article about MMA, do you save it somewhere?

A    Not necessarily.

Q    All right.  But any documents that you would have are going to be on your server?

A    I don't have a server.

Q    How do you backup your files?

A    I use a service that's called CARET Legal.

Q    Okay.

A    So it's a cloud.  We got rid of servers at our office years ago.

Q    But it's in the cloud?

A    Yeah.

Q    And it has a backup of everything?

A    I don't know.

Q    You don't know?  You didn't call them when you got this 2004 and said make sure I'm producing everything?

Matthew Monson
February 26, 2026

A     This is CARET Legal, so it's a cloud-based service.  You asked me if they have backups.  I don't know if they have backups.  I assume they could, but I don't know.

Q     You assumed they would, right?

A     You can call CARET Legal and ask them.

Q     But you didn't, that's all I'm trying to figure out.

A     No.

Q     You did not call them and say are there documents because there are things that you couldn't produce, right, that you said you don't have any more?

MS. MONTERO:
        Objection to form because that assumes that CARET Legal would be able to search for his documents.

MS. GOOTT:
        We don't know because he didn't ask.

MS. MONTERO:
        But your question assumes that they would be able to do it.

**Matthew Monson**
**February 26, 2026**

BY MS. GOOTT:

Q    Do you understand that when you click on a Dropbox link the documents open and go into your Dropbox account?

A    I do not know that, no.

Q    You don't know that?

A    No.

Q    So if you, prior to answering this discovery, you didn't search your Dropbox?

A    No.

Q    And do you now understand that it is likely that you have documents in there? Let me back up.

A    No, that's not the case.

Q    Hold on.  You received documents --

A    I didn't receive.  It's not a document.

Q    It's a link to someone else's Dropbox?

A    It's a video.

Q    It's Dropbox.com, we see that, right?

A    Right.  And we provided that link to you.

Q    When you click on it, right, and you

Matthew Monson
February 26, 2026

open it, someone else's link, it downloads into your Dropbox account. And all I'm asking you is you did not search your Dropbox account before responding to this discovery, correct?

A    Correct.

Q    All right.

A    But when you click on this, it doesn't, it's not characterized the way you characterize it.

Q    That wasn't my question.

A    A video pops up.

Q    That's not my question. I want to know what else is in that Dropbox.

A    Certainly I'm happy to go look.

Q    Please do. So 24071, you're communicating with Ms. Bradford about, I don't even want to put this on the record, gossip about people in MMA's office, right?

A    Yes, ma'am. They're not married, so it's okay.

Q    That's all right, but that is, you talked about, you talked about romance relationships between multiple people, right, with Ms. Bradford?

A    Yeah.  What I was discussing here because it was very peculiar to me because Claude's wife called.

Q    I didn't ask you that and we don't need to talk about it.  We don't need to talk about other people's --

A    You're bringing it up.

Q    No, I asked you a general question after I prefaced it with I don't want to talk about details.  My question was you and Ms. Bradford had multiple conversations about sexual marital relationships of people that worked at MMA, right?  You talked about people's divorces, you talked about who was sleeping with who.  Without going into detail, we don't need to put that stuff on the record, but isn't that a true statement?

A    Yeah.  And that's reflected on that page.

Q    All right.  How often is data backed up on CARET Legal?

A    I don't know.  It's not a backup like a traditional server like you have a server in your office.

**Matthew Monson**
**February 26, 2026**

Q    No, iCloud.  I mean, in the cloud because I'm learning here that according to their website it gets backed up daily.

A    Okay.

Q    So will you contact and see if there's anything there that maybe was deleted and you didn't produce?

A    What I would want to do with you as far as going forward on things like that if there's something --

Q    No.

A    If there's something that you think I haven't given you that --

Q    No, no, no, that's not how it works.  You were ordered, you were ordered over your objection to produce.

A    And we did.

Q    And, and that requires you to do due diligence to get the information.  If it is not produced, it is not my burden to tell you what you didn't produce.  So all I'm asking, and you don't have to commit to it, but if you want to do it, please do.  And you communicate with Ms. Bradford letting her know when MMA lawyers are selling their

**Matthew Monson**
**February 26, 2026**

house, right?

A    Can you refer to a page?

Q    24075.

A    Okay.

Q    Personal stuff, right, people's relationships, selling their homes, who's working where, right, it's all gossip?

MS. MONTERO:

Object to the form of the question.

BY MS. GOOTT:

Q    Right?  You talked to Ms. Bradford about your Allied clients, right, and specific cases, right?

A    Which page?

Q    I'm asking you in general.

A    I don't recall.  You're looking at documents.

Q    I know I'm looking at documents. I'm asking you do you have a recollection that you would talk to Ms. Bradford about your cases?

A    Not necessarily about cases.  Again, I'm seeing that there's a reference to Allied on 24079.

Matthew Monson
February 26, 2026

Q    You talked to her about the Ripoll case, right?

A    Yes.

Q    All right.  You really investigated Velawcity, right?

A    I don't know what you mean by really.

Q    Did you investigate Velawcity?

A    Yes.

Q    Did you investigate Equal Access Justice Fund?

A    Yes.

Q    Did you investigate Apex?

A    Yes.

Q    Did you investigate MMA's inner workings of who was employed there?

A    I don't know that I investigated.  I think on people working there I think I became aware of people when they quit or whatever.

Q    Right.  Because you were communicating with current employees, correct?

A    In one instance, yes, maybe two instances.

**Matthew Monson**
**February 26, 2026**

Q    In at least one, and who is that?

A    That would have been Megan Chapman.

Q    Who else?

A    I don't know if he's still there or not.  Kyle Bosch.

Q    Who else?

A    That's what I can recall.

Q    What about Katie Aromi, her too?

A    I don't know that I was communicating with her while she was still there.

Q    We'll show you.

A    Okay.  I don't know what all her dates of employment were.

Q    But you were communicating with those three, right?

A    I did communicate with Katie.  I don't know that I communicated with her while she was still employed.

Q    All right.  But at least two while they were employed.  More people that you communicated with after they were no longer employed, right?

A    Yes.

Q    Who paid you or was this pro bono

all of the time you spent, I mean, we've got how many pages of text messages with FBI, the LDI, the State Bar, the Louisiana Supreme Court.  Did anybody pay you or was this just something that you did for yourself?

A     It depends on the circumstance.  So if it was something I did on behalf of Allied --

Q     Tell me what you did on behalf of Allied?

A     Well, we had the individual cases that we worked on.

Q     No, no, no.  I'm talking about what I was referencing.

MS. MONTERO:

Wait.  I think this gets into his work product that --

MS. GOOTT:

No, I'm not asking communications.

MS. MONTERO:

Ask the question.

BY MS. GOOTT:

Q     I want to know did you file a Bar complaint on behalf of Allied?

A      Yes, I believe there's several.

Q      All right.  Did you communicate with the LDI on behalf of Allied interests?

A      As relates to MMA or just in general?

Q      The only thing I'm asking you about is MMA.  Did you communicate with the LDI as Mr. Monson individually or Monson Law Firm as lawyer for Allied?

A      I don't know that I did on behalf of Allied because the LDI complaint was on behalf of the Cafarrels.

Q      I'm asking just about Allied.

A      Yeah, I'm trying to --

Q      So did you communicate with the LDI when you did, for example, if you said to LDI's lawyer, those sanctions got reversed, we need to get the AG involved.  Were you doing that as Katherine Monson's husband that you wanted the lawsuit to be successful, were you doing that as Mr. Monson individually, or were you doing it as a lawyer on behalf of Allied?

A      I think I was doing it as a lawyer on behalf of Allied and all the other

different clients.

Q    All the other insurance companies?

A    Yes.

Q    All right.  When you were -- and that relates to the LDI communications and the complaint, correct?

A    Yeah.  But again, that complaint was still on behalf of the Cafarrels.

Q    Got it.  You were also doing that for your insurance clients?

A    No, I was doing that for the Cafarrels.

Q    So the communications, so that was limited -- let me make sure I'm clear.  So when you told, my specific question was when you said, hey, sanctions are reversed, LDI, we've got to go to the AG, that wasn't on behalf of your insurance clients?

A    It's more of a general statement, right?

Q    Got it.

A    More of a general statement.

Q    On behalf of Allied and your other insurance company clients?

A    Yeah.

Matthew Monson
February 26, 2026

Q    All right.  When you filed, so we have the Bar complaints, we have the LDI communications.  When you are sending all of this information, pages of texts and e-mails and attachments to Ms. Bradford at the FBI, are you doing that on behalf of your wife to help her lawsuit?

A    No.

Q    Are you doing it on behalf of yourself or are you doing it as a lawyer in your capacity representing Allied or the other insurance companies?

A    The way that I see it, I was doing it on behalf just in general more on behalf --

Q    Yourself?

A    On behalf of thousands of people who were affected by this.

Q    You were doing it as a public service for the State?

MS. MONTERO:

Objection to the form of the question.

THE WITNESS:

Not for the State, but I'm just

**Matthew Monson**
**February 26, 2026**

talking about, so this was something that affected 15, 16 thousand people.

Q    No, I understand.

A    So from that standpoint, I was cooperating with Ms. Bradford assisting her in the investigation.

Q    This is more than cooperation.

MS. MONTERO:

You're interrupting him.

BY MS. GOOTT:

Q    I'm sorry.  This is more than cooperation.  This is more than just answering questions.  You are actively sending her information, correct?

A    I provided her --

MS. MONTERO:

Object to the form of the question.

THE WITNESS:

I provided her information about MMA.

BY MS. GOOTT:

Q    Actively without a request?

A    No, the request was a standing request.

Q    So at the beginning she said, hey, tell me what you know and then for how many months, from March of 2023 until at least we have the latest communication is January of this year, right?

A    Yeah.

Q    So this was standing that you were constantly, regularly, excuse me, e-mailing her information without request?

MS. MONTERO:

Objection.

THE WITNESS:

That's not without request. You're mischaracterizing my testimony.

BY MS. GOOTT:

Q    All right.  So haven't heard from you, but here's a document, that refers back to the first phone call you had with her in 2022 that said indefinitely?

A    It was in 2023.

MS. MONTERO:

Objection to the form of the question.

BY MS. GOOTT:

Q    So indefinitely, your understanding

Matthew Monson
February 26, 2026

is that indefinitely for as long as you know information you are going to constantly provide?

A    Yes.

Q    And is that investigation still going?

A    I don't know.  Well, I assume, yes.

Q    You don't know?

A    Well, the investigation is still on the I believe on the FBI website.  There's an open investigation that they're referring to.

Q    Right.  Have you received any forms to fill out?

A    I did fill out the form on the FBI website.

Q    All right.  Who did you file it out on behalf of?

A    I filled it out on behalf of myself.

Q    Your name?

A    Yes.

Q    Your wife's name?

A    I don't know that I filled it out, I think I just filled it out on behalf of my name.

**Matthew Monson**
**February 26, 2026**

Q    Where is that form?

A    I don't have that form.  It's an on-line form.

Q    You didn't make a copy of it?

A    No.

Q    No screen shot?

A    No.  I'm not sure that you could even do that.

Q    You let Ms. Bradford know that we were seeking your 2004 Examination, right?

A    Yes.

Q    And did you have a conversation with her about it?

A    I did.

Q    What did she tell you?

A    She said let them have it all.

Q    All right.  Anything else?

A    No.

Q    Did she tell you delete things that aren't related to MMA?

A    No.  It was actually just the opposite.

Q    So you chose to remove things that don't relate to MMA?

MS. MONTERO:

Object to the form of the question.

THE WITNESS:

No, no, no, I see what you're saying. No, actually generally what she told me was that everything --

BY MS. GOOTT:

Q   Not generally. Specifically.

A   I'm going to answer the question the way I do it. You can pick it apart later. Generally what she told me was that everything that she has is logged like the communications that we have is logged and that she has no problem with you guys getting anything.

Q   Wonderful. And you regularly sent her orders from courts, right?

A   I did send her orders from court, yes.

Q   You talked to her about your wife's lawsuit against MMA?

A   I mean, can you point to a page?

Q   No. I'm asking you if you talked to her about your wife's lawsuit?

A   I don't recall doing that.

**Matthew Monson**
**February 26, 2026**

Q   Is there a reason why the subject matter in an e-mail to her would be Katherine Monson matter?

A   I don't know.  Can you show me the e-mail, please?

Q   Yeah.  Oh, let me put a sticker on it.  That's Exhibit 6.  All right.  Do you see what's the subject matter of that e-mail?

A   Yeah, yeah.

MS. MONTERO:

Do you have a copy?

MS. GOOTT:

I'm so sorry, Suzy, I keep doing that.

BY MS. GOOTT:

Q   So you agree with me that Exhibit 6 to this deposition is communications from you to Ms. Bradford and the subject is Katherine Monson matter, right?

A   Yeah, that's the subject.

Q   And that is referring to the lawsuit that your wife filed against MMA and Velawcity, right?

A   I don't know.  I'm looking at the

**Matthew Monson**
**February 26, 2026**

attachments to see.  There's nine attachments to that and there's another page.

Q    Let me ask you this.  What does, without looking at it because it doesn't have all of that, what does Katherine Monson matter mean to you?

A    On this --

Q    No idea, huh?

A    No.

Q    Mr. Monson, your wife sued MMA and Velawcity, correct?

A    Yes, she did.

Q    You were heavily involved in that lawsuit, weren't you?

MS. MONTERO:

Objection to form.

THE WITNESS:

I'm involved, but not heavily.

BY MS. GOOTT:

Q    You were involved.  Whose idea was it to have your wife sue MMA?

A    Rob Couhig.

Q    Who's that?

A    He's the attorney, the lead

Matthew Monson
February 26, 2026

attorney, in that case.

Q    How did he find out that she had a claim that she wanted to prosecute against MMA?

A    He attended the February 1st Franatovich hearing.  He was in the gallery.

Q    Right.  He approached her and said can I represent you?

A    No, he approached me.

Q    He approached you?

A    Yes.

Q    And he approached you and said can I represent your wife?

A    Yes.

Q    Was it unsolicited?

A    No.  I know him otherwise.

Q    But he just came up to you and said I want to represent your wife?

A    Yeah, actually.

Q    Just like that?

A    I knew him previously, but that's exactly what happened.

Q    All right.  It went through her.  He didn't approach her?

Matthew Monson
February 26, 2026

A    No.

Q    Because your wife wasn't in court?

A    No.

Q    He came to you and said I want to represent your wife?

A    I think, yes.

Q    It was his idea?

A    Yes.

Q    Let's go sue MMA?

A    Yes.

Q    Why are you going to have your wife be the plaintiff?

A    Because she received a text message.

Q    She received it.  And it was unsolicited, right?

A    100 percent.  No matter what you think you have, you're wrong.

Q    Okay.  And so because she received a text message, she sued MMA and Velawcity for how many millions of dollar?

A    She didn't sue for millions of dollars.

Q    How much did she sue for?

A    She didn't sue for any amount of money.

Matthew Monson
February 26, 2026

Q    Zero?

A    No.

Q    That was the goal, to get zero from MMA and Velawcity?

A    There's, the lawsuit says what it says, but there's no like we're suing you for 5 million dollars.  It was a class action lawsuit.

Q    Yeah.  How many millions?

A    I have no idea.

Q    No idea.  But you picked the lawyer?

A    No, the lawyer picked me.

Q    The lawyer picked you.  You agreed to it?

A    Yeah.

Q    You took it to your wife?

A    Yes.

Q    And you said I think you should do this?

A    Yes.

Q    And she signed an engagement agreement with him?

A    Yeah.

Q    Did you sign it?

A    I don't know.  I don't think so.

Q    Well, if you did, it's possible if you don't know, then I need to see a copy of that contract.  If you have a contract with the lawyer to sue MMA, I want to see it.

MS. MONTERO:

Well, that was beyond the scope of the 2004 Notice.

BY MS. GOOTT:

Q    Were you having communications with this lawyer about MMA and your wife's claims?

A    It's not a part of the things that you asked for for this rule.

Q    I'm asking you a question.  What is the name of this lawyer that represented your wife?

A    The name of this lawyer is Rob Couhig, C-O-U-H-I-G.

Q    C-O-U-H-I-G.  And Mr. Couhig, he just approached you and did you report him to the Bar for barratry?

A    No.

Q    This unsolicited let me represent you?

A    I think you misunderstood the rules.

Q    No, you said he approached you.

A    Yes, I know, but you misunderstood the rules.  If you have a prior relationship, then it's not something that's inappropriate.

Q    Has he ever represented your wife before?

A    No.

Q    Has he ever represented you before?

A    No.  We both went to Georgetown together.  We belong to Georgetown Club of Louisiana.  We knew each other.

Q    All right.  Y'all are buddies?

A    No, we're not buddies.

Q    Good buddies?

A    No.

Q    You went to college together?

A    No.  He's a lot older than me.

Q    I don't know who he is.

A    I know, so if --

Q    My question is, no, you said this man approached you, this lawyer approached you, and that's how -- but let's back up one second.  You don't even know who signed

**Matthew Monson**
**February 26, 2026**

the agreement?  Is there a legal agreement between Mr. Couhig, how do you say his name?

A    Couhig.

Q    Couhig.  Did he sign a fee agreement with your wife Katherine Monson?

A    Yes.

Q    As you sit here today, are you his client or is it just your wife?

A    I could be somebody that's part of that class.

Q    Are you, were you part of the class?  Was the class ever certified?

A    I don't know what the status of it is.

Q    Of course you know what the status is.  You know that the lawsuit was dismissed.

A    No, I don't.

Q    You don't know that the lawsuit was dismissed?

A    No, I don't.

Q    Then why did you text about it and say had I handled this, this wouldn't have happened?

A   You're going to have to show me.

Q   Yeah.  You're saying under oath that as you sit here today you don't know that your wife's class action lawsuit was dismissed?  You think it's still pending in Federal court in the Southern District of Texas?

A   I do not know what the current status of that case is.

Q   Do you believe that it is pending?

A   I don't believe anything.  I just don't know.  Whatever it is, it is.

Q   Your wife filed a proof of claim in the debtors bankruptcy case, in MMA's bankruptcy case, you know that, right?

A   Okay.

Q   No, no, no, not okay.  You know that to be true?

A   If she did do it, then it would have been through Mr. Couhig.

Q   Listen to my question.

A   I did.

Q   You know that your wife filed a proof of claim in the bankruptcy case?

A   You're testing my knowledge.

Matthew Monson
February 26, 2026

Page 181

Q   No, I'm asking you if you know, yes or no?

A   I just want to be clear.

Q   Yes or no?  Do you know or do you not know?

A   Please stop badgering me.  I'm confused by your question.  The way you say, you know this is a statement.  It's not a question.  You make a statement.

Q   That's what happens in trial when you make a leading question.

A   We're not in trial.

Q   Tell me this.  As you sit here today, is it your sworn testimony that you have no idea that your wife's class action lawsuit against MMA was dismissed in the Southern District of Texas, yes or no?

A   No.

Q   Is it your sworn testimony that you have no idea that your wife filed a proof of claim in MMA's bankruptcy case?

A   I don't know.

Q   Is it your sworn testimony that you don't know that MMA objected to her claim and her claim was disallowed?

A   I do not know.

Q   You follow what happens in the MMA case daily, don't you?

A   No.

Q   You post every order on your Linked In page of what happens in MMA.

A   That's actually not true.

Q   How often do you post?

A   The posts were produced.

Q   Right.  And are you telling me that there's an order entered about your wife disallowing her claim in the MMA case that you write about nonstop and you don't know about it?

A   Yes.

Q   That's your sworn testimony?

A   Yes.

Q   And you post to the world every time something bad happens to MMA, right?

A   No.

Q   Did you post when there was an appeal to the -- let me back up.  We're going to go through your posts and we'll see.

A   My posts are the posts.  So you say

Matthew Monson
February 26, 2026

every time something bad happens to MMA.

Q    Let's look at this I'm talking about the bankruptcy case.  This is interesting to me.  How many pages do you think your Linked In posts are just about MMA, just about MMA?

A    I don't know.  I know that the links to them were 98 pages.

Q    This is you produced, right?

A    Yeah, that was 98 pages.

Q    All 98 pages.  What big a font do you think this is?

A    I don't know.

Q    Small, right?

A    I'm not going to characterize that.

Q    Can you read it?

A    Actually I can.

Q    Read it for me.

A    I can see the Monson Law Firm participates in All-Star presentation at CLM2024.

Q    These are produced from you, correct?  And I'm going to make this Exhibit 7.  Here you go, Suzy.  I asked you to produce all of your links and posts

Matthew Monson
February 26, 2026

about MMA, right?

A    Wrong.

Q    Oh, that's right, it's limited, right, it's not even everything because it was until What day?

A    April 9th of 2024.

Q    So from April 9th of 2024 that's what you did, this is how many pages?

A    That's 98 pages.

Q    98 pages.  And that is not even half of what you post about MMA on your Linked In page, right?

A    I don't know if it's half or not.

Q    It's probably a tenth, right?

A    No, I'm not going to agree to that. It is what it is.

Q    It is what it is.  And you are the, you probably consider yourself an expert on MMA, don't you?

A    No, ma'am.

Q    No.  But you're responsible, solely responsible, let's look at your website. Oh, I didn't finish this.  We'll get back to your website in a second.  The bar complaint was Allied, LDI, FBI was on

behalf of the people, right, right?  Do you want to keep that testimony that the FBI all of the communications between you and Ms. Bradford related to MMA and all of your e-mails, texts, phone calls, was done on behalf of all the people?

MS. MONTERO:

Objection to characterization.

THE WITNESS:

Insurance industry as well.

BY MS. GOOTT:

Q   The insurance industry.  Was it done on behalf of your wife?

A   No.

Q   Was it done on behalf of Allied and the other insurance companies as a lawyer?

A   Generally, yes.  So the insurance industry, the clients.

Q   Does that include when you communicated with Ms. Bradford all of the communications, the texts, the e-mails, the phone calls, all of the documents produced, was that done by you as Katherine Monson's husband trying to help her with this litigation that you think is still pending?

**Matthew Monson**
**February 26, 2026**

A    No.

Q    Or was it done as your role as a lawyer on behalf of your insurance company client Allied?

A    It's more in the role on behalf of insurance companies.

Q    Does that include your clients?

A    Yes.

Q    Okay.  I'm just focused on Allied right now because you've identified them as a client.  Did you make a State Police report?

A    No, I did not.

Q    Are you aware that a special report was issued?

A    Yes.  And my name's in there, yes.

Q    Yes.  Do you remember what it says?

A    No.

Q    Well, you communicated with Mr. Daniel Graff, right?

A    Subsequent to the report, yeah.

Q    So first the report was issued?

A    Yes.

Q    And then you communicated with Mr. Graff of the State Police, right?

A     Yes.

Q     All right.  And you communicated with Mr. Graff of the Louisiana State Police only after this report was entered, right?

A     I believe the dates, I'll go with whatever those e-mails are.  I believe it was after this that they wanted to meet with me.

Q     And you did meet with them?

A     Yes.

Q     And you talked about this report?

A     Yes.  Well, I don't know about the report, but whatever.

Q     You read the report?

A     Yes.

Q     And in the report it says, mentions you, right?

A     It does.  But it mentions me as through Department of Insurance.

Q     Right.

A     Getting to what you said, I did not file a complaint.

Q     It says per LDI allegations were brought to them by Matthew Monson of the

**Matthew Monson**
**February 26, 2026**

Monson Law Firm, right?

A    Yes, ma'am.

Q    Through assisting a customer, Monson discovered irregularities.  Who's that customer?

A    I don't know because I didn't prepare this report.

Q    No, I understand, but what do you believe that is?  You made representations to the LDI?

A    The only LDI complaint I filed was for the Cafarrels.

Q    Okay.  So through assisting a customer Monson discovered irregularities in MMA's practices and determined they were deceiving individuals and stealing insurance claims settlement funds.  Do you see that?

A    There it is, yeah, I do.  My complaint --

Q    Hold on.  This Louisiana State Police, I appreciate that you're laughing, that this is funny to you, but your prior testimony was you have absolutely no personal knowledge that MMA stole money,

right?  Remember that testimony?

A    I do.

Q    And now the Louisiana State Police report says that you represented these things to the LDI.  This is coming from the LDI, correct?  It says per LDI, right?

A    Yes, that's what that says.

Q    So you read this report, right?

A    Uh-huh (affirmative).

Q    And Mr. Graff contacts you?

A    Yes.

Q    And he asks to meet with you?

A    Yes.

Q    And you schedule a meeting?

A    Yes.

Q    And you go to the meeting?

A    Yes.

Q    And where is the meeting?

A    The meeting is at their office. They have an office in Covington, Louisiana.

Q    All right.  And so Mr. Graff asks you to share any documents regarding MMA investigation, right, remember that?

A    I don't remember that.

Q    Here's Exhibit 10.  Do you see that?

A    Yeah.

Q    He asks you to send him documents, right?

A    Yes.

Q    Do you ever tell him I reviewed your one-page report.  LDI says that I represented that MMA is stealing insurance claims settlement funds, I didn't say that because I couldn't have said it?

A    I don't think I did say it.

Q    You didn't?  Did you tell the LDI that MMA is stealing insurance claims settlement funds?

A    What I told the FBI --

Q    No, I'm not asking what you told them.

A    You're asking me.

Q    Mr. Monson, did you tell the LDI -- you would agree with me as a lawyer that accusing someone, accusing a lawyer --

A    I didn't accuse them of that, I didn't.

Q    Mr. Monson, please do not interrupt. You would agree with me that if somebody

Matthew Monson
February 26, 2026

was accused of stealing insurance claim settlement funds, that that would be a really big deal, right?

A    Yes.

Q    And you read this report, correct?

A    I read the report.

Q    Did you read this and say -- let me ask a different question.  Did you tell the LDI that MMA was stealing insurance claim settlement funds?

A    No.

Q    All right.  So when the LDI, if the LDI made that representation to the Louisiana State Police, they were just wrong?

A    I don't know that they did make those.  It's in the report.

Q    Correct.  And you communicated with Mr. Graff by text, correct?

A    I believe so, yeah.

Q    And you communicated with Mr. Graff by e-mail of the Louisiana State Police, correct?

A    Yeah.

Q    And you met with him in person?

Matthew Monson
February 26, 2026

A    Yes.

Q    And you talked to him on the phone?

A    Yeah.

Q    And did you ever tell him, hey, I didn't say that, I never told the LDI that MMA stole insurance claim settlement funds? Did you ever tell him that?

A    So --

Q    Listen to my question.  Did you ever tell Mr. Graff or anyone at the Louisiana State Police that what they put in their report was incorrect, that you never said that?

A    It doesn't say that I did say that.

Q    Per LDI, allegations were brought to them by Attorney Matthew Monson of the Monson Law Firm, right?  Through assisting a customer, that's you --

A    Yes.

Q    -- through assisting a customer, Monson, no question this is you?

A    For the first part of that phrase.

Q    Through assisting a customer, Monson discovered.  Are you saying under oath that through assisting a customer might not

**Matthew Monson**
**February 26, 2026**

relate to you?

A    No.

MS. MONTERO:

Object to form.

THE WITNESS:

The first part of that phrase I believe relates to me.  The second part doesn't necessarily relate to me.

BY MS. GOOTT:

Q    In the same sentence it says, through assisting a customer Monson discovered irregularities in MMA's practices and determined, you?

A    I don't agree with --

MS. MONTERO:

Object to the form of the question.  Object to the characterization.

BY MS. GOOTT:

Q    Monson discovered.

A    Monson determined.

Q    Monson discovered.

A    Yes.

Q    Look at the front of the sentence.

A    I'm looking at the front.  And then there's an end.

**Matthew Monson**
**February 26, 2026**

Q    Discovered irregularities and determined.  They, who's the "they" there?

A    It doesn't say.

Q    Right.  But you can speak English. The "they" refers to MMA, right, the preceding noun, MMA's practice and determined they were deceiving individuals and stealing insurance claims.  My question to you, Mr. Monson, is in all of your communications, did you ever tell anyone at the Louisiana State Police that that is not what you said to the LDI?

A    I don't recall.

Q    Did you ever call Mr. Caldwell or anyone at the LDI and say, I just saw this report from the Louisiana State Police, it says that you told them that I accused MMA of stealing insurance claim settlement funds --

A    No.

Q    -- and that's incorrect?

A    No.

Q    Did you ever do that?

A    No.  Especially when you look at the next paragraph.

Matthew Monson
February 26, 2026

Q    Did you ever do that?

MS. MONTERO:

He already answered that.

THE WITNESS:

No, I didn't.

BY MS. GOOTT:

Q    All right.

A    Because I didn't say it.

Q    Mr. Monson, there is no pending question for you.

A    You're ignoring the next paragraph.

Q    I don't need --

A    You're picking and choosing, it's so funny.

Q    Mr. Monson, I'm going to object to your side bar and I'm going to ask you a simple question.  Do you have any knowledge that MMA stole insurance claim settlement funds?

MS. MONTERO:

That has been asked and answered counsel.

THE WITNESS:

I asked and answered that a while ago.

**Matthew Monson**
**February 26, 2026**

BY MS. GOOTT:

Q   And the answer is you have no knowledge of that, right?

MS. MONTERO:

Asked and answered.

BY MS. GOOTT:

Q   Right?

MS. MONTERO:

Counsel, you're badgering the witness.  That has been asked and answered.

MS. GOOTT:

He can't tell the truth.  He lies over and over and, Suzy, you know it.  I haven't seen a lawyer witness lie like this in my career.  And unlike Mr. Monson, I actually litigate.  So I'm getting frustrated because he lies.  When you hand him a piece of paper, oh, I've never seen this before.  Well, not this exact copy.  It's a 2004 Notice.  That bullshit in front of a court, you know it, I know it, and you would never do it and I know you enough to know that.

MS. MONTERO:

**Matthew Monson**
**February 26, 2026**

Counsel, let's take a break.

Let's take a break.

MS. GOOTT:

It's going to be more than okay.

It's going to be great.

(Whereupon a 2 hour and 45 minute break was

taken.)

MS. MONTERO:

We've taken a break and had some discussions between Mr. Monson and counsel and we've made an agreement that we will suspend this 2004 Examination with an agreement that we will resume at some later agreeable date if need be.  And Mr. Monson, are you in agreement with that?

THE WITNESS:

Yes, I am.

MS. GOOTT:

Just to be clear, we've spent the last few hours talking off the record and we're going to continue this, I think continue is the more appropriate term, but we're going to continue it based on an agreement of a date and time that works, if it's actually necessary, with no

**Matthew Monson**
**February 26, 2026**

continuation date as of today.  But that we will agree to work together both time, location, and means.  Is that agreeable?

THE WITNESS:

Agreeable.

MS. GOOTT:

Okay.

* * * * * * * * *

C E R T I F I C A T E

        I, JAN I. SCHMIDT, CCR, in and for the State of Louisiana, as the officer before whom this testimony was taken, do hereby certify MATTHEW MONSON, to whom oath was administered, after having been duly sworn by me upon authority of R.S. 37:2554, did testify as hereinbefore set forth in the foregoing 198 pages;

        That this testimony was reported by me in the stenotype reporting method, was prepared and transcribed by me or under my personal direction and supervision, and is a true and correct transcript to the best of my ability and understanding;

        That the transcript has been prepared in compliance with transcript format guidelines required by statute or by rules of the board, that I have acted in compliance with the prohibition on contractual relationships, as defined by Louisiana Code of Civil Procedure Article 1434 and in rules and advisory opinions of the board; that I am not related to counsel or to the parties herein, nor am I otherwise interested in the outcome of this case.


                    _____
                       Jan I. Schmidt, CCR
                    Certified Court Reporter
                       State of Louisiana

**Matthew Monson**
**February 26, 2026**

**A**

**a.m** 1:17 57:16
**ability** 36:6 199:11
**able** 24:25 26:18
  109:8 112:10
  116:24 124:8
  143:17 155:18,25
**absolute** 29:6
**absolutely** 28:20,21
  33:20 56:7 188:24
**access** 48:22 49:4
  76:25 161:10
**accomplish** 74:19
**account** 26:20 27:10
  27:12,22 28:17
  29:3,10 37:23
  153:4,7,9 156:4
  157:2,4
**accurate** 65:15 66:2
  66:4 128:2 153:3
**accurately** 87:15
**accuse** 190:22
**accused** 191:1
  194:17
**accusing** 190:21,21
**acknowledged**
  128:7
**Acquaintances**
  14:11
**acquainted** 22:4
  72:1,6
**acted** 199:13
**acting** 111:17,20
  126:7
**action** 176:8 180:4
  181:15
**active** 25:11 120:21
  120:24 121:1
**actively** 167:13,23
**addendum** 130:12
  131:1,3,5
**additional** 95:14
**address** 27:13 28:13
  29:1 35:24 39:14
  53:17 56:11,11
  122:24
**addressed** 35:14,18
  35:21,24 37:9
  40:12
**addresses** 27:23
  28:8
**administered** 199:5
**administering** 4:22
**admitted** 90:9,13
  91:3
**advance** 105:13
  107:2,4 142:7

**advice** 50:12
**advisory** 199:15
**affirmative** 28:2
  88:22 92:5 94:11
  107:13 142:17
  189:9
**afford** 73:4
**AG** 164:18 165:17
**agent** 102:6,14
  103:6 109:20,25
  110:12,23 111:11
  111:14,18,21,25
**aggravated** 124:3
  132:9 139:5
**ago** 29:2 49:22
  84:20,22,24 85:1
  116:19 120:12
  122:6 154:18
  195:25
**agree** 42:15,19 89:1
  136:1 151:16
  172:17 184:15
  190:20,25 193:14
  198:2
**agreeable** 197:14
  198:3,5
**agreed** 4:3 73:9
  96:17 176:13
**agreeing** 141:21
**agreement** 14:17
  72:19 76:17,22,23
  77:11 176:22
  179:1,1,5 197:11
  197:13,15,24
**Alabama** 23:2
**All-Star** 183:20
**allegation** 89:22
**allegations** 43:22
  45:23 63:16 82:7
  82:15,16 87:21,22
  187:24 192:15
**Allied** 68:22,23 69:7
  69:12,20 70:1,4
  70:11,12,13 71:13
  71:14 98:7 99:5
  101:4 125:19
  128:3,8 131:24
  160:13,25 163:9
  163:11,25 164:3,9
  164:11,13,23,25
  165:23 166:11
  184:25 185:15
  186:4,9
**America** 98:12 99:7
**amount** 49:24 101:6
  175:24
**and/or** 4:12

**anger** 129:16
  132:11,12,15
**angry** 130:2 131:6
  139:12
**answer** 4:13 7:1,6
  9:25 10:2,6,8,12
  10:19 12:3,17
  17:20 18:5 20:1,3
  35:6 36:3,17
  37:21 45:11,13
  47:17 52:8 55:19
  59:4 63:20 64:14
  71:1,8,21 87:14
  91:12 105:16
  107:24 108:2
  109:10 110:22
  111:3,5,8 116:6
  124:17 128:21,24
  139:4 146:10
  153:19 171:9
  196:2
**answered** 10:10
  15:25 63:22,24
  64:4 128:12 195:3
  195:21,24 196:5
  196:11
**answering** 19:21
  36:5 156:8 167:13
**answers** 10:3 15:18
  106:2
**anybody** 48:19
  102:14 113:13
  123:19 163:4
**apart** 171:10
**Apex** 90:10 91:2
  161:13
**appeal** 182:22
**appear** 131:24
**appraisal** 127:12,15
  127:18
**appreciate** 35:25
  36:3,23 74:18
  146:7 188:22
**approach** 174:25
**approached** 81:9
  174:8,10,11,13
  177:21 178:2,23
  178:23
**appropriate** 197:22
**approximately** 7:10
  43:19
**apps** 21:24
**April** 67:12,14 69:5
  69:6,16,17 70:6
  70:14,17 142:1,16
  184:6,7
**argue** 17:24 27:4

**arguing** 64:7 89:5
**argument** 120:9,10
**argumentative**
  105:21,22 112:18
  112:20
**Aromi** 162:8
**article** 4:15 62:4,7
  63:4,7 64:19
  128:5,16,17 154:6
  199:15
**ASAP** 140:6,20
**asked** 9:24 10:10,24
  11:18 36:1 46:13
  53:21 59:7 64:25
  65:4 68:9 84:8
  96:16 107:10
  108:6,23 109:6
  113:7,10,23 119:4
  128:15 150:11
  155:2 158:8
  177:14 183:24
  195:21,24 196:5
  196:10
**asking** 10:5,23
  11:10,16 22:9
  45:7,8,9,12,20
  47:2 52:21 56:17
  65:23 66:2 68:8
  82:17 87:12,13
  91:14 92:25 93:1
  100:22 103:23
  106:7 109:2,4,6
  110:14 112:4,5
  120:11 121:12
  134:4 146:8 157:3
  159:22 160:16,20
  163:20 164:6,13
  171:23 177:15
  181:1 190:16,18
**asks** 189:12,22
  190:3
**assist** 80:25 117:12
**assistance** 19:20
**assisting** 167:5
  188:3,13 192:17
  192:20,23,25
  193:11
**associate** 97:20
**associated** 27:22
**Associates** 14:20
  17:4 22:17,19
  40:16 54:1 59:11
  95:4
**Association** 135:10
**assume** 155:4 169:7
**assumed** 94:5 155:6
**assumes** 155:18,24

**ATA** 23:1,7,11,14
  23:15
**attached** 3:10,11,13
  44:2
**attachments** 166:5
  173:1,2
**attempting** 43:9
**attended** 77:25
  174:5
**attention** 68:4 69:8
  69:13 70:10
**attorney** 6:3 13:18
  31:4 36:7 41:1
  57:4 77:12 83:1
  87:11 124:21
  125:16 173:25
  174:1 192:16
**attorney-client**
  67:15
**attorneys** 7:18
  31:18 32:8 33:22
  34:5,17,25
**August** 20:12 39:10
  39:22 40:8 41:17
  47:22 49:3 57:10
  57:13 59:17
**aunt** 104:16
**Austin** 150:8
**authority** 41:14
  199:6
**auto** 65:5 118:10
  119:16,23 120:17
**automatically** 123:6
**available** 117:4
  143:24 151:4
**average** 134:11
**aware** 11:17 13:1,4
  19:17 52:5 53:4
  81:22 88:1 161:19
  186:14

**B**

**B** 3:1
**back** 18:22 29:15,22
  59:14 83:1 101:5
  112:4 113:23
  122:14,20,23
  123:1 124:10,15
  127:8 130:4,5,7,8
  133:17 142:12
  156:13 168:18
  178:24 182:22
  184:23
**backed** 158:21
  159:3
**background** 62:21
**backup** 154:13,21

**Matthew Monson**
**February 26, 2026**

158:23
**backups** 155:3,4
**bad** 9:16 182:19
   183:1
**Badger** 106:17,18
   108:6,23 109:17
   111:9 146:21
**badgering** 181:6
   196:9
**bankruptcy** 146:19
   180:14,15,24
   181:21 183:3
**bar** 3:4,5,6 38:22,24
   41:19 42:5,6,16
   43:2 47:22 49:15
   71:12,15 78:8
   96:14,20,22,23
   97:6 98:1,6 99:4
   135:10,11,23
   163:3,24 166:2
   177:22 184:24
   195:16
**Barcus** 60:18
**barratry** 177:22
**based** 88:2 197:23
**basic** 126:19
**basis** 154:3
**beginning** 1:17
   168:1
**behalf** 42:25 53:9
   54:14,15 71:5,13
   71:16 77:21 78:1
   78:4,7,9 88:15
   96:15 97:8,16
   98:2,7,17,18,18
   98:18,22,24 99:5
   128:12 131:24
   132:1 163:8,10,25
   164:3,10,12,23,25
   165:8,18,23 166:6
   166:9,14,15,17
   169:18,19,24
   185:1,6,13,15
   186:3,5
**behavior** 129:8
**believe** 8:4,5,6
   11:12 20:12 21:7
   22:2 25:2 26:21
   26:24 27:1,14
   31:3,8 33:16
   34:18,20 35:1,3,9
   35:13,14 39:9,12
   39:15 41:22 51:25
   54:19 59:24 62:24
   64:1,2,3 75:14
   78:23 79:10,12
   82:6,14 84:10

90:8,25 98:5,8,20
98:21,25 103:4
105:4 107:12,14
107:16,17,20,22
125:16 126:22
127:4,23 128:16
133:25 146:24
147:1 148:20
149:14 152:20
164:1 169:10
180:10,11 187:6,7
188:9 191:20
193:7
**belong** 82:5 88:16
   178:12
**belonged** 82:11
   87:17 88:9
**belongs** 82:5
**best** 36:5 199:10
**better** 74:15 114:2
**beyond** 177:7
**big** 18:23 30:14
   92:14 183:11
   191:3
**bit** 127:9 133:16
**blank** 69:22
**blinds** 29:17
**block** 132:3,7
**blocked** 124:7 131:8
   133:7
**Blvd** 5:1
**board** 199:13,15
**bono** 73:2,9,22 75:6
   79:20,25 80:2,3
   80:10,15,21
   162:25
**Bosch** 162:5
**bottom** 115:6,15
   147:7 150:22
**boy** 36:18
**Bradford** 15:5,12
   15:14,16 16:2,7
   16:12,21 17:2
   18:4 19:1,1,9,17
   20:3,10,14 21:21
   22:5,15,21 24:9
   24:16 25:17,22
   26:6 29:16,25
   30:9 99:11 100:4
   100:5 102:17
   104:22 105:2
   107:11 108:7,24
   112:10,24 113:10
   113:22 114:18
   115:8,16,24
   123:17,18 133:17
   136:4,18 137:22

141:25 142:9
143:6 147:25
150:23 157:17,25
158:11 159:24
160:12,21 166:5
167:5 170:9
172:19 185:4,20
**brand** 150:24
**break** 93:14,15
   197:1,2,6,9
**breaking** 114:3
**bringing** 115:8,12
   133:21 158:7
**brought** 68:3,19
   69:7,12 70:9
   94:13 109:15
   113:3,6,11 134:23
   187:25 192:15
**buddies** 178:14,15
   178:16
**bullshit** 196:21
**bullying** 36:15
**burden** 159:20
**businesses** 50:11,18
**button** 65:2

—————————
**C**
—————————

**C** 2:1 199:2,2
**C-O-U-H-I-G**
   177:19,20
**C.C.P** 4:15
**Cafarrel's** 71:16
   94:17,20
**Cafarrels** 51:4,5,7
   51:13,22 71:14,23
   72:4,11 75:10,11
   75:13 76:12,18
   77:20,22 78:1,5,7
   78:10 79:8 80:12
   80:22 81:1,18
   94:9,10,13 95:17
   95:18 97:5,23
   98:2,22,24 164:12
   165:8,12 188:12
**Caldwell** 31:1 33:24
   34:5,13,15,17
   194:14
**call** 20:22,23 21:1
   32:5 34:10 54:11
   69:21 136:6
   139:20 140:1,6,15
   140:16,20 145:13
   149:22 150:8,10
   154:23 155:7,12
   168:18 194:14
**called** 20:18 23:1
   140:2,18 154:2,3

154:14 158:3
**calling** 21:2
**calls** 31:23 34:16
   101:17 105:5
   185:5,22
**canceled** 128:20
**capacity** 166:11
**care** 145:25
**career** 84:11 196:16
**careful** 109:17
   111:10,25
**CARET** 154:3,14
   155:1,7,18 158:22
**Carlos** 2:17
**case** 4:14 21:4 22:6
   65:1 84:16 85:24
   88:23,25 89:15,16
   89:20,21 92:3
   97:3,4 115:25
   120:19 124:16,17
   124:18 125:10,19
   125:23 126:21
   127:5,7 128:8,18
   128:22,23 129:5,6
   129:7 130:10,12
   130:16 140:2,2,19
   140:19,23 141:2
   156:14 161:2
   174:1 180:9,14,15
   180:24 181:21
   182:3,12 183:3
   199:16
**cases** 91:1 160:14
   160:22,23 163:12
**categorically** 56:7
   56:15
**CCR** 1:24 4:21
   199:4,19
**cease** 142:6,10
**cell** 26:3,4,6,13,14
   116:15,16,17,18
   124:8 131:15
   132:8
**certain** 73:14
**Certainly** 101:23
   157:15
**certification** 4:9
**certified** 1:24
   179:13 199:20
**certify** 199:5
**chambers** 125:2
**Chapman** 162:2
**CHAPTER** 1:8
**characterization**
   103:12,21,24
   151:17 185:8
   193:17

**characterize** 92:24
   107:19,20 132:6
   157:10 183:15
**characterized** 157:9
**charge** 41:8
**charges** 113:3,5,11
**Charlie** 2:14
**Charter** 29:2
**chat** 115:11
**check** 121:24
**checks** 80:23 95:10
   95:18,19,20,22
   96:1,3,11
**children** 104:14
**choosing** 195:13
**chose** 170:23
**circumstance** 163:7
**Citizens** 69:20 70:3
**Civil** 4:6 199:14
**claim** 65:4 78:21
   81:2,5,11 94:18
   94:21 95:1,3,5
   128:8 174:3
   180:13,24 181:21
   181:24,25 182:12
   191:1,9 192:6
   194:18 195:18
**claimed** 124:18
**claims** 51:8,12
   67:18 79:4 128:3
   128:6 177:12
   188:17 190:9,13
   194:8
**clarify** 86:2 121:4
**class** 14:7 176:7
   179:11,12,13
   180:4 181:15
**Claude's** 158:3
**clear** 101:16 142:21
   165:14 181:3
   197:19
**clearly** 17:17 58:14
   101:14 132:13
**click** 64:20 65:11,17
   66:8,14 116:9,10
   117:9 120:5,6
   156:3,25 157:8
**clicked** 65:2 117:20
**clicking** 116:13
   117:25
**client** 74:18 81:22
   82:5,11,12,13
   83:21 87:1,17
   88:9,15,17 90:13
   91:11 92:8 93:10
   98:19 179:9 186:4
   186:11

clients 50:17,17,20 51:7 67:16,22 68:12,20 69:7,10 70:19 71:6 79:20 80:4,10 101:3 132:1 160:13 165:1,10,18,24 185:18 186:7
clients' 88:2 90:7
CLM2024 183:21
close 29:16 66:13,14
cloud 153:21 154:17 154:19 159:1
cloud-based 155:2
Club 178:12
clue 58:23,24,25 59:1,3,8,9,13,15 66:10 74:8 134:15
co-worker 48:8
co-workers 59:19
Coconut 7:17
Code 4:6 199:14
college 178:18
combative 12:6
come 61:22 62:2 79:19 117:21 139:2,3,9 149:11
comes 19:5 84:15
coming 189:5
comments 146:20
Commissioner 30:23
commit 159:22
common 112:1
communicate 21:20 26:5 30:16,21 33:25 35:16,20 37:6 49:8 61:2,12 75:24 104:21,22 105:12 107:10 131:14 132:4 159:24 162:17 164:2,7,15
communicated 19:9 20:17 29:23 30:3 30:6,10,23 33:9 38:18,19 61:4,7,9 75:22 76:1 79:1 94:16 102:13,18 104:1 108:5 136:7 136:16 137:21,24 137:25 138:3 162:18,22 185:20 186:19,24 187:2 191:18,21
communicating 16:21 18:3 21:13

21:15 22:24 99:10 101:7 134:10 157:17 161:22 162:10,15
communication 33:4 34:24 35:2 36:8 49:14 76:5 76:10 95:12 114:17 122:15 143:6 148:25 149:9 168:4
communications 22:15 24:12 25:16 26:10 32:6 34:22 37:11,25 38:13 61:16,18 68:9 71:11 76:11 101:17 109:19 136:2 137:2 139:7 141:22,25 144:11 147:18 163:20 165:5,13 166:3 171:13 172:18 177:10 185:3,21 194:10
companies 50:3,7,9 50:15,22 51:1 67:19 69:1,15 73:16,18 79:5,17 95:8 98:10 99:15 106:22 165:2 166:12 185:16 186:6
company 51:6,8,12 67:21 70:13 78:23 78:24 94:24 95:6 95:13,15 101:3 165:24 186:3
compel 127:12,18
compensated 101:4
complainant 97:14
complainants 60:19 60:20,23
complained 129:8
complaint 3:4,5,6 35:11,13 37:8,10 38:20,23 39:9,13 40:23 41:19 42:5 42:6,17 43:2,18 44:6,17,20 47:22 48:6 49:11,15 59:17,20 78:8,9 96:20,22 97:6 98:2,6,14,23 163:25 164:11 165:6,7 184:25 187:23 188:11,20

complaints 39:3,6,8 60:2 71:15 96:14 96:23 99:4 166:2
complete 75:2
compliance 199:12 199:13
compliant 11:11
complied 11:13,18 28:18
comply 11:4,6 96:25 120:22,23 120:25 121:2
computer 26:19 49:4
concern 68:14,18 69:9 73:5
concerned 129:4
concerns 69:25 70:4
Conduct 43:4,12
conducting 20:4
conference 115:17 124:13,22,25 125:22 128:15,18 128:20 148:9
conferences 126:14 126:15
confuse 46:16 78:17
confused 11:21,23 11:25 15:24 34:11 37:19 44:8,12 52:9,14 58:8,10 58:12,14,16,17 62:25 63:12,18 90:5 181:7
confusing 36:13 82:23 84:5 87:4 91:8 112:7
congratulate 107:7
connect 108:6,23
Connecting 152:10
connection 19:6,23 51:24 114:2
consider 102:16 117:22 184:18
considered 4:15
consistent 107:17
constantly 168:8 169:3
Consultants 23:1
contact 77:19 124:8 131:8,9,9,11,13 140:5 159:5
contacted 127:20
contacts 189:10
contentious 93:22 93:23 94:4
context 91:24 92:2

continual 17:1
continuation 198:1
continue 197:21,22 197:23
continuously 6:12
contract 177:3,3
contractual 199:14
contrary 66:11
conversation 34:3,9 93:24 101:14 130:11 138:12 148:8 152:16 170:12
conversations 15:2 17:1 31:17 158:11
cooperating 99:21 167:5
cooperation 167:7 167:12
copy 44:2,17,20 47:22 48:6 114:22 138:22 170:4 172:12 177:2 196:20
corporate 50:12
correct 13:11 16:7 17:8 22:12 23:16 28:22 29:25 35:11 37:7,8 38:10 40:9 40:13 41:17 48:4 51:25 59:21,23 62:8 66:12 79:18 82:20 85:4 86:8 88:9,13,18,24 97:8,18,24 100:1 100:9 101:8 114:18 120:2,13 133:5 137:20 143:9,12 153:10 157:5,6 161:23 165:6 167:14 173:12 183:23 189:6 191:5,18,19 191:23 199:10
corrected 138:17
costumes 24:20
Couhig 173:23 177:19,20 179:2,4 179:5 180:20
counsel 4:4 40:13 45:4 48:7 57:15 58:15 59:18,23 124:18 195:22 196:9 197:1,10 199:15
count 101:20
couple 42:6 50:11

course 21:1 179:16
court 1:2,24 12:20 77:21,23,25 85:24 87:25 88:5,20 105:11 125:24 126:2 127:13 128:21 135:8,12 135:13,17 145:14 163:4 171:18 175:2 180:6 196:22 199:20
Court's 11:14 32:11
courtesy 36:22
courthouses 105:10
courtroom 89:4,7 89:18,19 92:4 125:1,2,3,9 126:3
courts 171:17
Covington 189:20
created 6:7,9
credit 134:22,22,25
Creek 7:17
Cristobal 2:15
current 161:22 180:8
currently 5:15 26:7 48:25 152:18
customer 188:3,5 188:14 192:18,20 192:23,25 193:11

——————

**D**

D 3:1 4:16
Dacoma 2:5
daily 159:3 182:3
damage 73:25 74:3 74:9 81:5
Daniel 186:20
data 158:21
date 21:6 43:20 60:13,14 197:14 197:24 198:1
dated 40:7
dates 42:8 162:14 187:6
David 31:1 60:25 61:1
day 52:8 64:8,11 140:8 143:14 184:5
days 26:15,16 116:20 122:4,11 144:6
deal 191:3
Debtor 1:7
debtors 8:18 180:14
deceiving 188:16

**Matthew Monson**
**February 26, 2026**

194:7
decide 133:12
decided 64:20 65:11
   65:17 66:7
decision 80:14,17
   80:18 83:22 96:19
decreased 49:25
defendants 127:19
defense 71:24
deficiencies 146:2
define 87:12
defined 199:14
definition 86:9,12
   86:14,16,18,21
   92:20
degree 73:14
delay 92:10
delete 25:9 26:9
   37:17,20 118:10
   119:17,24 120:17
   121:9,13,19 122:4
   124:1 132:3
   170:19
deleted 25:8 37:22
   38:12 119:9
   121:25 123:6,15
   123:20,21 124:5
   131:7 139:18
   159:7
deleting 37:25
   120:1
Department 30:15
   30:19 135:9
   187:20
depends 97:1 163:7
depicted 62:24
deposed 64:15
deposition 4:4
   13:16 93:19
   148:20 149:16
   150:12 172:18
depositions 149:5
desist 142:6,11
detail 29:15 158:16
details 103:7 158:10
determined 188:15
   193:13,20 194:2,7
developed 101:2
different 42:23,24
   132:1 165:1 191:8
difficult 95:7,9
diligence 159:19
direction 199:10
directly 127:21
disallowed 181:25
disallowing 182:12
disaster 54:11

127:23,25
DisasterClaimHel...
   54:5,12 56:4
disciplinary 40:13
   45:4 48:7 49:11
   57:14 58:15 59:18
   59:23
discover 88:14
discovered 188:4,14
   192:24 193:12,19
   193:21 194:1
discovery 156:9
   157:5
discuss 19:4 31:15
   140:24
discussed 19:23
   100:2
discussing 22:20
   124:16 158:1
discussion 13:8
   108:8,11,17,21
   114:12
discussions 197:10
dismiss 128:22
dismissal 130:10
dismissed 127:5,8
   128:14 130:11
   179:18,21 180:5
   181:16
dismissing 128:6
displeasure 139:1
disputed 95:2
distinction 15:7
   39:2 82:21
distribution 142:4
   143:8
District 1:2,3 126:2
   126:13 135:14,15
   135:16 180:6
   181:17
divorces 158:14
docket 10:18
document 3:9,10
   9:5,8,12 65:5
   100:22 110:18
   133:18 142:2
   143:11 156:17
   168:17
documents 13:2
   25:16 144:7,17,18
   146:5 148:16
   149:5 153:14,20
   153:24,25 154:9
   155:13,19 156:3
   156:12,15 160:18
   160:19 185:22
   189:23 190:3

doing 12:7 36:9,24
   46:23,25 55:7
   57:11 92:15 98:16
   98:17 99:12,13,20
   119:15 133:25
   164:19,21,22,24
   165:9,11 166:6,9
   166:10,13,19
   171:25 172:14
dollar 175:20
dollars 175:22
   176:7
dominance 150:25
Donelon 30:24
   31:14,17,20,24
   32:7 33:4,10
downloads 157:1
draft 45:3 46:22,22
drafted 59:21
drawing 69:21,24
drinks 132:19,20
Dropbox 152:14,17
   152:18,19,22,23
   152:24 153:2,4,7
   153:9,11,12,12,14
   156:3,4,9,19
   157:2,4,14
Dropbox.com
   156:21
due 144:8 159:18
duly 5:4 199:6
duty 96:21,25

_____
          E
E 2:1,1 3:1,1 199:2
   199:2
e-mail 3:8,12 21:13
   21:21,23 27:14,18
   27:19,23 28:7,13
   28:25 29:10 31:20
   35:23 38:1 49:13
   53:16 56:11,11
   76:4,9 148:22
   149:8 151:24
   152:1 172:2,5,9
   191:22
e-mailed 16:6
   150:14 151:23
e-mailing 168:8
e-mails 17:1 21:19
   27:20,21 34:1,7
   37:17,20,22 38:15
   149:4,15 150:13
   166:5 185:5,21
   187:7
earlier 86:23 100:2
   116:18 152:16

early 39:10
Eastern 126:12
   135:14
easy 65:3
Edna 152:24 153:7
   153:12
effect 109:20 128:14
   130:1
either 14:22 83:20
   116:4 134:9
elevator 147:10
else's 156:18 157:1
employed 5:11,13
   161:16 162:19,21
   162:23
employee 15:7 79:8
employees 15:2,9
   161:22
employment 6:15
   162:14
ended 72:15 100:12
   100:14 127:2
   129:2
endorse 96:11
engagement 72:18
   76:17,22,23 77:11
   176:21
English 194:4
enjoy 55:10 148:3
entered 56:12 80:20
   141:18,21 182:11
   187:4
entire 92:15
entirety 11:19
entities 39:3
entity 40:18
Equal 161:10
Especially 194:24
ESQ 2:4,9
essentially 130:3
   139:6
estimate 127:22,25
   128:1
evaluation 65:1
everybody 18:24
evidence 38:9 53:15
   56:10 85:6,7,9,14
   86:11 112:9 119:6
   121:7,16 126:9
   129:7
evidences 43:10
ex 115:10
exact 31:3 196:20
exactly 45:8 80:25
   106:10,13 109:6
   174:23
exam 10:22 13:15

29:9 138:10
   140:10
examination 1:13
   6:20 7:25 8:3,8,10
   8:18,21 9:3,25
   11:2,8,15 32:12
   88:6 89:9 119:22
   138:19 170:10
   197:12
examined 5:6
example 164:16
exchange 24:16
exchanged 16:12
   21:19 25:21
excuse 58:8 168:8
exhibit 3:3,4,5,6,7,8
   3:9,10,11,12,13
   8:14,16,21 13:10
   13:14,15 40:7
   42:4,12,12 43:18
   44:6 59:4 60:1,5,6
   60:7 114:16
   141:25 148:3
   172:7,17 183:24
   190:1
exist 25:7,10
existed 32:19
expecting 20:23
   21:1 131:11
experience 85:16
expert 184:18
explain 77:10
   110:20,25 111:2
   146:4
explains 54:23
express 132:11,14
expressed 132:12
   139:1
expressing 129:17
eyes 92:14

_____
          F
F 199:2
face 115:3
fact 95:13,24
   120:22
factor 74:16
fail 23:18,20
fair 14:25 22:3 29:4
   88:4 104:24
false 65:13
familiar 44:8,13
   65:7,9 67:11,13
   68:10 70:15 82:8
   127:14 131:5
family 104:7
far 51:4 83:16,17

**Matthew Monson**
**February 26, 2026**

159:9
**fast** 136:1
**faster** 37:5
**FBI** 15:3,8,10,14 18:4 20:25 22:21 22:21 29:24 30:2 30:8 38:18 71:11 99:11,24 101:7 102:5,14 103:6,15 104:4,23 105:2 108:7,24 113:4,24 163:3 166:6 169:10,15 184:25 185:2 190:15
**FBI's** 99:21
**February** 1:14 5:3 6:8 20:20 21:5,10 24:9 142:12 174:5
**Federal** 4:6 126:2 128:21 180:6
**fee** 179:5
**feel** 12:5
**feelings** 64:18
**feet** 147:10,22
**felons** 115:18,22
**figure** 18:24 155:10
**file** 38:22 39:3,4,5 39:15 46:18,19 65:4 78:4 96:20 96:21,24 98:6 108:25 139:10 163:24 169:17 187:23
**filed** 10:17 37:8,11 38:20 39:8 41:19 44:17 71:15 78:6 78:8 96:14 97:6 98:1,4,13,21 99:5 124:17 128:20,23 166:1 172:23 180:13,23 181:20 188:11
**files** 48:22 49:4,6 128:11 130:14 154:13
**filing** 4:10 67:18
**fill** 54:14 169:14,15
**filled** 169:19,23,24
**find** 26:18 71:23 76:24 108:25 113:7 118:7 143:18 144:17 146:5 149:12 154:5 174:2
**finding** 117:12
**fine** 50:19
**finish** 135:25

184:23
**finished** 12:2
**fired** 41:12
**firm** 1:7,15 2:3,7 5:12,16,22,24 6:6 6:9,12,21 7:9,11 7:20 8:19 9:4 14:13,18,19,23 19:14 41:2,6,20 45:2,21 48:19 49:24 50:2,8,14 50:17,21 64:24 67:18 76:14,18 79:9,16,20,21 80:11 85:17 93:8 97:7,10,13 121:15 125:15 127:11 164:9 183:19 188:1 192:17
**firm's** 98:18 127:7
**firms** 19:23 39:15
**first** 5:4 18:24 20:11 20:13,16 22:4 39:9 42:9,16,17 64:22 66:21 67:9 67:10 68:3,10,19 70:9 82:25 115:2 127:11 136:5 143:23 168:18 186:22 192:22 193:6
**five** 61:10 83:11 84:22 85:25 101:22 136:13,17 136:24 137:1
**flip** 55:5
**Florida** 7:16,17 13:22,23 51:15
**focus** 46:17 113:22
**focused** 186:9
**follow** 65:3 182:2
**follows** 5:7 44:3
**followup** 16:1
**font** 183:11
**foregoing** 199:7
**forever** 26:14
**form** 4:12 32:21 38:3 59:12 96:6 99:17 101:10 102:8,20 103:9,18 105:20 106:1 112:13 123:10 151:14 155:17 160:9 166:22 167:17 168:22 169:15 170:1,2,3 171:1 173:17

193:4,16
**formalities** 4:8
**format** 199:12
**formerly** 14:19
**forms** 169:13
**forth** 199:7
**fortunately** 119:3
**forward** 78:19 159:9
**four** 7:13,23 51:16 144:6
**Franatovich** 21:4 94:14,15 174:6
**fraud** 31:12
**free** 65:1 72:25 73:8
**friend** 102:17 113:16,25
**friendly** 147:15
**friends** 14:9
**front** 12:25 55:9 83:20 131:24 133:18 147:2 193:23,24 196:22
**frustrated** 196:18
**frustration** 129:16 129:18
**fucking** 145:7,13,16 145:18,23 146:17
**full** 5:9
**Fund** 161:11
**funds** 87:1 95:14 188:17 190:9,14 191:2,10 192:6 194:19 195:19
**funny** 12:21 113:20 188:23 195:14
**furniture** 25:4
**further** 127:9

---
**G**
---

**Galindo** 2:15 124:11,13,17 126:18,25 128:11 129:6,11,12,15,24 130:6,18,25
**Galindo's** 125:15 127:6
**gallery** 174:7
**galley** 92:4
**games** 9:21,23 47:6
**general** 33:12,16 35:24 50:18 75:5 97:1 100:10,19 105:2 158:8 160:16 164:5 165:19,22 166:14
**generally** 15:16

23:2 50:5 51:2 128:1 171:5,8,11 185:17
**Georgetown** 178:11 178:12
**getting** 34:11 74:14 84:25 96:10 171:15 187:22 196:17
**give** 12:18 139:3 146:3 148:19,21 150:16
**given** 159:13
**gives** 43:19
**glad** 113:21 147:19
**go** 10:16 14:3 18:12 18:15,19,22,23 24:22 25:1 27:9 29:15,22 37:5 40:11 52:1,10,25 59:14 74:6 77:21 77:23 112:4 113:23 115:6 129:21 130:22 132:18 133:17,19 135:24 141:12 146:3 148:13 154:5 156:4 157:15 165:17 175:9 182:23 183:24 187:6 189:16
**goal** 74:12,13 78:15 176:3
**goes** 124:10 152:15
**going** 6:25 7:5 9:21 10:6,8,12,16 12:1 12:2 18:22,23 29:15,16,21 36:20 36:21 45:10,11,15 54:11 55:8,10,19 59:14 60:16 65:22 70:25 78:19 92:24 94:5 105:13 107:21,24 108:2 108:25 110:21 120:8 127:1 130:8 130:9,10 133:15 133:16 134:21 140:19,24 144:25 145:1 146:15 148:13 154:10 158:16 159:9 169:2,6 171:9 175:11 180:1 182:23 183:15,23 184:15 195:15,16

197:4,5,21,23
**good** 17:25 67:2 113:21 141:12 147:4 178:16
**GOOTT** 2:4 5:8 6:24 7:4 8:15 10:11,14 27:8 29:20 33:2,13,18 38:7 40:2 56:1 68:7 71:2,7 90:22 91:5 93:16 96:12 99:23 101:15 102:12,23 103:13 103:22 105:23 106:4,6 108:14,19 108:22 112:15,19 114:14,23 115:1 123:12 137:12,19 145:10,17,21 146:6,13,16 149:7 149:18 151:21 155:20 156:1 160:11 163:19,23 167:10,22 168:15 168:24 171:7 172:13,16 173:20 177:9 185:11 193:9,18 195:6 196:1,6,12 197:3 197:18 198:6
**gossip** 157:19 160:7
**gotten** 44:22
**government** 109:21 110:1,13,24 111:11,15,19,21 112:1
**graduate** 14:5
**Graff** 186:20,25 187:3 189:10,22 191:19,21 192:10
**Gravier** 1:16 2:9
**great** 67:2 197:5
**group** 23:1
**guess** 5:23 67:17 74:13 147:17
**guessing** 147:22
**guidelines** 199:12
**guys** 107:1 171:14

---
**H**
---

**H** 3:1
**half** 49:22 184:10 184:13
**Halloween** 24:20
**Hammer** 60:25 61:1 61:16,19 64:19 65:14 66:6,12

**Matthew Monson**
**February 26, 2026**

Page 205

**hand** 8:12 10:16 196:18
**handed** 9:1,2,11,11 9:14
**handled** 179:24
**handling** 19:11
**Hang** 114:7,9
**happen** 18:9 34:10 56:16,18 139:24 143:25 150:7,7
**happened** 32:19 45:2 90:12 127:17 139:25 174:23 179:25
**happening** 127:3 129:2 140:13 145:5
**happens** 117:10 126:23 140:16 181:10 182:2,6,19 183:1
**happy** 12:13 24:22 24:25 36:10 62:14 86:14 140:24 144:3 157:15
**haranguing** 92:17 92:19
**harassing** 92:11,12
**head** 23:25 31:12 154:2
**hear** 5:18
**heard** 89:22 91:21 92:6 122:6 135:17 168:16
**hearing** 88:20 89:6 94:14,16 140:9,12 140:17 141:6,7,10 174:6
**hearsay** 89:2
**heavily** 126:13 173:14,19
**hedging** 27:2 64:5,6
**held** 15:11 114:12
**hell** 112:4
**help** 19:10 26:12 74:18 81:7,8 99:12 100:15 114:10 117:19 118:7,7 166:7 185:24
**hereinbefore** 199:7
**hey** 127:21 128:13 141:5 145:9,9 150:11,14 165:16 168:1 192:4
**hidden** 113:1
**hiked** 147:13,20

**hire** 65:6 78:14 95:25
**hired** 74:1,2 78:12 95:16 96:2,4,8
**hires** 74:18
**HOA** 99:6
**HOAIC** 99:7,9
**Hold** 23:14 153:8 156:15 188:21
**holding** 147:19
**home** 73:25
**homeowner** 73:21
**homeowners** 67:23 68:1 73:13 79:4 80:1 98:12 99:7
**homes** 160:6
**honest** 63:24 64:3
**honestly** 36:4 106:3
**hour** 134:13 197:6
**hours** 134:5,5 197:20
**house** 160:1
**Houston** 2:5
**huh** 113:16 173:9
**humorous** 12:22
**hundreds** 126:5
**hurricane** 73:25
**hurricanedamage...** 66:18,20
**hurricanedamage...** 66:22,24 67:1
**hurricanedamage...** 64:23
**hurt** 64:18
**husband** 164:19 185:24
**Huye** 18:19 30:12 60:17

**I**

**ice** 133:13
**icloud** 26:20 27:10 27:13,22 116:8,24 159:1
**idea** 44:24 45:6,17 45:20,24 46:1 59:1 101:19,21 134:12,14 173:9 173:21 175:7 176:10,11 181:15 181:20
**identical** 10:21 42:17 44:3 48:9
**identified** 43:24 186:10
**identify** 59:10
**idiot** 145:7,13,16,18

145:23 146:17
**ignoring** 195:11
**image** 63:4,7
**implying** 147:5,6
**important** 105:15 105:24 106:2 134:18,20 139:8
**impossible** 48:2
**in-person** 31:16 34:4,14 105:7,8
**inappropriate** 178:6
**include** 85:6 185:19 186:7
**included** 96:10 149:6
**including** 4:8 133:1
**income** 5:15 6:18,22 6:22
**incorrect** 192:12 194:21
**indefinitely** 75:7 168:19,25 169:1
**indicating** 65:6
**individual** 76:13 87:24 163:12
**individually** 164:8 164:22
**individuals** 39:4 50:11 51:11,23 188:16 194:7
**industry** 185:10,12 185:18
**inert** 117:2
**information** 15:21 16:3 17:6,7,11,13 18:6 19:2,20 20:6 22:10 23:6,12,15 24:4 32:11 54:14 64:25 67:16 99:12 99:25 100:3,6,8 100:16 103:15,25 107:5 117:12 118:8 135:1,21 159:19 166:4 167:14,20 168:9 169:2
**inner** 161:15
**instance** 88:10,11 88:12,14 124:12 144:4,5 161:24
**instances** 87:20 90:8,11,13 91:1 161:25
**instruct** 7:1 46:19 52:1,10 70:25
**instructed** 46:18

121:20
**instruction** 7:6 12:18
**insurance** 30:16,19 31:12 50:3,7,9,15 50:22,25 51:6,8 51:12 67:19,21,21 68:11,19,25 69:15 70:13 71:24 73:16 73:18 78:21,23,24 79:4,5,17 81:1,5 81:11 94:17,21,24 94:25 95:5,6,8,13 95:15 98:9 99:14 101:3 106:22 135:9 165:2,10,18 165:24 166:12 185:10,12,16,17 186:3,6 187:20 188:17 190:8,13 191:1,9 192:6 194:8,18 195:18
**intended** 74:11
**intentionally** 37:25
**interest** 5:21
**interested** 23:5 199:16
**interesting** 71:22 183:3
**interests** 74:22 96:9 164:3
**internet** 151:3,5
**interrupt** 11:20,22 11:24 12:3,19 190:24
**interrupting** 167:9
**interview** 62:2
**interviewed** 62:3 63:10,15 66:6
**interviewing** 63:14
**intimidate** 37:1,3
**introduced** 20:13 20:15,24
**introductory** 20:22
**investigate** 67:10 100:15 161:8,10 161:13,15
**investigated** 70:18 161:4,17
**investigating** 19:18 67:6 134:6
**investigation** 18:7 18:10 19:7,24 20:5,7 22:11,23 31:13 71:10 99:22 152:11 167:6 169:5,9,11 189:24

**investigations** 19:11 19:13
**involve** 22:19
**involved** 22:17 24:2 64:21 65:13,18 66:9,15 80:18,22 87:25 89:15,16 91:2 126:14 164:18 173:14,19 173:21
**involvement** 92:3 127:7
**involving** 22:25 139:7
**irregularities** 188:4 188:14 193:12 194:1
**issue** 68:2,3 81:6 91:9 124:15 125:11,12,13 135:17
**issued** 142:13,23 186:15,22
**issues** 84:7

**J**

**jail** 18:20
**Jan** 1:24 4:21 199:4 199:19
**January** 6:8 37:13 50:13 51:1,11 136:8 137:3,7,10 137:22 138:1,4 140:3 168:4
**Jayne** 2:15
**job** 12:16,17,21 17:25 36:16 64:14 75:2
**John** 77:13,15 79:2
**Johnie** 2:16
**joint** 80:16
**judge** 14:7 83:20 94:9,17 123:22 124:2,3,13,14 125:1,8 126:3,7,7 126:18,20,21,25 128:3,4,4,5,16,17 129:1,14 130:5,18 131:6,23 132:7,17 133:1,2,5,7,16 138:3 140:3,9 141:5,17,20 146:19,25 147:2
**judges** 71:12 126:12
**judgment** 83:23
**July** 56:6 57:16 58:5,13 70:17

72:13 127:9
**June** 127:9 147:7
  152:2
**jury** 83:20
**Justice** 161:11

---
**K**

**Katherine** 43:1 57:3
  57:4 60:21 164:19
  172:3,20 173:6
  179:6 185:23
**Katie** 162:8,17
**Katy** 2:16
**keep** 12:1 60:16
  81:18 85:16
  107:18 142:3
  143:8 146:15
  153:23,25 172:14
  185:2
**keeping** 82:4
**kept** 82:10
**Kermit** 89:12
**kids** 104:10
**Killingsworth**
  60:18
**kind** 34:23 47:17
  50:1 81:5 85:11
  100:11 106:20
**Kingwood** 7:14,19
**knew** 58:18,18
  80:20 109:14,14
  140:12 174:22
  178:13
**know** 8:7 10:15
  12:21,22 14:14,23
  19:22 21:14 22:22
  23:25 25:25 28:25
  29:23 31:3,11
  34:1,3 35:15
  38:17,19 39:13
  41:25 44:19,23,25
  45:14 46:7,14
  47:9,10,10,13,14
  47:15 48:1,17,21
  49:20 50:16 51:20
  52:16 56:13 57:23
  60:3 61:14,25
  62:12,16 63:6
  67:5,7 68:9 69:3
  72:15 73:6 74:5
  79:11,22 80:5,23
  82:17,22 83:8
  84:17 86:20 87:2
  87:13,23 88:3
  89:10,11 91:22
  93:5 100:2 101:12
  102:4,10 104:1,13

104:15,17,19
106:10,13,13
107:4,14,16,22
109:5,11,12,13,18
110:2,4,8,10,12
111:14,22 113:16
114:6 115:20
116:5,7 117:7
118:13,14,21
119:5 129:4 136:5
136:5,11,11
138:18 139:8,13
141:1 142:4,5
143:4,10,20 144:1
144:18,25 145:2
146:11 149:4,4
151:9,18,25 152:5
152:23 153:5,8
154:22,23 155:3,5
155:21 156:5,6
157:14 158:23
159:25 160:19
161:6,17 162:4,9
162:13,18 163:24
164:10 168:2
169:2,7,8,23
170:9 172:4,25
174:17 176:25
177:2 178:3,20,21
178:25 179:14,16
179:17,20 180:3,8
180:12,15,17,23
181:1,4,5,8,22,24
182:1,13 183:7,7
183:13 184:13
187:13 188:6
191:16 196:14,22
196:22,23,24
**knowing** 23:5
**knowledge** 53:22
  81:23,25 82:2,4,9
  82:18,22,25 84:8
  84:14 86:3,4,8,17
  86:19,22,24 87:2
  87:10,10,16,18,19
  88:8 90:3,5 91:11
  92:7 93:4,9
  140:14 180:25
  188:25 195:17
  196:3
**known** 14:19
**Krista** 15:5,12
**Kyle** 162:5

---
**L**

**L** 4:1
**L-A-D-D** 125:17

**Ladd** 125:17 129:13
  129:15
**lady** 152:8,25
**Lam** 40:25 41:1,16
  42:5 44:11,16
  45:2,21 46:18
  48:8,23,24 49:3,8
  49:14,19 52:1,10
  52:25 53:24
**Lam's** 43:14,20
**language** 45:5
**largely** 17:3
**late** 124:10
**latest** 168:4
**laughing** 112:3
  188:22
**Lauren** 40:25 41:1
**law** 1:7,15 2:3,7 4:7
  5:12,16,22,24 6:6
  6:9,12,21 7:9,11
  7:19 8:19 9:4 14:3
  14:13,18,23 19:14
  19:22 41:5,20
  48:19 50:8,14,21
  64:24 76:14,18
  79:9,21 80:11
  85:17 93:8 97:10
  97:13 121:15
  164:8 183:19
  188:1 192:17
**lawsuit** 99:13
  164:20 166:7
  171:21,24 172:22
  173:15 176:5,8
  179:17,20 180:4
  181:16
**lawsuits** 127:11,17
**lawyer** 12:18 64:9
  64:10,11,12,17
  71:24 74:24 76:7
  78:25 81:24 82:18
  93:4,7 106:18,19
  144:11 164:9,17
  164:23,24 166:10
  176:11,12,13
  177:4,11,16,18
  178:23 185:16
  186:3 190:20,21
  196:15
**lawyers** 7:5,8 24:5
  41:20 72:2,7 97:8
  97:12,17 115:22
  118:6 159:25
**LDI** 30:15,17,17,21
  31:4 33:5 35:11
  38:19 71:11 98:14
  98:23 135:11

137:25 142:7,13
142:23 143:6
163:3 164:3,7,11
164:15 165:5,17
166:2 184:25
187:24 188:10,11
189:5,6,6 190:7
190:12,19 191:9
191:12,13 192:5
192:15 194:12,15
**LDI's** 164:17
**lead** 173:25
**leading** 181:11
**learn** 70:22
**learning** 159:2
**leave** 18:25 49:21
  92:19
**legal** 106:21 154:3
  154:15 155:1,7,18
  158:22 179:1
**let's** 30:14 39:21
  50:19 55:22 59:25
  82:24 83:1 84:13
  85:16 86:2 87:5
  101:16 113:22
  135:24,24 146:14
  175:9 178:24
  183:2 184:22
  197:1,2
**letter** 35:21 38:9
  45:3,22,24 46:4
  46:18,20,21 48:9
  118:18,24 119:1,7
  120:12 121:6
  142:7,13,24,25
**letterhead** 60:9,11
**letters** 76:2
**letting** 139:13
  159:24
**licensed** 13:20,21
  13:24
**licenses** 39:17
**lie** 196:15
**lies** 196:13,18
**life** 103:7
**LIGA** 69:25
**limit** 50:19 69:19
**limitations** 128:11
**limited** 165:14
  184:3
**Lindsay** 6:3
**line** 52:11,25 106:23
  114:7
**link** 26:18 64:20,22
  65:12 66:8,15,16
  66:21 117:6
  152:14,19,21,24

153:7,12,14 156:3
156:18,23 157:1
**Linked** 3:9 22:1,2
  182:5 183:5
  184:11
**links** 25:11 65:18
  117:3 183:7,25
**list** 146:1,4
**listed** 13:14 39:15
  40:15,22 60:19,20
**listen** 12:23 17:20
  19:15 36:16,20,21
  37:4 47:7 55:16
  66:1 71:19 108:15
  121:14 133:3
  180:21 192:9
**listening** 124:11
**lists** 60:17
**literally** 9:10 69:21
  69:24 111:13
**litigate** 85:2,5
  196:17
**litigated** 83:7 84:9
  84:10,16 85:1,24
**litigation** 78:2
  185:25
**litigator** 147:4
**little** 36:18 115:3
  117:8 127:8
  133:16
**LoBello** 6:3
**location** 7:19 198:3
**log** 54:6,10,13
**logged** 53:16 56:3
  171:12,13
**logo** 148:4
**long** 5:21 93:6
  116:19 118:20
  129:3 139:20
  169:1
**longer** 25:11 162:22
**look** 8:16 9:4 11:15
  26:22 32:10 39:21
  42:4,9,22 59:25
  60:9 62:14,18,19
  92:20 105:17
  111:10 112:3
  115:2 119:18
  122:15,20,23
  123:1 124:19
  127:21 128:13
  142:5 146:3
  150:22,22 151:22
  152:18 157:15
  183:2 184:22
  193:23 194:24
**looked** 26:25 84:4

**Matthew Monson**
**February 26, 2026**

**looking** 42:8 60:5,6 60:7 67:4 160:17 160:19 172:25 173:5 193:24
**Loss** 23:1
**lot** 21:15 37:5 69:22 102:5,10 106:25 108:4 139:1 178:19
**Louisiana** 1:17 2:10 4:22 5:2 7:15 13:21,24 30:15,18 38:22,24 39:17 40:12 43:3,11 45:3 48:7 51:14 51:17,19 57:14 59:17,22 69:17,20 70:3 73:22 82:13 126:13 135:8,9,10 135:12,14,15,16 135:22 163:3 178:13 187:3 188:21 189:3,21 191:14,22 192:10 194:11,16 199:4 199:14,20
**LSP** 3:11
**Luther** 152:25 153:7
**Luther's** 153:12
**lying** 112:21

**M**

**M** 2:9
**M-I-N-E-O** 77:17
**ma'am** 9:20 21:11 22:7 30:1,4 40:10 40:14 41:18 52:4 52:6 58:1,25 68:13,17,21 72:9 94:3 115:5,9,14 129:22 130:7,17 131:2 148:1 150:21 151:1 157:20 184:20 188:2
**Mac** 116:25
**mad** 129:1
**magistrate** 126:12 126:20 133:1
**maintaining** 116:20
**majority** 50:6
**making** 12:5 15:6 45:23 63:8 85:8 113:19 121:7
**man** 178:23
**management**
130:13
**Mandeville** 5:2 7:15
**manner** 43:10
**March** 115:4,7,20 136:4 168:3
**marital** 158:12
**Mark** 125:17
**Marks** 150:8
**married** 104:12 157:20
**Masson** 78:24 81:12 81:13,14
**Mat** 6:22
**matter** 69:8 120:22 172:2,3,8,20 173:7 175:16
**matters** 33:10,12 90:10
**Matthew** 1:13 4:4 5:1,10 28:3 60:21 187:25 192:16 199:5
**matthew@monso...** 27:19 28:4 37:18
**McClenny** 14:19 17:3 22:17,19 40:16 54:1 59:11 95:3,21,25,25 96:10
**MDMonson@cha...** 27:25 28:1,10
**meal** 132:23
**mean** 35:15,20 36:25 46:16 50:5 52:15,24 56:13 60:3 64:18 65:8 81:9,24 82:1 86:5 101:13 102:11 109:25 110:5,11 110:16,17 111:1 111:11,16 112:6,7 116:10 117:8,16 143:20 147:3,11 159:1 161:6 163:1 171:22 173:7
**meaning** 76:2
**means** 36:8 46:10 52:16,18 86:3,20 110:20,23 111:14 120:1 198:3
**meant** 87:3 111:4 111:17
**mediator** 126:17
**meet** 16:15 20:9 31:14 132:17 187:8,10 189:12
**meeting** 34:8,14
105:7 125:8,20 126:17,24 129:3,3 129:9 132:13 189:14,16,18,19
**meetings** 17:2 34:4 105:8 126:3,6
**Megan** 162:2
**melted** 133:13
**member** 5:23,25
**memory** 146:23
**mentioned** 54:1 65:9 77:13 148:12
**mentioning** 147:12
**mentions** 64:24 187:17,19
**message** 21:22 43:23 44:2,7,12 49:17 52:3 56:4 57:16 58:5,12 59:3,10 63:11,17 106:8 109:16 122:11 142:16 175:13,19
**messaged** 140:4
**messages** 3:7,13 16:13 17:2 24:11 24:23 26:18 34:19 53:18 65:16 109:3 116:20 119:3,9,18 119:19,20,20 121:24 122:4 123:6,15,20,21 124:1,5 131:7 163:2
**met** 20:11 72:8 77:4 77:6 191:25
**method** 199:9
**mgoott@walkera...** 2:6
**Mid** 21:10
**Middle** 135:16
**million** 176:7
**millions** 175:20,21 176:9
**mind** 48:3 102:5,10
**Mineo** 77:13,15,21 79:2,3,3 80:17
**minute** 197:6
**minutes** 139:21,22
**Miriam** 2:4 6:20
**mischaracterizati...** 27:6 32:22 90:16
**mischaracterizing** 168:14
**missing** 144:12,12 144:13
**misunderstood**
178:1,3
**MMA** 1:7 2:3 14:13 14:18,22,23 15:3 15:14,17 16:21,24 18:4,15,18,25 19:3,5,6,13,19 20:5 22:6,11,22 23:23 24:2 29:11 29:24 30:3,22 31:17,21 32:7 33:6,20,25 34:5 34:17,24 35:7,9 35:12,17 37:7 38:9,15,18,23,25 39:1 40:21,22 41:20 44:18 45:4 49:9 51:24 52:2 52:11,13 53:1,21 54:9 58:19 59:2 59:16,18 61:3,8 61:10,13 62:7 64:21 65:6,12,18 66:8,11,15 67:6 67:11,14,17,22,22 68:10,14 69:9 70:15,18,22 71:10 73:22 80:22,23 81:17 82:4,10 86:7,25 87:16 88:1,8,16 89:23 90:5,9,12 91:1,11 92:8 93:9 96:3 97:10,13,18 98:14 100:6,9,20 101:1 101:7 113:4,11 115:10,25 119:7 120:12 124:18,21 125:11,12,13 127:12,13,21 129:5,21,23 130:13,19,22,25 133:25 134:6,9,10 134:11,24 135:3,4 138:9,14 143:7 150:23 153:24 154:6 158:13 159:25 164:4,7 167:21 170:20,24 171:21 172:23 173:11,22 174:4 175:9,19 176:4 177:4,11 181:16 181:24 182:2,6,12 182:19 183:1,5,6 184:1,11,19 185:4 188:25 189:23 190:8,13 191:9
192:6 194:5,17 195:18
**MMA's** 157:19 161:15 180:14 181:21 188:15 193:12 194:6
**Monday** 5:12
**money** 81:14,16,17 81:18 82:4,10 86:7 87:17 88:2,8 88:16 90:6,6,7,14 91:11 92:8 93:10 175:25 188:25
**Monson** 1:13 2:7 3:10 4:5 5:1,10,16 5:22 6:6,9,12,21 7:8,11,19 8:19 9:4 9:22 11:16 15:1 28:3 39:7 41:5 43:1 44:7 47:20 49:1 50:8,14,20 50:21 55:16 56:2 59:9 60:6,21,21 67:4 73:15 76:14 76:15 79:8,21 80:10 82:17 85:17 87:8 98:16 110:14 114:15 121:15 149:9 164:8,8,22 172:3,20 173:7,11 179:6 183:19 187:25 188:1,3,14 190:19,24 192:16 192:17,21,23 193:11,19,20,21 194:9 195:9,15 196:16 197:10,15 199:5
**Monson's** 6:22 164:19 185:23
**Monsonfirm.com** 38:1
**Monsons** 64:20 65:11,17 66:7
**MONTERO** 2:9 6:19 7:2 8:13 10:9 27:5 29:18 32:20 33:11 38:2 39:25 55:21 68:5 70:23 71:4 90:15,20 93:13 96:5 99:16 101:9 102:7,19 103:8,17 105:19 105:25 108:10,16 112:12,17 114:4 114:21 123:9 137:5,15 145:4,8

145:19,24 146:9 149:3,10 151:13 155:16,23 160:8 163:16,21 166:21 167:8,16 168:10 168:21 170:25 172:11 173:16 177:6 185:7 193:3 193:15 195:2,20 196:4,8,25 197:8
**month** 59:20 69:3 97:21
**months** 120:2,12 131:22 168:3
**Morgan** 128:16
**morning** 148:4
**Moseley** 2:14 14:20 17:4 18:12,19 22:17,19 30:5,7 30:10 40:16 54:1 59:11 93:17,19,25 95:25 96:1,10 97:7,9 114:1 115:21
**Moseley's** 95:21
**Mosely** 95:3
**motion** 128:24 139:10
**Mount** 147:13,20
**mountain** 147:13
**move** 29:14 93:2
**moving** 145:22,23
**multi-network** 150:24
**multiple** 15:8 97:7 157:24 158:11

—— **N** ——

**N** 2:1 3:1 4:1
**Naccari** 1:15 2:8
**name** 5:9 27:12 57:2,3 78:25 87:23 89:10,11 95:21 169:20,22 169:25 177:16,18 179:3
**name's** 186:16
**names** 51:20
**Nathan** 31:6
**nature** 12:6 53:20
**nearly** 48:9
**necessarily** 19:8 126:10 151:16 154:8 160:23 193:8
**necessary** 87:7 197:25

**need** 5:18 11:15 17:20 36:2,3 47:7 54:24 55:3 74:19 92:13 96:24 111:5 115:11 132:7,10 133:20 141:1 144:21 158:5,5,16 164:18 177:2 195:12 197:14
**needed** 19:10 20:6 81:6,8,8 132:3
**never** 10:1 15:23 22:8 32:18,19 52:20 72:8 75:11 75:12,15,16,17,19 75:22 77:4,6,7,25 95:24 113:10 122:10,14,14,20 122:23 123:1,4,13 127:13 132:24,25 192:5,12 196:19 196:23
**nevermind** 143:15
**New** 1:16 2:10
**news** 61:1 62:4
**nice** 12:11
**night** 140:10 141:3
**nine** 173:1
**nonresponsive** 65:23
**nonstop** 182:13
**Nope** 145:22,22
**normal** 125:25
**normally** 107:25
**North** 14:7 123:22 124:2,4,14,14 126:18,20,25 128:4 129:1,14 130:5,18 131:7 132:17 133:2,5,7 133:16 138:4 140:4 141:20
**North's** 125:1,9
**notice** 3:3 4:5 8:7,8 8:10,18,22 9:18 9:25 10:17 12:25 137:6,9 177:8 196:21
**noun** 194:6
**November** 60:13,14 124:23 130:15 133:8
**number** 43:23 44:9 44:13 57:19,21,22 57:24 58:2,3 65:10 68:25 123:2 127:10

**nurse** 57:8

—— **O** ——

**O** 4:1
**oath** 4:22 47:13 86:24 111:24 180:2 192:24 199:5
**object** 27:6 65:22 96:6 99:17 101:10 102:8,20 103:9,18 105:20 106:1 123:10 160:9 167:17 171:1 193:4,16,17 195:15
**objected** 141:10 181:24
**objection** 10:13 32:21 38:3 90:16 90:21 112:13 130:9 151:14 155:17 159:16 166:22 168:11,22 173:17 185:8
**objections** 4:11,14 85:8
**observe** 88:17,19
**obtaining** 70:19
**obviously** 117:8
**offering** 85:7
**office** 7:14,15,16,16 40:12 45:4 48:7 57:14 58:14 59:18 59:22 61:20,24 62:20,22 66:7 72:2,7 117:15 118:4 131:10 150:19 154:18 157:19 158:25 189:19,20
**officer** 199:4
**offices** 7:12,13
**official** 31:11 110:13 125:22
**officially** 117:16
**officiated** 4:22
**oh** 9:15 12:8 112:7 114:24 145:3 148:13 172:6 184:3,23 196:19
**Ohlsson** 2:16 25:2
**okay** 5:25 6:4 8:20 9:17 12:16 18:8 19:16 30:25 36:4 39:5 42:14 50:1 54:3 60:8 77:18

82:24 84:13 87:5 88:7 89:6 91:6,20 91:24 95:16 96:13 98:9,13,23 109:10 113:25 117:1 130:8 135:13 138:15,16 142:10 154:16 157:21 159:4 160:4 162:13 175:18 180:16,17 186:9 188:13 197:4 198:7
**old** 28:13 122:10
**older** 178:19
**on-line** 170:3
**once** 16:19 61:6,8 94:1,2 131:21
**one-page** 190:7
**ones** 152:21
**open** 88:5 100:5,11 100:14 105:10 116:11 156:3 157:1 169:11
**opinions** 199:15
**opposite** 170:22
**opt** 52:2,15,16,20 52:24
**opted** 53:17
**opting** 52:12,23
**oral** 32:7
**order** 11:14 28:17 32:12 127:4 128:5 130:13 137:4 141:18 182:5,11
**ordered** 13:2,5 137:2 159:15,15
**orders** 135:17 171:17,18
**original** 127:19 128:4,5 137:13
**originally** 16:22 127:5
**Orlando** 115:17 148:10
**Orleans** 1:16 2:10
**outcome** 199:16
**overall** 19:24

—— **P** ——

**P** 2:1,1 4:1
**p.m** 1:18
**page** 3:2 42:9 64:23 106:15 115:2,6,7 115:15,16 116:2 133:18,24 141:24 147:7 148:2 152:7

152:16 158:20 160:2,15 171:22 173:3 182:6 184:12
**pages** 163:2 166:4 183:4,8,10,11 184:8,9,10 199:7
**paid** 95:10 162:25
**paper** 9:13,14,19 10:20,21 55:9,11 86:6 117:8 154:4 196:19
**paragraph** 4:16 42:16,18 43:17 127:3,4 194:25 195:11
**paralegal** 2:17
**part** 52:15 62:4 78:13,16,18 79:13 95:2 99:21 103:4 124:11 138:12 177:13 179:10,12 192:22 193:6,7
**participates** 183:20
**particular** 9:13 144:4
**particularly** 129:4
**parties** 199:16
**party** 45:23 48:9 88:23,25
**passed** 140:3
**Patterson** 2:4,16
**pay** 72:21,23 163:4
**peculiar** 158:2
**pending** 36:11,12 36:14 52:7 180:5 180:10 185:25 195:9
**penny** 81:20 82:10 86:25
**people** 19:4 29:8 39:16 51:10 68:15 82:7 91:2 111:25 113:14 117:17,18 118:3 127:24 135:1 157:19,24 158:13 161:18,19 162:21 166:17 167:2 185:1,6
**people's** 158:6,14 160:5
**percent** 51:2,3 65:15 66:4 71:25 73:10,11,19 175:16
**period** 70:6 128:10 137:11

**Matthew Monson**
**February 26, 2026**

permitted 4:7
person 16:16 31:15
   34:7,23 77:6 89:8
   89:10,12,14 91:22
   96:24 114:8 138:6
   191:25
personal 76:11
   81:23,23,25 82:2
   82:3,9,18,21,25
   84:8,13 86:3,4,8
   86:16,19,22,24
   87:2,9,10 88:7
   90:4 93:3,9 103:7
   160:5 188:25
   199:10
personally 39:6
   41:5 53:6 54:13
   76:1,6,10 82:6,8
   123:16
phone 21:1,16,23
   26:3,4,6,13,14
   31:23 32:5 34:10
   34:16,23 44:9,13
   57:19,21,22 58:2
   58:3 75:20 77:8
   101:17 104:23
   105:5 116:15,16
   116:17,19 122:12
   123:2 124:8
   131:15 132:8
   136:6,12 138:8
   140:5 148:12
   149:22,25 151:19
   168:18 185:5,22
   192:2
phonetic 89:13
   149:17
photo 62:15,16 63:1
   147:22
photograph 61:23
   62:1
photographs 24:16
   24:19,21 104:4,7
   147:21
photos 63:1
phrase 129:23
   192:22 193:6
pick 144:20,21,22
   144:24 171:10
picked 176:11,12,13
picking 195:13
Pico 147:13,20
picture 25:5 30:15
   62:10 63:9 122:21
   148:5,7
pictures 25:18,20
   103:1,16 104:10

147:24
piece 9:12,14 55:9
   55:11 86:6 196:19
pieces 9:19 10:20,21
pissed 133:14
place 6:16 38:6
   148:11
plaintiff 125:14,16
   175:12
plank 69:24
play 9:22
players 29:21
playing 47:6
PLCC 2:3
pleadings 21:4 78:4
   78:7
please 10:25 11:20
   11:22,24 12:19
   27:4 37:4 46:17
   77:16 92:11
   100:12 110:20
   114:15 140:6
   157:16 159:23
   172:5 181:6
   190:24
plenty 35:7
PLLC 1:7
plugged 114:5,6
point 24:20 25:3
   38:12 54:2,7
   119:14 133:11
   140:15 171:22
Police 186:11,25
   187:4 188:22
   189:3 191:14,22
   192:11 194:11,16
pops 157:12
posed 63:22
position 31:10
possession 32:25
possible 46:6,10,11
   46:15,17,24 47:2
   47:4,8,12,18,21
   47:23,25 48:5,10
   48:12 77:2,3
   136:20,21 153:13
   177:1
possibly 59:2
post 182:5,8,18,21
   184:11
posted 107:6
posting 107:2 134:9
posts 106:23,25
   107:2,8 182:9,23
   182:25,25 183:5
   183:25
power 135:18

practice 79:14
   194:6
practices 188:15
   193:13
practicing 93:6
preceding 194:6
precipitating 74:16
prefaced 158:9
prejudice 128:23
preparation 11:2
prepare 188:7
prepared 13:13
   199:9,12
prescriptive 128:10
present 2:13 151:23
presentation 150:23
   183:20
presented 21:3
   55:13
presenting 85:7
preservation 38:9
   118:18,23 119:1,7
   120:11 121:6
preserved 121:8,17
presupposing 143:1
preventing 131:13
previously 174:22
prior 9:8 26:13 66:9
   142:23 156:8
   178:4 188:23
prison 18:13,16
privilege 67:16
pro 73:2,9,22 75:6
   79:20,25 80:1,3
   80:10,15,21
   162:25
proactive 119:8
   121:17,18
proactively 121:15
probably 67:12
   141:12 184:14,18
problem 115:18
   171:14
problematic 94:5
Procedure 4:6
   199:14
proceeding 77:23
   78:3
process 37:24 38:5
   38:6 127:12,15
produce 13:3,5,6
   22:14 23:15,19,20
   25:22,23 32:15,18
   61:15 137:2
   139:15 141:22
   148:23 155:14
   159:7,16,21

183:25
produced 13:2 24:5
   25:6,15 26:1
   33:17 61:17 109:8
   114:17 136:3
   139:25 140:3
   143:23 144:6,15
   148:24,25 159:20
   182:9 183:9,22
   185:22
producing 154:25
product 70:24
   163:18
production 143:19
professional 12:10
   12:12,14,15 43:4
   43:12 103:5,14
prohibition 199:14
proof 180:13,24
   181:20
property 74:4,6,9
prosecute 174:3
provide 17:6,7,11
   18:6 19:2 24:2
   44:16 64:25
   100:18 169:3
provided 15:18,20
   16:2 23:9,12
   44:19 59:20
   100:24 103:25
   117:4 135:21
   156:23 167:15,20
providing 19:20
   99:11,24 134:25
public 142:3 143:8
   143:15 166:19
publicly 134:22
pull 25:10 116:9,12
   116:13,25
pulled 151:5
purpose 16:20,25
   17:5,10 18:3
   74:12
purposes 4:7
pursuant 4:5 43:2
   98:4
pursue 128:2
pursuing 128:7
put 25:3 39:23
   42:11 55:16 125:6
   125:23 131:19
   157:18 158:16
   172:6 192:11

**Q**
qualify 65:2
question 4:12 9:16

10:8,13 11:21,23
   11:25 12:24,25
   15:7,24 19:15,25
   20:2 30:12 31:16
   35:25 36:11,12,14
   36:17 37:4,19
   45:12,13 46:16
   47:8,21 48:5 52:7
   52:9,14 53:21
   55:14,15,17,20,25
   58:11,15 59:5,7
   65:25 66:1,23
   67:24 71:9,19
   74:15,17 83:24
   84:1 85:10,12,14
   87:15 91:6,7 93:2
   93:8 95:7,9 99:18
   105:21 106:2
   107:23,24 108:15
   109:4,10,11
   110:22 111:5
   112:5,14 116:6
   119:4 121:14
   123:11,16 126:20
   133:3 155:24
   157:11,13 158:8
   158:10 160:10
   163:22 165:15
   166:23 167:18
   168:23 171:2,9
   177:15 178:22
   180:21 181:7,9,11
   191:8 192:9,21
   193:17 194:8
   195:10,17
questionable 23:3
questioning 65:19
questions 10:7,24
   12:17 15:19 16:1
   17:21 18:5 19:21
   22:9 46:13 52:8
   55:6 63:21,22,25
   64:4,8,15 87:4
   91:8 100:23
   105:17 106:3
   108:3 167:13
quick 93:14
quietly 36:16,20,21
quit 161:19
quite 9:9 17:17
   147:1
quote 65:2

**R**
R 2:1 199:2
R.S 199:6
reached 16:22 22:5

**Matthew Monson**
**February 26, 2026**

Page 210

| | | | | |
|---|---|---|---|---|
| **read** 8:2,10 9:24 10:1,18 54:24 55:3,8 86:5,6 183:16,18 187:15 189:8 191:5,6,7 | 114:11,13 124:20 125:4,6,7,21 126:4,24 127:13 130:19 157:18 158:17 197:20 | 160:6 199:14 **relevant** 6:23 100:25 137:10 **rely** 114:8 **remember** 21:6,14 | 69:20,23 73:21 79:7 80:1 177:16 178:7,10 189:4 190:8 **representing** 50:6 | 190:6 **Reynaud** 60:17 **rid** 154:17 **ridiculous** 113:20 **right** 6:11,25 8:9 |
| **reading** 4:9 55:10 65:20 **real** 85:15 136:1 **realize** 67:17 119:10 119:13,16,23 120:19 122:1,8 | **redact** 23:18,21 **redacted** 22:13 23:14,22 24:11 **refer** 54:8 108:13 152:13 160:2 **reference** 29:9 | 24:25 55:4 63:12 63:14 99:2 104:18 104:20 110:9 118:15,16 146:20 146:22,23 148:10 149:24 150:3,3 | 67:23 68:1 69:10 75:6 83:21 91:4 125:14,15,18 166:11 **represents** 79:16 106:22 | 9:22 11:4 12:12 12:16 13:7,18 14:13,22,24 15:13 15:14 16:6,23 17:23 18:22 20:1 20:9,19 21:8,12 |
| **realized** 119:14 **really** 12:5 27:24 28:12,15 49:1 53:18 82:10 87:7 90:6 93:20 127:9 130:24 133:20 139:4 147:4 161:4 161:7 191:3 | 160:24 **referencing** 163:15 **referred** 53:24 130:13 **referring** 13:9 14:14 30:18 34:12 39:23 40:5 54:4 55:1 62:13 66:16 67:5,7 82:12 | 186:17 189:1,24 189:25 **remembering** 128:19 **remove** 96:3 120:16 130:9 170:23 **repeat** 145:12 **rephrase** 31:15 137:20 | **request** 16:3 24:3 28:19 33:1 99:25 100:7,11,12,15 105:1 141:8 150:12 167:23,24 167:25 168:9,13 **requested** 22:16 125:5 | 21:24 22:3,13,18 24:1,6,15 26:9 29:14 30:14 31:9 32:14,17 34:21 35:10,16 36:8 37:5,17 38:8,17 38:20 39:18 40:23 41:16,21 42:5,7,7 |
| **reason** 62:23 93:20 152:6 172:1 **reasons** 25:25 **Rebekka** 148:17 149:1,9 150:9 **Rebekka's** 149:11 | 106:8 109:7,15,23 115:19,21 134:2,3 144:1,19 169:12 172:22 **refers** 14:18 168:17 194:5 | **replied** 127:20 150:15 **reply** 3:6 59:21,21 **report** 177:21 186:12,14,21,22 187:4,12,14,15,17 | **requesting** 100:23 119:21 **requests** 13:1 **required** 199:13 **requirement** 11:10 **requirements** 11:7 | 42:12,15,18 43:1 43:1,6,12,14,17 43:20 44:4,9,16 46:12 48:3 50:13 55:14 56:2,12,15 |
| **recall** 24:8,10 28:15 32:2,9 35:5,6,23 37:14 39:18 44:21 46:5,8,10,23,25 47:1,5 58:17 63:19,20 69:14 76:19,21 94:12 98:11 104:9 136:19 150:2 160:17 162:7 171:25 194:13 | **reflected** 158:19 **refresh** 55:1 109:9 **refreshing** 40:19 **refuse** 110:21 **refusing** 111:3 145:3 146:10 **regarding** 19:2 22:10 23:15 30:3 31:21 37:7 40:15 49:15 189:23 | 188:7 189:4,8 190:7 191:5,6,17 192:12 194:16 **reported** 1:23 41:10 199:8 **reporter** 1:24 12:20 61:1 125:24 145:14 199:20 **reporting** 65:8 66:5 103:6 199:9 | **requires** 159:18 **research** 133:25 134:1 151:11 **researching** 134:11 **reserved** 4:13 **resolve** 81:1 95:5 **resolved** 91:1 95:2 **respond** 65:24 **responding** 147:17 147:19 157:4 | 57:17 58:8 60:2 60:12,16,23 62:5 62:11,20,23 63:3 63:3,5,8,12,18 64:19 66:5 68:18 68:22 69:10 71:17 72:10 73:13,17,24 74:11,20,25 76:8 79:17 80:22 82:3 82:11,18 83:21 |
| **receipt** 44:7,11 **receive** 52:2 65:1 66:25 142:22 156:16 | **registered** 57:8 **regular** 79:13 **regularly** 37:20 79:3 168:8 171:16 | **reports** 66:7,12 **repot** 3:11 **represent** 50:3,9,10 51:10 53:2,22 | **response** 32:11 68:11 **responsible** 135:2 184:21,22 | 85:18,18,23 86:6 86:11 88:12,21 89:1,2,15 90:2 92:2,4 94:8 95:11 |
| **received** 38:8 43:22 56:5 57:15,24 58:4 63:17 66:19 95:18 118:18,23 118:25 119:6 120:11 121:6 144:10 156:15 169:13 175:13,14 175:18 | **relate** 170:24 193:1 193:8 **related** 11:14 15:3 18:4 22:6 23:23 29:11 38:15 52:11 58:19 59:15 71:10 138:9,13 153:24 170:20 185:4 199:15 | 57:13 68:15,25 69:2,16,19,22 72:10 73:9,12,16 73:18 74:22 78:19 79:4 80:14 91:25 95:7 96:8 99:14 127:13,22 174:9 174:14,19 175:5 177:24 | **responsive** 24:3 32:25 **responsiveness** 4:12 **result** 18:9 **resulted** 52:12 **resume** 197:13 **retain** 26:14 **retained** 26:15 **retainer** 72:21 **retired** 57:8 | 95:19,23 96:19,20 96:23 97:14,21 98:1,3,14,21 99:4 99:5,9 100:7 101:14 102:6 104:5,21 105:13 105:15,18 106:5,9 106:14,18,20,24 107:1,3,11,16 |
| **receiving** 100:5 **recognize** 63:9 148:4 **recollection** 20:8 35:4 40:20 45:18 55:2 109:9 122:18 160:20 **record** 10:3 85:8 | **relates** 96:9 164:4 165:5 193:7 **relation** 90:9 131:18 **relationship** 72:16 93:22 103:5,24 178:5 **relationships** 157:24 158:12 | **representation** 43:10 75:3 78:13 78:16,18 80:21 191:13 **representations** 188:9 **represented** 22:8 50:15 51:23 68:16 | **revealing** 67:15 **reversed** 164:17 165:16 **review** 8:23,24,25 9:1,7,10,13,19 11:1 12:24 13:7 13:12 44:3 **reviewed** 8:22 9:18 | 109:17,22 113:8 113:18 114:9,20 115:8,13 117:11 117:20,22 120:5,7 120:20 121:19 124:24 125:20 126:23 127:8 128:6,12,19,25 129:25 130:20,23 130:24 131:1,4,25 |

133:15,21,22
134:1,22,24 135:3
135:21 140:5
143:3,4,13 144:7
144:13 148:16
149:19 151:4,22
152:2,13,14 154:9
155:6,14 156:22
156:23,25 157:7
157:19,22,25
158:13,21 160:1,5
160:7,12,13,14
161:2,4,5,21
162:16,20,23
164:2 165:4,20
166:1 168:5,16
169:13,17 170:10
170:17 171:17
172:7,20,24 174:8
174:24 175:15
178:14 180:15
182:10,19 183:9
183:14 184:1,3,4
184:12,14 185:1,1
186:10,20,25
187:2,5,18,21
188:1 189:1,6,8
189:22,24 190:4
191:3,12 192:17
194:4,5 195:7
196:3,7
**Ripoll** 124:16,19,19
124:20 125:10
126:21 127:14,18
127:20 128:12
130:16 161:1
**Ripoll's** 127:5
**Rob** 173:23 177:18
**Robertson** 140:2,18
140:23
**Rodriguez** 2:17
140:9 141:17
147:2
**role** 126:16 186:2,5
**romance** 157:23
**Roof** 81:5
**Roofing** 90:10 91:2
**roughly** 72:12
**row** 10:24
**rule** 1:13 8:3,8 43:3
98:5 138:18
177:14
**rules** 43:3,11 86:11
178:1,4 199:13,15
**run** 93:7

**— S —**

**S** 2:1 4:1
**sale** 25:4
**sanctions** 164:17
165:16
**Sanctuary** 5:1
**sat** 132:20
**save** 154:6
**saw** 8:7 75:17 88:15
105:10 194:15
**saying** 9:17 47:17
47:19 63:1 91:13
107:18 117:5
121:23 122:3
126:17 129:19
138:13 139:6
142:25 144:12
150:1,6,14 153:11
171:5 180:2
192:24
**says** 9:5 43:2,8 44:6
58:7,9 64:19 86:7
98:21 99:1 111:18
137:6 147:19
152:23 176:5,6
186:17 187:17,24
189:4,6,7 190:7
193:10 194:17
**scare** 36:25 37:2
**schedule** 189:14
**scheduled** 128:18
**Schmidt** 1:24 4:21
199:4,19
**school** 14:3
**scope** 177:7
**screen** 24:21 25:1
25:12,13,17,19
62:17 116:3 170:6
**scripts** 148:20
**sealing** 4:9
**search** 28:17 32:10
37:15 52:11 53:1
136:22,23 155:19
156:9 157:3
**searched** 122:10
136:25
**second** 43:17 59:15
71:22 114:8
115:16 128:21
146:15 178:25
184:24 193:7
**secretary** 115:10
149:12
**see** 8:17 9:5,6 29:17
43:4,5,7,13,16,21
43:24,25 60:8,9
60:10,12,14,17
64:21 65:2,5,12

65:18 66:8,15
88:8 105:9,13
109:8 114:10
115:4 116:2,4,5
121:24 151:10
156:21 159:5
166:13 171:4
172:8 173:1 177:2
177:4 182:24
183:19 188:18
190:1
**seeing** 129:7,19
160:24
**seek** 128:2
**seeking** 19:19 22:10
95:14 103:15
170:10
**seen** 10:19,20 63:7
149:8 196:15,19
**selling** 159:25 160:6
**send** 47:11 76:4,9
100:8,12,20 103:1
104:10 105:2
107:1,5 115:3
138:22 142:1,18
143:5 149:19
150:19,23 151:18
171:18 190:3
**sending** 112:9 166:3
167:14
**sends** 42:5
**sent** 24:4 25:1 35:23
42:7 45:21 47:10
47:21 48:1,8 59:2
59:22 76:3 80:24
122:21 148:22
151:6 152:8,21,25
171:16
**sentence** 43:9 44:1
193:10,23
**sentences** 65:10
**separate** 20:5,7
59:16,19
**served** 120:16
**server** 49:6 154:11
154:12 158:24,25
**servers** 154:18
**service** 118:7
154:14 155:2
166:20
**services** 52:12,23
73:4 87:25
**sessions** 105:11
**set** 116:19 127:1
199:7
**setting** 119:12 122:1
122:5,9

**settle** 94:20,22,23
94:23,25
**settlement** 126:14
188:17 190:9,14
191:2,10 192:6
194:18 195:18
**sexual** 158:12
**shape** 59:12
**share** 46:21 104:7
142:9 189:23
**shared** 23:6 48:6
104:4
**sharing** 103:6,16
147:24
**Shelton** 2:14
**shock** 56:12,13
**short** 35:5 37:21
93:15 153:19
**Short-term** 146:23
**shortly** 136:6
**shot** 25:19 62:17
170:6
**shots** 25:2,12,14,17
116:3
**shotted** 24:21
**show** 62:13 143:16
146:22 162:12
172:4 180:1
**showed** 147:22
**showing** 24:24
65:20
**shows** 117:8
**side** 195:16
**sign** 53:1 65:5
176:24 179:5
**signed** 29:1 76:17
77:2,4,11 79:24
128:5 176:21
178:25
**significant** 101:6,13
134:1,5
**signing** 4:9
**similar** 8:24 45:5,22
59:19 129:7
**simple** 13:1 91:10
195:17
**single** 49:13 81:22
144:24
**sir** 8:9
**sit** 11:13,17 45:18
89:11 179:8 180:3
181:13
**sitting** 89:17 92:3
**six** 120:12
**sleeping** 158:15
**slide** 148:5,7,14,15
**slides** 148:3,11,14

**Small** 183:14
**smiley** 115:3
**Snowden** 60:18
**solely** 184:21
**solicit** 43:9
**Solutions** 127:24,25
**somebody** 53:8,21
79:24 86:7 89:7
91:20 92:6 122:21
134:10 135:18
179:10 190:25
**somebody's** 123:2
**son** 72:1,3,4
**Sonnier** 89:13,25
91:22
**Sonnier's** 91:18
**soon** 133:21
**sorry** 12:8 16:19
34:11 39:12
114:24 167:11
172:14
**sort** 23:3 129:19
**sound** 65:7
**sounds** 65:9
**source** 5:15 6:18
**sources** 6:21,22
**Southern** 1:3 180:6
181:17
**speak** 5:18 15:10
36:17,21,22 42:21
94:8 110:19
114:15 194:4
**speaks** 110:18
**special** 186:14
**specific** 9:19 10:1
10:20,25 64:24
85:15 100:23
134:4 143:21
144:2,3 146:5
160:14 165:15
**specifically** 24:8
63:15 93:18
146:12 171:8
**speculate** 45:7,10
**Spell** 77:16
**spend** 108:4
**spent** 101:5,6 134:4
134:5,9,19 163:1
197:19
**spoke** 15:13 16:9
19:14 35:8 75:9
75:11
**spoken** 75:12
136:11,14
**stand** 152:6
**standing** 167:24
168:7

Matthew Monson
February 26, 2026

standpoint 167:4
stare 92:13
staring 36:23
start 21:12 67:9
    87:5 135:24 136:4
started 127:11
starting 67:17 72:12
starts 43:18
state 4:21 29:6
    38:22,23 71:12
    78:8 135:10,11,23
    163:3 166:20,25
    186:11,25 187:3
    188:21 189:3
    191:14,22 192:11
    194:11,16 199:4
    199:20
stated 17:17 128:1
statement 29:5
    65:13 88:21 92:6
    158:18 165:19,22
    181:8,9
states 1:2 44:3
status 113:24
    125:22 126:15
    128:15,18,19
    179:14,16 180:9
statute 128:10
    199:13
Stay 59:13
stealing 90:13 91:11
    91:13,15,16 92:8
    92:24 93:9 188:16
    190:8,13 191:1,9
    194:8,18
stenotype 199:9
steps 65:3 119:8
    120:21,24 121:1
    121:20
Sternberg 1:15 2:8
Steve 106:9
Steven 124:16
    125:10
sticker 39:23 172:6
stipulate 93:18
stipulated 4:3
stipulation 141:21
stole 86:7 90:6
    188:25 192:6
    195:18
stop 36:18 68:6
    92:11,12 145:20
    146:15 181:6
strategy 150:24
Strebek 31:6 34:21
    34:22,24 35:8,14
    35:17,18,21 37:7

37:12
Strebek's 31:9
Street 1:16 2:9
strictly 103:14
stuff 112:24,25
    113:19 129:20
    139:18 158:17
    160:5
subject 98:20,25
    99:20 101:12
    172:1,8,19,21
submitted 35:15
    127:23
subpoena 3:3 8:2,7
    8:17
Subsequent 186:21
successes 106:24
successful 147:2
    164:21
suddenly 119:16
sue 173:22 175:9,21
    175:23,24 177:4
sued 173:11 175:19
suggested 97:23
suing 176:6
suit 127:20 128:11
    128:21
Suite 1:16 2:9 5:2
supervision 199:10
supervisor 41:7
supposedly 129:5
Supreme 135:8,12
    135:13 163:4
sure 10:23 28:18
    41:9 51:3 54:7
    63:8 84:2,6 86:2
    104:25 119:8
    121:4,7,16 138:15
    138:16 154:25
    165:14 170:7
surprise 53:18
    56:14
surprised 26:17
    58:7 67:3,3
suspend 197:12
SUZANNE 2:9
Suzy 2:9 128:16
    146:7 172:14
    183:24 196:14
suzy@snw.law 2:10
sweeter 12:9
sworn 5:4 15:23
    17:15 18:2 29:12
    90:12 111:23
    143:4 181:14,19
    181:23 182:16
    199:6

system 153:25

_____T_____

T 2:4 3:1 4:1,1
    199:2,2
table 55:25
take 7:5 8:16 25:15
    45:16 61:22 88:8
    93:14,21 113:1
    119:8 120:21,24
    121:1,19 127:8
    134:21,22,25
    135:4,18 147:10
    197:1,2
taken 1:14 4:5 63:2
    86:25 93:15 197:7
    197:9 199:5
talk 15:8 30:14 42:2
    46:3 51:3 82:24
    84:13 87:6 94:22
    94:23 107:25
    133:20 135:22
    144:3 147:15
    152:7 158:5,6,10
    160:21
talked 18:25 24:9
    75:19 77:7 91:18
    115:24 131:2
    141:2 151:19
    157:23,23 158:14
    158:14 160:12
    161:1 171:20,23
    187:12 192:2
talking 8:6 9:12
    12:1 14:24 24:1
    25:12,13 46:14
    52:22 76:13 85:11
    85:13,14 86:10
    106:10 108:17,20
    121:10 126:16
    129:10 130:19
    137:10 142:10
    146:1,12 149:24
    150:4 152:25
    153:17,18 163:14
    167:1 183:2
    197:20
Tampa 7:16
tangentially 130:21
tech 117:15 120:8
    120:10
technical 25:25
techy 117:17,18,23
    118:3
telephone 16:10
tell 5:4 19:17 20:4
    20:16 22:13 29:7

41:23 42:22 47:8
    52:25 74:24 78:25
    86:16 90:11,23
    92:22 100:14
    110:6,21 111:25
    113:15 115:16
    126:23 128:25
    129:16 139:2,15
    139:18 141:5,9,15
    141:18,20 142:2
    143:7 159:20
    163:10 168:2
    170:15,19 181:13
    190:6,12,19 191:8
    192:4,7,10 194:10
    196:13
telling 9:7,9 55:24
    64:16 66:3 109:5
    133:19 143:7
    147:16 150:4
    153:15 182:10
tenth 184:14
term 52:20 87:10
    197:22
terms 77:10 89:5
    106:21 121:6
    131:19
testified 5:6 48:13
    86:23
testify 13:13 199:6
testimony 10:15
    15:23,25 17:16
    18:2 24:13,14
    27:7,16,17 29:12
    32:17,22 33:19
    45:16 66:9 90:12
    91:19 111:23
    120:17,18 143:5
    150:5,12 168:14
    181:14,19,23
    182:16 185:2
    188:24 189:1
    199:5,8
testing 180:25
Texas 1:3 2:5 7:14
    7:19 13:21 14:1
    180:7 181:17
text 3:7,13 16:13
    17:1 21:13,17,22
    21:23 24:11,23
    26:18 34:19 43:23
    44:1,7,12 49:17
    52:3 53:17 56:4
    57:15 58:5 59:2
    59:10 63:11,17
    64:21 65:12,16,18
    66:8,17,19,23,25

106:8 109:3,16
    114:16 119:3,20
    122:3,11 123:20
    123:21 124:1,5
    131:7 132:2,14,25
    133:4 140:10
    142:16 163:2
    175:13,19 179:23
    191:19
texted 44:9,14
    131:20,23 140:20
texts 21:18 166:4
    185:5,21
Thank 40:4,19
    93:12 99:9
thanks 147:11
thing 26:13 28:23
    97:16 112:1
    116:21,23 117:9
    119:2 121:18
    124:12 128:13
    139:25 164:6
things 13:4 15:17
    22:16,18,25 23:2
    23:4 24:23,24
    26:12,14,15 35:6
    35:8 76:3 82:22
    85:11 101:2
    106:25 115:25
    117:2,20 120:6
    121:9,20 143:17
    143:18,22 146:1
    147:20 151:11
    155:13 159:9
    170:19,23 177:13
    189:5
think 17:17 26:11
    34:9 45:1,1 51:18
    54:23 63:1 78:2,6
    79:24 80:6,8
    100:17 101:18
    117:4 129:22
    132:12 134:17
    137:9 139:8 140:6
    144:5 147:20
    148:6,8,12 149:23
    159:12 161:18,18
    163:17 164:24
    169:24 175:6,17
    176:18,25 178:1
    180:5 183:4,12
    185:25 190:11
    197:21
thinking 51:14
    92:16 150:13
Third 133:18
thought 15:17 23:4

**Matthew Monson**
**February 26, 2026**

100:25 132:2
**thousand** 167:2
**thousands** 166:17
**three** 10:24 46:13
  48:10 51:16,18
  65:3 144:6 162:16
**Thursday** 1:14 5:3
**time** 4:13 20:11,16
  21:12 28:14 37:21
  37:22 43:19 50:10
  50:10 58:19 59:25
  60:1,4 70:6 75:9
  81:10 84:15 85:2
  85:6 92:16 100:19
  101:5,6 106:23
  108:4 113:14,21
  116:19 118:25
  119:10 120:15
  127:10 131:18
  134:9,19 137:11
  163:1 182:18
  183:1 197:24
  198:2
**timely** 144:7
**times** 16:18 59:8
  61:10,13 104:23
**title** 31:4,11
**today** 9:8,22 10:16
  11:2,13,17 12:16
  13:8 45:19 49:19
  64:10,14 105:16
  141:6 179:8 180:3
  181:14 198:1
**today's** 52:8 115:16
**told** 15:16 58:14
  67:22 111:7,9
  113:16,25 116:18
  124:14 130:3,5
  138:10 150:8
  165:15 171:6,11
  190:15,16 192:5
  194:17
**top** 9:4 23:25 40:11
  60:9 154:2
**topic** 109:15
**topics** 13:8,9,12,14
  18:23 23:24
**traditional** 158:24
**transcribed** 199:9
**transcript** 199:10
  199:12,12
**transcripts** 149:16
  150:15
**transfer** 88:15
**treating** 36:19
**trial** 4:14 83:16,17
  83:17,18 84:3,4

84:15 85:3,21,24
  181:10,12
**trials** 83:6 84:11
**trick** 47:17
**tried** 84:16
**true** 15:1 16:2 56:3
  108:8 158:18
  180:18 182:7
  199:10
**truly** 28:15,23
**Trust** 70:13
**truth** 5:4,5,6 196:13
**try** 12:8 93:21
  114:15 117:21
  148:13
**trying** 12:20 47:15
  47:16 65:24 78:17
  84:2 98:11 107:18
  107:19,19 155:10
  164:14 185:24
**Tulane** 14:4
**turn** 118:10,17
  141:24
**turned** 118:14
**turning** 115:11
  118:15
**TV** 114:7
**twice** 16:19 105:11
**two** 49:22 65:16
  84:20 95:19
  139:21,22 142:11
  148:20 149:14
  150:13 161:24
  162:20
**Ty** 149:16
**type** 117:8 129:8
**typed** 110:7,9

_____
**U**
**U** 4:1
**uh-huh** 28:2 88:22
  92:5 94:11 107:12
  142:17 189:9
**ultimately** 140:1
**unavailable** 143:23
**unaware** 32:24 82:6
**unblock** 133:12
**unblocked** 133:10
**uncomfortable** 12:6
**understand** 7:24
  12:4 14:16 17:21
  17:22 30:17 35:19
  35:22 36:7 46:9
  52:23 54:10 58:11
  81:24 82:1 83:18
  84:3,6 85:10 86:3
  86:4,13 87:9,14

92:9 121:3 156:2
  156:11 167:3
  188:8
**understanding** 84:7
  92:23 168:25
  199:11
**unfamiliar** 11:9
  19:12 80:7 113:5
**uninterested** 9:23
**UNITED** 1:2
**unprofessional**
  92:12
**unsolicited** 15:21
  43:23 44:1 63:17
  174:16 175:15
  177:24
**uploaded** 154:5
**urgency** 140:22
**use** 27:25 28:8,10
  29:7,10 112:23
  153:6 154:14
**useful** 100:18
**users** 64:25

_____
**V**
**vacation** 103:2,16
  104:4 147:24
**vast** 50:6,6,6
**Veith** 148:17 149:25
**Velawcity** 53:15,23
  161:5,8 172:24
  173:12 175:19
  176:4
**video** 62:17 127:24
  153:16 156:20
  157:12
**violation** 43:11
**voluntarily** 99:24
  100:24 151:11

_____
**W**
**Wabeke** 2:15
**wait** 12:2 68:6,6
  129:19 163:17
**waived** 4:10
**WALKER** 2:4
**want** 12:23 17:12
  17:18 18:9,12,15
  18:18 68:9 69:3
  84:5 86:13 90:4
  93:17 94:6,22
  111:17,20 112:8
  113:2 131:9
  142:21 143:4
  146:19,25 150:11
  157:13,18 158:9
  159:8,23 163:24

174:19 175:4
  177:4 181:3 185:2
**wanted** 17:8 73:7
  132:10 164:20
  174:3 187:8
**warned** 106:14,17
  109:17
**wasn't** 25:5 69:9
  73:12 128:1,7
  148:14 157:11
  165:17 175:2
**water** 148:3,5,7,11
  148:13,14,15
**way** 20:17 21:21
  49:9 52:21 53:1
  59:12 87:6 99:8
  107:25 157:9
  166:13 171:10
  181:7
**we'll** 29:22 51:3
  106:16 108:4
  113:18 115:2
  127:2 143:3,16
  162:12 182:23
  184:23
**we're** 9:21 10:16
  18:22,23 25:12,13
  29:15 54:11 84:6
  129:19 133:15,16
  176:6 178:15
  181:12 182:22
  197:21,23
**we've** 136:11 163:1
  165:17 197:9,11
  197:19
**web** 64:23
**website** 52:2,22
  54:3,6,8,11,12,13
  159:3 169:10,16
  184:22,24
**websites** 53:23,25
**week** 24:6,12 134:6
  134:7,13
**weeks** 42:6 44:18
  48:10 122:6
  136:13,17,24
  137:1
**went** 64:22 66:21
  88:17 119:2,18
  133:14 174:24
  178:11,18
**weren't** 67:3,4
  95:13 119:9
  173:15
**Western** 135:15
**White** 1:15 2:8
**wife** 53:11,13 56:5,8

56:24 57:1,15
  58:13 60:2,22
  63:11,16 97:17
  99:13 158:3 166:7
  172:23 173:11,22
  174:14,19 175:2,5
  175:11 176:16
  177:17 178:7
  179:6,9 180:13,23
  181:20 182:11
  185:13
**wife's** 54:14,15 57:3
  59:16 98:17
  169:22 171:20,24
  177:11 180:4
  181:15
**Willie** 149:16
**willingly** 23:12
**withheld** 137:14
**withhold** 137:18
**witness** 4:23 32:23
  33:15 38:4 55:23
  90:17,24 96:7
  99:19 101:11
  102:9,21 103:10
  103:19 108:12
  112:22 133:22
  137:8,17 145:6
  149:13 151:15
  152:10 166:24
  167:19 168:12
  171:3 173:18
  185:9 193:5 195:4
  195:23 196:10,15
  197:16 198:4
**witnessed** 88:6
**witnesses** 115:8,12
**Wonderful** 171:16
**word** 47:6 87:9
  94:23
**words** 42:22,24
  43:15 109:18
  110:3,9,10,15,15
**work** 7:8,18 41:2
  49:19,24 50:1
  57:11 70:24 71:20
  72:25 73:7,11
  86:15 106:21
  163:18 198:2
**worked** 6:12 41:3,4
  41:5 45:2 50:20
  80:11 97:12,17
  158:13 163:13
**working** 41:16
  57:12 71:5 85:17
  105:18 112:11
  160:7 161:18

**Matthew Monson**
**February 26, 2026**

workings 161:16
works 45:21 159:14
  197:24
world 182:18
wouldn't 48:1 53:19
  132:5,6 134:7
  179:24
write 182:13
writing 33:10 34:23
  35:20 37:6 75:23
  76:2 105:3 136:8
  136:17 137:21
  138:4,5
written 32:7 33:3
  40:8 146:18
wrong 15:17 128:17
  138:16,17 175:17
  184:2 191:15
wrongfully 96:1
wrote 62:5 83:2
  110:15 111:13,16
  111:24 127:25
  145:15
WWL 61:1

—————————
        X
—————————
X 3:1,1

—————————
        Y
—————————
y'all 42:2 178:14
yeah 12:5 21:7,18
  23:8,10 25:5
  27:15 32:4 33:14
  50:22 71:14 79:10
  83:17 85:13 94:7
  99:7 106:19 107:9
  107:15,15 108:13
  113:15 120:8
  131:9 133:23
  139:23 143:22
  148:13 149:14
  151:7,16 152:3
  154:20 158:1,19
  164:14 165:7,25
  168:6 172:6,10,10
  172:21 174:20
  176:9,15,23 180:2
  183:10 186:21
  188:19 190:2
  191:20,24 192:3
year 49:22 79:23
  80:3 84:18 136:9
  136:10 150:24
  168:5
years 29:2,2,2 49:22
  84:20,22,24 85:1
  85:16,25 93:5,6

154:18

—————————
        Z
—————————
Zach 2:14 93:17
  149:17
Zach's 150:5
zero 35:2 176:1,3
ZOOM 2:13

—————————
        0
—————————
005309 59:9
024055 115:3
024056 115:15
024057 117:6

—————————
        1
—————————
1 3:3 8:14,16,22
  13:15 51:1,3
  73:11 130:12
1.5 129:23
10 3:12 59:8 61:13
  83:13 84:24 85:1
  85:15 101:24
  190:1
100 65:15 66:4
  175:16
101 5:2
11 1:8 3:13 90:8,11
  90:13,25
115 3:7
1266 9:5
1434 199:15
1443 4:15
14th 60:13,14
15 167:2
15th 21:9 137:3,7
  137:10,22 138:1,4
  140:3
16 7:10 167:2
16th 20:20 21:5
  24:9 115:4
173 3:8
17th 56:6 57:16
  58:5,13 142:12
18 127:4
1800 1:16 2:9
185 3:9
19 127:3,4
191 3:12
198 199:7
1997 13:25 14:6
  83:3,4
19th 136:8 144:7
1st 37:13 142:14
  147:7 174:5

—————————
        2
—————————

2 3:4 40:1,3,7 42:12
  43:18 44:6 197:6
2.0 129:23 130:22
20 83:15 84:10 93:4
  102:1 127:4
2004 1:13 7:25 8:3,8
  8:10,18,21 9:3,25
  10:17,21 11:1,7
  11:14 12:25 13:14
  28:19 32:12
  119:22 120:16
  122:7 138:10,19
  140:10 154:24
  170:10 177:8
  196:21 197:12
2006 14:2
2011 6:8,13,16
  85:18,20
2021 29:4 51:11,23
2022 28:8 37:13
  39:12,22 40:8
  41:17 47:23 49:3
  50:14 51:1 56:6
  57:10,13,16 58:5
  60:13,15 67:12,14
  69:4,5,6,16,17
  70:7,14,17,18
  72:13 73:22 80:12
  127:10 168:19
2023 20:12,20 21:5
  24:10 115:4,20
  124:10,23 134:6
  136:4 142:1,14
  147:8 168:3,20
2024 184:6,7
2026 1:14 5:3 39:10
  39:11
20th 115:7
22 59:17
22nd 152:2
23 130:15 133:8
24-31596 1:7
24057 116:2 133:19
24060 141:24
24065 147:7
24066 148:2
24067 150:22
24069 152:13
24071 157:16
24075 160:3
24079 160:25
25 93:5,6
26 1:14 5:3
29th 142:1,16

—————————
        3
—————————
3 3:5 42:4,12 128:5

128:16,17
30 26:15,16 104:23
  116:20 122:4,11
30th 147:17
37:2554 199:6
3rd 40:8

—————————
        4
—————————
4 3:6 60:1,5,6,7
  150:24
4:31 1:18
41 3:4
43 3:5
4307032100 57:20
45 197:6
4815 2:5

—————————
        5
—————————
5 3:7 5:1 114:16
  142:1 148:3 176:7
50 102:3

—————————
        6
—————————
6 3:8 172:7,17
61 3:6

—————————
        7
—————————
7 3:9 183:24
7:01 57:16
70112 2:10
7700 147:10,22
77092 2:5

—————————
        8
—————————
8 3:10
8.3 43:3 98:5
8/26/22 3:5
8/3/22 3:4

—————————
        9
—————————
9 3:3,11
9:29 1:17
935 1:15 2:9
98 183:8,10,11
  184:9,10
9857890259 58:3
99 71:25 73:10,19
99.9 51:2
9th 184:6,7