IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re:<br><br>MMA LAW FIRM, PLLC,<br><br>*Debtor.* | Case No. 24-31596<br><br>Chapter 11 |
| MMA LAW FIRM, PLLC,<br><br>*Plaintiff*,<br><br>v.<br><br>MATTHEW MONSON, THE MONSON LAW FIRM, LLC, KATHERINE MONSON, AND ALLIED TRUST INSURANCE COMPANY,<br><br>*Defendants*. | Adv. Proc. No. 26-03107 |

**MATTHEW MONSON AND THE MONSON LAW FIRM, LLC'S MOTION TO DISMISS PURSUANT TO RULE 12(B)(6)**

**THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THIS MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THIS MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THIS MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THIS MOTION AT THE HEARING.**

**REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

## TABLE OF CONTENTS

Page


TABLE OF AUTHORITIES .......... iv

I. INTRODUCTION .......... 1

II. STANDARD OF REVIEW .......... 2

A. Standard for Rule 12(b)(6) Motion to Dismiss. .......... 2

B. Standard for Pleading RICO Claims under Rule 9(b). .......... 3

III. CAUSE OF ACTION NO. 1: VIOLATION OF RICO .......... 5

A. The SAC Fails to Plead the Necessary Predicate Acts. .......... 5

1. The Allegations of Mail and Wire Fraud are Insufficient. .......... 6

2. The Allegations of the Bar Complaints, the LDI Complaint, the Police Report, the Online Statements, the Disciplinary Transmissions, and the LinkedIn Post Do Not Constitute Fraud. .......... 7

3. Defamation is Not a Predicate Act. .......... 9

4. The Predicate Acts Fail for Want of Proximate Damages. .......... 10

5. The Allegations of Obstruction of Justice are Insufficient. .......... 11

6. The SAC Fails to Plead Facts to Establish an Enterprise. .......... 12

B. The SAC Attempts to Plead an Association-in-Fact Enterprise but Fails to Plead the Necessary Elements .......... 13

1. The SAC Fails to Plead the Existence of an Enterprise Separate and Apart from the Pattern of Racketeering Activity. .......... 13

2. The SAC Fails to Plead the Existence of an Ongoing Organization. .......... 15

3. The SAC Fails to Plead an Enterprise whose Members Function Through a Decision-Making Structure. .......... 15

4. The SAC Does Not Meet RICO's Continuity Requirement. .......... 15

C. The Predicate Acts Do Not Span an Adequate Length of Time to Meet The Requirements for Closed Continuity. .......... 16

D. The Predicate Acts Do Not Pose a Future Threat Such That They Meet Open-Ended Continuity. .......... 17

IV. CAUSE OF ACTION NO. 2: RICO CONSPIRACY .......... 19

V. CAUSE OF ACTION NO. 3: TORTIOUS INTERFERENCE & CAUSE OF ACTION NO. 4: TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS .......... 20

A. The SAC Fails to Allege Claims for Tortious Interference (Cause Of

Action No. 3) or Tortious Interference With Prospective Business Relationships (Cause Of Action No. 4) Against Monson or TMLF. .................... 20

1. MMA's Tortious Interference Claims Are Time-Barred ......................... 21

a. The Tortious Interference with Contract Claim (Cause of Action No. 3) Is Time-Barred. .................................... 21

b. The Tortious Interference with Prospective Business Relationship Claim (Cause of Action No. 4) is Also Time-Barred. ..................................................................... 23

B. Causes of Action Nos. 3 and 4 Fail on Their Merits. .......................................... 23

1. The Litigation Privilege Confers Absolute Immunity on Monson's Litigation Conduct. ......................................................... 23

2. MMA Fails to Allege a Valid Tortious Interference Claim for Either Cause of Action Nos. 3 or 4 Against Monson or TMLF. ............................................................................................. 25

C. MMA Fails to State a Claim for Business Disparagement Cause of Action No. 5. .......................................................................................... 28

1. Business Disparagement is not a Continuing Tort as to any Internet posting. ........................................................................... 31

2. MMA has No Standing to Bring Claim on Behalf of William Huye. ............................................................................................. 31

D. MMA Fails to State a Claim for Its Cause Of Action No. 6 - Defamation and/or Defamation Per Se – All Such Claims are Time Barred. ............................................................................................... 32

1. MMA's Allegations of Defamation and Defamation Per Se. .................. 32

2. Texas Recognizes the Single Publication Rule: Defamation is Not a Continuing Tort. ............................................................. 34

E. Cause Of Action No. 7 –MMA's § 1983 Claim Fails Because it Does Not Allege the Deprivation of a Constitutionally Protected Property Right / Interest. ............................................................................................ 35

1. MMA Does Not have a Constitutionally Protected Property Interest in "Its Contingency Fee Interest." ............................................. 37

3. MMA Does Not have a Constitutionally Protected Property Interest in Its "Right To Operate A Louisiana Law Practice." ........................................................................................................ 38

4. The LDI Does not have the Authority to Regulate the Practice of Law in Louisiana and Cannot Deprive MMA of any Alleged Property Right to Operate a Louisiana Law Practice. ........................................................................................... 39

5. Independently, MMA Pleads no Actual Deprivation of any Property Interest. ........................................................................ 40

VI. CONCLUSION ........................................................................................................ 41
CERTIFICATE OF SERVICE ........................................................................................ 42

# # #

# TABLE OF AUTHORITIES

Page

## Cases

*Abraham v. Singh*, 480 F.3d 351 (5th Cir. 2007) ........ 22

*Allstate Ins. Co. v. Plambeck*, 802 F.3d 665 (5th Cir. 2015) ........ 15

*Amigo Broad., LP v. Spanish Broad. Sys., Inc.*, 521 F.3d 472 (5th Cir. 2008) ........ 30

*Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006) ........ 12

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........ 2, 3

*Atkinson v. Anadarko Bank and Trust Co.*, 808 F.2d 438 (5th Cir. 1987) ........ 16

*Augustson* ........ 42

*Augustson v. Linea Aerea Nacional-Chile S.A.*, 76 F.3d 658 (5th Cir. 1996) ........ 41

*Barnhill v. Johnson*, 503 U.S. 393 (1992) ........ 41, 42

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ........ 2, 3

*Blackburn v. City of Marshall*, 42 F.3d 925 (5th Cir. 1995) ........ 41

*Bonner v. Henderson,* 147 F.3d 457 (5th Cir. 1998) ........ 15

*Bonton v. Archer Chrysler Plymouth, Inc.*, 889 F.Supp. 995 (S.D. Tex. 1995) ........ 4

*Bryan v. City of Madison*, 213 F.3d 267 (5th Cir. 2000) ........ 42

*Calcasieu Marine Nat'l Bank v. Grant*, 943 F.2d 1453 (5th Cir. 1991) ........ 15, 19

*Calk v. Highland Const. & Mfg.*, 376 So. 2d 4959 (La. 1979) ........ 10

*Cantey Hanger, LLP v. Byrd*, 467 S.W.3d 477 (Tex. 2015) ........ 27

*Carpenter v. U.S.*, 484 U.S. 19 (1987) ........ 8

*Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219 (5th Cir. 2010) ........ 23

*Cicalese v. Univ. of Tex. Med. Branch*, 924 F.3d 762 (5th Cir. 2019) ........ 2

*Ciminelli v. U.S.*, 598 U.S. 30 (2023) ........ 8, 9

*Cinel v. Connick*, 15 F.3d 1338 (5th Cir. 1994) ........ 41

*Clemens v. McNamee*, 638 F.Supp.2d 742 (S.D. Tex. 2009) ........ 26

*Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909 (Tex. 2013) ........ 32

*Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666 (1999) ........ 44

*Conn. Bd. of Pardons v. Dumschat*, 452 U.S. 458 (1981) ........ 45

*Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473 (2d Cir. 2014) ........ 6

*Crosswell v. Rodriguez*, 2023 U.S. Dist. LEXIS 171753 2023 WL

6206911 (S.D. Tex. Sept. 8, 2023) ........................................................................ 16

*Crowe v. Henry,* 43 F.3d 198 (5th Cir. 1995) .................................................................. 15

*D&T Partners, L.L.C. v. Baymark Partners Mgmt., L.L.C.,* 98 F.4th 198 (5th Cir. 2024) ........................................................................................ 18, 22

*Davis v. HydPro, Inc.*, 839 S.W.2d 137 (Tex. App.1992) ............................................... 30

*Davis-Lynch, Inc. v. Moreno,* 667 F.3d 539 (5th Cir. 2012) ............................................ 23

*Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262 (5th Cir. 2012) ........................................................................................................ 44, 45

*DiVittorio v. Equidyne Extractive Ind., Inc.*, 822 F.2d 1242 (2nd Cir. 1987) ..................................................................................................................... 5

*Dodson & Hooks, APLC v. La. Cmty. Dev. Capital Fund, Inc.*, 2018-1784 (La. App. 1 Cir. 12/18/19), 302 So. 3d 1127 ........................................................... 43

*Edgenet v. GS1 AISBL*, 742 F.Supp.2d 997 (E.D. Wisc. 2010) ......................................... 9

*Elliott v. Foufas,* 867 F.2d 877 (5th Cir. 1989) .............................................................. 15

*EnvTech, Inc. v. DeBusk*, 178 F.4th 208 (5th Cir. 2026) ................................................... 5

*Glassdoor, Inc. v. Andra Grp., L.P.*, 575 S.W.3d 523 (Tex. 2019) ...................... 33, 35, 36, 39, 40

*H.J. Inc. v. Nw. Bell Tel. Co.,* 492 U.S. 229 (1989) .......................................... 18, 20, 22

*Heden v. Hill*, 937 F.Supp. 1230 (S.D. Tex. 1996) ............................................................ 4

*Hemi Grp., LLC v. City of New York*, 130 S.Ct. 983 (2010) ............................................ 12

*Hill v. Heritage Res*., 964 S.W.2d 89 (Tex. App. 1997) ............................. 24, 25, 26, 27

*Hutton v. City of Baton Rouge*, 217 La. 857, 47 So.2d 665 (La. 1950) ............................. 44

*In re City of Lubbock*, 666 S.W.3d 546 (Tex. Crim. App. 2023) ...................................... 26

*In re Mastercard Int'l, Inc., Internet Gambling Litigation*, 132 F.Supp.2d 468 (E.D. La. 2001) ...................................................................................................... 5

*In re Raspanti*, 2008-0954 (La. 3/17/09), 8 So. 3d 526 ..................................................... 28

*In re Willis*, 143 B.R. 428 (Bankr. E.D. Tex. 1992) ................................................... 11, 43

*Innova Hosp. San Antonio, Ltd. P'ship v. Blue Cross & Blue Shield of Ga., Inc.*, 892 F.3d 719 (5th Cir. 2018) ............................................................................. 3

*James v. Brown*, 637 S.W.2d 914 (Tex. 1982) ................................................................. 27

*Kelly v. U.S.*, 590 U. S. 391 (2020) ................................................................................ 8, 9

*Kennedy v. City of Arlington*, 165 F.4th 937 (5th Cir. 2026) .......................................... 2, 3

*Kimm v. Lee*2005 WL 89386 (S.D.N.Y. Jan. 13, 2005), *aff'd sub nom. Kimm v. Chang Hoon Lee & Champ, Inc*., 196 Fed. App'x 14 (2d Cir. 2006) ...................................................................................................... 10, 11

*La. State Bar Ass'n v. Theard*, 72 So. 2d 310 (1954) ........................................................ 44

*Lancaster Comm. Hosp. v. Antelope Valley Hosp. Dist*., 940 F.2d 397 (9th

Cir. 1991) .......... 9

*Landry's, Inc. v. Animal Legal Defense Fund*, 631 S.W.3d 40 (Tex. 2021) .......... 27, 28

*Leffall v. Dall. Indep. Sch. Dist.,* 28 F.3d 521 (5th Cir. 1994).......... 40

*Malvino v. Delluniversita*, 840 F.3d 223 (5th Cir. 2016) .......... 18, 22

*Manax v. McNamara*, 660 F.Supp.657 (W.D. Tex. 1987), *aff'd*, 842 F.2d 808 (5th Cir. 1988).......... 9, 11

*Manax v. McNamara,* 842 F.2d 808 (5th Cir. 1988) .......... 14, 16, 19, 20

*Marre v. U.S.*, 117 F.3d 297 (5th Cir. 1997).......... 11, 41, 42, 43

*Mills v. Polar Molecular Corp*., 12 F.3d 1170 (2d Cir. 1993).......... 5

*Molina-Aranda v. Black Magic Enters., L.L.C.*, 983 F.3d 779 (5th Cir. 2020) .......... 12

*Montesano v. Seafirst Commercial Corp.*, 818 F.2d 423 (5th Cir. 1987).......... 15

*Moreno v. Novoa*, 676 S.W.3d 748 (Tex. App. 2023).......... 28

*Nationwide Bi-Weekly Admin., Inc. v. Belo Corp.*, 512 F.3d 137 (5th Cir. 2007) .......... 36, 40

*Neuwirth v. La. State Bd. of Dentistry*, 845 F.2d 553 (5th Cir. 1988) .......... 41

*Ocean Energy II v. Alexander & Alexander,* 868 F.2d 740 (5th Cir. 1989) .......... 17, 19

*Pharmacare v. Caremark*, 965 F.Supp. 1411 (D. Hawai'i 1996).......... 9

*Richardson-Eagle, Inc. v. William M. Mercer, Inc.*, 213 S.W.3d 469 (Tex. App. 2006) .......... 30

*Saucier v. Hayes*, 373 S.2d 102 (La. 1978) .......... 10, 42, 43, 45

*Shaffer v. Williams*, 794 F.2d 1030 (5th Cir. 1986).......... 15

*Shell Oil Co. v. Writt*, 464 S.W.3d 650 (Tex. 2015).......... 29

*Snow Ingredients, Inc. v. SnoWizard, Inc*., 833 F.3d 512 (5th Cir. 2016).......... 14, 21, 23

*St. Paul Mercury Ins. Co. v. Williamson,* 224 F.3d 425 (5th Cir. 2000) .......... 17

*Steed v. HB1 Alt. Holdings, LLC*, 2024 U.S. Dist. LEXIS 71414 (S.D. Tex. Mar. 8, 2024).......... 16, 17, 21

*Tel-Phonic Servs., Inc. v. TBS Int'l, Inc*., 975 F.2d 1134 (5th Cir. 1992) .......... 4

*Tex. Beef Cattle Co. v. Green*, 921 S.W.2d 203 (Tex. 1996).......... 29

*Thompson v. Deutsche Bank Nat'l Tr. Co*., 775 F.3d 298 (5th Cir. 2014) .......... 37

*Thornton v. Micrografx, Inc*., 878 F.Supp. 931 (N.D. Tex. 1995) .......... 5

*Turner v. Pleasant*, 663 F.3d 770 (5th Cir. 2011).......... 3

*U.S. v. Cauble*, 706 F.2d 1322 (5th Cir. 1983) .......... 6

*U.S. v. Eufrasio*, 935 F.2d 553 (3d Cir. 1991) .......... 6

*U.S. v. Gigante*, 166 F.3d 75 (2d Cir. 1999) .......... 6

*U.S. v. Herron*, 825 F.2d 50 (5th Cir. 1987) .......... 8

*U.S. v. Nix*, 1997 U.S. Dist. LEXIS 25013 (S.D. Miss. Apr. 16, 1997) .......... 6

*U.S. v. Sanders*, 952 F.3d 263 (5th Cir. 2020) .......... 7

*U.S. v. Spalding*, 894 F.3d 173 (5th Cir. 2018) .......... 7

*U.S. v. Swenson*, 25 F.4th 309 (5th Cir. 2022) .......... 6

*Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724 (5th Cir. 2019) .......... 2, 3, 11

*Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711 (Tex. 2001) .......... 32

*Walsh v. America's Tele-Network Corp.*, 195 F.Supp. 2d 840 (E.D. Tex. 2002) .......... 4, 5

*Word of Faith World Outreach Ctr. Church v. Sawyer*, 90 F.3d 118 (5th Cir. 1996) .......... 20, 22

**Statutes**

11 U.S.C. § 108 .......... 33

18 U.S.C. § 1341 .......... 8

18 U.S.C. § 1343 .......... 8

18 U.S.C. § 1961 .......... 6, 14

18 U.S.C. § 1962 .......... 5, 23

LA. CONST. ART. V., § 5 .......... 45

LA. REV. STAT. § 22:1928 .......... 28, 29

LA. REV. STAT. § 37:218 .......... 10, 42, 45

TEX. CIV. PRAC. & REM. CODE § 16.002 .......... 37, 39

TEX. CIV. PRAC. & REM. CODE § 16.003 .......... 24, 33

TEX. GOV'T CODE § 81.072 .......... 28, 29

**Rules**

FED. R. CIV. P. 12 .......... 1, 2

FED. R. CIV. P. 9 .......... 4, 5

LA. SUP. CT. RULE XIX, § 12 .......... 28, 29

# # #

Defendants Matthew Monson and the Monson Law Firm, LLC ("TMLF") (collectively, the "Monson Defendants") respectfully submit this Motion to Dismiss, pursuant to FED. R. CIV. P. 12(b)(6), seeking dismissal with prejudice of all claims asserted against them by Plaintiff, MMA Law Firm, PLLC ("MMA"), in its Second Amended Complaint (Doc. 28) ("SAC"). The claims are all subject to dismissal for failure to state a claim upon which relief may be granted under the applicable statutes and theories.[1]

## I. INTRODUCTION

In *A Beautiful Mind*, John Nash—a mathematical genius—becomes convinced that disparate, ordinary events are pieces of a vast clandestine conspiracy. The audience initially sees the world through Nash's eyes, and the theory appears coherent only because each isolated event is viewed through the lens of a predetermined conclusion. The tragic revelation is not that the individual observations were false, but that the connections between them existed only in Nash's perception.

In its SAC, McClenny, Moseley & Associates, PLLC ("MMA") employs the same narrative device. MMA identifies a collection of unrelated events, communications, court rulings, business dealings and other events, then invites the Court to assume that they are all components of a coordinated criminal scheme. Yet the Second Amended Complaint never pleads facts that plausibly connect those isolated events into the sweeping conspiracy MMA alleges. Instead, MMA substitutes speculation for factual allegations, inference for evidence, and suspicion for plausibility.

Federal pleading standards require more. Under *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

---

[1] Contemporaneous with this filing, Katherine Monson is filing a Motion to Dismiss the claims against her (Doc. 44, 45), and the Monson Defendants incorporate by reference the arguments from that motion as if restated herein, *in extenso*.

570 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), a complaint must allege facts that permit a reasonable inference of liability—not merely a sequence of disconnected occurrences woven together by conjecture. Labels, conclusions, and imaginative narratives cannot transform ordinary conduct into an actionable conspiracy. Once the conclusory allegations are set aside, what remains is precisely what Rule 12(b)(6) is designed to expose: a series of unrelated facts that do not plausibly establish any claim for relief. The Court should therefore dismiss MMA's SAC against the Monson Defendants in its entirety.

## II. STANDARD OF REVIEW

### A. Standard for Rule 12(b)(6) Motion to Dismiss.

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Twombly*, 550 U.S. at 570; *Kennedy v. City of Arlington*, 165 F.4th 937, 942 (5th Cir. 2026); *Scott v. Factory Mut. Ins. Co*., 105 F.4th 816, 819 (5th Cir. 2024). A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Walker v. Beaumont Indep. Sch. Dist*., 938 F.3d 724, 735 (5th Cir. 2019); *Cicalese v. Univ. of Tex. Med. Branch*, 924 F.3d 762, 765 (5th Cir. 2019). The *Twombly* plausibility standard is not akin to a probability requirement; it asks for more than a sheer possibility that a defendant has acted unlawfully. *Walker*, 938 F.3d at 735.

The factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true, even if doubtful in fact. A well-pleaded complaint may proceed even if it appears that a recovery is very remote and unlikely. *Twombly*, 550 U.S. at 555-56; *Innova Hosp. San Antonio, Ltd. P'ship v. Blue Cross & Blue Shield of Ga., Inc.*, 892 F.3d 719, 726 (5th Cir. 2018). Determining whether a complaint states a plausible claim for relief is a context-specific task that requires the reviewing court to draw on its judicial

experience and common sense. *Iqbal*, 556 U.S. at 679; *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011).

In evaluating a Rule 12(b)(6) motion, the Court must accept all well-pleaded facts as true and view them in the light most favorable to the plaintiff. All questions of fact and any ambiguities in the controlling substantive law must be resolved in the plaintiff's favor. However, the Court is not bound to accept as true a legal conclusion couched as a factual allegation. *Iqbal*, 556 U.S. at 678; *Walker*, 938 F.3d at 735. The tenet that a court must accept all of the allegations contained in a complaint as true is inapplicable to legal conclusions. *Iqbal*, 556 U.S. at 678. The Court need not presume true a number of categories of statements, including legal conclusions; mere labels; threadbare recitals of the elements of a cause of action; conclusory statements; and naked assertions devoid of further factual enhancement. *Kennedy*, 165 F.4th at 942.

Accordingly, a complaint's allegations must make relief plausible, not merely conceivable, when taken as true. "Factual allegations that are merely consistent with a defendant's liability stop short of the line between possibility and plausibility of entitlement to relief and thus are inadequate." *Walker*, 938 F.3d at 735.

### B. Standard for Pleading RICO Claims under Rule 9(b).

The gravamen of the SAC turns around a RICO conspiracy allegedly undertaken by the Monson Defendants and Katherine Monson. *See* SAC, ¶¶ 376 – 559. Therefore, the pleading of these RICO claims, which are based on predicate acts of fraud, are subject to the heightened pleading requirements of FED. R. CIV. P. 9(b). *Tel-Phonic Servs., Inc. v. TBS Int'l, Inc.*, 975 F.2d 1134, 1138-39 (5th Cir. 1992) (Rule 9(b)'s particularity requirement "applies to the pleading of fraud as a predicate act in a RICO claim"); *Walsh v. America's Tele-Network Corp.*, 195 F.Supp. 2d 840, 846 (E.D. Tex. 2002) ("To properly plead RICO claims under Rule 9(b), the plaintiffs must plead the time, place and contents of the false representations, as well as the identity of the

person making the misrepresentations and what the person obtained by the representations."); *Heden v. Hill*, 937 F. Supp. 1230, 1243 (S.D. Tex. 1996) ("[A]llegations of mail fraud and wire fraud must be made with the particularity required by FED. R. CIV. P. 9(b)"). Under Rule 9(b), "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." FED. R. CIV. P. 9(b). Particularity, at a minimum, requires allegations as to the time, place, and the contents of the representation upon which the fraud is based, as well as the identity of the person making the representation, and the objective of the fraud. *See Tel-Phonic*, 975 F.2d at 1139; *Bonton v. Archer Chrysler Plymouth, Inc*., 889 F.Supp. 995, 1004 (S.D. Tex. 1995). In the civil context, Rule 9(b) also requires that the plaintiff specifically allege how *each* act of fraud furthered the fraudulent scheme, *Heden*, 937 F.Supp. at 1243, and how *each* defendant participated in the fraud. *DiVittorio v. Equidyne Extractive Ind., Inc.*, 822 F.2d 1242, 1247 (2nd Cir. 1987); *Walsh,* 195 F. Supp. 2d at 846; *Thornton v. Micrografx, Inc*., 878 F.Supp. 931, 937 (N.D. Tex. 1995). It is not enough that the plaintiff vaguely to attribute the alleged fraudulent activity to the "defendants" collectively. *See Mills v. Polar Molecular Corp*., 12 F.3d 1170, 1175 (2d Cir. 1993); *In re Mastercard Int'l, Inc., Internet Gambling Litigation*, 132 F.Supp.2d 468, 482 (E.D. La. 2001). Neither the claims against the Monson Defendants nor the claims against Katherine Monson, discussed fully in a separate brief, meet this heightened standard and MMA's assertion that the heightened pleading standard does not apply in this case, *see* SAC, ¶ 380, is without merit.[2]

---

[2] *EnvTech, Inc. v. DeBusk*, 178 F.4th 208 (5th Cir. 2026) (which MMA relies on for the proposition that the heightened pleading standard does not apply, involved RICO predicates based on theft of trade secrets and conspiracy to steal trade secrets – not mail or wire fraud as is alleged in this case. *EnvTech* rejected a special heightened pleading standard merely because RICO was predicated on criminal offenses. It did not eliminate Rule 9(b) where, as here, the alleged predicate offenses themselves are fraud.).

## III. CAUSE OF ACTION NO. 1: VIOLATION OF RICO

The Racketeer Influenced and Corrupt Organizations Act ("RICO") is a criminal statute[3] that has been used to pursue criminal defendants such as alleged members of the "Dixie Mafia,"[4] the "Cowboy Mafia,"[5] la Cosa Nostra,[6] and, the alleged leader of the Genovese crime family, Vincent "The Chin" Gigante.[7] Through the SAC, MMA seeks to pursue a lawyer, his firm, and his wife under the civil aspect of that same statute. The result is equivalent to deer hunting with a bazooka. The allegations simply do not fit the elements of the claim.

### A. The SAC Fails to Plead the Necessary Predicate Acts.

In order to state a claim for violation of the RICO statute, a plaintiff must allege two or more related predicate acts. Predicate acts are acts which constitute violations of criminal statutes listed in 18 U.S.C. § 1961(1).

"RICO claims premised on mail or wire fraud must be particularly scrutinized because of the relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support it." *Crawford v. Franklin Credit Mgmt. Corp*., 758 F.3d 473, 489 (2d Cir. 2014). To allege mail and wire fraud, the MMA must allege facts establishing (1) a scheme to defraud, (2) use of the mails or wire communications to execute that scheme, and (3) the specific intent to defraud. *See*, *e.g.*, *U.S. v. Swenson*, 25 F.4th 309, 316 (5th Cir. 2022) (mail fraud); *U.S. v. Sanders*, 952 F.3d 263, 277 (5th Cir. 2020). "For both crimes, showing a "scheme to defraud"

---

[3] 18 U.S.C. § 1962.

[4] *U.S. v. Nix*, 1997 U.S. Dist. LEXIS 25013, at *3 (S.D. Miss. Apr. 16, 1997).

[5] *U.S. v. Cauble*, 706 F.2d 1322, 1329 (5th Cir. 1983).

[6] *U.S. v. Eufrasio*, 935 F.2d 553, 558 (3d Cir. 1991).

[7] *U.S. v. Gigante*, 166 F.3d 75, 78 (2d Cir. 1999).

requires proof of a "false or fraudulent material misrepresentation. *U.S. v. Spalding*, 894 F.3d 173, 181 (5th Cir. 2018).

**1. The Allegations of Mail and Wire Fraud are Insufficient.**

MMA alleges mail fraud, wire fraud, and obstruction of justice as its predicate acts, as follows:

1. That a Louisiana Office of Disciplinary Counsel bar complaint filed by Katherine Monson (the "Monson Bar Complaint") was an instance of mail fraud; (SAC ¶¶ 395-402)

2. That a Louisiana Office of Disciplinary Counsel bar complaint filed by Lauren Lam (the "Lam Bar Complaint") was an instance of mail fraud; (SAC ¶¶ 403-406)

3. That a Louisiana Office of Disciplinary Counsel bar complaint filed on behalf of the Caffarels by The Monson Law Firm (the "Caffarel Bar Complaint") was an instance of mail fraud. (SAC ¶ 407-412)

4. That a complaint to the Louisiana Department of Insurance ("LDI") filed by Matthew Monson (the "LDI Complaint") constituted mail fraud; (SAC ¶¶ 413-419)

5. That all of the foregoing Bar Complaints and the LDI Complaint were submitted electronically, constituting wire fraud; (SAC ¶¶ 422-425)

6. That the filing of a Class Action Lawsuit by Katherine Monson (the "Class Action") and every subsequent filing in that case constituted wire fraud; (SAC ¶¶ 426-430)

7. That the filing of a Proof of Claim in MMA's Bankruptcy proceeding by Katherine Monson was an instance of wire fraud; (SAC ¶¶ 431-432)

8. That Mr. Monson's republishing of a police report accusing Plaintiff of "stealing settlement funds" (the "Police Report") constituted wire fraud; (SAC ¶¶ 433-434)

9. That Matthew Monson made false statements to the LDI (the "LDI Statements"), constituting wire fraud; (SAC ¶¶ 435-437)

10. That vague false statements were made to LDI officials by Matthew Monson, (the "Online Statements") constituting wire fraud; (SAC ¶¶ 438-440)

11. That the transmission of confidential disciplinary information by Matthew Monson (the Disciplinary Transmissions") constituted wire fraud; (SAC ¶¶ 441-446)

12. And, that the "LDI Just Dropped the Hammer" LinkedIn Post by Matthew Monson (the "LinkedIn Post") constituted wire fraud. (SAC ¶¶ 447-448).

**2. The Allegations of the Bar Complaints, the LDI Complaint, the Police Report, the Online Statements, the Disciplinary Transmissions, and the LinkedIn Post Do Not Constitute Fraud.**

The mail and wire fraud statutes criminalize "scheme[s] or artifice[s] to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. §§ 1341, 1343. "Although the statute[s] [are] phrased in the disjunctive" the Supreme Court has "consistently understood the 'money or property' requirement to limit the "scheme or artifice to defraud" element because the "common understanding" of the words "to defraud" when the statute was enacted referred "to wronging one in his property rights." *Ciminelli v. U.S.*, 598 U.S. 306, 312 (2023) (citations omitted). This understanding reflects not only the original meaning of the text, but also that the fraud statutes do not vest a general power in "the Federal Government […] to enforce (its view of) integrity in broad swaths of state and local policymaking." *Kelly v. U.S.*, 590 U. S. 391, 404 (2020). Accordingly, the Government must prove not only that wire fraud defendants "engaged in deception," but also that money or property was "an object of their fraud." *Ciminelli*, 598 U.S. at 312; *Kelly*, 590 U.S. at 402.[8]

Under this definition, MMA has not alleged a "scheme to defraud." First, the SAC does not allege facts establishing that the Monson Defendants sought to *obtain* MMA's money or property. The SAC alleges that the objective of the scheme to defraud was to "impair MMA's business operations, damage its reputation, and deprive it of its legal practice and contingent fee interests." (SAC ¶ 450.) As *Kelly* and *Ciminelli* make clear, the victim's property must be the *object* of the defendant's fraud. Here, there are no such allegations; thus, there is no mail or wire fraud.

[8] The Supreme Court has made clear that "scheme to defraud" is defined the same under the mail and wire fraud statutes. *See*, *e.g.*, *Carpenter v. U.S.*, 484 U.S. 19 (1987); *see also U.S. v. Herron*, 825 F.2d 50 (5th Cir. 1987).

Second, the types of harm here—commercial injury (*i.e.*, impairment of "business operations"), injury to MMA's legal practice, and damage to its contingent fee interests—are not "money" or "property" as the cases applying the mail and wire fraud statutes define those terms. Courts have repeatedly held that impairing a company's ability to compete or otherwise conduct business does not constitute a tangible property interest and thus does not constitute mail or wire fraud. *See*, *e.g.*, *Lancaster Comm. Hosp. v. Antelope Valley Hosp. Dist*., 940 F.2d 397, 406 (9th Cir. 1991) (loss of customers and market share was "far too amorphous a blow to support a claim of mail" or wire fraud); *Pharmacare v. Caremark*, 965 F.Supp. 1411, 1419 (D. Hawai'i 1996) (loss of a "level playing field" and loss of customers were not money or property that could support a mail or wire fraud claim); *Edgenet v. GS1 AISBL*, 742 F.Supp.2d 997, 1018-19 (E.D. Wisc. 2010) ("[A]nticompetitive injury is not a proper basis for mail or wire fraud […] .").

Likewise, courts have routinely held that reputational harm cannot support a claim mail or wire fraud claim. *See*, *e.g.*, *Manax v. McNamara*, 660 F.Supp.657, 660 (W.D. Tex. 1987), *aff'd*, 842 F.2d 808 (5th Cir. 1988) (where defendant coordinated false and misleading press articles harmful to plaintiff, the scheme was not a fraud on tangible or intangible rights, but rather was damage to his reputation and thus could not be a predicate act under RICO); *Kimm v. Lee*2005 WL 89386, at *4 (S.D.N.Y. Jan. 13, 2005), *aff'd sub nom. Kimm v. Chang Hoon Lee & Champ, Inc*., 196 Fed. App'x 14 (2d Cir. 2006) ("Though Kimm may well have suffered reputational injury as a result of the defendants' alleged acts, no one was induced to part with anything of value as a result.") (internal quotation marks and citation omitted);

Similarly, the loss of a contingency fee interest is not a traditional property interest under the mail and wire fraud statutes. Under both Texas and Louisiana law, a contingency fee contract—

at least before judgment or settlement—does not create a property interest.[9] Instead, such contracts create only a contractual expectancy. *See Calk v. Highland Const. & Mfg.*, 376 So. 2d 495, 499 (La. 1979) (holding under LA. REV. STAT. § 37:218 that the interest obtained by a lawyer in a contingent fee award "a privilege, rather than an ownership right"; "this interpretation was necessary if the statute was to have any validity at all, for our Code of Professional Responsibility states that a lawyer shall not acquire a *proprietary* interest in a cause of action." (emphasis added)); *Saucier v. Hayes*, 373 S.2d 102, 105 (La. 1978); *Marre v. U.S.*, 117 F.3d 297, 308 (5th Cir. 1997) ("Under Texas law, a contingency fee agreement is generally considered to be an executory contract. Therefore, as a general rule, 'an attorney does not receive a legal or equitable interest pursuant to a contingency fee contract until the contingency actually occurs.'") (quoting *In re Willis*, 143 B.R. 428, 431 (Bankr. E.D. Tex. 1992)). Because none of injuries alleged by MMA qualifies as "money" or "property" under the mail and wire fraud statutes, MMA has not alleged a scheme to defraud—and therefore has failed to allege mail and wire fraud as predicate acts.

Finally, the SAC does not even assert that the Confidential Disciplinary Transmissions themselves were false. (SAC ¶ 441-445). Falsity is a required element for fraud, and so that predicate must fail for that additional reason.

**3. Defamation is Not a Predicate Act.**

MMA's claims that Monson made false statements about MMA in the Online Statements and in the LinkedIn Post do not constitute mail or wire fraud. These claims represent nothing more than an attempt to transform ordinary defamation claims into RICO predicate acts. Courts,

---

[9] MMA has pleaded that Texas Law applies to the allegations of its SAC. (Doc. 28, ¶¶ 4-7). The Monson Defendants dispute this allegation. MMA's position is particularly absurd as it relates to any claims arising out of the Contingency Fee Contracts. These contracts were allegedly engagement agreements between MMA and Louisiana clients to represent the Louisiana Clients in hurricane property damage claims to the client's property in Louisiana, against their homeowner's insurer, who had issued a policy of insurance in Louisiana. There is no Texas connection to this claim.

including the Fifth Circuit, have repeatedly dismissed RICO claims trying to shoehorn defamation allegations into RICO predicate acts. *Walker*, 938 F.3d at 738 ("[N]either defamation, intentional interference, nor online harassment qualifies as a RICO predicate act."); *Manax*, 660 F. Supp. at 660-61 (where defendant coordinated false and misleading press articles harmful to plaintiff, the scheme was not a fraud on tangible or intangible rights, but rather was damage to his reputation and thus could not be a predicate act under RICO); *Kimm*, 2005 WL 89386, at *4 (dismissing plaintiff's RICO claim where plaintiff alleged false statements perpetrated to harm his reputation). Once again, MMA has failed to allege a valid mail or wire fraud claim.

**4. The Predicate Acts Fail for Want of Proximate Damages.**

The civil remedies section of the RICO statute provides recourse to any "person injured in his business or property by reason of a violation" of the statute. 18 U.S.C. § 1964. This requires that a plaintiff establish proximate cause. *Molina-Aranda v. Black Magic Enters., L.L.C.*, 983 F.3d 779, 784 (5th Cir. 2020). However, the Fifth Circuit has held, in line with the holding of the United States Supreme Court, that the requirements of proximate cause are heightened in the context of a RICO claim. "The proximate causation standard in this context is not one of foreseeability; instead, the plaintiff must demonstrate that the alleged violation 'led directly' to the injuries." *Id.* (quoting *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006); *see also Hemi Grp., LLC v. City of New York*, 130 S.Ct. 983, 989 (2010) (plurality opinion)). In order for MMA's predicate acts to provide the basis for its RICO claim, it must have pled that the predicate acts "led directly" to its injuries. *Hemi*, 130 S.Ct. at 992 (plurality opinion). "If some other conduct directly caused the harm, the plaintiff cannot sustain a RICO claim." *Molina-Aranda*, 983 F.3d at 784.

Several of the predicate acts fail this test. First, the alleged injury resulting from the Bar Complaints was the "MMA's removal from the Western District of Louisiana." SAC ¶ 400. While MMA may have pled that the Bar Complaints "led directly" to MMA's removal from the district,

that argument ignores the intervening conduct of its attorneys including but not limited to William R. Huye, Zach Mosely, and Grant P. Gardiner. (*See e.g*., Doc. 28-15, SAC Ex. 4; Doc. 28-64, SAC Ex. 64). Without the weighing of the Bar Complaints, the subsequent investigation, and the decision by the Western District, MMA would not have been removed from the Western District of Louisiana. The Bar Complaints cannot serve as predicate acts because they fail for want of proximate cause.

Similarly, the LDI Complaint and the LDI Statements do not meet RICO's proximate cause standard. MMA alleges that it was damaged when "the LDI issued an order imposing a $2 million fine on MMA based in material part on the misrepresentations of the LDI Complaint." SAC ¶ 417. MMA's own allegation betrays the intervening conduct that actually "led directly" to its injury – the LDI had to issue an order. The LDI Complaint and the LDI Statements cannot serve as a predicate act because it does not meet RICO's test for proximate cause.

With respect to the Class Action (SAC ¶ 426-430), the Proof of Claim (SAC ¶ 431-432), the Police Report (SAC ¶ 433-434), the Online Statements (SAC ¶ 435-437), the Disciplinary Transmissions (SAC ¶ 441-446), and the LinkedIn Post (SAC ¶ 447-448), MMA does not assert specific damages in the respective sections of those predicate acts. It appears from the Conclusion as to Wire Fraud Predicate Acts section (SAC ¶ 449-450) that the claimed damages for those predicate acts are reputational. As discussed above, those are not recoverable categories of damages under RICO, whether proximately caused or not.[10]

**5. The Allegations of Obstruction of Justice are Insufficient.**

[10] The Monson Defendants also incorporate by reference the argument regarding the *Noerr-Penington* doctrine, as set forth in Katherine Monson's Memorandum in Support of FRCP 12(b)(6) Motion to Dismiss (Doc. 45), as if stated herein.

The SAC's "obstruction of justice" allegations regarding Mr. Monson's alleged *ex parte* conversation with Judge Cain also fail to allege a predicate act. (SAC ¶ 451-466). *Snow Ingredients* makes clear that litigation conduct—even when it violates ethical rules (such as those prohibiting *ex parte* contact with federal judges)—does not rise to the level of a criminal act sufficient to establish obstruction of justice. *Snow Ingredients, Inc. v. SnoWizard, Inc*., 833 F.3d 512 (5th Cir. 2016). That MMA alleges that some of Mr. Monson's alleged *ex parte* statements to Judge Cain were untrue, does not change the analysis. To the contrary, as here, the plaintiffs in *Snow Ingredients* alleged that the defendants had made false statements to the Court, but nonetheless the Fifth Circuit held that such conduct did not establish a RICO predicate act under the obstruction of justice statute. *See id*.

MMA has failed to plead two or more viable predicate acts against any of the defendants. Its claim for violation of RICO should be dismissed based on the SAC's failure to meet that basic pleading requirement.

**6. The SAC Fails to Plead Facts to Establish an Enterprise.**

In order to establish a RICO claim, a plaintiff must plead the existence of an enterprise. An enterprise is "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C.S. § 1961(4). In this case, Plaintiff does not appear to plead that the enterprise was any "individual, partnership, corporation, association, or other legal entity." It appears that Plaintiff attempted to plead an association-in-fact enterprise but ultimately failed to plead sufficient facts to support such a claim. "It is important to note at the outset that, whatever the pleading requirement for other causes of action, plaintiffs in RICO claims 'must plead specific facts, not mere conclusory allegations, which establish the enterprise.'" *Manax v. McNamara,* 842 F.2d 808, 811 (5th Cir. 1988) (quoting *Montesano v. Seafirst Commercial Corp.*, 818 F.2d 423, 427 (5th Cir. 1987)).

**B. The SAC Attempts to Plead an Association-in-Fact Enterprise but Fails to Plead the Necessary Elements.**

MMA alleges that "Monson, The Monson Law Firm, LLC, and Katherine Monson, together with Allied Trust Insurance Company and other persons known and unknown, formed and operated an association-in-fact enterprise [...] ." SAC ¶ 388. The association-in-fact enterprise is an alternative to the more formal structures that can be pled. Nonetheless, an association-in-fact enterprise "consists of personnel who share a common purpose and collectively form a decision-making structure." *Bonner v. Henderson,* 147 F.3d 457, 460 (5th Cir. 1998) (citing *Shaffer v. Williams*, 794 F.2d 1030, 1032 (5th Cir. 1986)). More specifically, an "association-in-fact enterprise '(1) must have an existence separate and apart from the pattern of racketeering, (2) must be an ongoing organization and (3) its members must function as a continuing unit as shown by a hierarchical or consensual decision making structure." *Allstate Ins. Co. v. Plambeck*, 802 F.3d 665, 673 (5th Cir. 2015) (quoting *Calcasieu Marine Nat'l Bank v. Grant*, 943 F.2d 1453, 1461 (5th Cir. 1991)); *see also In re Mastercard Int'l Inc.,* 132 F.Supp.2d 468, 477 (E.D. La. 2001), *aff'd sub nom. In re MasterCard Intern. Inc.*, 313 F.3d 257 (5th Cir. 2002) (citing *Crowe v. Henry,* 43 F.3d 198, 205 (5th Cir. 1995); *see Elliott v. Foufas,* 867 F.2d 877, 881 (5th Cir. 1989)) (holding that a plaintiff pleading association-in-fact enterprise must also plead that the association in fact enterprise (1) has an existence separate and apart from the pattern of racketeering, (2) is an ongoing organization and (3) functions as a continuing unit as shown by a hierarchal or consensual decision making structure.).

**1. The SAC Fails to Plead the Existence of an Enterprise Separate and Apart from the Pattern of Racketeering Activity.**

The SAC does not contain a single allegation of association by the alleged members of the enterprise beyond their predicate acts. On the contrary, it appears to allege that the constituent

members of the alleged enterprise are members specifically and exclusively because of their predicate acts.

A RICO enterprise must be more than its alleged pattern of racketeering activity. If a pattern of racketeering activity alone was sufficient to plead a RICO enterprise, the enterprise requirement would collapse upon itself. The Fifth Circuit has consistently held that an "enterprise must be 'an entity separate and apart from the pattern of activity in which it engages.'" *McNamara,* 842 F.2d at 811(quoting *Atkinson v. Anadarko Bank and Trust Co.*, 808 F.2d 438, 440 (5th Cir. 1987)). The Southern District of Texas has elaborated that this "means that the enterprise must be an ongoing organization and that its members must function as a continuing unit as shown by a hierarchical or consensual decision-making structure." *Steed v. HB1 Alt. Holdings, LLC*, 2024 U.S. Dist. LEXIS 71414 at *20 (S.D. Tex. Mar. 8, 2024) (citing *Crosswell v. Rodriguez*, 2023 U.S. Dist. LEXIS 171753 2023 WL 6206911, at *3 (S.D. Tex. Sept. 8, 2023)). The requirement that the enterprise be something separate from the pattern "is consistent with Congress' intention to 'prevent RICO from becoming a surrogate for garden-variety fraud actions properly brought under state law.'" *Id.* If there is no enterprise, the litigant's claim is in ordinary fraud. Here, MMA has not raised any allegations supporting the existence of an enterprise separate from the predicate acts. On the contrary, MMA alleges an enterprise focused only on "their shared objective of dismantling MMA." SAC ¶ 388. Where, as here, there are no allegations other than those of predicate acts to support the existence of an enterprise, the RICO claim must be dismissed. "[A]n enterprise must be more than the summation of predicate acts." *Ocean Energy II v. Alexander & Alexander,* 868 F.2d 740, 748 (5th Cir. 1989).

**2. The SAC Fails to Plead the Existence of an Ongoing Organization.**

The SAC also fails to plead the existence of an ongoing organization – the second element of an association-in-fact enterprise. However, this element is more fully discussed during treatment of the continuity requirement.

**3. The SAC Fails to Plead an Enterprise whose Members Function Through a Decision-Making Structure.**

The Fifth Circuit has been unequivocal in holding that "[i]f the alleged enterprise is an association-in-fact, the plaintiff must show evidence of…a hierarchical or consensual decision-making structure." *St. Paul Mercury Ins. Co. v. Williamson,* 224 F.3d 425, 440-41 (5th Cir. 2000) (citing *Elliott*, 867 F.2d at 881). This requirement "is consistent with Congress' intention to 'prevent RICO from becoming a surrogate for garden-variety fraud actions properly brought under state law.'" *Steed*, 2024 U.S. Dist. LEXIS 71414 at *20 (quoting *Malvino v. Delluniversita*, 840 F.3d 223, 231 (5th Cir. 2016)).

MMA fails to plead any decision-making structure that governs the purported enterprise. Does Mr. Monson make the decisions? Does he defer to his client, Allied? Does his law firm take the lead? Is Katherine Monson calling the shots for the purported enterprise? These questions have to be answered in allegations in order to plead the existence of an enterprise. There has to be *some* decision-making structure. MMA has failed to plead a hierarchical decision-making process, as it is unclear who allegedly reports to whom. MMA has also failed to allege consensual decision-making whatsoever – there is no allegation that the purported RICO persons got together and decided consensually on a path forward. There are only vague allegations of a "conspiracy," and that single word does not meet the requirement that a plaintiff plead a decision-making structure.

**4. The SAC Does Not Meet RICO's Continuity Requirement.**

Continuity is a key element of the pattern requirement for pleading RICO. "To establish the pattern element, a plaintiff must show both a relationship between the predicate offenses […]

and the threat of continuing activity." *D&T Partners, L.L.C. v. Baymark Partners Mgmt., L.L.C.,* 98 F.4th 198, 205 (5th Cir. 2024) (quoting *Malvino*, 840 F.3d at 231). "A RICO plaintiff can prove 'continuity' by alleging 'a closed period of repeated conduct,' or 'past conduct that by its nature projects into the future with a threat of repetition.'" *D&T Partners, L.L.C.*, 98 F.4th at 205 (quoting *H. J. Inc. v. Nw. Bell Tel. Co.,* 492 U.S. 229, 241 (1989)). Here, MMA has failed to sufficiently plead either the so-called "closed" or "open-ended" continuity. "Continuity or the ongoing nature of an association in fact is the linchpin of enterprise status." *Ocean Energy II*, 868 F.2d at 749.

### C. The Predicate Acts Do Not Span an Adequate Length of Time to Meet The Requirements for Closed Continuity.

Even if they were adequately stated, the few predicate acts that Plaintiff has stated do not span an adequate time period to meet the requirements for closed continuity – they establish only a handful of alleged predicates in service of a short-term goal. "A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long term criminal conduct." *H. J. Inc.*, 492 U.S. at 241-42. The Fifth Circuit has held that continuity was insufficiently plead where an alleged enterprise only pursued "a single, short-term goal." *Calcasieu*, 943 F.2d at 1462. It went on to hold that "an ad hoc association would lack the continuity required to support a RICO claim." *Id*. (citing *Manax,* 842 F.2d at 812).

In *McNamara*, an analogous case in which a physician and his clinic asserted RICO claims against a group of lawyers and media publishers, the Fifth Circuit affirmed the dismissal of RICO claims for lack of allegations supporting enterprise continuity. 842 F.2d at 810. The plaintiff alleged that one of the lawyers made malicious and false statements about his ability to practice medicine and then coordinated to have the media defendants publish corresponding stories; that

the defendants solicited and encouraged frivolous malpractice lawsuits against him; and that they encouraged complaints to the Board of Medical Examiners. *Id*. The United States District Court for the Western District of Texas found, and the Fifth Circuit affirmed, that the complaint lacked sufficient allegations of continuity. "This association, however, lacks the continuity required of RICO enterprises. The association as alleged has one short-term goal -- the destruction of Manax's medical practice -- and presumably will disband upon the attainment of that goal." *Id*. at 811. The Court went on to hold that "[t]he association was ad hoc; *i.e.*, it was formed for the immediate accomplishment of one specific end. It therefore lacked the continuity required to bring it within RICO's ambit." *Id*. at 812. The allegations of the SAC could be similarly described – the enterprise existed for the accomplishment of a singular shared objective – the defendants' alleged "shared objective of dismantling MMA." SAC ¶ 388. If the destruction of MMA was the raison d'être of the alleged enterprise, there was no enterprise. The short-term nature of the association fails to meet the continuity requirement for a RICO enterprise.

### D. The Predicate Acts Do Not Pose a Future Threat Such That They Meet Open-Ended Continuity.

At the risk of stating the obvious, MMA is in bankruptcy. Plaintiff has alleged that the RICO members joined together for a singular goal: "their shared objective of dismantling MMA." SAC ¶ 388. There is no risk of future criminal activity because, as alleged, Defendants have met their singular objective. To meet the requirements of open-ended continuity, there must be a threat of conduct repeated into the future:

> An open period of conduct involves the establishment of 'a threat of continued racketeering activity.' This may be shown where there exists a "specific threat of repetition extending indefinitely into the future," or 'where it is shown that the predicates are a regular way of conducting defendant's ongoing legitimate business.'

*Word of Faith World Outreach Ctr. Church v. Sawyer*, 90 F.3d 118, 122 (5th Cir. 1996) (quoting *H.J. Inc.*, 492 U.S. at 242-43). Here, MMA has not alleged any conduct that would suggest an

ongoing threat of repeated criminal conduct. Instead, they allege a single, discrete scheme. A completed scheme is not likely to be repeated.

In *Steed*, the plaintiff alleged the existence of a RICO conspiracy to fraudulently foreclose on a single piece of real estate that the plaintiff allegedly owned. 2024 U.S. Dist. LEXIS 71414, at *2. The plaintiff's late mother had taken out a second mortgage on the home; following her death, one of the lenders foreclosed. *Id.* at *5. The lender then gained physical custody of the house and demolished it. The plaintiff alleged that the conduct constituted the collection of an unlawful debt because the debt was not owed because the lender failed to make certain repairs following hurricane damage. *Id.* at *6.

The presiding magistrate judge issued a Memorandum and Recommendation that was ultimately adopted by the district court, finding that the RICO claim should be dismissed. *Id*. at *15-22. The court specifically found that the plaintiff had failed to "allege that any act amounts to or poses a threat of […] continued criminal activity." *Id*. at *19. The court put a finer point on why there was no open-ended continuity: "all of the conduct he alleges has already occurred, and the foreclosure and sale of the [real estate] are already completed; Plaintiff does not allege that any future conduct is anticipated by virtue of the defendants' alleged past acts." *Id.* (*Snow Ingredients, Inc.*, 833 F.3d at 524). In short, the deed had been done. Based on the same rationale, the *Steed* court went on to hold that the petition failed to meet RICO's enterprise requirements – the claims "fail to allege the existence of any ongoing enterprise that is separate and apart from the already-completed collection of 'unlawful debt' in which it allegedly engaged." *Steed*, 2024 U.S. Dist. LEXIS 71414 at *21.

The same principle can be applied to MMA's claims herein. There is no open-ended continuity because there is no ongoing threat that the alleged RICO actors will destroy MMA again. Assuming only for the purposes of this argument, that the allegations are true, the defendants

have succeeded in their singular goal – the destruction of MMA. The allegations of the SAC do not suggest any risk of repetition. MMA has already allegedly been "destroyed." There can be no open-ended threat.

Open-ended continuity requires either a specific threat of repetition extending into the future or a showing that the predicate acts are the defendants' regular way of doing business. *H.J. Inc.*, 492 U.S. at 242–43; *D&T Partners*, 98 F.4th at 208–09. "Pleading the mere existence of lawsuits is not the same as pleading facts" showing a regular practice. *Word of Faith*, 90 F.3d at 124. The SAC alleges no comparable scheme against any other target, and its own allegations confirm the scheme already reached its natural conclusion: MMA has declared bankruptcy and is no longer operating as an ongoing concern. SAC ¶ 391; *D&T Partners*, 98 F.4th at 210 (a scheme reaching its "natural conclusion" defeats open-ended continuity).

Nor does the volume of alleged mailings and wire transmissions substitute for a showing of multiple victims or an ongoing practice. Even 31 predicate acts against one victim fail to show continuity absent evidence of a broader pattern. *Malvino*, 840 F.3d at 232–33 (distinguishing *Abraham v. Singh*, 480 F.3d 351 (5th Cir. 2007), where hundreds of victims established "systemic victimization"). Because the SAC alleges a single, finite scheme directed at a single victim in pursuit of an objective it alleges was already accomplished, it fails to plead the continuity element sufficient to demonstrate a pattern of racketeering activity.

## IV. CAUSE OF ACTION NO. 2: RICO CONSPIRACY

MMA seeks to bootstrap an ordinary fraud claim into a RICO claim and, from there, to gin up a RICO conspiracy under 18 U.S.C. § 1962(d). The SAC fails to state a claim for conspiracy, as it does not contain sufficient allegations of an over-arching agreement among the alleged conspirators. First, as the Fifth Circuit has held, without a valid substantive RICO claim, there can be no civil RICO conspiracy claim. *Davis-Lynch, Inc. v. Moreno,* 667 F.3d 539, 551 (5th Cir.

2012). As set forth in the preceding paragraphs, MMA has failed to plead a substantive RICO claim. Furthermore, MMA has failed to plead the existence of an agreement. It has plead that Allied instructed its counsel to pursue certain litigation strategies. SAC ¶¶ 543-544; 546-547. It has plead that Matthew Monson and other unspecified co-conspirators shared the goal of "starving" MMA. SAC ¶ 545. It has plead that at all times, Matthew Monson was acting on behalf of TMLF. SAC ¶ 548. And that Matthew Monson influenced the conduct of his wife. SAC ¶ 549. That does not a conspiracy make.

A successful RICO conspiracy claim "requires that the conspirator must at least know of the conspiracy and 'adopt the goal of furthering or facilitating the criminal [or unlawful] endeavor.'" *Chaney v. Dreyfus Serv. Corp*., 595 F.3d 219, 239 (5th Cir. 2010). Consequently, "a RICO civil complaint, at the very least, must allege specifically an agreement to commit predicate acts." *Snow Ingredients, Inc*., 833 F.3d at 526. There is no allegation of an overarching agreement. In the absence of an underlying RICO violation and any compelling allegations of agreement, the claim for conspiracy must fail.

## V. CAUSE OF ACTION NO. 3: TORTIOUS INTERFERENCE & CAUSE OF ACTION NO. 4: TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS

### A. The SAC Fails to Allege Claims for Tortious Interference (Cause of Action No. 3) or Tortious Interference with Prospective Business Relationships (Cause of Action No. 4) Against Monson or TMLF.

MMA asserts two state-law tortious interference theories against Monson and TMLF: tortious interference with existing contracts and tortious interference with prospective business relations.[11] Both fail on the face of the SAC. First, they are time-barred. Second, they are barred

[11] In light of Monson's position in this lawsuit that Louisiana is the proper venue, Monson assumes for the purposes of this motion, but does not concede that Texas law governs MMA's claims.

by the litigation privilege. Finally, and in all events, MMA fails to plausibly plead the elements of either claim.

### 1. MMA's Tortious Interference Claims Are Time-Barred.

#### a. The Tortious Interference with Contract Claim (Cause of Action No. 3) Is Time-Barred.

A two-year statute of limitations governs claims for tortious interference in Texas. *See* TEX. CIV. PRAC. & REM. CODE § 16.003(a); *Hill v. Heritage Res.*, 964 S.W.2d 89, 116 (Tex. App. 1997) ("Actions based upon tortious interference with an existing contract [and] tortious interference with business relations and slander of title are all controlled by a two-year statute of limitations.").

MMA first filed suit against Monson and TMLF on April 8, 2026. *See* Dkt. 1, Complaint. A tortious-interference claim accrues "when facts come into existence which authorize a claimant to seek a judicial remedy or when the wrongful act effects an injury." *Id*. at 116. As such, any alleged tortious interference on the part of Monson or TMLF with respect to MMA and for which MMA seeks recovery here must have occurred two years prior to April 8, 2026, or less, *i.e*. on April 8, 2024, or sooner. *See*, *e.g.*, *Hill*, 964 S.W.2d at 116. MMA's own pleadings demonstrate this is not the case. More specifically, ***every*** act of interference on which MMA relies and about which MMA complains allegedly occurred ***before*** April 8, 2024:

| **Allegedly Tortious Conduct** | **Date** |
|---|---|
| Monson attended a Home and Garden Show at the Superdome in New Orleans with his wife Katherine and allegedly went booth to booth, "messing with" MMA while it was marketing its services to potential clients. SAC ¶ 64. | March 2022 |
| Allied and Monson together allegedly make the decision to "go on the attack" against MMA to "starve [it] of money." SAC ¶¶ 62–69, 543–45. | June 2022 |
| Monson allegedly engages in *ex parte* communications with Judge Cain, which purportedly procures the October 21, 2022 Stay Order freezing identified Allied Cases. SAC ¶¶ 188–224, 567(a). | October 2022 |

| **Allegedly Tortious Conduct** | **Date** |
|---|---|
| Monson files bar complaints and complaints with the LDI against MMA and its attorneys that allegedly procure the Suspension Order removing MMA's Louisiana counsel from practice. SAC ¶¶ 89-96; 132–60, 567(b). | August 2022–January 2023 |
| LDI enters an order ***imposing*** a $2 million fine and cease-and-desist on MMA, allegedly in response to a complaint Monson filed. | May 1, 2023 |
| Monson allegedly provided the Louisiana Department of Insurance with false information which was subsequently transmitted to the Louisiana State Police. SAC, ¶ 114. | October 2023 |
| Monson made a presentation titled "How MMA Went Away", delivered at the 2024 Claims Conference and Insurance Services Expo in Boston, Massachusetts where Monson allegedly stated that Monson and Allied made a decision to "force [the schemes] into the consciousness of the court systems and Department of Justice" because "MMA was such a bad law firm." SAC ¶¶ 66-68. | March 17, 2024 |
| Phelps Dunbar withdraws as MMA's counsel in the EAJF Litigation, allegedly due to a LinkedIn post by Monson prior to that date. SAC ¶¶ 352–64, 581–92. | March 18, 2024 |
| Monson allegedly engages in *ex parte* communications with Magistrate Judge Michael North concerning the *Ricks* Order. SAC ¶¶ 225–60, 567(d).[12] | April 1 and 5, 2024 |

Coincidentally enough, MMA did not file for bankruptcy until April 9, 2024—the day *after* limitations ran and long after the majority of Monson, TMLF and Allied's alleged interference had occurred. *See In Re MMA Law Firm PLLC*, No. 24-31596, (Bankr. S.D. Tex. 2024) For all these reasons, MMA's tortious interference with existing business relations claim accrued outside the

[12] And, at any rate, these alleged *ex parte* communications do not open Monson or TMLF up to tort liability. Judicial immunity bars civil liability for communications made in judicial proceedings, including statements made in contemplation of and preliminary to the proceedings. *Clemens v. McNamee*, 638 F.Supp. 2d 742, 745 n.2 (S.D. Tex. 2009). And the SAC's *ex parte* allegations were all made in connection with MMA-related proceedings that resulted in hearings—at which MMA was able to present argument. MMA lost no opportunity to be heard, *In re City of Lubbock*, 666 S.W.3d 546, 558 (Tex. Crim. App. 2023), and the SAC's *ex parte* allegations do not rise to the level of creating independent liability in a separate action.

two-year limitations window and is thus time-barred as a matter of law. *See Hill*, 964 S.W.2d at 116; SAC ¶¶ 322, 364, 591–92.

**b. The Tortious Interference with Prospective Business Relationship Claim (Cause of Action No. 4) is Also Time-Barred.**

This same analysis defeats MMA's tortious interference with prospective business relations theory, which rests on the same pre-April 2024 conduct. SAC ¶¶ 596–99.

MMA identifies its prospective relationships as the retention of replacement Louisiana counsel and continued or expanded financing from EAJF and other lenders. SAC ¶¶ 607–08. Yet MMA was not going to obtain that business before bankruptcy: by its own allegations, the suspension of its counsel, the regulatory orders, and the disparagement had already foreclosed those relationships before April 8, 2024. *See*, *generally*, *id.* And, MMA could not obtain future business after its April 9, 2024 bankruptcy either since it had ceased operations in Louisiana by then. *See, e.g.*, SAC ¶ 322. Because no actionable interference with any prospective relationship is alleged to have occurred on or after April 8, 2024, this theory is time-barred as a matter of law as well. *See Hill*, 964 S.W.2d at 116.

**B. Causes of Action Nos. 3 and 4 Fail on Their Merits.**

**1. The Litigation Privilege Confers Absolute Immunity on Monson's Litigation Conduct.**

Texas recognizes an absolute judicial proceedings privilege that shields communications made in or in relation to a judicial proceeding from tort liability. *See Landry's, Inc. v. Animal Legal Defense Fund*, 631 S.W.3d 40, 46 (Tex. 2021) ("Communications in the due course of a judicial proceeding will not serve as the basis of a civil action for libel or slander, regardless of the negligence or malice with which they are made."). As the Texas Supreme Court explained in *Landry's*, this privilege attaches to statements that bear some relationship to a proceeding in which the attorney is employed; it applies regardless of whether the statements are alleged to be false or

to have been made with malice; and it turns on the communication's connection to the litigation rather than on the label the plaintiff attaches to its claim. *Id.* at 46 (quoting *James v. Brown*, 637 S.W.2d 914, 916 (Tex. 1982); *see Cantey Hanger, LLP v. Byrd*, 467 S.W.3d 477, 485 n.12 (Tex. 2015)).

All of Matthew Monson's communications which MMA claims are sufficient to hold the Monson Defendants or Allied liable enjoy judicial immunity, specifically, the alleged *ex parte* communications with Judge Cain and Magistrate Judge North in the MMA proceedings; the sanctions memorandum Monson and TMLF filed on Allied's behalf; and related statements made to those courts. SAC ¶¶ 176–78, 452–61, 547, 567(a), (d). Because those communications were all made in and in relation to pending judicial proceedings, they are absolutely privileged and cannot supply the willful and intentional act of interference on which both claims depend—regardless of MMA's allegations that such communications were false or malicious. *See Landry's, Inc.*, 631 S.W.3d at 46–47. The tortious interference claims against the Monson Defendants are built on such privileged communications and are thus protected as a matter of law. *See id*. MMA's tortious interference claims against Allied based on Monson's conduct that occurred during litigation should be dismissed for this reason as well. *See id*.

Similar to the litigation privilege, complaints made to attorney disciplinary authorities are absolutely immune from civil liability. *See* TEX. GOV'T CODE § 81.072(g); *Moreno v. Novoa*, 676 S.W.3d 748, 751 (Tex. App. 2023); *see also* LA. SUP. CT. RULE XIX, § 12(A); *In re Raspanti*, 2008-0954 (La. 3/17/09), 8 So. 3d 526, 540. The immunity applies regardless of motive, including allegations of bad faith. *Moreno*, 676 S.W.3d at 751; *Raspanti*, 8 So. 3d at 535–36. The same protection extends to complaints made to insurance regulators, which are likewise absolutely immune from liability as a matter of law. *See* LA. REV. STAT. § 22:1928; *Reagan v. Guardian Life Ins. Co.*, 166 S.W.2d 909, 912-13 (1942).

MMA's allegations about Mr. Monson's complaints to the Office of Disciplinary Counsel and *communications* with the Louisiana Department of Insurance fall squarely within these categories of absolutely immune communications. MMA relies heavily on those communications as a basis for its claims. SAC ¶¶ 122–139; 149–154; 343, 567 (b), (c). But recharacterizing those protected communications as actionable conduct does not overcome absolute immunity. Accordingly, MMA's claims fail to the extent they are based on complaints to the Louisiana Office of Disciplinary Counsel and LDI. *See* TEX. GOV'T CODE § 81.072(g) ("A person may not maintain an action against a complainant or witness in a disciplinary proceeding based on a communication made by the complainant or witness to the commission, a grievance committee, or the chief disciplinary counsel. The immunity granted by this subsection is absolute and unqualified."); *Shell Oil Co. v. Writt*, 464 S.W.3d 650, 655 (Tex. 2015) ("The rule is one of public policy. It is founded on the theory that the good it accomplishes in protecting the rights of the general public outweighs any wrong or injury which may result to a particular individual.") (internal citations omitted); LA. REV. STAT. § 22:1928 (provides immunity from civil liability for reporting suspected fraud); LA. SUP. CT. RULE XIX, § 12(A) (provides immunity from civil suits for communications to the board, hearing committees or disciplinary counsel).

**2. MMA Fails to Allege a Valid Tortious Interference Claim for Either Cause of Action Nos. 3 or 4 Against Monson or TMLF.**

"To recover for tortious interference with an existing contract, a plaintiff must prove: "(1) the existence of a contract subject to interference; (2) a willful and intentional act of interference; (3) the act was a proximate cause of the plaintiff's damages; and (4) actual damage or loss." *Tex. Beef Cattle Co. v. Green*, 921 S.W.2d 203, 210 (Tex. 1996). To meet the proximate-cause requirement, a plaintiff must "bring forth sufficient facts so that the evidence, and logical inferences drawn from the evidence, support a reasonable probability that the defendant's acts or omissions were a substantial factor in bringing about injury." *Richardson-Eagle, Inc. v. William*

*M. Mercer, Inc.*, 213 S.W.3d 469, 474 (Tex. App. 2006). "To establish proximate cause, a party must show that 'the defendant took an active part in persuading a party to a contract to breach it.'" *Amigo Broad., LP v. Spanish Broad. Sys., Inc.*, 521 F.3d 472, 493 (5th Cir. 2008) (quoting *Davis v. HydPro, Inc.*, 839 S.W.2d 137, 139 (Tex. App.1992)).

Here, MMA fails to meet this proximate-cause requirement as to Monson or TMLF. MMA claims that Monson's publication on his LinkedIn page about two on-going lawsuits brought against MMA was the proximate cause for Phelps Dunbar to withdraw from representing MMA and consequently caused damage to MMA by forcing MMA into bankruptcy. The SAC states that on September 1, 2023, EAJF filed suit against MMA seeking damages of $30 million and on December 19, 2023, PCG Consulting LLC obtained a default judgment against MMA in the amount of approximately $11 million. SAC, ¶¶ 581-582. Phelps Dunbar withdrew from both lawsuits on March 18, 2024. SAC, ¶ 591. MMA alleges it was not able to afford and timely secure replacement counsel after which point EAJF filed a motion for summary judgment against MMA seeking judgment for approximately $38 Million. *Id*.

Assuming that it were true that Monson's postings on LinkedIn indeed prompted Phelps Dunbar to investigate a conflict and withdraw from MMA's two cases (i.e. satisfying prong 1 of the test for tortious interference with contractual relations), and assuming it were true that Monson was intentionally posting on LinkedIn in order to prompt Phelps Dunbar to withdraw from representing MMA (satisfying prong 2), MMA concedes that it was unable to afford or timely secure replacement counsel for a hearing date on April 9, 2024, in spite of the fact that Phelps Dunbar had filed a motion to Withdraw in the PCG Litigation over a month prior, on March 5, 2024 and filed a motion to withdraw in the EAJF Litigation on March 18, 2024. SAC ¶ 586.

Based on the allegations in the SAC, MMA had over a month from Phelp Dunbar's first withdrawal, until April 9, 2024, to obtain new counsel to provide a defense to these claims instead

of filing for bankruptcy. Likewise, MMA would have had to pay Phelps Dunbar for its legal services if it had not withdrawn just as it would have had to pay any other replacement counsel for representation. But as alleged, MMA was unable to afford these legal fees. Therefore, even if it were true that Monson's LinkedIn publications and communications regarding the EAJC and PCG Litigations were the cause of Phelps Dunbar to withdraw, and Monson was intentionally trying to interfere with MMA's contractual relationship with Phelps Dunbar, it does not follow that Monson's LinkedIn publications and communications were the reason that MMA filed for bankruptcy since, as alleged, MMA was unable to afford to pay counsel for representation. If MMA could not afford new counsel, there is no reason to believe that it could have continued to afford Phelps Dunbar, a notably reputable firm that charges premium rates for its services, as counsel. It also bears noting that, as a law firm itself, MMA could have, at a minimum, enrolled on its own behalf and sought a continuance to gain more time before the April 9, 2024 hearing took place.[13] There is no allegation, however, that these steps occurred. MMA's intentional interference with contractual relations claim against Monson and TMLF should be dismissed.

The prospective business relations claim fails for the additional reason that it lacks an independently tortious or unlawful act. To state such a claim, a plaintiff must plead: "(1) a reasonable probability that the plaintiff would have entered into a business relationship with a third party; (2) that the defendant either acted with a conscious desire to prevent the relationship or knew interference was substantially certain to result; (3) **that the defendant's conduct was**

---

[13] It goes without saying also that MMA's founding partner Zachary Moseley is a licensed Texas attorney who has exhibited no qualms about representing his own interest pro se. (*See* In re: MMA Law Firm, PLLC, Case No. 24-31596, Rec. Doc. 1682, John Zachary Moseley's Emergency Motion to Enforce Confirmation Order and Settlement Agreement, for Temporary Restraining Order and Injunctive Relief, and for Declaratory Relief wherein Mr. Moseley represents himself pro se.

**independently tortious or unlawful**; (4) that the interference proximately caused injury; and (5) the plaintiff suffered actual damage or loss." *Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909, 923 (Tex. 2013) (emphasis added).

Here, as with the existing-contract claim, MMA cannot establish proximate cause as to Monson or TMLF. And the claim independently fails because none of the underlying conduct—neither the public comments, the pursuit of legal remedies, the filing of complaints, or, specifically to Monson and Monson Law, the discussion and publication on LinkedIn of lawsuits filed against MMA and MMA's representation of Phelps Dunbar, both of which are a matter of public record—was itself unlawful. *See Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 727 (Tex. 2001) ("a statement made against the plaintiff, though defamatory, may be protected by a complete or qualified privilege."). MMA therefore has not made out a prima facie case for tortious interference with a prospective business relationship. Both its tortious interference claims therefore fail and should be dismissed in their entirety.

### C. MMA Fails to State a Claim for Business Disparagement Cause of Action No. 5.

As iterated above, the Monson Defendants do not agree that Texas law applies to the state law causes of action brought by MMA. However, regardless of whether Louisiana or Texas law applies, MMA has failed to state a claim upon which relief can be granted for its Cause of Action No. 5 – Business Disparagement.[14]

A business disparagement claim has a two-year statute of limitations in Texas. TEX. CIV. PRAC. & REM. CODE § 16.003(a); *Glassdoor, Inc. v. Andra Grp., L.P.*, 575 S.W.3d 523, 527 (Tex.

[14] Under Louisiana law, all causes of action for business disparagement that occurred before July 1, 2024, are subject to a one-year prescriptive period which accrued on the date of publication. All causes of action for business disparagement that occurred after July 1, 2024, are subject to a two-year prescriptive period which accrued on the date of publication. Regardless of if it is a one year or two-year prescriptive period/ statute of limitations, all causes of action are time barred under Louisiana law.

2019). The Bankruptcy Code provides a limited extension of time—specifically, an extension to the latter of the original state limitations period or two years after the order for relief—for prepetition claims whose limitations periods had not expired before the petition was filed. 11 U.S.C. § 108(a).

This adversarial proceeding was filed on April 8, 2026. All of the actions MMA complains of in support of its business disparagement claim occurred more than 2 years before the filing of this action and are time barred. To illustrate, the chart below itemizes each alleged act of business disparagement:

| **Allegation of Business Disparagement** | **Date** | **Para** |
|---|---|---|
| Monson Files Complaint Against MMA with the LDI on behalf of the Caffarels. | August 26, 2022 | 90 |
| Monson Forwards LDI order to FBI | April 29, 2023 | 106 |
| Monson posted on his public LinkedIn, stating that USAttorneys.com appeared to be an attorney referral service and shared the same physical address as MMA. Later that same day, Monson sent a text message to [Steve] Badger, stating, "I just posted. The questions I raised were carefully worded based on a conversation with one of their key employees today." | April 29, 2023 | 366 |
| Monson posted on LinkedIn referencing Attorney General Jeff Landry's comments regarding MMA and stated, "*excuses, excuses, excuses. Fortunately, I'm at the state police headquarters today. Maybe I can help move things forward*." | September 20, 2023 | 262 |
| Monson communicated with Louisiana State Police Investigator Daniel Graff to schedule a meeting at Monson's office regarding MMA. In that exchange, Monson stated, "It will be great to assist for efforts in any way possible." | October 9, 2023 | 263 |
| Monson confirmed an in-person meeting with the Louisiana State Police and transmitted pleadings filed against MMA, providing litigation materials to law enforcement in connection with its investigation. | October 13, 2023 | 265 |
| La. State Police Initial Complaint attributing allegations of stealing insurance claim settlement funds issued. | October 17, 2023 | 114 |
| The Louisiana State Police issued an Initial Complaint Report against MMA asserting that Monson discovered and reported that MMA was stealing insurance claim funds. | October 17, 202 | 266 |

| | | |
|---|---|---|
| Monson posts State Police's initial complaint alleging that MMA was "stealing insurance claim funds" on LinkedIn. | November 8, 2023 | 117 |
| Investigator Graff informed Monson via text message that the Louisiana State Police was coordinating with the FBI in its investigation of MMA. | December 18, 2023 | 269 |
| At the Insurance Conference, Monson stated as a fact that MMA "is the biggest insurance fraud that has ever been busted." | March 17, 2024 | 371 |
| Monson stated as a fact that his bar complaints had resulted in the disbarment of MMA attorney William Huye. (emphasis in original). | March 17, 2024 | 373 |
| The interference with MMA's engagement of Phelps Dunbar, i.e., Monson posted on LinkedIn regarding MMA's engagement of the Phelps Dunbar law firm in its litigation adverse to the Equal Access Justice Fund. | February 24, 2024 | 492, 510, 525-526, 532, 556(i) |
| Monson stated that the Louisiana Attorney General had received $155,000 in campaign donations from MMA and had "looked the other way.<br><br>This is a gross misrepresentation – Monson does not state that MMA donated $155,000. | February 20, 2025 | 628-631 |

As to MMA's allegations that Monson falsely accused it of bribery (the $155,000 donation to the Louisiana Attorney General, MMA relies on a YouTube video - https://www.youtube.com/watch?v=O_6acWsU7Hw – published on February 20, 2025, entitled "*The Unethical Practices Threatening Insurance Claims with Matthew Monson from the Monson Law Firm*"). (See SAC ¶¶ 628-631; See also footnotes 27, 35, 56, 57, 69, 71, 73, 175, 176, 177). In the video repeatedly referenced and repeatedly relied upon in the SAC, Mr. Monson *does not* say that MMA donated $155,000. The statement is that MMA donated $15,000.00. (See https://www.youtube.com/watch?v=O_6acWsU7Hw video at minutes 19:45 – 20:03). Further, Mr. Monson makes no allegation of bribery. But most importantly, on February 20, 2025 – the date "*The Unethical Practices Threatening Insurance Claims with Matthew Monson from the Monson Law Firm*" YouTube video was broadcast, MMA had already filed bankruptcy and was no longer a going concern such that it could suffer business disparagement by any statements made

by Monson in the video.[15]

**1. Business Disparagement is not a Continuing Tort as to any Internet posting.**

Several of the alleged acts of business disparagement involve internet posts by Monson on LinkedIn. Under Texas law, any cause of action arising from those internet posts accrued on the date of the posting.

In *Glassdoor*, the Texas Supreme Court addressed a business disparagement claim by Andra Group for anonymous reviews posted on Glassdoor's website. *Glassdoor*, 575 S.W.3d at 525. The Texas Supreme Court acknowledged that Texas courts apply the "single publication rule". Under that rule, a cause of action accrues "on the last day of the mass distribution of the printed matter containing the defamatory statement," which is when "the publisher of the statement has made the libelous matter available to his intended audience." *Id*. at 528. The Texas court noted also the United States Court of Appeals for the Fifth Circuit has held that this rule applies to publicly available information on the internet. *Id*. (citing *Nationwide Bi-Weekly Admin., Inc. v. Belo Corp.*, 512 F.3d 137, 144-46 (5th Cir. 2007)).

**2. MMA has No Standing to Bring Claim on Behalf of William Huye.**

At ¶ 373 of the SAC and incorporated in its business disparagement claim in against MMA, it states, that [at an Insurance Conference on March 17, 2024] "Monson stated as a fact that his bar complaints had resulted in the <u>disbarment</u> of MMA attorney William Huye." (emphasis in original). William Huye is not a party to this action and MMA does not have standing to bring a claim on his behalf.[16]

---

[15] MMA and its principle donated $15,000 to Jeff Landry's campaign and a related PAC on 4/4/20223 and 4/5/2023. (Exhibit 1 – Jeff Landry Candidate's Report, pg. 339 of 613). (Exhibit 2 – In Re MMA Law Firm, PLLC, Doc. 14, pg. 2 of 36)

16 Exhibit 3 - Williams Huye was the MMA lawyer in charge of its New Orleans office. On August 28, 2026, the United States Department of Justice in the Eastern District of Louisiana charged Mr. Huye by bill of information with

### D. MMA Fails to State a Claim for Its Cause Of Action No. 6 - Defamation and/or Defamation Per Se – All Such Claims are Time Barred.

As previously iterated, The Monson Defendants dispute MMA's position that Texas law applies to its state law claims. However, for the purpose of this Motion to Dismiss MMA's defamation and defamation *per se* claim, the result is identical regardless of whether it is analyzed under Texas or Louisiana law.

This civil action was filed on April 9, 2026. Included at Cause of Action No. 6 is a claim against Matthew Monson and TMFL for Defamation and Defamation *per se*. Any such claims are time-barred and should be dismissed with prejudice.

A motion to dismiss pursuant to Rule 12(b)(6) is a proper vehicle to address dismissal of a claim barred by the applicable statute of limitations. *Thompson v. Deutsche Bank Nat'l Tr. Co.*, 775 F.3d 298, 302 (5th Cir. 2014). A person must bring suit libel or slander not later than one year after the day the cause of action accrues. TEX. CIV. PRAC. & REM. CODE § 16.002(a).

#### 1. MMA's Allegations of Defamation and Defamation Per Se.

MMA's claim for defamation and defamation per se are included at ¶¶ 620 – 641 of it's Second Amending Complaint. The allegedly defamatory statements and the dates of each statement are as follows:

| Allegation of Defamation & Defamation Per Se | Date | Para ¶ |
| --- | --- | --- |
| Monson Files Complaint Against MMA with the LDI on behalf of the Caffarels. | August 26, 2022 | ¶¶ 90, 620(b) |
| Monson Forwards LDI order to FBI. | April 29, 2023 | ¶ 106 |

conspiracy to commit wire fraud. The bill of information details the experiences of eight Louisiana homeowners whose property damage claims were impacted by the false and fraudulent actions of Huye, "Law Firm A" and "Co-Conspirator 1". As a result, most of the named victims either did not receive monies designated to repair their roofs, or had the amount reduced due to the withholding of unauthorized attorney's fees and expenses. In some instances, Co-Conspirator 1 endorsed settlement checks without proper authorization from homeowners, and deposited funds earmarked for their damages into Law Firm A's bank account.

| | | |
|---|---|---|
| Monson posted on his public LinkedIn, stating that USAttorneys.com appeared to be an attorney referral service and shared the same physical address as MMA. Later that same day, Monson sent a text message to [Steve] Badger, stating, "I just posted. The questions I raised were carefully worded based on a conversation with one of their key employees today." | April 29, 2023 | ¶ 366 |
| Monson posted on LinkedIn referencing Attorney General Jeff Landry's comments regarding MMA and stated, "*excuses, excuses, excuses. Fortunately, I'm at the state police headquarters today. Maybe I can help move things forward*." | September 20, 2023 | ¶ 262 |
| Monson communicated with Louisiana State Police Investigator Daniel Graff to schedule a meeting at Monson's office regarding MMA. In that exchange, Monson stated, "It will be great to assist for efforts in any way possible." | October 9, 2023 | ¶ 263 |
| Monson confirmed an in-person meeting with the Louisiana State Police and transmitted pleadings filed against MMA, providing litigation materials to law enforcement in connection with its investigation. | October 13, 2023 | ¶ 265 |
| La. State Police Initial Complaint attributing allegations of stealing insurance claim settlement funds issued. | October 17, 2023 | ¶¶ 114, 620(a) |
| The Louisiana State Police issued an Initial Complaint Report against MMA asserting that Monson discovered and reported that MMA was stealing insurance claim funds. | October 17, 2023 | ¶ 266 |
| Monson republished by interstate wire, on his LinkedIn account, the Louisiana State Police's initial complaint alleging that MMA was "stealing insurance claim funds" on LinkedIn. | November 8, 2023 | ¶¶ 623-625 |
| Investigator Graff informed Monson via text message that the Louisiana State Police was coordinating with the FBI in its investigation of MMA. | December 18, 2023 | ¶ 269 |
| The interference with MMA's engagement of Phelps Dunbar, i.e., Monson posted on LinkedIn regarding MMA's engagement of the Phelps Dunbar law firm in its litigation adverse to the Equal Access Justice Fund. | February 24, 2024 | ¶¶ 492, 510, 525-526, 532, 556(i) |
| At the Insurance Conference, Monson stated as a fact that MMA "is the biggest insurance fraud that has ever been busted." | March 17, 2024 | ¶¶ 365-374, 620(c), 632-633 |
| Monson stated as a fact that his bar complaints had resulted in the <u>disbarment</u> of MMA attorney William Huye. (emphasis in original). | March 17, 2024 | ¶¶ 626-627 |

| | | |
|---|---|---|
| Monson's Website ¶¶ 344-351 - These paragraphs address the CLE at the PLRB Insurance Conference on March 17, 2024. | March 17, 2024 | ¶ 344, Doc. 28-8 - Exhibit 8 |
| In a YouTube interview transmitted to a nationwide audience, Matthew Monson stated as a fact that the former Louisiana Attorney General had taken no action against MMA because he had received "$155,000 in campaign donations from MMA" and had "looked the other way." | February 20, 2025 | ¶¶ 628-631 |

The alleged defamatory statements were made or published between August 26, 2022 and February 20, 2025. This Civil Action was filed on April 8, 2026. Any cause of action for defamation or defamation per se arising out of these statements is time barred. TEX. CIV. PRAC. & REM. CODE § 16.002(a).

**2. Texas Recognizes the Single Publication Rule: Defamation is Not a Continuing Tort.**

The Texas Supreme Court acknowledged that Texas courts apply the "single publication rule" for information made publicly on the internet. *Glassdoor*, 575 S.W.3d at 523. The "single publication rule" provides:

> No person shall have more than one cause of action for damages for libel […] or any other tort founded upon any single publication or exhibition or utterance, such as any one edition or issue of a newspaper or book or magazine or any one presentation to an audience or any one broadcast over radio or television or any one exhibition of a motion picture. Recovery in any action shall include all damages for any such tort suffered by the plaintiff in all jurisdictions.

*Mayfield v. Fullhart*, 444 S.W.3d 222, 227 (Tex. App. 2014). Publication is complete on "the last day of the mass distribution of copies of the printed matter" because that is the day when the publishers, editors and authors have done all they can to relinquish all right of control, title and interest in the printed matter. *Id.*

Under this rule, a cause of action accrues "on the last day of the mass distribution of the

printed matter containing the defamatory statement," which is when "the publisher of the statement has made the libelous matter available to his intended audience." *Glassdoor*, 575 S.W.3d at 528. The Texas court noted also the United States Court of Appeals for the Fifth Circuit has held that this rule applies to publicly available information on the internet. (citing *Nationwide*, 512 F.3d at 144-46).

MMA's reliance on *Stephan v. Baylor Med. Ctr.*, 20 S.W.3d 880, 890 (Tex. App. 2000) is misguided. There are no allegations of republication in the SAC such that any such republication would be separately actionable. Further, any republication by Monson or TMLF as alleged in ¶ 623 is time barred as MMA acknowledges that "[O]n November 8, 2023 Monson republished by interstate wires […] ."

MMA's causes of action for defamation and defamation *per se* against Monson and TMLF are all time barred and should be dismissed with prejudice.

### E. Cause Of Action No. 7 –MMA's § 1983 Claim Fails Because it Does Not Allege the Deprivation of a Constitutionally Protected Property Right / Interest.

MMA claims that the LDI Defendants and Matt Monson conspired to violate its civil rights under 42 USC § 1983. Doc. 28 ¶¶ 64 –657. To state a claim under §1983, a plaintiff must (1) allege a violation of rights secured by the Constitution or laws of the United States ***and*** (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law. *Leffall v. Dall. Indep. Sch. Dist.,* 28 F.3d 521, 525 (5th Cir. 1994).

To state a cause of action for conspiracy between the state and a private actor, MMA must allege facts that suggest: 1) an agreement between the private and public defendants to commit an illegal act, and 2) an actual deprivation of constitutionally protected rights. *Cinel v. Connick*, 15 F.3d 1338, 1343 (5th Cir. 1994). That second requirement has two components: a constitutionally protected right, and an actual deprivation of it. MMA pleads neither, and the failure of the first disposes of the second. In other words, no defendant, public or private, can conspire to deprive

MMA of *a right MMA never actually held in the first place*. Therefore, MMA's claim must fail because it has no constitutionally protected property interest in the unrealized contingent fee interest or in its right to operate a Louisiana law practice.[17]

The Constitution creates no property interests; they arise from independent sources such as state law. *See Barnhill v. Johnson*, 503 U.S. 393, 398 (1992); *Marre*, 117 F.3d at 307; *Augustson v. Linea Aerea Nacional-Chile S.A.*, 76 F.3d 658, 662 (5th Cir. 1996). But federal law, not state law, determines whether an interest rises to a legitimate claim of entitlement. *Neuwirth v. La. State Bd. of Dentistry*, 845 F.2d 553, 557 (5th Cir. 1988). The claimant must have more than a unilateral expectation. *Blackburn v. City of Marshall*, 42 F.3d 925, 936-37 (5th Cir. 1995) (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)); *see also Bryan v. City of Madison*, 213 F.3d 267, 274-75 (5th Cir. 2000). MMA identifies two interests: "its contingent fee interests and its operating Louisiana law practice." Doc. 28, ¶ 650. Neither is constitutionally protected property. The LDI had no authority to reach the second in any event, and MMA pleads no deprivation of either.

Following its investigation, LDI concluded that MMA had represented to insurance companies that it represented insureds – that MMA did not in fact represent. Doc. 28-15. In response to its investigation, LDI issued a cease-and-desist letter instructing MMA to cease this conduct that violated the Louisiana Insurance Code. LDI did not issue any order preventing MMA from continuing its Louisiana law practice. Doc. 28-15. LDI imposed fines against MMA, Moseley, McClenny and Huey that totaled $2M. MMA (and the others) appealed the LDI's order and prevailed. The fine was never paid. Doc. 28-21 – Admin. Judge Reversal of LDI Order.

[17] Doc. 28, ¶ 650. MMA does not claim that the § 1983 Defendants took overt actions to shut down its Louisiana Law Operation. Instead, MMA claims that the §1983 Defendants caused tangential problems for MMA such that in essence it took its attention, time and energy away from its Louisiana Law Practice.

### 1. MMA Does Not have a Constitutionally Protected Property Interest in "Its Contingency Fee Interest."

An attorney's right to compensation pursuant to a contingency fee agreement is a property right determined under applicable state law. *Barnhill*, 503 U.S. at 398; *Marre*, 117 F.3d at 307; *Augustson*, 76 F.3d at 662. The answer is the same under Louisiana and Texas law, so the Court need not resolve which State's law governs. In Louisiana, LA. REV. STAT. § 37:218 permits an attorney to acquire as his fee an interest in the subject matter of a suit, proposed suit, or claim, and (in a case cited by MMA in the SAC) the Louisiana Supreme Court has held that this statute "cannot be construed to authorize an attorney to acquire by assignment the actual ownership of a fixed percentage of his client's claim." *Saucier*, 373 So.2d at 115. The interests it safeguards is "no more than a privilege granted to aid the attorney's collection of a fully earned fee out of the fund which the satisfaction of the client's claim yields," contingent on the attorney's successful performance. *Id.* at 117. Put another way, the interest "operates as a privilege on funds eventually obtained in the suit or claim. The interest is not an ownership interest in the suit or claim." *Dodson & Hooks, APLC v. La. Cmty. Dev. Capital Fund, Inc.*, 2018-1784 (La. App. 1 Cir. 12/18/19), 302 So. 3d 1127, 1133 (citing *Saucier*, 373 So. 2d at 117).

Texas law is no different. A contingency fee agreement is generally considered to be an executory contract,[18] and "an attorney does not receive a legal or equitable interest pursuant to a contingency fee contract until the contingency actually occurs."[19] MMA's SAC does not establish that the contingencies ever occurred, and under either State's law an unrealized contingency yields an expectancy rather than a constitutionally protected property interest.

---

18 *Marre*, at 307-08 (5th Cir. 1997), (citations omitted); See also *Hoover Slovacek LLP v. Walton*, 206 S.W.3d 557, 564 (Tex. 2006) (Texas Disciplinary Rule 1.08(h) forbids a lawyer from acquiring "a proprietary interest in the cause of action or subject matter of litigation the lawyer is conducting for the client," subject to a contingent-fee exception).

19 *Marre*, 117 F.3d at 308 (citing *Willis*, 143 B.R. at 431).

### 3. MMA Does Not have a Constitutionally Protected Property Interest in Its "Right to Operate a Louisiana Law Practice."

MMA is a Texas limited liability company with its principal place of business in Texas. Doc. 28, ¶ 257. It holds no license to practice law in Louisiana, and any constitutional interest in such a license belongs to the individual attorneys admitted by the Louisiana Supreme Court, who are not plaintiffs here. What MMA describes is a business, not a license: "going-concern value," investment in marketing, intake, and client acquisition, funding and lender relationships, and "reputational injury." Doc. 28, ¶ 375(d)–(f); ¶ 664. A "generalized right to be secure in one's business interests" is not a protectible property interest under the Due Process Clause. *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 672 (1999).

Even assuming MMA held such a license, it would not hold constitutionally protected property. MMA assumes that a license to practice law is a natural or constitutionally granted right. The Louisiana Supreme Court instructs that such an assumption is erroneous.

> The right to practice law is not a natural or constitutional right, nor an absolute right or a right de jure, but is a privilege or franchise. The right to practice law is not 'property,' nor in any sense a 'contract,' nor a 'privilege or immunity,' within the constitutional meaning of those terms. It cannot be assigned or inherited but must be earned by hard study and good conduct.

*La. State Bar Ass'n v. Theard*, 72 So. 2d 310, 315 (1954).

While the right to practice law – once granted – may fall under constitutional protection, the jurisprudence is unwavering that before an attorney is disbarred [or in this case "deprived of his Louisiana Law practice"] he should have notice of the grounds of the complaint against him and ample opportunity to of explanation and defense. *Id.* at 315. As explained infra, the LDI took no action to deprive MMA of its Louisiana law practice.

The Fifth Circuit rejected an analogous claim in *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 271 (5th Cir. 2012). In that case, taxicab certificate holders argued their

certificates were protected property. However, the court held such a certificate "is in the nature of a personal privilege or license…and the holder does not acquire a property right." *Id.* (quoting *Hutton v. City of Baton Rouge*, 217 La. 857, 47 So.2d 665, 668 (La. 1950)). The court continued that a protected interest "cannot arise in an area voluntarily entered into…which, from the start, is subject to pervasive Government control." *Id.* at 274. Evidence of a secondary market, secured loans, and treatment as marital property did not change the result. *Id.* at 270 (quoting *Conn. Bd. of Pardons v. Dumschat*, 452 U.S. 458, 465 (1981)).

**4. The LDI Does not have the Authority to Regulate the Practice of Law in Louisiana and Cannot Deprive MMA of any Alleged Property Right to Operate a Louisiana Law Practice.**

Under Louisiana law, the LDI does not have any authority over the practice of law, as MMA acknowledges in its SAC. Doc. 28, ¶ 651. That authority belongs exclusively to the Louisiana Supreme Court which has held, "[T]his court has exclusive and plenary power to define and regulate all facets of the practice of law, including the admission of attorneys to the bar, the professional responsibility and conduct of lawyers, the discipline, suspension and disbarment of lawyers, and the client-attorney relationship. The sources of this power are this court's inherent judicial power emanating from the constitutional separation of powers. The standards governing the conduct of attorneys by rules of this court unquestionably have the force and effect of substantive law." *Montgomery v. St. Tammany Par. Gov't*, 2017-1811 (La. 06/27/18), 319 So. 3d 209, 221; LA. CONST. ART. V., § 5.

That same authority led the Court in *Saucier* to construe LA. REV. STAT. § 37:218 as conferring a privilege rather than ownership. *Saucier*, 373 So. 2d at 116-17. An agency with no power to admit an attorney to practice has no power to deprive one of the practices. MMA's own allegations answer its claim: Donelon acknowledged the LDI "does not regulate law firms" before

the LDI acted (Doc. 28, ¶ 652; Doc. 28-21), and the Order was vacated for lack of jurisdiction because MMA is a law firm. Doc. 28-15, 28-21.

**5. Independently, MMA Pleads no Actual Deprivation of any Property Interest.**

Because MMA held no constitutionally protected property interest, there was nothing of which the § 1983 Defendants could deprive it, and the analysis ends there. Even assuming a protected interest, MMA pleads no actual deprivation. The cease-and-desist letter directed MMA to stop conduct that violated the Louisiana Insurance Code; it did not order MMA to stop practicing law and did not purport to. Doc. 28-15. MMA alleges no overt action by the § 1983 Defendants to shut down its Louisiana operation, only tangential problems that drew its attention, time, and energy away from that practice. Doc. 28, ¶ 650.[20] Diverted attention is not a deprivation or property. Nor does anything MMA pleads regarding Matthew Monson describe a taking: for example, paragraph 647 catalogues urging the Insurance Commissioner to act, an introduction to an investigative vendor, coordination with agency counsel, receipt of an advance copy of an order, a text message, a claim of credit, and continued communication. Doc. 28, ¶ 647. While this may detail access; none plausibly allege that Matthew Monson seized, encumbered, or compelled the transfer of anything MMA owned.

In fact, MMA concedes the point stating, "[t]he injury MMA suffered was not the fine it ultimately defeated." Doc. 28, ¶ 650. The fine was the property the State purported to reach. The documents MMA relies upon to make the quantum leap that the fines imposed by the LDI equate to state action depriving it of its Louisiana Law Practice belie its plea. Doc. 28-15, 28-21. LDI's

---

[20] MMA does not claim that the § 1983 Defendants took overt actions to shut down its Louisiana Law Operation. Instead, MMA claims that the 1983 Defendants caused tangential problems for MMA such that in essence it took its attention, time and energy away from its Louisiana Law Practice.

cease-and-desist letter and $2M fine did not purport to bar MMA from practicing law. Doc. 28-15. The fine imposed was never paid by MMA and MMA has not alleged any facts to suggest that it was under eminent threat of requirement to pay the fine. MMA appealed the fine and on January 31, 2025 – almost 9 ½ months *after* MMA filed a Chapter 11 bankruptcy petition – prevailed on the appeal. Doc. 28, ¶ 322; Doc. 28-21.

## VI. CONCLUSION

For the foregoing reasons, the Monson defendants pray for a dismissal of all claims against them with prejudice.

DATED: September 2, 2026

Respectfully submitted,

**STERNBERG, NACCARI & WHITE, LLC**

By: **/s/ Ryan J. Richmond**
Ryan J. Richmond (TXBN 24086224)
450 Laurel Street, Suite 1450
Baton Rouge, LA 70801
Tel.: (225) 412-3667
Fax: (225) 286-3046
ryan@snw.law

AND

M. Suzanne Montero (La. Bar No. 21361)[21]
Graham H. Williams (La. Bar No. 36731)[22]
Johnston Burkhardt (La. Bar No. 38687)[23]
935 Gravier Street, Suite 1800
New Orleans, LA 70112
Tel.: (504) 308-1395
Fax: (504) 534-8961
suzy@snw.law
graham@snw.law
johnston@snw.law

---

[21] Pro hac vice application granted in case no. 25-31596. (Bkr. Dkt. 1300)

[22] Pro hac vice motion in progress.

[23] Pro hac vice motion in progress.

*Attorney for the Monson Defendants*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the foregoing Motion was served on:

1. Miriam Goott (mgoott@walkerandpatterson.com)
2. Johnie J. Patterson, II (jjp@walkerandpatterson.com)
3. David Keith Isaak (disaak@steptoe.com);
4. Allison Standish Miller (amiller@steptoe.com)
5. Shaundra M. Schudmak (sschudmak@lawla.com)
6. Josh McDiarmid (josh.mcdairmid@butlersnow.com)
7. Davis S. Rubin (david.rubin@butlersnow.com)
8. Roshni Mahendru (roshni.mahendru@butlersnow.com)

by Notice of Electronic Filing through the Court's CM/ECF system or by email on Wednesday, September 2, 2026.

**/s/ Ryan J. Richmond**
Ryan J. Richmond