FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA
2026 AUG 28 PM03 46
CAROL L. MICHEL, CLERK

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**FELONY**

**BILL OF INFORMATION FOR CONSPIRACY TO COMMIT WIRE FRAUD**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL NO.** 26-198 |
| **v.** | * | **SECTION:** SECT. C MAG. 4 |
| **RICHARD WILLIAM HUYE, III** | * | **VIOLATIONS:** 18 U.S.C. § 371<br>18 U.S.C. § 1343 |
| | * | |

* * *

The United States Attorney charges that:

**COUNT 1**

(Conspiracy to Commit Wire Fraud)

**A. AT ALL TIMES MATERIAL HEREIN:**

1. Law Firm A was a Texas-based law firm that established an office in New Orleans, Louisiana, on or around October 26, 2020, located at 1820 St. Charles Avenue, Suite 110, New Orleans, Louisiana 70130.

2. Defendant **RICHARD WILLIAM HUYE, III ("HUYE")** was an attorney licensed to practice law in Louisiana who was given the title of Managing Partner for Law Firm A and previously resided in Louisiana.

3. Co-Conspirator 1 was a founding partner of Law Firm A and resided in Texas.

✓ Fee USA
___ Process
X Dktd
___ CtRmDep
___ Doc.No.

Exhibit 3

4. Roofing Company 1 was an out of state company that performed roofing, sheet metal, and siding repair.

5. Hurricane Ida was a Category 4 hurricane that made landfall in Southeast Louisiana on August 29, 2021.

6. Before Hurricane Ida, Roofing Company 1 utilized a business model based upon "door knockers" to canvas neighborhoods after storms in other states where it did business. Once a homeowner agreed to a roof inspection by the Roofing Company 1 representative, the homeowner would often be asked to enter into an Assignment of Benefits ("AOB") contract.

7. At the time Hurricane Ida struck Louisiana, Louisiana law did not prohibit the use of AOBs in connection with storm related litigation, but most Louisiana homeowners' insurance policies contained certain contractual limitations or restrictions against their use.

8. Roofing Company 1 was introduced to Law Firm A at several storm litigation conferences/seminars in approximately 2019 through 2021 and entered into discussions about working together in 2021.

9. The Clerk of Court's Office for the Eastern District of Louisiana maintained its Electronic Case Files server in a state other than Louisiana.

10. Victims R.C., J.P., T.B., S.B., S.R., T.M., M.R., and B.M. all resided within the Eastern District of Louisiana.

**B. <u>THE CONSPIRACY:</u>**

Beginning on or about November of 2021, and continuing through at least March 6, 2023, in the Eastern District of Louisiana and elsewhere, the defendant **HUYE**, Law Firm A, Co-Conspirator 1, and others known and unknown to the United States Attorney, willfully and knowingly did combine, conspire, confederate and agree to transmit and cause to be transmitted

by means of wire communications in interstate commerce writings, signs, signals, pictures and sounds for the purpose of executing a scheme and artifice to defraud and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Section 1343.

## C. <u>PURPOSE OF THE CONSPIRACY:</u>

It was the purpose of the conspiracy for defendant **HUYE**, Law Firm A, Co-Conspirator 1, and others, to devise a scheme to obtain money and property from insurance companies and Louisiana homeowners; by fraudulently stating to insurance companies, mortgage companies, and courts that they represented homeowners whose homes were damaged by Hurricane Ida and other similar storms; when in fact the homeowners had not hired **HUYE**, Law Firm A, or Co-Conspirator 1, and had no attorney client relationship with them. Through this conspiracy and scheme, defendant **HUYE**, Law Firm A, and Co-Conspirator 1 planned to bypass certain insurance limitations and obtain at least $40 million, which included attorney's fees, penalties, damages, and estimating costs, from hundreds of homeowners and their insurers within the Eastern District of Louisiana, including but not limited to S.B., T.M., S.R., J.P., R.C., T.B., M.R., and B.M.

## D. <u>MANNER AND MEANS OF THE CONSPIRACY:</u>

The manner and means by which the objectives of the conspiracy were accomplished included, but was not limited to, the following:

1. Following Hurricane Ida in August of 2021, Law Firm A and Co-Conspirator 1 devised a scheme to capture as clients a large number of Louisiana homeowners who had suffered property damage through an aggressive social media marketing and advertising campaign that blanketed southern Louisiana.

2. Law Firm A and Co-Conspirator 1 also endeavored to take advantage of Roofing Company 1's door-to-door solicitation and encouraged Roofing Company 1 to consider entering the Louisiana market, with Law Firm A taking on the role of its legal representative.

3. Starting on or about November of 2021, Law Firm A was asked by Roofing Company 1 to review the legalities of AOBs in Louisiana, and **HUYE** and Co-Conspirator 1 falsely assured Roofing Company 1 that it could use its AOB business model in Louisiana without any issues.

4. At the time, most Louisiana homeowner insurance policies had anti-assignment language regarding post-loss benefits to a third party like Roofing Company 1 or the assignments needed approval from the insurer.

5. **HUYE**, Law Firm A, and Co-Conspirator 1 led Roofing Company 1 to believe that they would be able to utilize the Roofing Company 1 AOB business model in Louisiana. Based on their advice, Roofing Company 1 decided to enter the Louisiana market on or about January 2022 with the understanding that Law Firm A would disclose the existence of the AOB, and handle all of the contact and negotiations with the homeowner's insurance company.

6. As per its business model, Roofing Company 1 representatives went door-to-door and offered homeowners free roof inspections in areas affected by Hurricane Ida and other recent storms. If the roof was damaged, Roofing Company 1 then offered to handle needed repairs and the claim with the homeowner's insurance company. If acceptable, the homeowners signed a work order and a Roofing Company 1 AOB, which they were generally told allowed Roofing Company 1 to speak directly with their insurance company.

7. At no time did the Roofing Company 1 AOB or work order disclose to the Louisiana homeowner that Roofing Company 1 intended to hire attorneys for the further handling of the property damage claim.

8. As per their agreement, all Roofing Company 1 AOBs were forwarded to Law Firm A for the making of a demand for payment and the possible collection of penalties.

9. In some instances, homeowners refused to retain Roofing Company 1, canceled the AOB agreement, or were confused about the meaning of an AOB. Nonetheless, Roofing Company 1 would, at times, still process the AOB and forward it to Law Firm A for handling.

10. After obtaining an AOB, Law Firm A and Roofing Company 1 would then sign an attorney engagement contract. Law Firm A instructed Roofing Company 1 to sign the contract on behalf of the Louisiana homeowner and on many occasions filled in the homeowner's email and phone number with Roofing Company 1's information.

11. As part of the scheme to defraud, Law Firm A and Roofing Company 1 created an attorney engagement letter which allowed Law Firm A to retain a contingency percentage of the amount recovered from the Louisiana homeowner's damages, despite no authorized attorney contract between Law Firm A and the Louisiana homeowner.

12. After receiving the Roofing Company 1 AOBs, Law Firm A, under **HUYE's** electronic signature and with Co-Conspirator 1 listed as a "Founding Partner," fraudulently sent letters of representation to insurance companies on behalf of at least 856 homeowners in the Eastern District of Louisiana, which all mentioned the potential collection of penalties under Louisiana law.

13. The letters of representation falsely stated that Law Firm A represented the homeowner, intentionally failed to disclose the existence of the Roofing Company 1 AOB, and intentionally failed to disclose that Law Firm A's attorney-client relationship was actually with Roofing Company 1 and not the homeowner.

14. Subsequent letters sent by Law Firm A, under **HUYE's** electronic signature and with Co-Conspirator 1 listed as a "Founding Partner," to a number of Louisiana insurers also cited the potential for penalties under LA R.S. 22:1892.

15. The letters of representation also instructed the insurance company to no longer contact the insured homeowner and to list Law Firm A as payee on any payment or draft made on behalf of homeowner.

16. After the fraudulent letters of representation had been sent, Law Firm A hired a third-party estimator to inspect the Louisiana homeowner's property.

17. Despite only representing Roofing Company 1 by way of an AOB, Law Firm A would in some instances obtain an estimate for damages of a Louisiana homeowner's property that went beyond the scope of the Roofing Company 1 AOB, which was only for roof damage.

18. Despite being aware of the fraudulent letters of representation, **HUYE**, Law Firm A, and Law Firm A attorneys under their supervision and control did not disclose to any insurance company of the existence of the Roofing Company 1 AOBs and continued with pretending to represent only the Louisiana homeowners in additional correspondence, emails, settlement correspondence, and pleadings filed in court in furtherance of the scheme and artifice to defraud the Louisiana insurers and homeowners.

19. Despite only representing Roofing Company 1 by way of an AOB, Law Firm A would in some instances seek to settle claims for the entirety of a Louisiana homeowner's damages, including interior damages beyond the scope of the Roofing Company 1 AOB.

20. In some instances, **HUYE** and/or Law Firm A attorneys under **HUYE's** supervision settled or attempted to settle undisclosed Roofing Company 1 AOB claims with the Louisiana homeowner's insurance company without the knowledge or consent of the Louisiana homeowner.

21. In the instances where a Roofing Company 1 AOB claim was settled without the Louisiana homeowner's knowledge or consent, Law Firm A would attempt to retroactively obtain consent by sending the homeowner a "disbursement statement," detailing the total settlement figure along with deductions for Law Firm A's attorney's fees (ranging from 10% to 33%) and estimating costs (usually a percentage of the settlement) from the amount needed to repair or replace a roof.

22. The settlement statement contained a limited power of attorney seeking permission for Law Firm A to endorse any settlement checks it received on behalf of the homeowner.

23. If a Louisiana homeowner's property was encumbered by a mortgage, the settlement check for the Roofing Company 1 AOB claim would often require the mortgage company's consent to the settlement by way of an additional signature on the check.

24. As part of the scheme to defraud, when mortgage companies did not endorse encumbered checks sent to Law Firm A from insurance companies, Law Firm A electronically filed Complaints for Declaratory Judgment with the Clerk of Court for the Eastern District of Louisiana Office against the mortgage companies, which were electronically signed by **HUYE**.

25. In an effort to force the mortgage company to endorse the check issued by the insurance company, the Law Firm A complaints falsely stated in part:

> Separately, and at various different times over the past two years, **[Law Firm A] was hired on a contingency-fee basis to provide legal services to and represent each of the several above-listed homeowners-mortgagers** in connection with their property insurance claims against their respective property insurance carriers for the damages to their properties caused by Hurricanes Laura, Delta, and Ida.
>
> Pursuant to the retainer agreements signed by each of the Homeowners, **each homeowner agreed to pay [Law Firm A] an amount equal to 33% of all monies recovered by [Law Firm A] in connection with their respective insurance claims**, plus reimbursement of expenses (emphasis added).

The complaints also falsely alleged that:

> [Law Firm A] prepared for the Homeowners, and the Homeowners, signed, written disbursement statements ("Breakdowns") detailing the specific portion(s) of all such proceeds **due to [Law Firm A] pursuant to the contingency-fee contracts signed by the homeowners** (emphasis added).

26. The Louisiana homeowners who signed Roofing Company 1 AOBs did not hire Law Firm A as legal counsel, they did not sign contingency-fee contracts with Law Firm A, and many times never received or signed disbursement statements as Law Firm A claimed in its Declaratory Judgment pleadings.

27. In some instances, such as with S.B., T.M., and J.P., the homeowners' claims were not negotiated or mediated by Law Firm A; however, because Law Firm A sent fraudulent letters of representation to their insurance companies, funds paid related to their claims were sent to Law Firm A from their insurance companies.

28. In other instances, Co-Conspirator 1 negotiated and deposited checks sent to Law Firm A on behalf of the homeowners into Law Firm A's Texas trust account without the knowledge and consent of the said homeowners.

29. After Law Firm A's scheme was discovered and made public through court filings in approximately February of 2023, an attorney representing Law Firm A acknowledged to a court that Law Firm A actually represented only Roofing Company 1 in at least 856 instances, and not the Louisiana homeowners. Law Firm A, under **HUYE's** electronic signature, further confirmed the falsity of the letters by sending two corrective letters of representation to all of the insurance companies who had been unknowingly dealing with Roofing Company 1 AOB claims.

30. Co-Conspirator 1 later held a meeting with the Law Firm A employees in the New Orleans office on or about March 6, 2022, which was surreptitiously recorded by Law Firm A employees. Co-Conspirator 1 stated:

> [Roofing Company 1] was a loophole for us. It was my decision to do this. It's my fault. I'll take full responsibility for that. What happened with [Roofing Company 1] is in states like Florida, Texas, Colorado, where they have a lot of hurricane or hail damage claims, the law is very defined. It's been through the courts. They've been doing the law for 30, 40 years. You know exactly what you can do and what you can't do with AOB's. So, what's an AOB? It's an assignment of benefits, that's when a roofer comes and knocks on your door and you sign a contract with them, the roofer now takes the place of the homeowner when negotiating the insurance claim, with an insurance company. Well, in Louisiana there's no law on the books about what you can or can't do with an AOB……

> If we tell the insurance company we represent the roofing company, they are going to tell us to fuck off and they're not going to ever negotiate with us. But, since we have the rights of the homeowner, let's tell the insurance company we are the homeowner, then that's gonna to be, they will negotiate with us quicker. They will pay us faster.

**E. <u>OVERT ACTS:</u>**

In furtherance of the conspiracy and to achieve the objects thereof, **HUYE**, Law Firm A, and Co-Conspirator 1 committed and caused to be committed the following overt acts, among others, in the Eastern District of Louisiana and elsewhere:

1. Between January 2022 through approximately February of 2023, Law Firm A, under **HUYE's** electronic signature and with Co-Conspirator 1 listed as a "Founding Partner," emailed by wire communications fraudulent letters of representation to insurance companies on behalf of at least 856 homeowners in the Eastern District of Louisiana, including homeowners S.B., T.M., S.R., J.P., R.C., T.B., M.R., and B.M., which all failed to disclose the Roofing Company 1 AOB, intentionally mispresented who Law Firm A was representing, instructed the insurers to direct all communications to Law Firm A, instructed the insurers to add Law Firm A to all payments, and mentioned the potential collection of penalties under Louisiana law.

2. Law Firm A and Roofing Company 1 executed an attorney fee contract for each of the 856 homeowners in the Eastern District of Louisiana with the intention that Law Firm A would collect a portion of the amount paid by insurers for roofing damage.

3. On at least nine occasions, Law Firm A's attorneys, including **HUYE**, settled Roofing Company 1 AOB claims by way of mediation without disclosing the existence of the Roofing Company 1 AOB or who Law Firm A was actually representing to either the mediators or the insurance company attorneys.

4. On at least one occasion, Law Firm A, under **HUYE's** electronic signature, electronically filed a suit for damages claiming to represent a Louisiana homeowner who only signed a Roofing Company 1 AOB and who had denied formally retaining Law Firm A.

5. On at least three occasions, Law Firm A, under **HUYE's** electronic signature electronically filed Complaints for Declaratory Judgment in the Eastern District of Louisiana against the mortgage companies of Louisiana homeowners in an effort to obtain monies wherein the co-conspirators falsely stated that Law Firm A had been retained by Louisiana homeowners.

**VICTIM R.C.**

6. After R.C. signed a Roofing Company 1 AOB on or about January 14, 2022, Law Firm A, under **HUYE's** electronic signature and with Co-Conspirator 1 listed as a "Founding Partner," emailed a fraudulent letter of representation on or about February 22, 2022, to R.C.'s insurer, Progressive Insurance ("Progressive"), that failed to disclose the Roofing Company 1 AOB and repeatedly referred to R.C. as Law Firm A's client. The Law Firm A correspondence entitled "LETTER OF REPRESENTATION AND FIRST NOTICE OF LOSS" also cited additional penalties potentially due under Louisiana law at the time.

7. On or about April 22, 2022, Law Firm A, under **HUYE's** electronic signature and with Co-Conspirator 1 listed as a "Founding Partner," sent another letter to R.C.'s insurance company falsely stating that R.C. was "forced to retain" Law Firm A to ensure that his/her claim was properly evaluated and again mentioned penalties and attorney's fees as potentially being part of the demand.

8. Unknown to R.C., Law Firm A submitted an estimate to R.C.'s insurance company. Despite the fact there was no interior inspection of R.C.'s home to assess the interior damage, Law

Firm A settled all alleged damage to R.C.'s home, without his/her knowledge or consent, for approximately $26,000.00.

9. When Law Firm A received the Progressive check, Co-Conspirator 1 fraudulently endorsed the check using a "Power of Attorney" for R.C. without R.C.'s knowledge or consent, and the check was deposited into a Law Firm A trust account at Oakwood Bank.

10. R.C. never received the insurance proceeds sent to Law Firm A by her/his insurance company.

**VICTIM J.P.**

11. After J.P. signed a Roofing Company 1 AOB on or about February 18, 2022, Law Firm A, under **HUYE's** electronic signature and with Co-Conspirator 1 listed as a "Founding Partner," emailed a fraudulent letter of representation on or about March 8, 2022, to J.P.'s insurer, American National Property and Casualty Company ("American"), that failed to disclose the Roofing Company 1 AOB and repeatedly referred to J.P. as Law Firm A's client. The Law Firm A correspondence entitled "LETTER OF REPRESENTATION AND FIRST NOTICE OF LOSS" also cited additional penalties potentially due under Louisiana law at the time.

12. On or about May 24, 2022, Law Firm A, under **HUYE's** electronic signature and with Co-Conspirator 1 listed as a "Founding Partner," sent J.P.'s insurance company another letter falsely stating J.P. was "forced to retain" Law Firm A to ensure that her/his claim was properly evaluated and again mentioned penalties and attorney's fees as potentially being part of the demand.

13. In October of 2022, J.P. began receiving emails from Law Firm A advising her/him to contact them concerning her/his insurance claim. J.P. believed the emails were spam because she/he never hired an attorney to assist with a claim. J.P. received a call from Law Firm A and J.P.

informed them she/he did not hire an attorney. A Law Firm A representative told J.P. Roofing Company 1 had hired Law Firm A on J.P.'s behalf.

14. In December of 2022 J.P. received a notice of withdrawal from Law Firm A. J.P. contacted her/his insurance company and learned they had issued payments to Law Firm A, on J.P.'s behalf, totaling approximately $22,698.57.

15. Law Firm A received two American checks, payable to Law Firm A and J.P., which Co-Conspirator 1 fraudulently endorsed using a "Power of Attorney" for J.P. without J.P.'s knowledge or consent, and the checks were deposited into a Law Firm A trust account at Oakwood Bank.

16. Law Firm A did not disburse any of the insurance proceeds to J.P. and in or about June of 2023, J.P. filed suit against **HUYE**, Law Firm A, and Co-Conspirator 1, among others, for damages related to J.P. not receiving any settlement funds from Law Firm A.

17. J.P. thereafter settled with Law Firm A but received less than the total cost to repair his/her roof.

**VICTIM T.B.**

18. After T.B. signed a Roofing Company 1 AOB on or about February 24, 2022, Law Firm A, under **HUYE's** electronic signature and with Co-Conspirator 1 listed as a "Founding Partner," emailed a fraudulent letter of representation on or about March 9, 2022, to T.B.'s insurer, Allied Trust Insurance ("Allied"), that failed to disclose the Roofing Company 1 AOB and repeatedly referred to T.B. as Law Firm A's client. The Law Firm A correspondence entitled "LETTER OF REPRESENTATION AND FIRST NOTICE OF LOSS" also cited additional penalties potentially due under Louisiana law at the time.

19. As a result of the false letter of representation, on or about March 17, 2022, Allied sent Law Firm A a check for a partial undisputed payment via email and mail. The check was in the amount of approximately $14,460.32 and payable to T.B.'s mortgage company, T.B. and Law Firm A.

20. On or about April 6, 2022, T.B. reached out to Allied about the status of his/her claim. T.B. was informed Law Firm A had sent a letter of representation to Allied, and payment had been sent to Law Firm A.

21. T.B. informed Allied that he/she did not hire Law Firm A and the Allied representative emailed **HUYE** and requested confirmation of their representation.

22. Another Law Firm A attorney responded to the email and offered to endorse the check and send it to T.B. T.B. refused and requested the check be voided.

23. On or about June 26, 2022, Law Firm A, under **HUYE's** electronic signature and with Co-Conspirator 1 listed as a "Founding Partner," sent another letter to T.B.'s insurance company falsely stating that T.B. was "forced to retain" Law Firm A to ensure his/her claim was properly evaluated and again mentioned penalties and attorney's fees as potentially being part of the demand.

24. On October 26, 2022, Law Firm A sent a notice of withdrawal to Allied for T.B.'s property damage claim.

25. On or about November 29, 2022, Law Firm A, under **HUYE's** electronic signature, and for the benefit of Co-Conspirator 1, electronically filed a Complaint for Declaratory Judgment in the Eastern District of Louisiana against T.B.'s mortgage company, in an effort to get the mortgage company to endorse the $14,460.32 check issued by Allied.

26. The Complaint for Declaratory Judgment filed by **HUYE** falsely stated that Law Firm A had been retained by T.B.

27. Allied ultimately voided the settlement check sent to Law Firm A after T.B. reported that he/she had never hired Law Firm A.

**VICTIM S.B.**

28. After S.B. signed a Roofing Company 1 AOB on or about April 18, 2022, Law Firm A, under **HUYE's** electronic signature and with Co-Conspirator 1 listed as a "Founding Partner," emailed a fraudulent letter of representation on or about May 2, 2022, to S.B.'s insurer, Allied Trust Insurance ("Allied"), that failed to disclose the Roofing Company 1 AOB and repeatedly referred to S.B. as Law Firm A's client. The Law Firm A correspondence entitled "LETTER OF REPRESENTATION AND FIRST NOTICE OF LOSS" also cited additional penalties potentially due under Louisiana law at the time.

29. When another roofer who S.B. hired completed S.B.'s roof, the roofer sent his final bill to Allied. As instructed in the fraudulent letter of representation, Allied sent a check for approximately $19,000.00 to Law Firm A.

30. When Law Firm A received the Allied check, Co-Conspirator 1 fraudulently endorsed the check using a "Power of Attorney" for S.B. without S.B.'s knowledge or consent, and the check was deposited into a Law Firm A trust account at Oakwood Bank.

31. S.B. never received the insurance proceeds sent to Law Firm A by his/her insurance company and had to pay for the roof repairs from his/her personal savings.

**VICTIM S.R.**

32. After S.R. signed a Roofing Company 1 AOB on or about May 2, 2022, Law Firm A, under **HUYE's** electronic signature and with Co-Conspirator 1 listed as a "Founding Partner," emailed a fraudulent letter of representation on or about June 27, 2022, to S.R.'s insurer, Ocean Harbor ("Ocean"), that failed to disclose the Roofing Company 1 AOB and repeatedly referred to S.R. as Law Firm A's client. The Law Firm A correspondence entitled "LETTER OF REPRESENTATION AND FIRST NOTICE OF LOSS" also cited additional penalties potentially due under Louisiana law at the time.

33. On or about July 15, 2022, Law Firm A, under **HUYE's** electronic signature and with Co-Conspirator 1 listed as a "Founding Partner," sent another letter to S.R.'s insurance company falsely stating S.R. was "forced to retain" Law Firm A to ensure that his/her claim was properly evaluated and again mentioned penalties and attorney's fees as potentially being part of the demand.

34. In August of 2022, Law Firm A negotiated and settled S.R.'s claim with Ocean for approximately $15,000.00. As instructed in the letter of representation, Ocean issued the check payable to Law Firm A and S.R. and sent the check to Law Firm A.

35. When Law Firm A received the Ocean check, Co-Conspirator 1 fraudulently endorsed the check using a "Power of Attorney" for S.R. without S.R.'s knowledge or consent, and the check was deposited into a Law Firm A trust account at Oakwood Bank.

36. S.R. never received the insurance proceeds funds set to Law Firm A by his/her insurance company and had to pay for the roof repairs out of his/her own savings.

**VICTIM T.M.**

37. After T.M. signed a Roofing Company 1 AOB on or about June 22, 2022, Law Firm A, under **HUYE's** electronic signature and with Co-Conspirator 1 listed as a "Founding Partner," emailed a fraudulent letter of representation on or about July 18, 2022, to T.M.'s insurer, Sage Sure/IAT Insurance Group ("Sage"), that failed to disclose the Roofing Company 1 AOB and repeatedly referred to T.M. as Law Firm A's client. The Law Firm A correspondence entitled "LETTER OF REPRESENTATION AND FIRST NOTICE OF LOSS" also cited additional penalties potentially due under Louisiana law at the time.

38. On or about July 19, 2022, Law Firm A, under **HUYE's** electronic signature and with Co-Conspirator 1 listed as a "Founding Partner," sent another letter to T.M.'s insurance company falsely stating T.M. was "forced to retain" Law Firm A to ensure that her/his claim was properly evaluated and again mentioned penalties and attorney's fees as potentially being part of the demand.

39. On January 19, 2023, Sage issued a check for approximately $3,488.27, payable to Law Firm A, T.M., and T.M.'s mortgage company. The check was sent to Law Firm A and was never negotiated.

40. On or about December 29, 2022, T.M. spoke to her/his insurance company and learned for the first time that Law Firm A sent a letter of representation to Sage. T.M. called **HUYE** twice and left messages, but **HUYE** did not return the calls.

41. A representative of Law Firm A called T.M., informed her/him they had an encumbered check and indicated someone would call her/him back to get her/his information, in order for Law Firm A to withdraw from the case. No one from Law Firm A contacted T.M.

42. In February of 2023, a representative of T.M.'s mortgage company called and reported on November 30, 2022, that Law Firm A electronically filed a Complaint for Declaratory Judgment in the Eastern District of Louisiana against the mortgage company, in an effort to get the mortgage company to endorse the check issued by the insurance company.

43. The Complaint for Declaratory Judgment filed by **HUYE**, on behalf of Law Firm A, falsely stated that Law Firm A had been retained by T.M.

44. T.M. never received the insurance proceeds sent to Law Firm A by her/his insurance company.

**VICTIM M.R.**

45. After M.R. signed a Roofing Company 1 AOB on or about April 21, 2022, Law Firm A, under **HUYE's** electronic signature and with Co-Conspirator 1 listed as a "Founding Partner," emailed a fraudulent letter of representation on or about May 11, 2022, to M.R.'s insurer, Progressive Insurance ("Progressive"), that failed to disclose the Roofing Company 1 AOB and repeatedly referred to M.R. as Law Firm A's client. The Law Firm A correspondence entitled "LETTER OF REPRESENTATION AND FIRST NOTICE OF LOSS" also cited additional penalties potentially due under Louisiana law at the time.

46. On or about May 17, 2022, Law Firm A, under **HUYE's** electronic signature and with Co-Conspirator 1 listed as a "Founding Partner," sent another letter to M.R.'s insurance company falsely stating that M.R. was "forced to retain" Law Firm A to ensure that her/his claim was properly evaluated and again mentioned penalties and attorney's fees as potentially being part of the demand.

47. Unknown to M.R., on or about August 15, 2022, Progressive issued a check, payable to Law Firm A, M.R., and her/his mortgage company, in the amount of approximately $4,187.53, and sent it to Law Firm A.

48. Months later, M.R. began receiving calls from Law Firm A, which she/he believed were spam, because she/he had never retained counsel. Eventually M.R. called Law Firm A and informed them she/he never hired an attorney.

49. On or about November 30, 2022, Law Firm A, under **HUYE's** electronic signature, electronically filed a Complaint for Declaratory Judgment in the Eastern District of Louisiana against M.R.'s mortgage company, in an effort to get the mortgage company to endorse the $4,187.53 check issued by Progressive.

50. The Complaint for Declaratory Judgment filed by **HUYE** falsely stated that Law Firm A had been retained by M.R.

51. M.R. never received the insurance proceeds sent to Law Firm A by her/his insurance company.

**VICTIM B.M.**

52. After B.M. signed a Roofing Company 1 AOB on or about August 5, 2022, Law Firm A, under **HUYE's** electronic signature and with Co-Conspirator 1 listed as a "Founding Partner," emailed a fraudulent letter of representation on or about August 12, 2022, to B.M.'s insurer, USAA Insurance ("USAA"), that failed to disclose the Roofing Company 1 AOB and repeatedly referred to B.M. as Law Firm A's client. The Law Firm A correspondence entitled "LETTER OF REPRESENTATION AND FIRST NOTICE OF LOSS" also cited additional penalties potentially due under Louisiana law at the time.

53. On or about September 9, 2022, Law Firm A, under **HUYE's** electronic signature and with Co-Conspirator 1 listed as a "Founding Partner," sent another letter to B.M's insurance company falsely stating that B.M. was "forced to retain" Law Firm A to ensure that her/his claim was properly evaluated and again mentioned penalties and attorney's fees as potentially being part of the demand.

54. Shortly thereafter, and unknown to B.M., Law Firm A settled with USAA for the sum of approximately $16,957.55. As instructed in the letter of representation, USAA issued the check payable to Law Firm A, B.M., B.M.'s spouse, and sent the check to Law Firm A.

55. On or about October 8 and again on October 31, 2022, Law Firm A sent B.M. a disbursement statement with a power of attorney reflecting that Law Firm A had settled the property damage claim against USAA for approximately $16,957.55.

56. B.M. rejected the settlement and did not sign the power of attorney, which would have allowed Law Firm A to sign the USAA settlement check on his/her behalf along with his/her spouse.

57. When Law Firm A received the USAA check, Co-Conspirator 1 fraudulently endorsed the check using a "Power of Attorney" stamp for B.M. and B.M.'s spouse without their knowledge or consent, and the check was deposited into a Law Firm A trust account at Oakwood Bank.

58. On or about November 9, 2022, Law Firm A sent a letter to B.M. stating that "[w]e would like to take this opportunity to thank you once again for allowing us to represent you in connection with your property damage claim."

59. On or about December 19, 2022, Law Firm A, under **HUYE's** electronic signature and with Co-Conspirator 1 listed as a "Founding Partner," sent USAA another letter falsely stating that they B.M. was their "client" but that Law Firm A was no longer representing him/her going forward.

60. Months after the settlement, B.M. received calls and emails from Law Firm A, which she/he believed were spam, because she/he had never retained counsel.

61. B.M. never received the insurance proceeds sent to Law Firm A by her/his insurance company.

All in violation of Title 18, United States Code, Section 371.

## NOTICE OF FORFEITURE

1. The allegation of Count 1 of this Bill of Information is incorporated by reference as though set forth fully herein for the purpose of alleging forfeiture to the United States.

2. As a result of the offense alleged in Count 1, the defendant, **HUYE**, shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any property constituting or derived from proceeds obtained directly or indirectly, and any personal property used or intended to be used to commit the offense, including but not limited to any of the following:

3. If any of the above-described property, as a result of any act or omission of the defendant:

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third person;

c. has been placed beyond the jurisdiction of the Court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be subdivided without difficulty;

the United States shall seek a money judgment and, pursuant to Title 21, United States Code, Section 853(p), forfeiture of any other property of the defendant up to the value of said property.

DAVID I. COURCELLE
UNITED STATES ATTORNEY

EDWARD J. RIVERA
TRACEY N. KNIGHT
Assistant United States Attorneys

New Orleans, Louisiana
August 28, 2026

*No.* ____________________

# United States District Court

FOR THE

EASTERN DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA

*vs.*

RICHARD WILLIAM HUYE, III

BILL OF INFORMATION FOR
CONSPIRACY TO COMMIT WIRE FRAUD

Violation(s): 18 U.S.C. §§ 371 & 1343

*Filed* ____________________, *20* 26

____________________, *Clerk.*

*By* ____________________, *Deputy*

____________________
EDWARD J. RIVERA
Assistant United States Attorney